FILED
2018 Dec-03  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## <u>SOUTHERN DIVISION</u>

JIMMY WAYNE MARLOWE *et al.*,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

CIVIL ACTION NO.
1:17-CV-00309-ACA

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>UNITED STATES' MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

STATEMENT OF UNDISPUTED FACTS ............................................3

    A.    In March 2014, Providers at the VA Diagnosed Mr. Marlowe with a Fungal Infection in His Feet.................................................................4

    B.    Mr. Marlowe Visited the Coosa Valley Medical Center on March 25, 2014, Where an Emergency Room Physician Examined His Left Lower Extremity, But No Vascular Workup Was Ordered. ......................................................6

    C.    Approximately Two Months Later, Mr. Marlowe Visited Dr. Bowman (Private Podiatrist) Where His Lower Extremities Were Examined, But No Vascular Workup Was Ordered. ............................................................7

    D.    Mr. Marlowe Visited Dr. Pinson (Private Primary Care Physician) 2½ Weeks Later, But No Vascular Workup Was Ordered.........................................8

    E.    Mr. Marlowe Again Visited Dr. Pinson (Private Primary Care Physician) Approximately One Week Later, Where His Lower Extremities Were Examined, But No Vascular Workup Was Ordered. ............................................................8

    F.    Nearly One Month Later, Mr. Marlowe Visited Dr. Robert Henderson (Private Dermatologist), and His Lower Extremities Were Examined, But No Vascular Workup Was Ordered. ............................................................9

    G.    One Week Later, Mr. Marlowe Again Visited Dr. Pinson (Private Primary Care Physician), and His Lower Extremities Were Examined, But No Vascular Workup Was Ordered. ..........................................................10

    H.    Mr. Marlowe Visited Dr. Bourgeois (Private Dermatologist) Two Weeks Later, and Was Referred for a Vascular Workup. ...............................................10

I.    Mr. Marlowe Underwent a Vascular Bypass Surgery, and, Subsequently, Amputations. ....................................................................................................11

STANDARD OF REVIEW ......................................................................................11

ARGUMENT ..........................................................................................................13

A.    Plaintiffs Cannot Establish Causation Because Their Vascular Surgeon Expert Could Not Opine that the VA's Care Probably Caused the Injury. .........14

B.    Plaintiffs Cannot Demonstrate That the Standard of Care Was Breached Because at Least Four Other Physicians Examined Mr. Marlowe's Lower Extremities After the March 2014 VA Visit, and None of Them Referred the Patient for Further Vascular Workup. ................................................................18

CONCLUSION .......................................................................................................22

The United States of America, by and through Jay E. Town, United States Attorney for the Northern District of Alabama, and Jason R. Cheek, Assistant United States Attorney, submits this Memorandum of Law in support of its Motion for Summary Judgment.  As set forth in this Memorandum, the United States seeks summary judgment because Plaintiffs cannot meet their burden in establishing that the Defendant's actions caused the alleged injuries.  Plaintiffs also cannot demonstrate that the standard of care was breached.

## INTRODUCTION

Plaintiff Jimmy Wayne Marlowe—who was 80 years-old at the time of the allegations of this suit, and had been diagnosed with diabetes and atrial fibrillation—and his wife, Virginia Lightsey Marlowe, filed this medical malpractice suit against the United States seeking to recover under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671 *et. seq.*  Plaintiffs allege that during a March 14, 2014 medical appointment, a primary care physician with the U.S. Department of Veterans Affairs (VA) "failed to recognize or differentially diagnose the possibility of a blood flow occlusion or decreased blood flow to Jimmy Marlowe's feet[]" based on the same diminished pedal pulses Mr. Marlowe had for at least five years prior.  (Joint Status Report 1, ECF No. 25.)  Plaintiffs claim that the United States breached the standard of care by failing to order further vascular work up.  Plaintiffs further claim that this allowed "the condition

1

[to] progress[] to a complete occlusion or blocked blood flow and gangrene, and Veteran Marlowe ended up having to have both legs amputated." (*Id.* at 2.)

In the months following the March 14, 2014 appointment, however, Mr. Marlowe visited at least four outside, private physicians—including an emergency room physician, a podiatrist, a primary care physician, and a dermatologist—on at least six different occasions.[1]  Mr. Marlowe's lower extremities were examined during almost every one of those subsequent medical appointments with third-party physicians.  Yet none of those providers ordered that Mr. Marlowe receive vascular workup based on diminished pedal pulses.  Indeed, no medical provider referred him for additional evaluation until approximately 4½ months after the VA medical appointment at issue when black eschars were apparent on Mr. Marlowe's toes.[2]  (Attach. 16, Dr. Bourgeois Note of July 31, 2014.)

Plaintiffs' own expert witnesses also undermine their case.  Indeed, their own specially-retained expert witness described the VA physician at issue as a "good doctor."  (Attach. 19, McLane Tr. 118:8; 156:5.)  And Plaintiffs' vascular surgery expert—who was also amputated Mr. Marlowe's legs—opined that the VA physician did not commit malpractice.  (Attach. 18, Dr. Taylor Tr. 52:19–23.)

---

[1] To assist the Court with the timeline of events, the United States has provided, as Attachment 1, a timeline of the key medical appointments that occurred after Mr. Marlowe visited the VA Childersburg Clinic in March 2014.

[2] Following the March 2014 appointment at the VA Clinic, Mr. Marlowe did not attend any medical appointments with the VA physician until after his legs had been amputated.

That same vascular surgery expert further testified that he could not state that he probably could have saved Mr. Marlowe's lower extremities if he had been consulted in March 2014.  (Attach. 18, Dr. Taylor Tr. 17:22-18:5, 20:19–21:13, 21:17–22:3.)

STATEMENT OF UNDISPUTED FACTS

1.    In March 2014, Mr. Marlowe was 80 years-old.

2.    At that time, medical records indicate that Mr. Marlowe had been diagnosed with diabetes and atrial fibrillation,[3] among other conditions.  (Attach. 2, VA Primary Care Note of Mar. 14, 2014.)

3.    To prevent blood clots, Mr. Marlowe had a prescription through the VA for Coumadin (also known as Warfarin).  (*See, e.g.*, *id.*)

4.    Prior to March 2014, Mr. Marlowe had a documented history of diminished pedal pulses dating back to 2011.  (Attach. 3, VA Primary Care Notes of Feb. 5, 2013, & Nov. 8, 2011; Attach. 4, Podiatrist Notes of Feb. 24, 2014; July 15, 2013; Oct. 15, 2012; May 14, 2012; and Feb. 27, 2012.)

---

[3] Atrial fibrillation is an irregular heart rate that can increase one's risk for blood clots.

A. *In March 2014, Providers at the VA Diagnosed Mr. Marlowe with a Fungal Infection in His Feet.*

5.      On March 14, 2014, Mr. Marlowe presented to the VA's Childersburg Community Based Outpatient Clinic.  (Attach. 2, VA Primary Care Note of Mar. 14, 2014.)

6.      During the March 14, 2014 visit, Mr. Marlowe was evaluated and treated by Dr. Maria Rosario Cumagun,[4] a primary care physician employed by the VA.  (*Id.*)

7.      Dr. Cumagun's medical progress note indicated that Mr. Marlowe presented for a "follow up" and was "also concerned about lesions on both feet." (*Id.*)

8.      The progress note documented that "about 5 days [prior], he hit his left lower leg against a door and sustained an open wound."  (*Id.*)

9.      In the physical examination section of the medical note, Dr. Cumagun documented that Mr. Marlowe had a "1 x 1 cm round open lesion on the lateral left lower leg with no associated cellulitis[.]"  (*Id.*)

10.     Dr. Cumagun also noted the following related to Mr. Marlowe's feet: "Erythematous, scaly patches involving both feet mostly on the dorsum[.]"  (*Id.*)

---

[4] At all times relevant to this suit, Dr. Cumagun was an "employee of the government" as contemplated and defined by the FTCA.  *See* 28 U.S.C. § 2671.

4

11.     Dr. Cumagun's medical note reflects that Mr. Marlowe's dorsalis pedal pulses were decreased in both feet.  (*Id.*)

12.     According to Dr. Cumagun's medical note of March 14, 2014, she prescribed triamcinolone cream and clotrimazole to Mr. Marlowe.  (*Id.*)

13.     The same medical note indicates that Dr. Cumagun also ordered a teledermatology consult that day.  (*Id.*)

14.     Before Mr. Marlowe left the VA Childersburg Clinic that day, three photographs of his left foot were taken.  (Attach. 5, Photos from Mar. 14, 2014.)

15.     In a medical note dated March 20, 2014, Dr. Patricia Mercado–Perry, a VA dermatologist, entered her teleimaging report.  (Attach. 6, VA Teledermatology Note of Mar. 20, 2014.)

16.     Dr. Mercado's note of March 20, 2014 noted that Mr. Marlowe had the following diagnosis:  "Rash, infectious:  probable dermatophyte[.]"  (*Id.*)

17.     In the March 20, 2014 note, Dr. Mercado recommended that the triamcinolone cream be discontinued and that Mr. Marlowe begin applying Nizoral cream—also known generically as ketoconazole—to his feet.  (*Id.*)

18.     In an addendum note three days later, Dr. Cumagun discontinued the triamcinolone cream and clotrimazole.  (*Id.*)

19.     In that same addendum, Dr. Cumagun entered the following text:  "Please ask him to use Nizoral cream for a least a month."  (*Id.*)

5

20.     On March 24, 2014, the VA pharmacy entered a note that it had filled the prescription for Nizoral, or ketoconazole, by mail.  (Attach. 7, VA Pharmacy Note.)

21.      Following the March 14, 2014 appointment, Mr. Marlowe did not attend any medical appointments with Dr. Cumagun until October 10, 2014. (Attach. 21, Pls.' Resps. to Def.'s First Set of Req. for Admis. #7.)

22.     On multiple occasions from March 14, 2014 until July 31, 2014, Mr. Marlowe did not take his Coumadin/Warfarin as prescribed.  (Attach. 20, Pls.' Supplemental Resps. to Def.'s Second Set of Req. for Admis. #26)

> B.  *Mr. Marlowe Visited the Coosa Valley Medical Center on March 25, 2014, Where an Emergency Room Physician Examined His Left Lower Extremity, But No Vascular Workup Was Ordered.*

23.     On March 25, 2014, Mr. Marlowe visited the Coosa Valley Medical Center's emergency room.  (Attach. 8, Coosa Valley Emergency Room Note of Mar. 25, 2014.)

24.     According to the "History/Subjective" portion of the medical progress note, Mr. Marlowe presented to the emergency room because the wound on his left lower extremity was not "healing well."  (*Id.*)

25.     The medical note of Dr. Deborah Trujillo indicates that she examined Mr. Marlowe's left lower extremity and checked his pedal pulses.  (*Id.*)

6

26.     Dr. Trujillo's note documented that she found "[n]o [symptoms] or [o]bjective findings that are life or limb threatening."  (*Id.*)

27.     Mr. Marlowe was discharged from the Coosa Valley Medical Center that same day.  (*Id.*)

28.     There is no indication in the medical note whatsoever that Dr. Trujillo referred Mr. Marlowe for a vascular workup.  (*Id.*)

C. *Approximately Two Months Later, Mr. Marlowe Visited Dr. Bowman (Private Podiatrist) Where His Lower Extremities Were Examined, But No Vascular Workup Was Ordered.*

29.     A note from Podiatry Associates, P.C., dated May 15, 2014, indicates that Mr. Marlowe visited Dr. James Bowman, a private podiatrist, on that date. (Attach. 9, Dr. Bowman Note of May 15, 2014.)

30.     According to Dr. Bowman's medical note, he performed a debridement on all of Mr. Marlowe's toenails during the appointment.  (*Id.*)

31.     In the portion of the note related to the condition of Mr. Marlowe's skin, Dr. Bowman's medical note states:  "Patient denies rash, infection, blistering, nonhealing wounds and color change."  (*Id.*)

32.     There is no indication in the medical note whatsoever that Dr. Bowman referred Mr. Marlowe for a vascular workup.  (*Id.*)

7

### D. Mr. Marlowe Visited Dr. Pinson (Private Primary Care Physician) 2½ Weeks Later, But No Vascular Workup Was Ordered.

33.     A note from Craddock Health Center, P.C. dated June 2, 2014, indicates that Mr. Marlowe visited Dr. Walter Pinson, a primary care physician, on that date.  (Attach. 10, Dr. Pinson Note of June 2, 2014.)

34.     According to Dr. Pinson's medical note, Mr. Marlowe complained of nocturnal leg cramps.  (*Id.*)

35.     There is no indication in the medical note whatsoever that Mr. Marlowe complained about a rash or lesions on his feet.  (*Id.*)

36.     Dr. Pinson did not refer Mr. Marlowe for a vascular workup.  (Attach. 11, Dr. Pinson Tr. 16:16–17:6.)

### E. Mr. Marlowe Again Visited Dr. Pinson (Private Primary Care Physician) Approximately One Week Later, Where His Lower Extremities Were Examined, But No Vascular Workup Was Ordered.

37.     A note from Craddock Health Center, P.C. dated June 11, 2014, indicates that Mr. Marlowe visited Dr. Walter Pinson on that date.  (Attach. 12, Dr. Pinson Note of June 11, 2014.)

38.     According to Dr. Pinson's medical note, Mr. Marlowe complained of pain and tenderness on the bottom of his right big toe.  (*Id.*)

39.     According to the medical note, after examining Mr. Marlowe's feet, Dr. Pinson identified a lesion on the bottom of the patient's right big toe.  (*Id.*)

8

40.     The medical note indicates that Dr. Pinson debrided the area and

advised Mr. Marlowe to see a podiatrist if he did not get good relief.  (*Id.*)

41.     Dr. Pinson did not refer Mr. Marlowe for a vascular workup.  (Attach.

11, Dr. Pinson Tr. 20:11–20:20.)

> *F.  Nearly One Month Later, Mr. Marlowe Visited Dr. Robert Henderson*
> *(Private Dermatologist), and His Lower Extremities Were Examined, But*
> *No Vascular Workup Was Ordered.*

42.     A medical note from Shelby Dermatology dated July 9, 2014,

indicates that Mr. Marlowe visited Dr. Robert Henderson, a private dermatologist

on that date.  (Attach. 13, Dr. Henderson Note of July 9, 2014.)

43.     According to the medical note, during the visit, Mr. Marlowe

complained of a rash on both feet.  (*Id.*)

44.     Dr. Henderson noted that the rash had been present for one month.

(*Id.*)

45.     The note lists Mr. Marlowe's diagnosis as tinea pedis, which is a type

of fungal infection.  (*Id.*)

46.     Dr. Henderson's note indicates that he prescribed ciclopirox, a

medication used to treat fungal infections.  (*Id.*)

47.     Dr. Henderson did not observe any blood perfusion issues in Mr.

Marlowe's feet.  (Attach. 14, Dr. Henderson Tr. 9:16–10:19.)

48.     As a result, Dr. Henderson did not refer Mr. Marlowe for a vascular workup.  (*Id.*)

G. *One Week Later, Mr. Marlowe Again Visited Dr. Pinson (Private Primary Care Physician), and His Lower Extremities Were Examined, But No Vascular Workup Was Ordered.*

49.     A note from Craddock Health Center, P.C. dated July 16, 2014, indicates that Mr. Marlowe visited Dr. Walter Pinson again.  (Attach. 15, Dr. Pinson Note of July 16, 2014.)

50.     The medical record from that visit indicates that Mr. Marlowe had severe dermatitis on his feet.  (*Id.*)

51.     Dr. Pinson's medical note indicates that Mr. Marlowe had "developed sores on the tips of both big toes and several lesions on the top of his feet."  (*Id.*)

52.     According to the medical note, Dr. Pinson ordered that Mr. Marlowe receive a shot of Kenalog (which is the brand name for triamcinolone) and that he take Keflex (an antibiotic) for ten days.  (*Id.*)

53.     Dr. Pinson did not refer Mr. Marlowe for a vascular workup.  (Attach. 11, Dr. Pinson Tr. 22:24–23:9.)

H. *Mr. Marlowe Visited Dr. Bourgeois (Private Dermatologist) Two Weeks Later, and Was Referred for a Vascular Workup.*

54.     On July 31, 2014—approximately 4½ months after Mr. Marlowe was treated by Dr. Cumagun at the VA Childersburg Clinic—Mr. Marlowe was

evaluated by a private dermatologist, Dr. Gregory Bourgeois.  (Attach. 16, Dr. Bourgeois Note of July 31, 2014.)

55.     Dr. Bourgeois noted black eschars on Mr. Marlowe's toes and bilateral digital necrosis.  (*Id.*)

56.     Dr. Bourgeois ordered that Mr. Marlowe be admitted to the hospital for a vascular workup.  (*Id.*)

   *I.  Mr. Marlowe Underwent a Vascular Bypass Surgery, and, Subsequently, Amputations.*

57.     On August 6, 2014, Steven M. Taylor, M.D.—who Plaintiffs would later designate as an expert witness—performed an artery bypass surgery on Mr. Marlowe's right leg.  (Attach. 18, Dr. Taylor Tr. 73:19–21.)

58.     The bypass was unsuccessful and Dr. Taylor performed a below-the-knee amputation on Mr. Marlowe's right leg on August 11, 2014.  (*Id.* Dr. Taylor Tr. 33:9–10.)

59.     Dr. Taylor performed an above-the-knee amputation on the right leg in September 2014.  (*Id.* Dr. Taylor Tr. 33:17–19.)

60.     Dr. Taylor performed an above-the-knee amputation on the left leg on October 10, 2014.  (*Id.* Dr. Taylor Tr. 34:3.)

<u>STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and that the

11

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In analyzing a motion under the summary judgment standard, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)).

12

Because this FTCA medical malpractice case arose in Alabama, Rule 56 must be read in conjunction with the "substantial evidence rule" as defined by the Alabama Medical Liability Act:  "Substantial evidence is that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."  Ala. Code § 6-5-542(5); *McAfee ex rel. McAfee v. Baptist Med. Ctr.*, 641 So. 2d 265, 266 (Ala. 1994).

## ARGUMENT

The FTCA is a limited waiver of sovereign immunity and provides the exclusive remedy for recovery against the United States for certain common law torts committed by federal employees acting within the scope of employment.  28 U.S.C. § 1346(b).  Under the doctrine of sovereign immunity, the United States is immune from suit except to the extent that immunity has been expressly waived by statute.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1993).

In waiving the United States' sovereign immunity under the FTCA, Congress placed certain conditions on suits against the United States.  One such condition requires that the United States be held liable "to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Another relevant condition mandates that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . . ."  *Id.* § 2674.  Based on these provisions,

13

the law of the state where the alleged tortious conduct occurred is applied in

determining whether the United States may be held liable under the FTCA.  28

U.S.C. § 1346(b)(1); *id.* § 2674.  Because the alleged malpractice in this suit arose

in Alabama, this state's substantive law applies in determining whether the United

States is liable, and, if so, to what extent.  *Suarez v. United States*, 22 F.3d 1064,

1065 (11th Cir. 1994).

Under the Alabama Medical Liability Act, to prevail in a medical

malpractice case, a plaintiff must prove by substantial evidence, "(1) the

appropriate standard of care, (2) the health-care provider's deviation from that

standard, and (3) a proximate causal connection between the health-care provider's

act or omission constituting the breach and the injury sustained by the plaintiff."

*Morgan v. Publix Super Markets, Inc.*, 138 So. 3d 982, 986 (Ala. 2013).

A. *Plaintiffs Cannot Establish Causation Because Their Vascular Surgeon Expert Could Not Opine that the VA's Care Probably Caused the Injury.*

For decades, Alabama's Supreme Court has consistently and repeatedly held

that, in order to prevail in a medical malpractice action, a plaintiff must prove that

the alleged negligence *probably* caused the alleged injury.  *Breland ex rel. Breland*

*v. Rich*, 69 So. 3d 803, 821 (Ala. 2011) ("To resolve the issue of causation, we

must determine whether the plaintiff presented evidence indicating that the delay

proximately *and probably caused* the plaintiff an actual injury." (emphasis

added)); *Lyons v. Vaughan Reg'l Med. Ctr., LLC*, 23 So. 3d 23, 28–29 (Ala. 2009)

("To have a valid claim under the Alabama Medical Liability Act, the Lyonses must provide evidence indicating that the negligence alleged is the *proximate and probable* cause of Julie's injury . . . ."); *Shanes v. Kiser*, 729 So. 2d 319, 320–21 (Ala. 1999) ("In medical malpractice cases, the plaintiff must prove that the alleged negligence probably caused the injury." (quotations omitted)); *McAfee ex rel. McAfee*, 641 So. 2d 265, 267 ("In medical malpractice cases, the plaintiff must prove that the alleged negligence probably caused the injury.  This has been the standard in Alabama for decades." (quotations and citation omitted)); *Williams v. Spring Hill Mem. Hosp.*, 646 So. 2d 1373, 1375 (Ala. 1994); *Univ. of Ala. Health Servs. Found., P.C. v. Bush ex rel. Bush*, 638 So. 2d 794, 802 (Ala. 1994); *Parrish v. Russell*, 569 So. 2d 328, 330 (Ala. 1990); *Byrd v. Martin*, 548 So. 2d 442, 444 (Ala. 1989); *Parrish v. Russell*, 569 So. 2d 328, 330 (Ala.1990) (quoting *Williams v. Bhoopathi*, 474 So. 2d 690 (Ala.1985)).

Indeed, a mere possibility "or one possibility among others" is insufficient to meet the burden of proof under Alabama precedent.  *Lyons*, 23 So. 3d at 29; *Thompson v. Patton*, 6 So. 3d 1129, 1135 (Ala. 2008); *Pacifico v. Jackson*, 562 So. 2d 174 (Ala. 1990); *Levesque v. Reg'l Med. Ctr. Bd.*, 612 So. 2d 445, 448 (Ala. 1993); *Pendarvis v. Pennington*, 521 So. 2d 969, 971 (Ala. 1988).

Plaintiffs identified Steven M. Taylor, M.D.—a private vascular surgeon who treated Mr. Marlowe beginning in August 2014—as a non-specially retained

15

expert witness on causation.[5]  Critically, Dr. Taylor testified that causation was not present.

When Dr. Taylor was asked at his deposition whether could have saved Mr. Marlowe's lower extremities if Dr. Cumagun had referred the patient to a vascular surgeon in March 2014, Dr. Taylor repeatedly said that he could not.  Plaintiffs summarized Dr. Taylor's expected opinion testimony as follows:  "I would expect Dr. Taylor to testify . . . that, if he could have seen Jimmy back in the spring time when his feet looked liked [sic] they did in the March 14[, 2014] photos and he still had a pedal pulse, although decreased or diminished, he most likely or probably could have saved Jimmy's legs."  (Attach. 17, Pls.' Expert Disclosures.)  But when asked at his deposition if he agreed with Plaintiffs' summary of his purported testimony, Dr. Taylor testified, "That's -- that would not be how I would state that."  (Attach. 18, Dr. Taylor Tr. 17:22-18:5.)  Dr. Taylor was then asked to testify how he would state his opinion:

> Q. Read, Doctor, if you will for me, the portion in brackets and tell me if there's anything else in [(Attach. 17, Pls.' Expert Disclosures)] that you would change.
>
> A. Yes. I think I was -- *I would not necessarily say that he would most likely or probably could have saved his legs.  I can't say that*.  That's a rather strong statement. What I would say is – the way I would state it, and again this is not in the legal form, but the way I would say it in a medical way is that looking at the pictures here, he appears to have a

---

[5] Consequently, Dr. Taylor did not produce an expert witness report.  *See* Fed. R. Civ. P. 26(a)(2)(C).

salvageable foot.  And so at that point I would institute a vascular workup to see if there's something that could be done to improve his perfusion.  Now, it could be at this point there's no distal targets to do a bypass with and it may be that it's not salvageable at this point.  But again, from the look of it, it looks salvageable.  Unless you have -- unless I know exactly what the perfusion is like, *I can't say for sure whether there's something that could have been done*.

. . . .

Q . . . *Can you say that you probably could have saved his legs?*

A. *No.*  I can say that I would have done a vascular -- a detailed vascular workup.  Based on those findings, then you can -- then I could be more definitive whether it's expected to be salvaged or not.  So in other words, again, just like I saw when the arteriogram I did where there were no distal targets to do a distal bypass to, it's possible that he has no distal targets in this picture.  I don't know that.  If he doesn't have distal targets, then the outcome would have been the same as what my outcome was.

(Attach. 18, Dr. Taylor Tr. 20:19–21:13, 21:17–22:3 (emphasis added).)

When asked later, Dr. Taylor again reiterated his uncertainty as to whether Mr. Marlowe's lower extremities could have been salvaged in March 2014:

Q. If Dr. Cumagun had ordered a Doppler study or referred him to a vascular surgeon or specialist in March of 2014, would the amputations have been necessary?

A. I don't know.

(Attach. 18, Dr. Taylor Tr. 36:1–5.)

Dr. Taylor also testified that, prior to his deposition, he was not aware that Mr. Marlowe had visited numerous private physicians—most of whom examined the patient's feet or lower extremities—after the March 2014 visit to the VA.

(Attach. 18, Dr. Taylor Tr. 14:18–15:5.)  Dr. Taylor further testified that what happened at these visits may affect his opinion as to the timeliness of how Mr. Marlowe's disease process progressed.  (*Id.* Dr. Taylor Tr. 17:17–21.)

The lack of causation in this case is compounded by the fact that numerous medical providers, from different medical specialties, evaluated Mr. Marlowe's lower extremities in the months subsequent to the VA appointment at issue.  Yet none of those providers believed the condition warranted referral to a vascular specialist.  In sum, Plaintiffs cannot meet their burden to demonstrate causation in this case.  That is, Plaintiffs have not disclosed qualified expert testimony that Mr. Marlowe's legs could have been saved had Dr. Cumagun referred the patient to a vascular surgeon in March 2014.

> B. *Plaintiffs Cannot Demonstrate That the Standard of Care Was Breached Because at Least Four Other Physicians Examined Mr. Marlowe's Lower Extremities After the March 2014 VA Visit, and None of Them Referred the Patient for Further Vascular Workup.*

A physician's standard of care is set forth in the Alabama Medical Liability Act:  "[A] physician's . . . duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians . . . in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case."  Ala. Code § 6-5-484(a).  To establish both the appropriate standard of care and that the health care provider breached that standard, a plaintiff must present expert

testimony from a "similarly situated health-care provider."  Ala. Code § 6-5-548;

*Morgan*, 138 So. 3d at 986.

There is overwhelming evidence—in the form of numerous private

physician visits and from Plaintiff's own expert—that Dr. Cumagun did not breach

the applicable standard of care by failing to refer Mr. Marlowe for additional

vascular workup based on the patient having diminished pedal pulses in March

2014.  In the months following the March 2014 appointment at the VA's

Childersburg Clinic, four private physicians treated Mr. Marlowe for substantially

similar complaints and none of the providers ordered any additional vascular

workup.  Specifically, Dr. Pinson—who, like Dr. Cumagun, is a primary care

physician—did not refer Mr. Marlowe for additional vascular workup despite

examining Mr. Marlowe's feet in June and July 2014.  Nor did Dr. Trujillo, an

emergency room physician, who examined Mr. Marlowe's lower extremities

eleven days after Dr. Cumagun.  The same is true for Dr. Bowman, a podiatrist,

who examined Mr. Marlowe's feet two months after Dr. Cumagun.  But there is

also Dr. Henderson—a dermatologist—who evaluated the patient's feet roughly

four months after Dr. Cumagun.  He also did not refer the patient for additional

vascular workup.  Instead, his diagnosis mirrored that of Dr. Cumagun.  Indeed, it

was not until approximately 4½ months after the visit to the VA Childersburg

Clinic that a dermatologist—Dr. Bourgeois—referred Mr. Marlowe for additional

19

vascular workup, not as a result of a diminished pedal pulse, but after finding black eschars on Mr. Marlowe's toes.  The majority of these physicians did not see any need to check Mr. Marlowe's pulses at all, and those that noted diminished pulses, *uniformly* declined to order additional workup.  Altogether, the treatment Mr. Marlowe received during the relevant time period demonstrates that the standard of care did not require vascular workup of Mr. Marlowe's feet in March 2014.

Plaintiffs' own experts likewise support Defendant's level of care.  Dr. Taylor—Plaintiffs' expert and treating vascular surgeon—testified at his deposition that Dr. Cumagun *did not* commit medical malpractice in her treatment of Mr. Marlowe:

> A. . . . there's nothing that I see that raises anything to the level of malpractice.
>
> Q. Okay.  So you don't think Dr. Cumagun committed malpractice.
>
> A. I do not.

(Attach. 18, Dr. Taylor Tr. 52:19–23.)  Plaintiff's other expert, Dr. Jerry McLane similarly commended Dr. Cumagun's care.  He testified that she was a "good doctor" and that she conducted a good clinical examination in March 2014. (Attach. 19, Dr. McLane Tr. 118:8; 156:5; 161:17-21.)

Plaintiffs' only evidence of a breach comes through Dr. McLane's generalized contention that a finding of a diminished pedal pulse requires a vascular workup.  Dr. McLane's testimony is insufficient to create a question

20

regarding the applicable standard of care owed by Dr. Cumagun to Mr. Marlowe at the March 2014 appointment, particularly in light of the care provided by numerous other medical providers.  Dr. McLane's testimony fails to account for the fact that Mr. Marlowe had reduced pedal pulses dating back to at least 2011. When Dr. McLane was asked "whether it affects his opinion" that "it was documented multiple times by multiple providers" "that Mr. Marlowe had decreased pedal pulses [beginning in] mid 2011," Dr. McLane backtracked on who had the responsibility to conduct a vascular workup and at what point in time: "Well, I mean, somebody somewhere should have ordered a Doppler."[6]  (*Id.* McLane Tr. 116:8–14.).  Dr. McLane's generalized assertion is not sufficient to create a triable issue as to whether Dr. Cumagun violated the standard in March 2014.  Rather, the actions and testimony of multiple treating physicians who personally examined Mr. Marlowe confirm that she did not.  In sum, "[t]he applicable standard was . . . amply demonstrated by plaintiff's private physicians." *Schunk v. United States*, 783 F. Supp. 72, 83 (E.D.N.Y. 1992).

---

[6] Dr. McLane goes on to suggest that it could be "both people's" (Dr. Cumagun and Dr. Pinson's) responsibility to run additional tests under the scenario where both are Mr. Marlowe's primary care physicians, but was referring to an obligation that may have been triggered by "the podiatry note" if that note was transmitted to either of those doctors.  (Attach. 19, Dr. McLane Tr. 117-118.).  This testimony is not helpful to Plaintiffs, however, because Mr. Marlowe did not see the podiatrist until May 2014—approximately two months after Dr. Cumagun saw the patient.  (Attach. 9, Dr. Bowman Note of May 15, 2014.).

<u>CONCLUSION</u>

The Court should grant summary judgment in favor of the United States because Plaintiffs cannot demonstrate that the VA's conduct probably caused Mr. Marlowe's legs to be amputated.  Alternatively, the VA's care did not breach the applicable standard of care.


Date:  December 3, 2018                Respectfully submitted,


                                       JAY E. TOWN
                                       UNITED STATES ATTORNEY

                                       <u>/s/ Jason R. Cheek</u>
                                       Jason R. Cheek
                                       Assistant U.S. Attorney
                                       U.S. Attorney's Office
                                       1801 Fourth Avenue North
                                       Birmingham, Alabama 35203
                                       (205) 244-2104
                                       (205) 244-2181 (fax)
                                       jason.cheek@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 3, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notice of this filing to all attorneys of record.

<u>/s/ Jason R. Cheek</u>
Jason R. Cheek
Assistant U.S. Attorney