FILED
2018 Dec-03 AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Attachment 14

Deposition Transcript of Dr. Henderson

                                                                    3
```
 1         IN THE UNITED STATES DISTRICT COURT            1                I N D E X
 2         FOR THE NORTHERN DISTRICT OF ALABAMA           2
 3                  SOUTHERN DIVISION                     3 EXAMINATION BY:                        PAGE NO.
 4                                                        4 Mr. Cheek                                  5
 5 JIMMY WAYNE MARLOWE,                                   5 Mr. Tipler                                10
 6                                                        6
 7      Plaintiff,                                        7            E X H I B I T S
 8                        CIVIL ACTION NO.:               8
 9        VS.          1:17-CV-00309-VEH                  9 PLAINTIFF'S EXHIBIT NO.                  MARKED
10                                                       10  1    Shelby Dermatology medical chart    12
11 UNITED STATES OF AMERICA,                             11  2    emedicine health article            24
12                                                       12  3    Merck Manual page - Tinea Pedis     27
13      Defendant.                                       13
14                                                       14 DEFENDANT'S EXHIBIT NO.                  MARKED
15      **VIDEOTAPED DEPOSITION OF DR. ROBERT HENDERSON** 15  1    Medical record dated 7/9/14         08
16                                                       16
17         Taken pursuant to Federal Rules of Civil      17
18 Procedure before KAREN DAVIS, CCR, Certified Court    18
19 Reporter and Commissioner for Alabama at Large, at the 19
20 office of Shelby Dermatology, 1022 1st Street N.,     20
21 Alabaster, Alabama, on Thursday, May 10, 2018,        21
22 commencing at 11:58 a.m.                              22
23                                                       23
24                                                       24
25                                                       25
```

                                                   2                                                         4
```
 1         A P P E A R A N C E S:                         1        VIDEOGRAPHER:  We now commence the videotaped
 2 APPEARING ON BEHALF OF THE PLAINTIFF:                  2 deposition in the United States District Court for the
 3     Mr. Steven D. Tipler                               3 Northern District of Alabama, Southern Division, in the
 4     Tipler Law Offices                                 4 matter of Jimmy Wayne Marlowe, et al., vs. United
 5     104 23rd Street South, Suite 100                   5 States of America, Civil Action No. 1:17-CV-00309-VEHA.
 6     Birmingham, Alabama  35233                         6        Our witness today is Dr. Robert Henderson.
 7     (205) 328-6800 * steventipler@gmail.com            7 Today's date is Thursday, May the 10th, 2018.  The time
 8                                                        8 is 11:58 a.m. Central Time.  We are located at Shelby
 9 APPEARING ON BEHALF OF THE DEFENDANT:                  9 Dermatology in Alabaster, Alabama.  Will all attorneys
10     Mr. Jason Cheek                                   10 present please state their names and who they
11     Ms. Sarah Wilson                                  11 represent.
12     Assistant United States Attorneys                 12        MR. CHEEK:  Jason Cheek on behalf of the
13     1801 Fourth Avenue North                          13 United States.
14     Birmingham, Alabama  35203                        14        MS. WILSON:  Sarah Wilson on behalf of the
15     (205) 244-2104 * Jason.Cheek@usdoj.gov            15 United States.
16     (205) 244-2140 * Sarah.Wilson2@usdoj.gov          16        MR. TIPLER:  Steve Tipler here on behalf of
17                                                       17 Jimmy and Virginia Marlowe.
18 APPEARING ON BEHALF OF THE DEPONENT:                  18        MR. KING:  Allen King, and I represent Dr.
19     Mr. Allen King                                    19 Henderson, a non-party to this action.
20     Starnes Davis Florie, LLP                         20        VIDEOGRAPHER:  You may swear the witness.
21     100 Brookwood Pl., 7th Floor                      21        D R. R O B E R T   H E N D E R S O N,
22     Birmingham, Alabama  35209                        22 Having been duly sworn, testifies as follows:
23     (205) 868-6050 * ack@starneslaw.com               23        COURT REPORTER:  Do you have any stipulations
24                                                       24 or anything that you need to put on the record?
25 ALSO PRESENT:  Paige Byrd, Videographer               25        MR. CHEEK:  No.
```

## Page 5

**EXAMINATION BY MR. CHEEK:**

Q. Dr. Henderson, thank you for your time today. Can you please just tell me your full name?
A. Robert Lane Henderson, Jr.
Q. And what's your profession?
A. Dermatologist.
Q. What does a dermatologist do?
A. We are the -- provide expert care of skin, hair and nails and mucus membranes.
Q. Do you hold any medical licenses?
A. Yes. State of Alabama.
Q. How long have you held that license?
A. Fourteen years?
Q. Do you hold any board certifications?
A. Dermatology. Alabama Board of Dermatology -- or American Board of Dermatology.
Q. Thank you. How long have you held that certification?
A. Fourteen years.
Q. How many patients are currently under your care?
A. Oh, thirty thousand?
Q. Okay. On any given day, approximately how many patients do you see?
A. Fifty to sixty.

## Page 6

Q. Tell me about any hardship or inconvenience that would occur if you had to reschedule those patients in a single day.
A. Ask the question again.
Q. Sure. If you had to reschedule patients for a single day, would you experience any hardship or inconvenience?
A. I guess I don't understand what you're asking. If I have to reschedule one patient?
Q. Well, let's say you had to potentially block out some -- some time to testify at a trial.
A. Oh. Yes. That would be greatly inconvenient.
Q. How so?
A. Loss of revenue. I would want to continue paying my staff and wouldn't be generating revenue to pay them either. And to delay the care of other patients who are wanting help would be very inconvenient for them.
Q. Did there come a time when you treated Mr. Jimmy Wayne Marlowe?
A. Yes.
Q. What did you treat him for?
A. Can I see my chart note? Or do you --
Q. Do you remember what you treated him for?

## Page 7

A. I remember from looking at my chart note recently.
    MR. CHEEK: Okay.
A. Yes. And it was for a tinea pedis, which is -- common names for that is ringworm, ringworm of the feet, or athlete's foot. Now, those are common terms, but the medical term is tinea pedis.
Q. And I want to specifically direct your attention to July 9th of 2014. Do you recall everything that you made a notation about -- well, first, do you recall treating Mr. Marlowe on that day?
A. No.
Q. Do you recall everything in your medical notes from that day?
A. No.
Q. Would anything refresh your recollection from that day? If I showed you your medical record from that day, would it refresh your recollection?
A. Yeah -- no.
Q. So you're saying if I showed you your medical note, it wouldn't help you remember what you --
A. I do not remember the specific encounter.
    MR. CHEEK: Okay.
A. I've looked at my note and I can't remember visually what he looks like and visually what I saw.

## Page 8

So all I have to go by is what I documented in my note.
Q. Okay. Do you recall why Mr. Marlowe visited you on July 9th of 2014?
A. I'd need to look at my records.
    MR. CHEEK: Okay. I'm going to mark this as Exhibit One. I'm going to show it to opposing counsel.
        (Whereupon Defendant's Exhibit No. 1 was marked for identification by the reporter.)
    MR. CHEEK: Dr. Henderson, if you would just please read this note to yourself and then hand it back to me when you're done.
        [Witness complies.]
Q. Thank you. Why did Mr. Marlowe visit you on July 9th of 2014?
A. Had a rash on his feet.
Q. And what did you note about this condition?
A. What did I note?
    MR. CHEEK: Yes, sir.
A. He had -- his feet were scaly and I noted a geographic distribution, which is typically something we see with tinea. Tinea being fungus or ringworm. And in this case, I said it was tinea pedis which means on the feet, but tinea can occur anywhere on the body and has other names if that's the case.
Q. And how long had this condition -- had Mr.

9

```
 1  Marlowe been experiencing this condition?
 2     A.     It says a month.
 3     Q.     And what would that information, the month
 4  long notation you wrote, where would you have gotten
 5  that information?
 6     A.     From Mr. Marlowe.
 7     Q.     What did you diagnose him with?
 8     A.     Tinea pedis.
 9     Q.     And how did you treat it?
10     A.     With a topical anti-fungal.  Ciclopirox.
11     Q.     During that visit, did Mr. Marlowe complain
12  of pain or cramps while walking?
13     A.     I don't remember.  I did not note it in my
14  chart note, so -- we try to record what they complain
15  of and I did not note that.
16     Q.     Did you mention anything in your note of July
17  9th, 2014 about blood profusion?
18     A.     No.
19     Q.     Why not?
20     A.     I -- I recorded what I was told.  What he
21  complained of.
22     Q.     Did you observe any blood profusion issues?
23     A.     No.
24     Q.     Did you mention anything of your note -- in
25  your note of July 9th, 2014 about blood circulation
```

10

```
 1  issues?
 2     A.     No.
 3     Q.     Why not?
 4     A.     I must have not had that concern.
 5     Q.     Did you mention anything in your note of July
 6  9th, 2014 about gangrene?
 7     A.     No.
 8     Q.     Why not?
 9     A.     I didn't see that.
10     Q.     Did you refer Mr. Marlowe to a vascular
11  surgeon on July 9th of 2014?
12     A.     No.
13     Q.     Why not?
14     A.     There would be no need for that.
15     Q.     Did you refer Mr. Marlowe for a Doppler study
16  on July 9th, 2014?
17     A.     No.
18     Q.     Why not?
19     A.     There was no need for that.
20            MR. CHEEK:  Thank you, Doctor.
21            MR. TIPLER:  Doctor, I'm Steve Tipler.  I
22  represent Jimmy and his wife Virginia.
23  EXAMINATION BY MR. TIPLER:
24     Q.     Have you met with these lawyers before or
25  talked to them before?
```

11

```
 1     A.     No.
 2     Q.     Okay.  And you have not met with me or talked
 3  to me before?
 4     A.     No, sir.
 5     Q.     Okay.  This is the first time for us to meet,
 6  I believe, right?
 7     A.     Yes.
 8     Q.     You're with Shelby Dermatology, PC?
 9     A.     Yes.
10     Q.     And we're at -- we're at your location, 1022
11  1st Street North in the conference room upstairs from
12  your Suite 201, right?
13     A.     Yes.
14     Q.     In Alabaster.
15     A.     Yes.
16            MR. TIPLER:  And let me show you what I'll
17  mark as Plaintiff's Exhibit No. 1.  I don't have an
18  extra copy right handy so let me let Jason look at it.
19            MR. CHEEK:  Counsel, this is just a copy of
20  what was disclosed by your office previously or is
21  there additional material?
22            MR. TIPLER:  Oh, there's nothing additional,
23  no.
24            MR. CHEEK:  Okay.
25     Q.     Plaintiff's Exhibit No. 1.  Take a look at
```

12

```
 1  that and tell me if that appears to be your complete
 2  chart or the complete chart of Shelby Dermatology, PC,
 3  which includes Defendant's Exhibit No. 1 as one of the
 4  documents.  And I think it includes billing records,
 5  not just office notes, correct?
 6     A.     Correct.  Can I take the paper clip off?
 7            MR. TIPLER:  Oh, yes.  Sure.
 8     A.     Yes.  It looks like our record.
 9     Q.     All right.  You, according to Defendant's
10  Exhibit No. 2 and one of the documents in Plaintiff's
11  Exhibit No. 2, you saw Jimmy Marlowe in your offices
12  here in Alabaster on July 9, 2014?
13     A.     Correct.
14     Q.     You saw him one time?
15     A.     Correct.
16     Q.     And approximately how long were you with him?
17     A.     I would guess five to ten minutes.
18     Q.     And in one of your examination rooms?
19     A.     Yes.
20     Q.     Do you recollect when you went in the
21  examination room with him if there was anyone else in
22  the room with him?
23     A.     I don't.
24     Q.     Do you recollect whether you closed the door
25  when you went in the room?  Is that --
```

Page 13

```
 1   A.   We all -- we usually do.
 2   Q.   Usually do.  Do you usually have somebody
 3 with you?
 4   A.   Yes.
 5   Q.   A nurse or an assistant?
 6   A.   Usually.
 7   Q.   And who was with you the day you examined
 8 him?
 9   A.   It will probably be on the page.
10        MR. TIPLER:  Okay.
11   A.   That would be Lisa Yates.
12   Q.   Who is Lisa Yates?
13   A.   She is one of our nurses.
14   Q.   Is she an RN?
15   A.   No.
16   Q.   LPN?
17   A.   She's one of our medical assistants.
18   Q.   Okay.  So she's not a nurse.
19   A.   No.
20   Q.   According to your note, you saw Jimmy Marlowe
21 on July the 9th, and according to your chart,
22 Plaintiff's Exhibit No. 1, your partner, Dr. -- is it
23 Bourgeois?
24   A.   Bourgeois.
25   Q.   Bourgeois, saw Jimmy on July 30th?
```

Page 14

```
 1   A.   Correct.
 2   Q.   Okay.  Have you gone through these notes
 3 previously?
 4   A.   I have.
 5   Q.   And when I say "these notes", I'm referring
 6 to both your note and Dr. Bourgeois' note.
 7   A.   Yes.
 8   Q.   When did you -- you saw Jimmy on July 9th.
 9 When did you first become aware that Dr. Bourgeois saw
10 Jimmy on July 30th or 31st?
11   A.   Perhaps a month or two ago.
12   Q.   Okay.  That was your first involvement with
13 this.
14   A.   Correct.
15   Q.   Since then.  Since July 9th.
16   A.   Yes.
17   Q.   And how did you become aware of Dr. Bourgeois
18 seeing him three weeks after you did?  How did you
19 become aware of that just a month ago?
20   A.   Through a Notice of Deposition, I think.
21   Q.   Okay.  And that's when you looked in the
22 chart and saw that he had been back to your --
23   A.   Correct.
24   Q.   -- clinic?
25   A.   Mmm hmm.
```

Page 15

```
 1   Q.   Okay.  Is Dr. Bourgeois your partner?
 2   A.   Yes.
 3   Q.   And presently your partner?
 4   A.   Correct.
 5   Q.   So he's here in Shelby County?
 6   A.   Correct.
 7   Q.   Still works out of this office?
 8   A.   Yes.
 9   Q.   Is this y'all's one office?
10   A.   We have another location.
11   Q.   Is this what you would call the main
12 location?
13   A.   Yes.  Yes.
14   Q.   Okay.  All right.  How is it that Jimmy came
15 to see you?
16   A.   I don't know.
17   Q.   You don't know if he was referred by another
18 physician or how -- how you ended up being his doctor
19 on that one day.
20   A.   I don't know.
21   Q.   But you only saw him that one day, and
22 according to what you just told me, it would at most be
23 five to ten minutes with him?
24   A.   I don't know.  I -- did I see him five to ten
25 minutes?  I really don't know.
```

Page 16

```
 1   Q.   You don't know if you even saw him that long.
 2   A.   Could have been longer.  I don't know.
 3   Q.   Could have been longer; could have been
 4 shorter?
 5   A.   I can't -- I can't speculate, so maybe I
 6 shouldn't have said five to ten minutes.  I just don't
 7 know.
 8   Q.   Could have been longer, could have been
 9 shorter; would that be correct?
10   A.   Correct.  Shorter would be a bit difficult
11 but...
12   Q.   You're thinking you usually see a patient at
13 least five minutes, but sometimes you could see them
14 ten, fifteen --
15   A.   Yes.
16   Q.   -- maybe longer.
17   A.   Yeah.
18        MR. TIPLER:  Okay.
19   A.   That -- that's very reasonable.
20   Q.   Okay.  Do you remember a person by the name
21 of Virginia Marlowe?
22   A.   No.
23   Q.   You don't recollect his wife Virginia being a
24 former patient of yours?
25   A.   No.
```

17

1  Q.  Do you recollect whether Jimmy was a big guy,
2  a little guy?
3  A.  I don't.
4  Q.  Short, tall?
5  A.  I don't.
6  Q.  How much he weighed?
7  A.  No.
8  Q.  Approximately?
9  A.  No.
10 Q.  Whether he was old or young?
11 A.  No.
12 Q.  Balding or plenty of hair?  Don't know that?
13 A.  No.
14 Q.  Okay.  Do you recollect whether Jimmy was an
15 active person that exercised, worked out, walked?
16 A.  No.
17 Q.  Your note, Defendant's Exhibit 1, says his CC
18 was rash.  What does CC mean?
19 A.  Chief Complaint.
20 Q.  Okay.  And the rash he was here about was on
21 both feet, correct?
22 A.  Correct.
23 Q.  Did you take any photographs?
24 A.  No.
25 Q.  Have you seen any photographs of his feet?

18

1  A.  No.
2  Q.  Were both feet cracked?  Let me let you look
3  at that and I will look at my copy.
4  A.  I -- the only --
5  Q.  According to the note, were both feet
6  cracked?
7  A.  I did not note that.
8  Q.  Well, it says cracked.
9  A.  That's his complaint.
10 Q.  Okay.  You're saying --
11 A.  So the top is the patient's --
12 Q.  I got you.  He's complaining of a rash on
13 both feet with cracked skin.
14 A.  Correct.
15 Q.  And whether he's saying they're cracked on
16 both feet, you don't know, but that's what he's saying.
17 A.  That's what he's complaining of, correct.
18 Q.  And he's complaining of it being red and
19 painful.
20 A.  Correct.
21 Q.  His feet being red and painful.
22 A.  Correct.
23 Q.  Now, is -- is this your handwriting up at the
24 top?
25 A.  That's --

19

1  Q.  His handwriting or whose handwriting?
2  A.  That's Yates' handwriting.
3  Q.  So everything up here under -- well, show me
4  where her handwriting stops and your handwriting
5  begins.
6  A.  So she noted all that down to the Review of
7  systems or through the Review of Systems.
8  Q.  Okay.  That would be --
9  A.  The ROS on the left.
10 Q.  ROS.  Okay.
11 A.  So everything short of ROS is my handwriting.
12 Q.  Okay.  Show me where your handwriting starts.
13 A.  So here down.  [Indicating]
14 Q.  From here, [indicating], like would this be
15 your handwriting right here and here and here?
16 A.  Well, actually -- actually, that would be Ms.
17 Yates as well.  So here down.  [Indicating]
18 Q.  Yours starts right here [indicating].
19 A.  Yes.
20 Q.  I'm going to put a red arrow right there.
21 Did I put that -- you're saying everything below that
22 red arrow is your handwriting and everything above is
23 Ms. Yates' handwriting.
24 A.  Correct.
25 Q.  Okay.  Okay.  She wrote that this problem

20

1 that he had with both feet was painful.  Did you get
2 into any discussion with him about how it was painful,
3 where it was painful, the degree of pain?  Anything
4 like that?
5  A.  I don't remember.
6  Q.  If you did, there's -- you would typically
7 note it, would you not?
8  A.  Correct.
9  Q.  And there's no notation about what the pain
10 was all about, other than it was painful.
11 A.  I would discuss his complaint and generally
12 note or change the complaints according -- if I found
13 something different than what Ms. Yates wrote down.  So
14 that -- if that was not an accurate representation of
15 his complaints, I should have noted something
16 different.
17 Q.  Right.  But I'm asking now, Doctor, about --
18 about -- there are no notations about where the pain
19 actually was, how -- the degree of pain he was having,
20 the type of pain he was having, whether it was sharp,
21 dull, aching, throbbing.  There's no notation about
22 that, correct?
23 A.  Right.
24 Q.  And if you had -- if you had discussed that
25 with him and he had said it was a throbbing pain, an

21

1  aching pain, you would have made a -- typically made a
2  note of that, would you not?
3      A.   I can't speculate.
4      Q.   You wouldn't --
5      A.   It depends.
6      Q.   It depends.  Okay.  But you don't recollect
7  any discussion about the pain.
8      A.   I don't recollect.
9      Q.   Okay.  Now, you were asked something about --
10 well, let me -- let me back up.  What does this mean
11 right here when it says Previous TX?
12     A.   Previous treatments.
13     Q.   Okay.  I'm going to write on my copy of your
14 chart, Plaintiff's Exhibit No. 1, I'm going to write
15 the word 'Treatment' under there where it says TX.  You
16 see what I've done?
17     A.   Sure.
18     Q.   That means -- has he had previous treatment
19 for the condition, right?
20     A.   Correct.
21     Q.   And it appears he had previous treatment
22 about a month back?
23     A.   No.  The -- the order is not in sync with the
24 categories on the left.  The one month most likely
25 designates the duration of the problem.

23

1      A.   Correct.
2      Q.   Okay.  This one month written beside the word
3  -- the words Previous Treatment --
4           MR. CHEEK:  Objection.
5      Q.   -- is one of the notes that Lisa made, right?
6      A.   Correct.
7      Q.   Now, you diagnosed him with -- how did you
8  describe it?  Tinea?
9      A.   T stands for Tinea.
10     Q.   I'm going to write on here in red again --
11     A.   That's fine.  Sure.
12     Q.   -- on my copy or on Plaintiff's Exhibit No.
13 1, your note.  Is that beside the word T, is that T-E?
14     A.   T-I.
15     Q.   T-I.
16     A.   T-I-N-I-A.
17     Q.   N-I-A.  And that's Pedis, P-E-D-I-S?
18     A.   Correct.
19     Q.   Now, what is -- well, I think you said, and
20 correct me if I'm wrong, that tini -- tinea --
21     A.   Tinea.
22     Q.   -- pedis, or tinea pedis, is ringworm of the
23 feet.
24     A.   Ringworm is a layman's term --
25          MR. TIPLER:  Mmm hmm.

22

1      Q.   Well, the chart -- your chart says HPI.
2  That's history?
3      A.   Of Present Illness.
4      Q.   Of Present Illness.  It says location, both
5  feet.  Symptoms, cracked.  Duration, red.
6      A.   See?  Dura -- red is not a duration.
7      Q.   So you're saying the red goes with what?
8      A.   Red would be a description.
9          MR. TIPLER:  Okay.
10     A.   Along with cracked.
11         MR. TIPLER:  Okay.
12     A.   Painful would be a symptom.
13         MR. TIPLER:  Okay.
14     A.   And one month most likely refers to duration.
15     Q.   Okay.  But it's beside -- it's down there
16 beside Previous Treatment, right, on the form?
17     A.   Perhaps, or maybe below it.
18     Q.   And do you recollect him telling you that he
19 had been to a physician about a month previous for
20 this?
21     A.   I don't remember.
22     Q.   Do you recollect him telling you or his wife
23 telling you that he was told to see a dermatologist?
24     A.   I don't remember.
25     Q.   You don't even remember his wife being there.

24

1      A.   -- for fungus.
2          MR. TIPLER:  Okay.
3      A.   Specifically, dermatophytes.
4      Q.   And -- and you said it's commonly called
5  athlete's foot, right?
6      A.   It's another layman's term.  Correct.
7      Q.   Okay.  So ringworm and athlete's foot are
8  layman's terms for tinea pedis.
9      A.   Correct.
10     Q.   Let me show you something I just pulled off
11 the Internet this morning.  This is something I just
12 got off the Internet, emedicinehealth, and it says
13 tinea pedis or -- and I may be mispronouncing it so I
14 apologize, but [Reading] tinea pedis or ringworm
15 infection of the feet appears as red, scaly, macerated
16 patches of skin.  What is macerated?
17     A.   Macerated is kind of wettish and looks like
18 the skin wants to slough off.
19     Q.   Okay.  [Reading] Often between the fourth and
20 fifth toes, breaks and tears in the skin may increase
21 risk of infection.  The soles and sides of the feet may
22 also be affected by pustules?
23     A.   Pustules.
24     Q.   What's that?
25     A.   Pus bumps.

25

```
 1   Q.   Visils (ph)?
 2   A.   Vesicles.
 3   Q.   Vesicles?  Okay.
 4   A.   Small blisters.
 5   Q.   And edema.
 6   A.   Swelling.
 7   Q.   Okay.  [Reading] Affected skin is often itchy
 8  and uncomfortable.
 9        Would that be -- is that a -- is what we see
10  there, does that look like athlete's foot or ringworm,
11  and is that a good description of it, a layman's
12  description of it?
13   A.   It's a fair description, and that is a good
14  picture of some people's athlete's foot.
15        MR. TIPLER:  Okay.  Okay.
16   A.   Or tinea pedis.
17   Q.   And why is it called athlete's foot?  When
18  you were in medical school or dermatology residency,
19  why did it get called -- why did -- how -- why did it
20  end up getting called athlete's foot?
21   A.   I couldn't speculate.
22   Q.   Is it because -- is it your understanding
23  it's because with an athlete, they'll oftentimes --
24  their feet will get hot and sweaty and wet in their
25  tennis shoes and athletic shoes and --
```

26

```
 1   A.   I'm not going to speculate.
 2   Q.   Okay.  You don't know that to be the case
 3  from your training?
 4   A.   No.
 5   Q.   Well, would you agree that tinea -- well, let
 6  me ask you this first:  Do you have the Merck Manual in
 7  your office?
 8   A.   No.
 9   Q.   Are you familiar with the Merck Manual?
10   A.   Yes.
11   Q.   That's a text of -- that's utilized I guess
12  in a lot of medical offices and in medical school,
13  right?
14   A.   Not medical school.
15   Q.   Okay.  What about in your residency?
16   A.   No.
17   Q.   Don't reference --
18   A.   We never --
19   Q.   -- Merck Manual ever?
20   A.   We never did.
21   Q.   Do you ever reference the Merck Manual?
22   A.   No.
23   Q.   Online or in booklet form?
24   A.   Never.
25   Q.   Well, let me ask you if tinea ped -- if you
```

27

```
 1  agree with this, and if you don't that's fine, okay?
 2  But if you do, tell me.
 3        Is -- [Reading] tinea pedis is a dermatophyte
 4  infection of the feet?
 5   A.   Correct.
 6   Q.   It is the most common dermatophytosis?
 7   A.   Correct.
 8   Q.   Because moisture resulting from foot sweating
 9  facilitates fungal growth.  Would you agree with that
10  statement?
11   A.   Not completely.
12   Q.   Okay.  So let me just do this then.  You
13  agree with what I've underlined in green, but you
14  disagreed, or don't necessarily agree, with what I
15  underlined in red, right?
16   A.   Correct.
17        MR. TIPLER:  Okay.  I'll make that
18  Plaintiff's Exhibit No. 3.
19        (Whereupon the document is marked P-3 for
20  identification.)
21   Q.   When I was asking you about -- never mind.
22        Let me just ask you this:  Is there any
23  mention in your note of the patient complaining of
24  itching?
25   A.   No.
```

28

```
 1   Q.   What is itching?  I mean --
 2   A.   I'm not so sure how to define it.
 3        MR. TIPLER:  Okay.  All right.
 4        THE DEPONENT:  [Laughs].
 5   Q.   There's no medical term particularly for
 6  itching.
 7   A.   Yeah, there is one.  Pruritus.
 8   Q.   Pruritus.  Okay.  There's no mention of
 9  pruritus in the note -- in your note.
10   A.   No.
11   Q.   And there's no mention of itching in your
12  note.
13   A.   Correct.
14   Q.   And that's by you or by --
15   A.   Correct.  Ms. Yates.
16   Q.   Ms. Yates.  Did I ask you, did you take
17  pictures of his feet?
18   A.   No.
19   Q.   Do you oftentimes take pictures or
20  photographs?
21   A.   No.
22   Q.   You prescribed what -- what is that you
23  prescribed?
24   A.   It's an anti-fungal.  Topical anti-fungal
25  medication.
```

```
                                                    29                                                          31
 1     Q.    And what is it?  I can't read your writing.      1     Q.    Okay.  All right.  You don't know if you can
 2     A.    Ciclopirox.  C-I-C-L-O-P-I-R-O-X.                2  get one on -- behind the ankle or behind the knee?
 3     Q.    Okay.  And it's a gel?                           3     A.    The only one I know of is on top of the foot.
 4     A.    I didn't note if I did the cream or gel          4     Q.    Okay.  Okay.  What is your understanding this
 5  version.                                                  5  case of -- that concerns Jimmy Marlowe is all about?
 6     Q.    But you can get either one.                      6     A.    My general understanding of the case?
 7     A.    Correct.                                         7           MR. TIPLER:  Mmm hmm.  Mmm hmm.
 8     Q.    And that was supposed to help with the           8           MR. KING:  Don't guess.
 9  condition?                                                9     A.    He's bringing a suit against the providers at
10     A.    Correct.                                        10  the VA for missing peripheral artery disease, which he
11     Q.    And if it was actually athlete's foot or        11  was found to have after he saw Dr. Bourgeois.
12  tinea pedis, this cream is something that's good, that   12           MR. TIPLER:  Okay.
13  would usually get rid of it?                             13     A.    Which led to double amputations, best I
14     A.    It's an effective treatment.                    14  remember.
15     Q.    Okay.  You found it in your experience to be    15           MR. TIPLER:  Right.
16  effective?                                               16     A.    So I'm guessing he contends that it was
17     A.    Yes.                                            17  missed previously.
18     Q.    Okay. All right.  I think you said at the       18     Q.    Okay.  Now, how did you learn that?  What you
19  beginning of this deposition that you did not            19  just told me.
20  specifically recollect this visit.  Mr. Marlowe.  You    20     A.    I think the deposition.  No, not the
21  were really going by having to go back and review that   21  deposition.  The -- well, the notice of --
22  note, right?                                             22     Q.    The notice of the deposition told you it was
23     A.    Correct.                                        23  --
24     Q.    Do you recollect if you touched his feet?       24     A.    I think it had part of the -- I can't
25     A.    I don't recollect.                              25  remember.  I think it had part of the case in it.  I

                                                    30                                                          32
 1     Q.    There is -- I noticed on Dr. --                  1  read something about the case with it, I believe.
 2     A.    Bourgeois.                                       2     Q.    Okay, that's what I was wondering, because
 3     Q.    Bourgeois' note that he's -- he made a note      3  the deposition notice just tells you who the parties
 4  that -- of nonpalpable pedial -- pedal pulse.  What       4  are.
 5  does that mean?  Nonpalpable pedial -- pedal pulse.       5     A.    Oh, okay.  When I got a -- did I get a notice
 6     A.    He couldn't feel a pulse in the feet.            6  for a deposition?  What notice did I get?  I got a
 7           MR. TIPLER:  Okay.                               7  notice.  I think it was for this deposition.
 8     A.    In the blood vessels.                            8           MR. TIPLER:  Okay.
 9     Q.    And there's no mention anywhere in your note     9     A.    And I contacted my malpractice carrier,
10  about pedal pulse, right?                                10  insurance, to ask them if I should be represented even
11     A.    Correct.                                        11  though this doesn't -- didn't seem to be against me,
12     Q.    Would -- did you check the pedal pulse?         12  and they advised that I should and they assigned Mr.
13     A.    No.                                             13  King here.  And since I didn't really know what it was
14     Q.    Or is that something you typically wouldn't     14  about, or maybe I asked them in the beginning, I think
15  do as a dermatologist?                                   15  they found the case and faxed it over.
16     A.    Typically wouldn't do.                          16           MR. TIPLER:  Okay.
17     Q.    Okay.  The pedal pulse is a pulse on top of     17     A.    Information about the case.
18  the foot?                                                18     Q.    So -- so you learned through your malpractice
19     A.    Correct.                                        19  -- your professional liability insurance carrier of
20     Q.    Where else can you get a foot -- excuse me.     20  what the case was about.
21  Where else can you get a pulse in the lower extremity?   21     A.    Someone faxed it over.  I think it was with
22  Behind the ankle?                                        22  them.
23     A.    I don't know.  [Laughs].                        23           MR. TIPLER:  Okay.
24     Q.    You don't know?  Okay.                          24           MR. KING:  We're going to object to that.  We
25     A.    Been quite awhile since I've tried to so...     25  don't want anything in the record about his malpractice
```

33

```
 1  provider.  That's statutory.  I think we can agree to
 2  that.
 3       Q.   And did -- did you ask for rep -- I'm quite
 4  often involved in taking sworn testimony from doctors,
 5  treating physicians, and you are a treating physician.
 6  And ninety percent of those, maybe more, the physician,
 7  the treating physician, does not have counsel present.
 8  Is that something that you asked for or that your
 9  carrier asked for?
10            MR. KING:  Object to that.  You can answer
11  it.
12       A.   My carrier asked for.
13       Q.   Okay.  Dr. Bourgeois according to -- well,
14  let me ask you this:  Have you discussed this matter
15  with Dr. Bourgeois?
16       A.   Yes.
17       Q.   And what did you learn from him?
18       A.   The facts of when he saw the patient on the
19  31st.
20       Q.   That the condition --
21       A.   From his recollection.
22       Q.   And what did he tell you the condition of his
23  feet were three weeks later on the 31st?
24       A.   As much as his chart note says, that he had
25  some black toes.
```

34

```
 1       Q.   Okay.  He had black toes and -- well, let me
 2  ask you this.  Maybe you can help me.  Let's look at
 3  his note, which is part of Defendant's Exhibit No. --
 4  excuse me.  Plaintiff's Exhibit No. 1.  Whose
 5  handwriting is this up at the top?
 6       A.   That would be another medical assistant.
 7  Cassie Blevins.
 8       Q.   Okay.  And where does her handwriting end and
 9  Dr. Bourgeois' handwriting begin best you can tell?
10       A.   Same as my note.  Here down.
11       Q.   Okay.  So I'll put another red arrow there.
12  I'll make a blue arrow this time so it won't be
13  confused.  So Ms. Blevins' note that he has tinea pedis
14  in both feet, very painful, getting worse, that's
15  beside the words "very painful", right?  That would
16  seem to indicate that the pain is getting worse.
17       A.   Correct.
18       Q.   The duration is what?  X one month.  What is
19  X one month, please?
20       A.   Times one month.
21       Q.   Times one month.  So that would be for --
22  it's been there like that for about a month?  That's
23  the way you would interpret that?
24       A.   I can't speculate.
25       Q.   You'd have to ask her, Kathy, what was
```

35

```
 1  actually said?
 2       A.   Correct.
 3       Q.   Okay.  And there's redness and dark spots and
 4  sores, right?
 5       A.   Dark spots now.
 6       Q.   Okay, yeah.  There's redness, dark spots now
 7  and sores.
 8       A.   Correct.
 9       Q.   And then it's -- it says previous TX,
10  previous treatment, out beside that it's got the cic --
11       A.   Ciclopirox.
12       Q.   Ciclopirox gel that you had prescribed.
13       A.   Correct.
14       Q.   And he noted at this point in time that under
15  digits and nails, black what?
16       A.   Eschars.
17       Q.   What does that mean?
18       A.   Necrotic skin.
19       Q.   Okay.  Black necrotic skin on the toes,
20  nonpalpable pedal pulse, meaning he could not detect a
21  pulse in his -- on the top of his foot.
22       A.   Correct.
23       Q.   And he came up with a diagnosis.  And what is
24  this right here?
25       A.   BL?  It looks like BL.
```

36

```
 1       Q.   Do you know what BL would mean?
 2       A.   We'd have to ask him.
 3            MR. TIPLER:  Okay.
 4       A.   Perhaps bilateral, but --
 5       Q.   Okay.  Okay.  Bilateral.  That would be both
 6  feet, right, if that's --
 7       A.   Correct.
 8       Q.   Bilateral means both feet.
 9       A.   Correct.
10       Q.   Digital necrosis ischemia, correct?
11       A.   Correct.
12       Q.   Admit to hospital for vascular workup,
13  correct?
14       A.   Correct.
15       Q.   And Dr. Bourgeois immediately got Dr. Steven
16  Taylor involved, who is a vascular specialist here
17  almost next door, right?
18       A.   Correct.
19       Q.   Okay.  And you understand that he was then
20  immediately admitted to the hospital and ended up
21  losing both legs as a result of lack of blood flow to
22  the lower extremities, right?
23       A.   Correct.
24       Q.   You would agree that if you acknowledge now
25  that this likely was a lack of blood profusion on July
```

37

1  **9, 2014, you would look pretty bad for not checking the**
2  **pedal pulses, for not having a venous Doppler**
3  **performed, and/or not referring Jimmy to a vascular**
4  **specialist.**
5           MR. KING:  Object to the argumentative nature
6  of that question.  You can answer if you can.
7           THE DEPONENT:  Ask the question again.
8           MR. TIPLER:  Okay.  Could you read it back to
9  him, please, ma'am?
10          (Whereupon the last question is read back by
11 the reporter.)
12          MR. KING:  Same objection.  Same objection.
13 Go ahead.
14          THE DEPONENT:  If -- if I acknowledge now?
15          MR. TIPLER:  Yeah.  If you acknowledge now.
16          THE DEPONENT:  I don't know how to answer
17 that.  That's --
18          MR. TIPLER:  You're saying you don't know if
19 you can answer that?
20          MR. KING:  I believe he's saying that he's
21 not -- he's not understanding the question.  If you
22 want to rephrase it.
23          THE DEPONENT:  I understand the question.
24 I'm not acknowledging that.  I don't know how to answer
25 a question when I'm not -- that's not a fact.

38

1      Q.   Okay.  But if it -- if you acknowledged that,
2  **if you acknowledged, if you said well, this likely was**
3  **a lack of profusion, then it would be appropriate to**
4  **refer the patient to a vascular specialist, would it**
5  **not?**
6           MR. KING:  Object to the form.  When?
7      Q.   At any point.  If a patient has lack of
8  profusion --
9           MR. KING:  At any point --
10     Q.   Let's just talk about Jimmy Marlowe.  If
11 **Jimmy Marlowe, if you thought he had lack of profusion**
12 **to his feet, what would the appropriate thing to do --**
13 **what would be the appropriate thing to do?**
14     A.   To get him to a vascular surgeon for a
15 workup.
16     Q.   Okay.  That's what you would do, rather than
17 **have a venous Doppler performed yourself or perform one**
18 **yourself; you would get him to a vascular specialist.**
19     A.   Yes.
20     Q.   Okay.  And I talked with you earlier about
21 **pedal pulses and other pulses in the lower extremity.**
22 **That's not something you typically check as a**
23 **dermatologist; am I understanding that to be the case?**
24     A.   Correct.
25     Q.   So that's not something that you would do if

39

1  you thought somebody maybe had a lack of profusion.
2  You would, rather than check the pedal pulse, you would
3  just get them to a vascular person who knows about that
4  kind of thing?
5      A.   Depends on the case.
6      Q.   Okay.  You do know how to check pedal pulse.
7      A.   Sure.
8      Q.   Okay.  Have you seen a person with gangrene
9  of the feet?
10     A.   Yes.
11     Q.   Have you seen a person that -- an individual
12 who had lack of profusion to their feet that hadn't
13 gotten to the point of gangrene?
14     A.   Yes.
15     Q.   And have you seen -- seen a person's feet
16 that has lack of profusion?
17     A.   Yes.
18     Q.   Okay.  And it goes from red to bluish or
19 darker colored to black, kind of, and then --
20     A.   The --
21     Q.   -- gets worse from there?
22     A.   We look for the blue and black.
23     Q.   Okay.  Okay.  That's what you're focused on,
24 the blue and black.
25     A.   Correct.

40

1      Q.   Okay.  And you don't recollect seeing blue
2  and black when you saw Jimmy Marlowe on July 9th.
3      A.   Correct.
4      Q.   Or do you?
5      A.   No, I don't recollect.  Correct.
6      Q.   If you had seen blue and black on July 9th,
7  would you have -- blue or black, let me back up.
8           If you had seen blue or black on his feet, on
9  his toes, would you have referred him to a vascular
10 specialist?
11     A.   Yes.
12     Q.   Would you have referred him to Dr. Taylor?
13     A.   Perhaps.
14     Q.   He's close by, right?
15     A.   Correct.
16     Q.   Other vascular surgeons here or vascular
17 specialists that you might go to?
18     A.   I think he has a partner now.
19          MR. TIPLER:  Okay.  Okay.  I think that's all
20 I have.  I thank you for your time.
21          MR. CHEEK:  Thank you, Doctor.  We're good.
22          THE DEPONENT:  Is that it?
23          VIDEOGRAPHER:  The time is 12:48 p.m.  This
24 concludes Tape No. 1 and the deposition of Dr.
25 Henderson.  We are off the record.

```
 1          FURTHER THE DEPONENT SAITH NOT,
 2          Deposition concluded 12:48 p.m.
```

                                            42
```
 1            C E R T I F I C A T E
 2  STATE OF ALABAMA
 3  COUNTY OF SHELBY
 4          I, Karen Davis, hereby certify that the
 5  above and foregoing deposition was taken down by me on
 6  Computerized Stenotype, and the questions and answers
 7  thereto were transcribed by me, and that the foregoing
 8  represents a true and correct transcript of the
 9  deposition given by said witness upon said hearing.
10          I further certify that I am neither of
11  counsel nor of kin to the parties in the action, nor am
12  I anywise interested in the result of said cause.
13
14      _/s/ KAREN DAVIS_____
15      KAREN DAVIS, CCR
16      ACCR #491
17      ACCR Expires 9/30/2018
18      Notary Commission Expires 1/31/2022
```

## 0

**08** 3:15

## 1

**1 [12]** 3:10, 3:15, 8:7, 11:17, 11:25, 12:3, 13:22, 17:17, 21:14, 23:13, 34:4, 40:24
**1/31/2022** 42:18
**10 [2]** 1:21, 3:5
**100 [2]** 2:5, 2:21
**1022 [2]** 1:20, 11:10
**104** 2:5
**10th** 4:7
**11:58 [2]** 1:22, 4:8
**12** 3:10
**12:48 [2]** 40:23, 41:2
**1801** 2:13
**1:17-CV-00309-VE** 1:9
**1:17-CV-00309-VE** 4:5
**1st [2]** 1:20, 11:11

## 2

**2 [3]** 3:11, 12:10, 12:11
**201** 11:12
**2014 [10]** 7:9, 8:3, 8:14, 9:17, 9:25, 10:6, 10:11, 10:16, 12:12, 37:1
**2018 [2]** 1:21, 4:7
**205 [4]** 2:7, 2:15, 2:16, 2:23
**23rd** 2:5
**24** 3:11
**244-2104** 2:15
**244-2140** 2:16
**27** 3:12

## 3

**3 [2]** 3:12, 27:18
**30th [2]** 13:25, 14:10
**31st [3]** 14:10, 33:19, 33:23
**328-6800** 2:7
**35203** 2:14
**35209** 2:22
**35233** 2:6

## 4

**491** 42:16

## 5

**5** 3:4

## 7

**7/9/14** 3:15
**7th** 2:21

## 8

**868-6050** 2:23

## 9

**9 [2]** 12:12, 37:1
**9/30/2018** 42:17
**9th [13]** 7:9, 8:3, 8:14, 9:17, 9:25, 10:6, 10:11, 10:16, 13:21, 14:8, 14:15, 40:2, 40:6

## A

**a.m [2]** 1:22, 4:8
**according [7]** 12:9, 13:20, 13:21, 15:22, 18:5, 20:12, 33:13
**ACCR [2]** 42:16, 42:17
**accurate** 20:14
**aching [2]** 29:21, 29:23
**ack@starneslaw.c** 2:23
**acknowledge [3]** 36:24, 37:14, 37:15
**acknowledged [2]** 38:1, 38:2
**acknowledging** 37:24
**action [4]** 1:8, 4:5, 4:19, 42:11
**active** 17:15
**additional [2]** 11:21, 11:22
**Admit** 36:12
**admitted** 36:20
**advised** 32:12
**affected [2]** 24:22, 25:7
**against [2]** 31:9, 32:11
**agree [7]** 26:5, 27:1, 27:9, 27:13, 27:14, 33:1, 36:24
**ahead** 37:13
**al** 4:4
**Alabama [11]** 1:2, 1:19, 1:21, 2:6, 2:14, 2:22, 4:3, 4:9, 5:11, 5:15, 42:2
**Alabaster [4]** 1:21, 4:9, 11:14, 12:12
**Allen [2]** 2:19, 4:18
**America [2]** 1:11, 4:5
**American** 5:16
**amputations** 31:13
**and/or** 37:3
**ankle [2]** 30:22, 31:2
**answers** 42:6
**anti-fungal [3]** 9:10, 28:24, 28:24
**anywise** 42:12
**apologize** 24:14
**APPEARING [3]** 2:2, 2:9, 2:18
**appears [3]** 12:1, 21:21, 24:15
**appropriate [3]** 38:3, 38:12, 38:13
**approximately [3]** 5:23, 12:16, 17:8
**argumentative** 37:5
**arrow [4]** 19:20, 19:22, 34:11, 34:12
**artery** 31:10
**article** 3:11
**asking [3]** 6:9, 20:17, 27:21
**assigned** 32:12
**assistant [3]** 2:12, 13:5, 34:6
**assistants** 13:17
**athlete** 25:23
**athlete's [8]** 7:6, 24:5, 24:7, 25:10, 25:14, 25:17, 25:20, 29:11
**athletic** 25:25
**attention** 7:9
**attorneys [2]** 2:12, 4:9
**Avenue** 2:13
**awhile** 30:25

## B

**bad** 37:1
**Balding** 17:12
**become [3]** 14:9, 14:17, 14:19
**begin** 34:9
**beginning [2]** 29:19, 32:14
**begins** 19:5
**behalf [6]** 2:2, 2:9, 2:18, 4:12, 4:14, 4:16
**behind [3]** 30:22, 31:2, 31:2
**beside [6]** 22:15, 22:16, 23:2, 23:13, 34:15, 35:10
**best [2]** 31:13, 34:9
**bilateral [3]** 36:4, 36:5, 36:8
**billing** 12:4
**Birmingham [3]** 2:6, 2:14, 2:21
**bit** 16:10
**BL [3]** 35:25, 35:25, 36:1
**black [11]** 33:25, 34:1, 35:15, 35:19, 39:19, 39:22, 39:24, 40:2, 40:6, 40:7, 40:8
**Blevins [2]** 34:7, 34:13
**blisters** 25:4
**block** 6:10
**blood [6]** 9:17, 9:22, 9:25, 30:8, 36:21, 36:25
**blue [7]** 34:12, 39:22, 39:24, 40:1, 40:6, 40:7, 40:8
**bluish** 39:18
**board [3]** 5:14, 5:15, 5:16
**body** 8:23
**booklet** 26:23
**Bourgeois [14]** 13:23, 13:24, 13:25, 14:6, 14:9, 14:17, 15:1, 30:2, 30:3, 31:11, 33:13, 33:15, 34:9, 36:15
**breaks** 24:20
**bringing** 31:9
**Brookwood** 2:21
**bumps** 24:25
**Byrd** 2:25

## C

**C-I-C-L-O-P-I-R-** 29:2
**can't [7]** 7:24, 16:5, 16:5, 21:3, 29:1, 31:24, 34:24
**care [3]** 5:8, 5:21, 6:17
**carrier [4]** 32:9, 32:19, 33:9, 33:12
**case [12]** 8:22, 8:24, 26:2, 31:5, 31:6, 31:25, 32:1, 32:15, 32:17, 32:20, 38:23, 39:5
**Cassie** 34:7
**categories** 21:24
**cause** 42:12
**CC [2]** 17:17, 17:18
**CCR [2]** 1:18, 42:15
**Central** 4:8
**certification** 5:18
**certifications** 5:14
**Certified** 1:18
**certify [2]** 42:4, 42:10
**change** 20:12
**chart [12]** 3:10, 6:24, 7:1, 9:14, 12:2, 12:2, 13:21, 14:22, 21:14, 22:1, 22:1, 33:24
**check [4]** 30:12, 38:22, 39:2, 39:6
**checking** 37:1
**Cheek [16]** 2:10, 3:4, 4:12, 4:12, 4:25, 5:1, 7:3, 7:23, 8:5, 8:9, 8:18, 10:20, 11:19, 11:24, 23:4, 40:21
**Chief** 17:19
**cic** 35:10
**Ciclopirox [4]** 9:10, 29:2, 35:11, 35:12
**circulation** 9:25
**Civil [3]** 1:8, 1:17, 4:5
**clinic** 14:24
**clip** 12:6
**close** 40:14
**closed** 12:24
**colored** 39:19
**commence** 4:1
**commencing** 1:22
**Commission** 42:18
**Commissioner** 1:19
**common [3]** 7:5, 7:6, 27:6
**commonly** 24:4
**complain [2]** 9:11, 9:14
**complained** 9:8
**complaining [4]** 18:12, 18:17, 18:18, 27:23
**complaint [3]** 17:19, 18:9, 20:11
**complaints [2]** 20:12, 20:15
**complete [2]** 12:1, 12:2
**completely** 27:11
**complies** 8:12
**Computerized** 42:6
**concern** 10:4
**concerns** 31:5
**concluded** 41:2
**concludes** 40:24
**condition [7]** 8:16, 8:25, 9:1, 21:19, 29:9, 33:20, 33:22
**conference** 11:11
**confused** 34:13
**contacted** 32:9
**contends** 31:16
**continue** 6:15
**correct [56]** 12:5, 12:6, 13:12, 12:15, 14:1, 14:14, 14:23, 15:4, 15:6, 16:9, 16:10, 17:21, 17:22, 18:14, 18:17, 18:20, 18:22, 19:24, 20:8, 20:22, 21:20, 23:1, 23:6, 23:18, 23:20, 24:6, 24:9, 27:5, 27:7, 27:16, 28:13, 28:15, 29:7, 29:10, 29:23, 30:11, 30:19, 34:17, 35:2, 35:8, 35:13, 35:22, 36:7, 36:9, 36:10, 36:11, 36:13, 36:14, 36:18, 36:23, 38:24, 39:25, 40:3, 40:5, 40:15, 42:8
**couldn't [2]** 25:21, 30:6
**counsel [4]** 8:6, 11:19, 33:7, 42:11
**County [2]** 15:5, 42:3
**Court [4]** 1:1, 1:18, 4:2, 4:23
**cracked [7]** 18:2, 18:6, 18:8, 18:13, 18:15, 22:5, 22:10
**cramps** 9:12
**cream [2]** 29:4, 29:12
**currently** 5:20

## D

**dark [3]** 35:3, 35:5, 35:6
**darker** 39:19
**date** 4:7
**dated** 3:15
**Davis [5]** 1:18, 2:20, 42:4, 42:14, 42:15
**Defendant [2]** 1:13, 2:9
**Defendant's [6]** 3:14, 8:7, 12:3, 12:9, 17:17, 34:3
**define** 28:2
**degree [2]** 20:3, 20:19
**delay** 6:17
**depends [3]** 21:5, 21:6, 39:5
**DEPONENT [8]** 2:18, 28:4, 37:7, 37:14, 37:16, 37:23, 40:22, 41:1
**deposition [14]** 1:15, 4:2, 14:20, 29:19, 31:20, 31:21, 31:22, 32:3, 32:6, 32:7, 40:24, 41:2, 42:5, 42:9
**dermatologist [5]** 5:6, 5:7, 22:23, 30:15, 38:23
**dermatology [9]** 1:20, 3:10, 4:9, 5:15, 5:15, 5:16, 11:8, 12:2, 25:18
**dermatophyte** 27:3
**dermatophytes** 24:3
**dermatophytosis** 27:6
**describe** 23:8
**description [4]** 22:8, 25:11, 25:12, 25:13
**designates** 21:25
**detect** 35:20
**diagnose** 9:7
**diagnosed** 23:7
**diagnosis** 35:23
**difficult** 16:10
**Digital** 36:10
**digits** 35:15
**direct** 7:8
**disagreed** 27:14
**disclosed** 11:20
**discuss** 20:11
**discussed [2]** 20:24, 33:14
**discussion [2]** 20:2, 21:7
**disease** 31:10
**distribution** 8:20
**District [4]** 1:1, 1:2, 4:2, 4:3
**Division [2]** 1:3, 4:3
**doctor [5]** 10:20, 10:21, 15:18, 20:17, 40:21
**doctors** 33:4
**document** 27:19
**documented** 8:1
**documents [2]** 12:4, 12:10
**door [2]** 12:24, 36:17
**Doppler [3]** 10:15, 37:2, 38:17
**double** 31:13
**Dr [19]** 1:15, 4:6, 4:18, 5:2, 8:9, 13:22, 14:6, 14:9, 14:17, 15:1, 30:1, 31:11, 33:13, 33:15, 34:9, 36:15, 36:15, 40:12, 40:24
**dull** 20:21
**duly** 4:22
**Dura** 22:6
**duration [5]** 21:25, 22:5, 22:6, 22:14, 34:18

## E

**earlier** 38:20
**edema** 25:5
**effective [2]** 29:14, 29:16
**either [2]** 6:17, 29:6
**emedicine** 3:11
**emedicinehealth** 24:12
**encounter** 7:22
**ended [2]** 15:18, 36:20
**Eschars** 35:16
**et** 4:4
**everything [6]** 7:10, 7:13, 19:3, 19:11, 19:21, 19:22
**examination [5]** 3:3, 5:1, 10:23, 12:18, 12:21
**examined** 13:7
**excuse [2]** 30:20, 34:4
**exercised** 17:15
**Exhibit [16]** 3:9, 3:14, 8:6, 8:7, 11:17, 11:25, 12:3, 12:10, 12:11, 13:22, 17:17, 21:14, 23:12, 27:18, 34:3, 34:4
**experience [2]** 6:6, 29:15
**experiencing** 9:1
**expert** 5:8
**Expires [2]** 42:17, 42:18
**extra** 11:18
**extremities** 36:22
**extremity [2]** 30:21, 38:21

## F

facilitates 27:9
facts 33:18
fair 25:13
familiar 26:9
faxed [2] 32:15, 32:21
Federal 1:17
feel 30:6
fifteen 16:14
fifth 24:20
Fifty 5:25
fine [2] 23:11, 27:1
five [5] 12:17, 15:23, 15:24, 16:6, 16:13
Floor 2:21
Florie 2:20
flow 36:21
focused 39:23
follows 4:22
foot [13] 7:6, 24:5, 24:7, 25:10, 25:14, 25:17, 25:20, 27:8, 29:11, 30:18, 30:20, 31:3, 35:21
foregoing [2] 42:5, 42:7
former 16:24
Fourteen [2] 5:13, 5:19
fourth [2] 2:13, 24:19
full 5:3
fungal 27:9
fungus [2] 8:21, 24:1

## G

gangrene [3] 10:6, 39:8, 39:13
gel [3] 29:3, 29:4, 35:12
general 31:6
generally 20:11
generating 6:16
geographic 8:20
gets 39:21
given [2] 5:23, 42:9
goes [2] 22:7, 39:18
gone 14:2
gotten [2] 9:4, 39:13
greatly 6:12
green 27:13
growth 27:9
guess [4] 6:8, 12:17, 26:11, 31:8
guessing 31:16

## H

hadn't 39:12
hair [2] 5:9, 17:12
handwriting [14] 18:23, 19:1, 19:1, 19:2, 19:4, 19:4, 19:11, 19:12, 19:15, 19:22, 19:23, 34:5, 34:8, 34:9
handy 11:18
hardship [2] 6:1, 6:6
having [5] 4:22, 20:19, 20:20, 29:1, 37:2
he's [12] 15:5, 18:12, 18:15, 18:16, 18:17, 18:18, 30:3, 31:9, 37:20, 37:20, 37:21, 40:14
health 3:11
hearing 42:9
held [2] 5:12, 5:17
Henderson [7] 1:15, 4:6, 4:19, 5:2, 5:4, 8:9, 40:25
hereby 42:4
history 22:2
hmm [4] 14:25, 23:25, 31:7, 31:7
hold [2] 5:10, 5:14
hospital [2] 36:12, 36:20
hot 25:24
HPI 22:1

## I

identification [2] 8:8, 27:20
Illness [2] 22:3, 22:4
immediately [2] 36:15, 36:20
includes [2] 12:3, 12:4
inconvenience [2] 6:1, 6:7
inconvenient [2] 6:13, 6:19
increase 24:20
indicate 34:16
indicating [4] 19:13, 19:14, 19:17, 19:18
individual 39:11
infection [3] 24:15, 24:21, 27:4
information [3] 9:3, 9:5, 32:17
insurance [2] 32:10, 32:19
interested 42:12
Internet [2] 24:11, 24:12
interpret 34:23
involved [2] 33:4, 36:16
involvement 14:12
ischemia 36:10
issues [2] 9:22, 10:1
itching [4] 27:24, 28:1, 28:6, 28:11
itchy 25:7

## J

Jason [3] 2:10, 4:12, 11:18
Jason.cheek@usdo 2:15
Jimmy [18] 1:5, 4:4, 4:17, 6:21, 10:22, 12:11, 13:20, 13:25, 14:8, 14:10, 15:14, 17:1, 17:14, 31:5, 37:3, 38:10, 38:11, 40:2
Jr 5:4
July [17] 7:9, 8:3, 8:14, 9:16, 9:25, 10:5, 10:11, 10:16, 12:12, 13:21, 13:25, 14:8, 14:10, 14:15, 36:25, 40:2, 40:6

## K

Karen [4] 1:18, 42:4, 42:14, 42:15
Kathy 34:25
kin 42:11
King [12] 2:19, 4:18, 4:18, 31:8, 32:13, 32:24, 33:10, 37:5, 37:12, 37:20, 38:6, 38:9
knee 31:2
knows 39:3

## L

lack [8] 36:21, 36:25, 38:3, 38:7, 38:11, 39:1, 39:12, 39:16
Lane 5:4
later 33:23
Laughs [2] 28:4, 30:23
Law 2:4
lawyers 10:24
layman's [4] 23:24, 24:6, 24:8, 25:11
learn [2] 31:18, 33:17
learned 32:18
least 16:13
led 31:13
legs 36:21
let's [3] 6:10, 34:2, 38:10
liability 32:19
license 35:7
licenses 5:10
likely [4] 21:24, 22:14, 36:25, 38:2
Lisa [3] 13:11, 13:12, 23:5
LLP 2:20
located 4:8
location [4] 11:10, 15:10, 15:12, 22:4
longer [4] 16:2, 16:3, 16:8, 16:16
looking 7:1
looks [4] 7:25, 12:8, 24:17, 35:25
losing 36:21
Loss 6:15
lower [3] 30:21, 36:22, 38:21
LPN 13:16

## M

ma'am 37:9
macerated [3] 24:15, 24:16, 24:17
main 15:11
malpractice [3] 32:9, 32:18, 32:25
Manual [5] 3:12, 26:6, 26:9, 26:19, 26:21
mark [2] 8:5, 11:17
marked [4] 3:9, 3:14, 8:8, 27:19
Marlowe [20] 1:5, 4:4, 4:17, 6:21, 7:11, 8:2, 8:13, 9:1, 9:6, 9:11, 10:10, 10:15, 12:11, 13:20, 16:21, 29:20, 31:5, 38:10, 38:11, 40:2
material 11:21
matter [2] 4:4, 33:14
maybe [7] 16:5, 16:16, 22:17, 32:14, 33:6, 34:2, 39:1
meaning 35:20
means [3] 8:22, 21:18, 36:8
medical [14] 3:10, 3:15, 5:10, 7:7, 7:13, 7:17, 7:20, 13:17, 25:18, 26:12, 26:12, 26:14, 28:5, 34:6
medication 28:25
meet 11:5
membranes 5:9
mention [7] 9:16, 9:24, 10:5, 27:23, 28:8, 28:11, 30:9
Merck [5] 3:12, 26:6, 26:9, 26:19, 26:21
met [2] 10:24, 11:2
mind 27:21
minutes [5] 12:17, 15:23, 15:25, 16:6, 16:13
mispronouncing 24:13
missed 31:17
missing 31:10
Mmm [4] 14:25, 23:25, 31:7, 31:7
moisture 27:8
month [14] 9:2, 9:3, 14:11, 14:19, 21:22, 21:24, 22:14, 22:19, 23:2, 34:18, 34:19, 34:20, 34:21, 34:22
morning 24:11
mucus 5:9

## N

N-I-A 23:17
nails [2] 5:9, 35:15
names [3] 4:10, 7:5, 8:24
nature 37:5
necessarily 27:14
necrosis 36:10
necrotic [2] 35:18, 35:19
neither 42:10
ninety 33:6
non-party 4:19
nonpalpable [3] 30:4, 30:5, 35:20
nor [2] 42:11, 42:11
North [2] 2:13, 11:11
Northern [2] 1:2, 4:3
Notary 42:18
notation [4] 7:10, 9:4, 20:9, 20:21
notations 20:18
note [38] 6:24, 7:1, 7:21, 7:24, 8:1, 8:10, 8:16, 8:17, 9:13, 9:14, 9:15, 9:16, 9:24, 9:25, 10:5, 13:20, 14:6, 14:6, 17:17, 18:5, 18:7, 20:7, 20:12, 21:2, 23:13, 27:23, 28:9, 28:9, 28:12, 29:4, 29:22, 30:3, 30:3, 30:9, 33:24, 34:3, 34:10, 34:13
noted [4] 8:19, 19:6, 20:15, 35:14
notes [5] 7:14, 12:5, 14:2, 14:5, 23:5
nothing 11:22
notice [7] 14:20, 31:21, 31:22, 32:3, 32:5, 32:6, 32:7
noticed 30:1
nurse [2] 13:5, 13:18
nurses 13:13

## O

object [4] 32:24, 33:10, 37:5, 38:6
objection [3] 23:4, 37:12, 37:12
observe 9:22
occur [2] 6:2, 8:23
office [6] 1:20, 11:20, 12:5, 15:7, 15:9, 26:7
offices [3] 2:4, 12:11, 26:12
oftentimes [2] 25:23, 28:19
Online 26:23
opposing 8:6
order 21:23

## P

P-3 27:19
P-E-D-I-S 23:17
p.m [2] 40:23, 41:2
Paige 2:25
pain [10] 9:12, 20:3, 20:9, 20:18, 20:19, 20:20, 20:25, 21:1, 21:7, 34:16
painful [9] 18:19, 18:21, 20:1, 20:2, 20:3, 20:10, 22:12, 34:14, 34:15
particularly 28:5
parties [2] 32:3, 42:11
partner [4] 13:22, 15:1, 15:3, 40:18
patches 24:16
patient [7] 6:9, 16:12, 16:24, 27:23, 33:18, 38:4, 38:7
patient's 18:11
patients [5] 5:20, 5:24, 6:3, 6:5, 6:18
pay 6:17
paying 6:16
PC [2] 11:8, 12:2
ped 26:25
pedal [10] 30:4, 30:5, 30:10, 30:12, 30:17, 35:20, 37:2, 38:21, 39:2, 39:6
pedial [2] 30:4, 30:5
pedis [15] 3:12, 7:4, 7:7, 8:22, 9:8, 23:17, 23:22, 23:22, 24:8,

## facilitates - recollect

23:13, 24:14, 25:16, 27:3, 29:12, 34:13
people's 25:14
percent 33:6
perform 38:17
performed [2] 37:3, 38:17
Perhaps [4] 14:11, 22:17, 36:4, 40:13
peripheral 31:10
person's 39:15
ph 25:1
photographs [3] 17:23, 17:25, 28:20
physician [5] 15:18, 22:19, 33:5, 33:6, 33:7
physicians 33:5
pictures [2] 28:17, 28:19
Pl 2:21
Plaintiff [2] 1:7, 2:2
Plaintiff's [9] 3:9, 11:17, 11:25, 12:10, 13:22, 21:14, 23:12, 27:18, 34:4
please [5] 4:10, 5:3, 8:10, 34:19, 37:9
plenty 17:12
point [4] 35:14, 38:7, 38:9, 39:13
potentially 6:10
prescribed [3] 28:22, 28:23, 35:12
present [5] 2:25, 4:10, 22:3, 22:4, 33:7
presently 15:3
previous [9] 21:11, 21:12, 21:18, 21:21, 22:16, 22:19, 23:3, 35:9, 35:10
previously [3] 11:20, 14:3, 31:17
probably 13:9
problem [2] 19:25, 21:25
Procedure 1:18
profession 5:5
professional 32:19
profusion [9] 9:17, 9:22, 36:25, 38:3, 38:8, 38:11, 39:1, 39:12, 39:16
provide 5:8
provider 33:1
providers 31:9
pruritus [3] 28:7, 28:8, 28:9
pulled 24:10
pulse [12] 30:4, 30:5, 30:6, 30:10, 30:12, 30:17, 30:17, 30:21, 35:20, 35:21, 39:2, 39:6
pulses [3] 37:2, 38:21, 38:21
pursuant 1:17
Pus 24:25
pustules [2] 24:22, 24:23

## Q

quite [2] 30:25, 33:3

## R

rash [4] 8:15, 17:18, 17:20, 18:12
rather [2] 38:16, 39:2
Reading [4] 24:14, 24:19, 25:7, 27:3
really [3] 15:25, 29:21, 32:13
reasonable 16:19
recently 7:2
recollect [14] 12:20, 12:24, 16:23, 17:1, 17:14, 21:6, 21:8, 22:18, 22:22, 29:20, 29:24, 29:25, 40:1, 40:5

**recollection [3]** 7:16, 7:18, 33:21
**record [7]** 3:15, 4:24, 7:17, 9:14, 12:8, 32:25, 40:25
**recorded** 9:20
**records [2]** 8:4, 12:4
**red [13]** 18:18, 18:21, 19:20, 19:22, 22:5, 22:6, 22:7, 22:8, 23:10, 24:15, 27:15, 34:11, 39:18
**redness [2]** 35:3, 35:6
**refer [3]** 10:10, 10:15, 38:4
**reference [2]** 26:17, 26:21
**referred [3]** 15:17, 40:9, 40:12
**referring [2]** 14:5, 37:3
**refers** 22:14
**refresh [2]** 7:16, 7:18
**rep** 33:3
**rephrase** 37:22
**reporter [4]** 1:19, 4:23, 8:8, 37:11
**represent [3]** 4:11, 4:18, 10:22
**representation** 20:14
**represented** 32:10
**represents** 42:8
**reschedule [3]** 6:2, 6:5, 6:9
**residency [2]** 25:18, 26:15
**result [2]** 36:21, 42:12
**resulting** 27:8
**revenue [2]** 6:15, 6:16
**review [3]** 19:6, 19:7, 29:21
**rid** 29:13
**ringworm [8]** 7:5, 7:5, 8:21, 23:22, 23:24, 24:7, 24:14, 25:10
**risk** 24:21
**RN** 13:14
**Robert [3]** 1:15, 4:6, 5:4
**room [4]** 11:11, 12:21, 12:22, 12:25
**rooms** 12:18
**ROS [3]** 19:9, 19:10, 19:11
**Rules** 1:17

**S**

**SAITH** 41:1
**Sarah [2]** 2:11, 4:14
**Sarah.wilson2@us** 2:16
**saying [8]** 7:20, 18:10, 18:15, 18:16, 19:21, 22:7, 37:18, 37:20
**says [10]** 9:2, 17:17, 18:8, 21:11, 21:15, 22:1, 22:4, 24:12, 33:24, 35:9
**scaly [2]** 8:19, 24:15
**seeing [2]** 14:18, 40:1
**seem [2]** 32:11, 34:16
**sharp** 20:20
**she's [2]** 13:17, 13:18
**Shelby [7]** 1:20, 3:10, 4:8, 11:8, 12:2, 15:5, 42:3
**shoes [2]** 25:25, 25:25
**short [2]** 17:4, 19:11
**shorter [3]** 16:4, 16:9, 16:10
**shouldn't** 16:6
**showed [2]** 7:17, 7:20
**sides** 24:21
**single [2]** 6:3, 6:6
**sixty** 5:25
**skin [8]** 5:8, 18:13, 24:16, 24:18, 24:20, 25:7, 35:18, 35:19
**slough** 24:18
**soles** 24:21
**somebody [2]** 13:2, 39:1
**Someone** 32:21

**sores [2]** 35:4, 35:7
**South** 2:5
**Southern [2]** 1:3, 4:3
**specialist [5]** 36:16, 37:4, 38:4, 38:18, 40:10
**specialists** 40:17
**specific** 7:22
**specifically [3]** 7:8, 24:3, 29:20
**speculate [5]** 16:5, 21:3, 25:21, 26:1, 34:24
**spots [3]** 35:3, 35:5, 35:6
**staff** 6:16
**stands** 23:9
**Starnes** 2:20
**starts [2]** 19:12, 19:18
**state [3]** 4:10, 5:11, 42:2
**statement** 27:10
**States [7]** 1:1, 1:11, 2:12, 4:2, 4:5, 4:13, 4:15
**statutory** 33:1
**Stenotype** 42:6
**Steve [2]** 4:16, 10:21
**Steven [2]** 2:3, 36:15
**steventipler@gma** 2:7
**stipulations** 4:23
**stops** 19:4
**Street [3]** 1:20, 2:5, 11:11
**suit** 31:9
**Suite [2]** 2:5, 11:12
**supposed** 29:8
**surgeon [2]** 10:11, 38:14
**surgeons** 40:16
**swear** 4:20
**sweating** 27:8
**sweaty** 25:24
**Swelling** 25:6
**sworn [2]** 4:22, 33:4
**symptom** 22:12
**Symptoms** 22:5
**sync** 21:23
**systems [2]** 19:7, 19:7

**T**

**T-E** 23:13
**T-I [2]** 23:14, 23:15
**T-I-N-I-A** 23:16
**taken [2]** 1:17, 42:5
**taking** 33:4
**tall** 17:4
**Tape** 40:24
**Taylor [2]** 36:16, 40:12
**tears** 24:20
**telling [3]** 22:18, 22:22, 22:23
**tells** 32:3
**ten [5]** 12:17, 15:23, 15:24, 16:6, 16:14
**tennis** 25:25
**term [4]** 7:7, 23:24, 24:6, 28:5
**terms [2]** 7:6, 24:8
**testifies** 4:22
**testify** 6:11
**testimony** 33:4
**text** 26:11
**thank [6]** 5:2, 5:17, 8:13, 10:20, 40:20, 40:21
**there's [10]** 11:22, 20:6, 20:9, 20:21, 28:5, 28:8, 28:11, 30:9, 35:3, 35:6
**thereto** 42:7
**they'll** 25:23
**they're** 18:15
**thing [3]** 38:12, 38:13, 39:4
**thinking** 16:12
**thirty** 5:22
**though** 32:11
**thousand** 5:22
**throbbing [2]** 20:21, 20:25

**Thursday [2]** 21:21, 21:24
**tinea [22]** 3:12, 7:4, 7:7, 8:21, 8:21, 8:22, 8:23, 9:8, 23:8, 23:9, 23:20, 23:21, 23:22, 24:8, 24:13, 24:14, 25:16, 26:5, 26:25, 27:3, 29:12, 34:13
**tini** 23:20
**Tipler [33]** 2:3, 2:4, 3:5, 4:16, 4:16, 10:21, 10:21, 10:23, 11:16, 11:22, 12:7, 13:10, 16:18, 22:9, 22:11, 22:13, 23:25, 24:2, 25:15, 27:17, 28:3, 30:7, 31:7, 31:12, 31:15, 32:8, 32:16, 32:23, 36:3, 37:8, 37:15, 37:18, 40:19
**today [2]** 4:6, 5:2
**Today's** 4:7
**toes [5]** 24:20, 33:25, 34:1, 35:19, 40:9
**top [6]** 18:11, 18:24, 30:17, 31:3, 34:5, 35:21
**topical [2]** 9:10, 28:24
**touched** 29:24
**training** 26:3
**transcribed** 42:7
**transcript** 42:8
**treat [2]** 6:23, 9:9
**treated [2]** 6:20, 6:25
**treating [4]** 7:11, 33:5, 33:5, 33:7
**treatment [7]** 21:15, 21:18, 21:21, 22:16, 23:3, 29:14, 35:10
**treatments** 21:12
**trial** 6:11
**tried** 30:25
**true** 42:8
**type** 20:20
**typically [6]** 8:20, 20:6, 21:1, 30:14, 30:16, 38:22

**U**

**uncomfortable** 25:8
**underlined [2]** 27:13, 27:15
**understand [3]** 6:8, 36:19, 37:23
**understanding [5]** 25:22, 31:4, 31:6, 37:21, 38:23
**United [7]** 1:1, 1:11, 2:12, 4:2, 4:4, 4:13, 4:15
**upon** 42:9
**upstairs** 11:11
**usually [6]** 13:1, 13:2, 13:2, 13:6, 16:12, 29:13
**utilized** 26:11

**V**

**VA** 31:10
**vascular [11]** 10:10, 36:12, 36:16, 37:3, 38:4, 38:14, 38:18, 39:3, 40:9, 40:16, 40:16
**venous [2]** 37:2, 38:17
**version** 29:5
**Vesicles [2]** 25:2, 25:3
**vessels** 30:8
**Videographer [4]** 2:25, 4:1, 4:20, 40:23
**videotaped [2]** 1:15, 4:1
**Virginia [4]** 4:17, 10:22, 16:21, 16:23
**Visils** 25:1
**visit [3]** 8:13, 9:11, 29:20
**visited** 8:2
**visually [2]** 7:25, 7:25

**W**

**walked** 17:15
**walking** 9:12
**wanting** 6:18
**wants** 24:18
**Wayne [3]** 1:5, 4:4, 6:21
**We'd** 36:2
**we're [4]** 11:10, 11:10, 32:24, 40:21
**weeks [2]** 14:18, 33:23
**weighed** 17:6
**wet** 25:24
**wettish** 24:17
**what's [2]** 5:5, 24:24
**Whereupon [3]** 8:7, 27:19, 37:10
**whether [6]** 12:24, 17:1, 17:10, 17:14, 18:15, 20:20
**whose [2]** 19:1, 34:4
**wife [4]** 10:22, 16:23, 22:22, 22:25
**Wilson [3]** 2:11, 4:14, 4:14
**witness [4]** 4:6, 4:20, 8:12, 42:9
**won't** 34:12
**wondering** 32:2
**works** 15:7
**workup [2]** 36:12, 38:15
**worse [3]** 34:14, 34:16, 39:21
**wouldn't [5]** 6:16, 7:21, 21:4, 30:14, 30:16
**writing** 29:1
**written** 23:2
**wrong** 23:20
**wrote [3]** 9:4, 19:25, 20:13

**Y**

**y'all's** 15:9
**Yates [8]** 13:11, 13:12, 19:2, 19:17, 19:23, 20:13, 28:15, 28:16
**yeah [5]** 7:19, 16:17, 28:7, 35:6, 37:15
**You'd** 34:25
**young** 17:10
**yours [2]** 16:24, 19:18
**yourself [3]** 8:10, 38:17, 38:18