FILED

2018 Dec-03  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Attachment 18

Deposition Transcript of Dr. Taylor

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ALABAMA
 3               SOUTHERN DIVISION
 4
 5  JIMMY WAYNE MARLOWE,
 6
 7      Plaintiff,
 8                          CIVIL ACTION NO.:
 9       VS.            1:17-CV-00309-VEH
10
11  UNITED STATES OF AMERICA,
12
13      Defendant.
14
15          DEPOSITION OF DR. STEVEN TAYLOR
16
17          Taken pursuant to Federal Rules of Civil
18  Procedure before KAREN DAVIS, CCR, Certified Court
19  Reporter and Commissioner for Alabama at Large, at the
20  office of Alabama Vascular Solutions, 632 2nd Street
21  N.E., Alabaster, Alabama, on Wednesday, October 3,
22  2018, commencing at 2:20 p.m.
23
24
25
```

**Page 2**

```
 1          A P P E A R A N C E S:
 2
 3  APPEARING ON BEHALF OF THE PLAINTIFF:
 4      Mr. Steven D. Tipler
 5      Tipler Law Offices
 6      104 23rd Street South
 7      Suite 100
 8      Birmingham, Alabama  35233
 9      (205) 328-6800 * steventipler@gmail.com
10
11
12  APPEARING ON BEHALF OF THE DEFENDANT:
13      Mr. Jason Cheek
14      Assistant United States Attorney
15      1801 Fourth Avenue North
16      Birmingham, Alabama  35203
17      (205) 244-2104 * Jason.Cheek@usdoj.gov
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1               I N D E X
 2
 3  EXAMINATION BY:                    PAGE NO.
 4  Mr. Cheek                             4
 5
 6
 7            E X H I B I T S
 8  PLAINTIFF'S EXHIBIT NO.              MARKED
 9      [None offered.]
10
11  DEFENDANT'S EXHIBIT NO.              MARKED
12  1    Email dated 4/2/2018              20
13  2    Three color photos               30
14  3    Memo of Dr. Taylor, 5/9/16       39
15  4    VA medical records               43
16  5    C.V. of Dr. Taylor               53
17  6    Coosa Valley record              53
18  7    Podiatry Associates report, 5/15/14  57
19  8    Southern Pain Specialists record  58
20  9    Record of Dr. Pinson dated 6/2/14  58
21  10   Records of Dr. Taylor            70
22
23
24
25
```

**Page 4**

```
 1     D R.  S T E V E N   T A Y L O R, Sworn.
 2  EXAMINATION BY MR. CHEEK:
 3     Q.   Good afternoon, Dr. Taylor.  My name is Jason
 4  Cheek.  I'm an Assistant United States Attorney and I
 5  represent the defendant, the United States, in this
 6  matter.
 7          I'm going to ask you some questions today in
 8  the form of a deposition.  Have you been deposed
 9  before?
10     A.   Yes.
11     Q.   Okay.  How many times?
12     A.   Roughly two or three, I think.
13     Q.   Let's just go over some ground rules just to
14  make sure we're on the same page.  If you don't
15  understand the question, just let me know; I'm happy to
16  rephrase.
17     A.   Okay.
18     Q.   I'm going to need verbal answers.  So far
19  you're doing well.
20     A.   Thank you.
21     Q.   Basically no head shakes, mmm hmm, uh-uh,
22  that kind of thing.  So if I ask you to clarify, I'm
23  not trying to be rude; I just have to make a record.
24     A.   Okay.
25     Q.   Please allow me to complete the question
```

5

1  before you answer, it makes Karen's job a lot easier if
2  we're not talking over one another.  If you need a
3  break, just let me know.  Are you on any medications
4  today?
5      A.    Blood pressure medicine.
6      Q.    Okay.  That wouldn't affect your ability to
7  testify truthfully or accurately today to your
8  knowledge?
9      A.    That's correct.
10     Q.    And your full name is Steven Mitchell Taylor?
11     A.    Correct, with a V.
12     Q.    First name is spelled with a V, correct?
13     A.    Yes.
14     Q.    I want to start by going through the opinions
15  that you have in this case.  Can you please list any
16  opinions you hold related to Mr. Marlowe in this case?
17     A.    Well, yes, I can.  It appears that he had
18  chronic ongoing embolization to both lower extremities
19  which resulted in tissue loss and critical limb
20  ischemia in both legs.  I attempted to perform a limb
21  salvage procedure on his left leg.  I believe it was
22  his left leg.  Hold on.  Let me check and make sure I
23  have that.  Correct, his left leg first.  It was
24  unsuccessful, and after that failure, we went to
25  primary amputation on the right leg.  Did not attempt

6

1  limb salvage for the right leg.
2      Q.    Okay.  And so what — what opinions do you
3  hold with respect to that medical issue?
4      A.    I don't — I don't understand.  Could you be
5  more specific, I guess?  I'm not sure what you're
6  asking me.
7      Q.    Sure.  Do you have any opinions related to
8  how that embolization progressed, the timeline?
9      A.    I think it was probably a — well, first of
10  all, let me first say that embolization is often very
11  difficult to diagnose.  And I think in this situation
12  he was presenting with symptoms and I think the
13  diagnosis was likely missed, and it delayed his
14  ultimate presentation to me and that may have
15  contributed to his failure and ultimately to his
16  amputations.
17     Q.    So I want to — before we get to your other
18  opinions, I want to focus in on the one part you just
19  stated which you think he had — and please correct me
20  if I'm wrong; I'm not trying to put words in your
21  mouth.
22     A.    Okay.
23     Q.    And I'm not a doctor, in case that was not
24  abundantly clear yet.  But you think that he had an
25  embolization problem that was initially misdiagnosed.

7

1      A.    Correct.  I won't say misdiagnosed.
2      MR. CHEEK:  Okay.
3      A.    It was not diagnosed, is a better way of
4  saying it.
5      MR. CHEEK:  Okay.
6      A.    It was not appreciated initially.  And quite
7  frankly, I was a bit surprised when I made the
8  diagnosis, too.  It's a very difficult diagnosis to
9  make.  And so when I first saw him, I thought that we
10  were looking at routine occlusive disease.  But when I
11  was working him up and realized that we were dealing
12  more with an embolization problem, which accelerates
13  sort of the tissue loss, and your body adapts to a
14  slowly-progressing occlusive disease better than it
15  would to more of an abrupt onset of ischemia which is
16  what you get in embolization.
17     Q.    When do you believe this initial — I don't
18  want to call it misdiagnosis, but I think you said
19  failure to diag — missed diagnosis occurred?
20     A.    Yes.  Yes.
21     Q.    Missed diagnosis occurred.
22     A.    I don't know for sure.  Initially the way he
23  presented to me was through a local dermatologist.  He
24  had gone and seen him about a month before I saw him.
25  He was seen by the dermatologist and was treated for a

8

1  fungal infection for his feet for a month.  Came back
2  to see — to see the dermatologist and he actually saw
3  his partner at that time and his partner saw his feet,
4  did not think that this was a fungal problem and
5  thought it was more of an ischemic problem and had him
6  admitted to the hospital through one of the
7  hospitalists and then I was consulted.
8          So initially my thought is that we were
9  looking at a month, around a month, but then come to
10  find out that it was — he was actually seen by
11  surgeons or physicians at the VA with similar problems.
12     Q.    And what do you mean by similar problems?
13     A.    Well, same presenting symptoms.  I'm assuming
14  they weren't as bad, with lesions on the feet, on both
15  feet, and diminished perfusion.
16     Q.    Are you aware of any treatment that occurred
17  between the VA saw Mr. Marlowe and when that
18  dermatologist saw Mr. Marlowe?
19     A.    No.
20     Q.    You're not familiar with — so your opinions
21  are based on what you've been told about the VA or what
22  you viewed related to the VA records and what you know
23  about his treatment at the dermatologist approximately
24  one month before you saw him initially?
25     A.    That's correct.

9

**Q.     You mentioned that emboli is difficult to diagnose?**

A.     Yes.  It presents — it's not necessarily always a straightforward presentation.

**Q.     Okay.  And just explain to me what you mean by that.  Why is it difficult to diagnose?  What does — it's not always a straightforward presentation; what does that mean?**

A.     Well, it can be — it can be — again, it can look like chronic occlusive disease such as this problem here.  It's not always very apparent that it's embolization.  There's not sort of pathognomonic signs that tell you if you see this it's emboli.

**Q.     If you have this embolization problem, how long does it develop?  Does it develop over years?  Hours?  Weeks?  Months?**

A.     Well, it depends on the size of the emboli, basically.

MR. CHEEK:  Okay.

A.     Okay?  So larger emboli occlude in larger vessels which would cause more of the limb to be ischemic.  And those are seen or those are, you know, become apparent that there's a problem very quickly.  People that are having small microemboli, very small particles that are going and slowly cause occlusive

11

goes downstream over years.  And so each individual event is not necessarily catastrophic enough to, you know, even make the patient that aware of it or a physician that aware of it.  But over time, it builds up into the — in the blood vessels and occludes the blood vessels over time to the point where it gets to a critical point and you start having tissue loss or you don't have enough blood flow, enough perfusion to keep the tissues alive.

**Q.     Is it possible that those microemboli can accumulate over the period of several months before you have this catastrophic — and we would all agree that gangrene and, you know, death of toes in lower extremities is catastrophic.**

A.     Yes.  Yes.

**Q.     So back to my question.  Is it possible that those microemboli could accumulate over several months?**

A.     Yes.

**Q.     Okay.  Is it probable that those microemboli in Mr. Marlowe's case developed over several months —**

A.     Yes.

**Q.     — before you saw him?**

A.     Yes.

**Q.     And how many months would they have accumulated in your best guess?**

10

disease over time, which is what's happened in this situation, it's not nearly as apparent.  So it can be, you know, some just — something as simple as pain and discoloration but not — but something that doesn't look profoundly ischemic.  It can look like any number of — any number of diseases that aren't necessarily vascular.

**Q.     So you said that you believe Mr. Marlowe's condition was more akin to a microemboli?**

A.     Yes.  I think he was having small microemboli over long periods of time and that's how — basically it filled up all his distal downstream blood vessels all the way up.  So —

MR. CHEEK:  Okay.

A.     — it wasn't like a large emboli that was wedged in the femoral artery in the groin, so to speak, or the popliteal artery at the knee that suddenly occludes the blood vessels from the groin down or the knee down.  He had small microparticles going downstream that caused less severe symptoms that built up over time.

MR. CHEEK:  Okay.

A.     It's very similar to what you see in patients that say have popliteal aneurysms and they have a clot that builds up in their aneurysm and the clot slowly

12

A.     It would be very difficult for me to give a reasonable answer to that.  That's not possible for me to give an answer to that.  I would say that given the complete lack of any what we would call named blood vessels below lower leg, below just above the ankle, the fact that he had none of those present on arteriogram leads me to believe that this was a very chronic problem.  In other words, if that happens quickly, then the foot dies very, very quickly and again he would — it would be more noticeable than what it was in this situation.  So because of the amount of emboli there, it leads me to believe that this was a slow ongoing process.

**Q.     But you can't say whether that slow ongoing process lasted for a couple months or six months?**

A.     No, or twelve months or eighteen months.

**Q.     Okay.  Just don't — just can't say.**

A.     Can't say.  It mean, it could have been an ongoing problem that's been for twelve, eighteen months, two years.

**Q.     Okay.  Do you hold any other opinions in this case that we have not discussed up until this point?**

A.     I don't think — none — none that we haven't discussed.  I think you have all of my opinions.

**Q.     Okay.  Now, in forming the opinions that we**

1 discussed today, can you tell me what you reviewed in
2 terms of medical records and medical texts, if you did
3 so?
4     A.     Well, I reviewed all of my medical records as
5 well as some of the — some records that were provided
6 by Mr. Marlowe's attorney.
7     Q.     Mr. Tipler.
8     A.     Yes.
9     Q.     And do you have those records that Mr. Tipler
10 provided to you?
11     A.     I don't.  I think it was more of a — it was
12 a — in a meeting that he showed me pictures and that
13 sort of thing.
14     Q.     But you have a recollection of that meeting.
15     A.     Yes.
16     Q.     Would it be fair to say that the records you
17 looked at in that meeting were VA medical records?
18     A.     I believe they were.
19     Q.     Okay.  Did you look at records from the
20 dermatologist we mentioned earlier today —
21     A.     No.
22     Q.     — during that meeting?
23     A.     No.
24     Q.     Did you look at any other records during that
25 meeting aside from the VA medical records?

1     A.     No.  Not to my recollection, no.
2     Q.     Would it be fair to say that that set of VA
3 medical records that you looked at was approximately
4 twenty-five pages?
5     A.     I don't remember, to be honest.
6     MR. CHEEK:  Okay.
7     A.     It was not extensive.
8     Q.     Okay.  Did you review any journals,
9 treatises, any other publications in forming your
10 opinions?
11     A.     No.
12     Q.     What sources do you typically review as part
13 of your practice?
14     A.     You know, typical vascular surgery journals,
15 often refer to vascular surgery texts.  Rutherford is
16 one that I refer to a lot.  I still look at surgical
17 atlases.
18     Q.     Okay.  We had — we talked earlier about one
19 assumption that you made in forming your opinion, and
20 please correct me again if I'm wrong.  That assumption
21 being that, or at least maybe it wasn't an assumption,
22 I don't know.  You let me know.  That you're not aware
23 of the treatment that occurred between when the VA saw
24 Mr. Marlowe in March of 2014, anything that occurred
25 between that date and when Mr. Marlowe saw that

1 dermatologist a month before you saw him.
2     A.     No.  I was not aware of that and I believe to
3 my best recollection Mr. Tipler is the one who informed
4 me that he was seen by the VA.  The patient didn't even
5 — I don't believe the patient told me that.
6     Q.     Okay.  And so in forming your opinions, did
7 you make any assumptions as to what may or may not have
8 happened between that March time frame and the month
9 before you saw him?
10     A.     I didn't make any assumptions, no.
11     Q.     Okay.  But you didn't consider that he saw
12 another third party private primary care physician
13 because you didn't have that knowledge.
14     A.     Correct.
15     Q.     You didn't have any knowledge that he saw a
16 podiatrist in that interim period.
17     A.     I was unaware of that.
18     Q.     Would you have liked to have known that
19 information prior to forming opinions in this case?
20     A.     No.
21     Q.     Okay.  And you're not aware that he saw an
22 emergency physician who looked at his lower extremities
23 in that interim period?
24     A.     I don't recollect that, no.
25     Q.     Okay.  And would you have liked to have known

1 that information before forming your opinions?
2     A.     And when you say forming my opinions, which
3 opinions are you specifically asking about?  My
4 opinions on how to treat the patient?
5     Q.     No, sir.  Your opinions related to the
6 progression of Mr. Marlowe's disease process or his
7 process.
8     A.     No, I don't think so.
9     Q.     Okay.  So it doesn't matter to you that he
10 saw — assume for me if you will that he saw an
11 emergency physician who looked at his lower
12 extremities.  It doesn't matter to you that he saw a
13 podiatrist who clearly examined his feet —
14     A.     Mmm hmm.
15     Q.     And it doesn't matter to you that he saw a
16 third party primary care physician in that interim
17 period?
18     A.     Doesn't matter to me — I still don't quite
19 understand what you mean by doesn't matter to me.  How
20 do you mean doesn't matter to me?  As far as how I
21 treated Mr. Marlowe or —
22     Q.     No, sir.  In terms of your opinion as to how
23 the disease process progressed.  Let me ask it a
24 different way.
25     A.     Okay.

17

1    Q.    Let's assume that what I told you is
2  accurate.
3    A.    Okay.
4    Q.    And that each of those physicians, there were
5  multiple visits to these non-VA medical providers.
6    A.    Okay.
7    Q.    Many of whom examined Mr. Marlowe's feet.
8  Would that information have been helpful to you in
9  treating Mr. Marlowe?
10   A.    No, it would not have been helpful to me in
11 treating Mr. Marlowe.
12   Q.    Okay.  Would that information have been
13 helpful to you in talking about how his disease process
14 progressed?
15   A.    It would have no bearing on how his disease
16 process progressed.
17   Q.    But would it have any bearing on how you
18 formed your opinion as to the timeliness of how that
19 progressed?
20   A.    It could have — it may have, yes.  It may
21 have.
22   Q.    Now, Mr. Tipler has said that your opinion
23 will be this:  Quote, if you, Dr. Taylor, could have
24 seen Mr. Marlowe back in the springtime, 2014, when his
25 feet looked like they did in the March 14 photos and he

18

1  still had a pedal pulse, although decreased or
2  diminished, he most likely or probably could have saved
3  Mr. Marlowe's legs.
4    A.    That's — that would not be how I would state
5  that.
6    Q.    Okay.  Tell me how you would state that.
7    A.    What I would say is that if I saw a patient
8  with lesions like this on his feet —
9         MR. CHEEK:  And let me just — I don't mean
10   to interrupt, Doctor.  Let me just clarify for the
11   record that Dr. Taylor is looking at two photos —
12   three photos from the March 14 visit to the VA
13   clinic.  I'm sorry to interrupt.
14   A.    So if I — at this time March 14, 2000 —
15 yeah, 2014.  If I saw this patient with these lesions
16 on his feet and I was concerned about his perfusion, in
17 other words, decreased pulses to me, there's either
18 pulses or there's not pulses, and if I could not
19 clearly feel a pulse, then I would have instituted a
20 vascular workup at that time.
21   Q.    If you could not have felt a pulse, you would
22 have done a vascular workup at that time?
23   A.    Correct.
24   Q.    Okay.  If the pulses were diminished, what
25 would you have done?

19

1    A.    If it's not clearly easily palpable, then he
2  would have gotten a vascular workup.
3    Q.    Okay, but that's —
4    A.    So —
5         MR. CHEEK:  Go ahead.
6    A.    If I had concern about his blood flow,
7  meaning that I had concerns about his pulses and having
8  lesions on the feet, I would have done a vascular
9  workup.
10   Q.    Okay.  Based on what you see in those
11 pictures, knowing that the pulses were diminished, what
12 do you think should have been done?
13   A.    Well, I would have started with noninvasive
14 tests.  A duplex and an ABI.
15        MR. TIPLER:  I'm sorry?
16        THE DEPONENT:  A duplex exam.  An ultrasound.
17        MR. TIPLER:  Okay.
18        THE DEPONENT:  And an ABI which is an ankle-
19   brachial index, to better qualify or quantify the
20   amount of perfusion that he has.  But I would have
21   had a very low threshold to do a contrasting study,
22   so either a CT angiogram or a traditional catheter
23   angiogram.
24   Q.    And when you're giving us sort of the
25 breakdown as to what you would have done, you're

20

1  speaking as a vascular surgeon.
2    A.    That's correct.
3    Q.    Was there anything else you wanted to change
4  from — and I can read it again to you, Mr. Tipler's
5  description of how you would testify in this case.
6  Anything else you want to change in that description?
7    A.    Can you read it again?
8         MR. CHEEK:  Absolutely.  In fact, let me do
9    this, Doctor.  I will — I'm going to go ahead and
10   mark this as Exhibit 1 so you can actually just go
11   ahead and read it.  And I'm going to mark the
12   relevant portion in brackets.
13        THE DEPONENT:  Okay.
14        MR. TIPLER:  Let me see what you —
15        MR. CHEEK:  Sir, read —
16        MR. TIPLER:  This is No. 1?
17        MR. CHEEK:  Yes.
18        MR. TIPLER:  Okay, thanks.
19   Q.    Read, Doctor, if you will for me, the portion
20 in brackets and tell me if there's anything else in
21 Exhibit 1 that you would change.
22   A.    Yes.  I think I was — I would not
23 necessarily say that he would most likely or probably
24 could have saved his legs.  I can't say that.  That's a
25 rather strong statement.  What I would say is — the main

21

1  way I would state it, and again this is not in the
2  legal form, but the way I would say it in a medical way
3  is that looking at the pictures here, he appears to
4  have a salvageable foot.  And so at that point I would
5  institute a vascular workup to see if there's something
6  that could be done to improve his perfusion.
7        Now, it could be at this point there's no
8  distal targets to do a bypass with and it may be that
9  it's not salvageable at this point.  But again, from
10 the look of it, it looks salvageable.  Unless you have
11 — unless I know exactly what the perfusion is like, I
12 can't say for sure whether there's something that could
13 have been done.
14     MR. CHEEK:  Okay.
15     A.    Is that —
16     **Q.    Yeah, let me see if I can hone in on this to**
17 **make sure I understand.  Can you say that you probably**
18 **could have saved his legs?**
19     A.    No.  I can't say that I would have done a
20 vascular — a detailed vascular workup.  Based on those
21 findings, then you can — then I could be more
22 definitive whether it's expected to be salvaged or not.
23 So in other words, again, just like I saw when the
24 arteriogram I did where there were no distal targets to
25 do a distal bypass to, it's possible that he has no

22

1  distal targets in this picture.  I don't know that.  If
2  he doesn't have distal targets, then the outcome would
3  have been the same as what my outcome was.
4        Now, it's reported that he had diminished
5  pulses.  It's been my experience that that doesn't
6  really mean a whole lot to me.  If you have — you
7  either have pulses or you don't.  And if people say you
8  have diminished pulses, that typically means that the
9  practitioner is feeling their own pulse.  So I don't
10 really take that to mean anything to me.  That's what
11 — the point I was trying to get to before, that, you
12 know, you either have a clearly palpable pulse and if
13 you don't have a clearly palpable pulse that I can feel
14 myself, then they get, for the most part, they get —
15 they get an angio or a contrasting study, but I would
16 certainly start with noninvasive studies.  But if I
17 could not clearly palpate a pulse, then they get a
18 detailed examination.
19     **Q.    And you said noninvasive studies earlier.**
20 **One of the things you said was a duplex?**
21     A.    Duplex is a type of ultrasound.
22     **Q.    Is that the same as a Doppler?**
23     A.    Well, a Doppler is — it's similar.  A
24 Doppler is just the sound that you're hearing whereas a
25 duplex is an ultrasound and you're actually looking at

23

1  wave morphology and blood vessel velocity.  It's more
2  detailed than just a Doppler.
3     **Q.    So Doppler — I'm sorry.  Duplex, you're**
4  **actually seeing images from the ultrasound?**
5     A.    Correct.
6     **Q.    But Doppler is just —**
7     A.    Is just the sound.  Correct.
8     **Q.    Okay.  I want you to assume with me for a**
9  **moment that Mr. Marlowe had seen a podiatrist for years**
10 **prior to this March 2014 visit and that diminished**
11 **pedal pulses had been documented for years, two, maybe**
12 **three years before the March 2014 visit.**
13        Based on that information, when would — when
14 should Mr. Marlowe have been referred to a vascular
15 surgeon?
16     A.    Well, it's difficult to say.  My opinion
17 would obviously be somewhat biased in that I personally
18 think that anybody that has diminished pulses should
19 see a vascular specialist.
20     MR. TIPLER:  Let me object, get my objection
21 on the record to the question.
22     MR. CHEEK:  As long as it's not a speaking
23 objection.
24     MR. TIPLER:  I need to get the objection to
25 him since he's a vascular and we're talking about

24

1  other disciplines in medicine.
2     A.    So just to repeat that answer, in my opinion,
3  if you — if there's suspicion of vascular disease,
4  even, you know, even with just diminished pulses, I
5  think a vascular specialist, not necessarily a vascular
6  surgeon, but a vascular specialist referral is
7  warranted.
8     **Q.    Okay.  Do you have an opinion as to whether**
9  **the standard of care would require referral to a**
10 **vascular specialist whenever diminished pedal pulses**
11 **are documented?**
12        MR. TIPLER:  Hang on just a second.  I have
13 to object because you're asking a vascular
14 specialist about the standard of care and I'm not
15 sure if you're asking him about the standard of
16 care of a vascular specialist or the standard of
17 care of an internist or the standard of care of a
18 podiatrist or the standard of care for an emergency
19 department physician.
20        MR. CHEEK:  Okay.
21        MR. TIPLER:  And I object.
22        MR. CHEEK:  I will clarify.  Thank you for
23 that.
24     **Q.    In your profession as a vascular surgeon,**
25 **does the standard of care require referral to a**

25

1 **vascular surgeon or specialist whenever a patient has**
2 **documented diminished pedal pulses?**
3        MR. TIPLER:  Object again because he's a
4  vascular specialist.  Vascular specialist — excuse
5  me, Jason, but it sounds like you're asking him
6  should a vascular specialist seeing the patient
7  refer the patient to a vascular specialist.  That's
8  where I'm having a problem.
9        MR. CHEEK:  You can answer, Doctor.
10   A.   Okay.  I — honestly, I don't know.  I can't
11  tell you whether that's the standard of care or not.
12   **Q.   Okay.  And why not?**
13   A.   It's a very vague — standard of care in and
14  of itself I think is a very vague definition.  And
15  again, part of it is — you know, I think there may be
16  different — I don't think there's a universal standard
17  for every physician.  In other words, I can't say what
18  a — what an internist's standard of care would be
19  because I'm not an internist and I don't think that
20  they should be held or not necessarily held to the same
21  levels as a — as a vascular specialist would be
22  concerning vascular disease.
23        By the same token, if I'm seeing a patient
24  that has, you know, blood pressure problems and my —
25  my understanding and my ability to treat that is

26

1  obviously not as good as an internist would be.  I
2  don't know if that makes sense, but...
3   **Q.   It does.  On March — I'm sorry, in March of**
4  **2014 — let me back up.  When I say Dr. Cumagun, do you**
5  **know who I'm referring to?**
6   A.   No.
7   **Q.   Okay.  So Dr. Cumagun, I'll represent to you,**
8  **is the VA primary care physician who saw Mr. Marlowe in**
9  **March of 2014.**
10   A.   Okay.
11   **Q.   So in March of 2014, did Dr. Cumagun breach**
12  **the standard of care by not getting Doppler testing on**
13  **the peripheral arteries of both of Mr. Marlowe's feet?**
14        MR. TIPLER:  Object.  Dr. Cumagun is an
15   internist and you are asking a vascular specialist
16   to express standard of care or opinion about
17   standard of care of a specialty of which he is not
18   and doesn't hold himself out to be.
19        MR. CHEEK:  You can answer.
20   A.   I don't — I don't know.  I don't know would
21  be my honest answer.  I would have done it myself but I
22  cannot say that he was below the standard of care.
23   **Q.   And by he — Dr. Cumagun is a woman.**
24   A.   I'm sorry.  He, she, my apologies.
25   **Q.   Just to make sure we're on the same page.  In**

27

1  checking the dorsal pedal — I'm sorry.  Let me start
2  anew.
3        Is checking the dorsal pedal pulse an
4  adequate examination to be able to assess the vascular
5  status of a lower extremity?
6   A.   It can be.
7   **Q.   Is the dorsal pedal pulse congenitally absent**
8  **in some people?**
9   A.   It can be, yes.
10   **Q.   If you're going to check just one pulse in a**
11  **patient's lower extremity, which one should it be?**
12   A.   I don't think you should just check one.
13   **Q.   Should a doctor refer every patient with**
14  **diminished pedal pulses to a vascular surgeon?**
15   A.   I think that — I'm sorry.  Can you state
16  that question again?
17   **Q.   Sure.  Should a doctor refer every patient**
18  **with diminished pedal pulses to a vascular surgeon?**
19        MR. TIPLER:  Same objection as before.
20   A.   I don't think they — no, I would not say
21  every single patient.  I mean, there's — if there's a
22  patient that's clearly in an end of life situation, you
23  know, that doesn't necessarily necessitate a referral.
24  There are situations where you would not necessarily
25  refer that patient to a vascular specialist.

28

1   **Q.   End of life being one situation.  Are there**
2  **others?**
3   A.   Somebody who was just an absolute prohibitive
4  risk for — for intervention, completely unable to
5  tolerate any sort of percutaneous or open procedure.
6  I'm sure there are some.  You know, I can't go as far
7  as to say that every patient should be referred.  I'm
8  sure there are other examples of patients that doesn't
9  necessarily require that.
10   **Q.   Let's assume that a patient's pedal pulses**
11  **had been diminished for two years and they had remained**
12  **unchanged.  The patient comes in to a doctor's office.**
13  **Should that doctor refer that patient to a vascular**
14  **surgeon?**
15        MR. TIPLER:  Object.  You can answer but I've
16   got to get some objections on the record.
17        THE DEPONENT:  I understand.
18        MR. TIPLER:  Thank you, Doctor.
19        THE DEPONENT:  Could you repeat that for me
20   to make sure I have it right?
21   **Q.   Let's assume that a patient's pedal pulses**
22  **have been diminished for two years and remain**
23  **unchanged.  The patient then goes into another doctor's**
24  **office.  Should that doctor refer that patient to a**
25  **vascular surgeon?**

29

1      MR. TIPLER:  Object.
2   A.   It would depend on the presenting symptom, is
3   what I would say, if I would refer that.
4   Q.   **Should a doctor obtain Doppler studies on all**
5   **patients who have diminished pedal pulses?**
6   A.   It would depend on the clinical —
7      MR. TIPLER:  Object.
8   A.   — situation.
9      MR. TIPLER:  Did you get my objection,
10   please, ma'am?
11   A.   It would depend on the clinical situation,
12   what the clinical complaints of the patient were.  If
13   it was completely asymptomatic from a vascular
14   standpoint, then I would not necessarily say you would
15   have to do that.
16   Q.   **Did Mr. Marlowe have peripheral artery**
17   **disease in March 2014 when he presented to Dr. Cumagun?**
18   A.   I don't know.
19   Q.   **And why don't you know?**
20   A.   Because I didn't feel the pulses and I can't
21   give an opinion based on another doctor's subjective
22   finding.
23      MR. CHEEK:  Okay.
24      MR. TIPLER:  When you say — he said he could
25   not feel the pulses.  You're saying you did not

30

1   feel the pulses in March of '14 or are you saying I
2   could not feel the pulses when I saw him in July?
3      THE DEPONENT:  I'm sorry.  I was — I thought
4   you were talking about — talking about when I saw
5   the patient or when another doctor saw the patient?
6   I'm a little confused.
7      MR. TIPLER:  I think there's some confusion
8   here.
9      MR. CHEEK:  No, I think the doctor was not
10   confused because the question said in March 2014.
11      THE DEPONENT:  Which was not me.  Correct?
12      MR. CHEEK:  Correct.
13      THE DEPONENT:  Okay.  Okay.  Just making
14   sure.  Yes, that was before I saw him.  Okay.
15   Q.   **Doctor, I'm going to mark pictures of Mr.**
16   **Marlowe's feet as Exhibit 2.  There are three pictures**
17   **in Exhibit 2, all from March 14th of 2014.  I will**
18   **represent to you that these were taken at the VA Clinic**
19   **on that date.**
20   A.   Okay.
21   Q.   **Looking at those pictures, does the redness**
22   **indicate a blood perfusion or circulation issue in your**
23   **opinion?**
24   A.   Does it — what is the word you used?  I'm
25   sorry, does it indicate?

31

1      MR. CHEEK:  Yes, sir.
2   A.   It doesn't definitively indicate.  It gives
3   suspicion for something like that.
4   Q.   **And why does it give suspicion?**
5   A.   I'd be concerned that these — again, taken
6   with the exam as a whole, decreased pulses and these
7   lesions on the feet, that would be the first thing that
8   would come to my mind is that you have a perfusion
9   problem.
10   Q.   **Anything else in the medical record that you**
11   **saw that would sort of send up a warning sign that**
12   **perhaps there's a perfusion or circulation issue?**
13   A.   Nothing that I'm — nothing that I'm
14   currently aware of, no.
15   Q.   **If you don't feel a pulse behind the knee,**
16   **would you be certain that you got extensive lack of**
17   **blood flow to the leg?**
18   A.   Just behind the knee?
19      MR. CHEEK:  Yes, sir.  If you don't feel a
20   pulse behind the knee.
21   A.   No.  That does not necessarily definitively
22   say you have significant occlusive disease.
23   Q.   **What else could it mean?**
24   A.   Just could mean that you can't feel a pulse
25   because the patient is large or his popliteal pulses

32

1   are difficult to feel so...
2   Q.   **If you don't feel a pulse behind the knee,**
3   **does that mean you wouldn't have an opportunity for**
4   **bypassing the foot with a popliteal to dorsal pedal**
5   **bypass and that you might have to have a femoral**
6   **popliteal bypass?**
7   A.   No, I wouldn't say that.
8   Q.   **You would disagree with that?**
9   A.   Yes.
10   Q.   **Okay.  Do you know whether the standard of**
11   **care requires referral to a vascular specialist or for**
12   **a Doppler study before claudication occurs?**
13      MR. TIPLER:  Object.  The standard of care of
14   a — what kind of physician?
15      MR. CHEEK:  I'll let you answer, Doctor.
16   A.   So if I understand it correctly, you're
17   asking me should people have a Doppler exam before
18   symptoms occur of claudication.
19      MR. CHEEK:  Yes, sir.
20   A.   I don't think that to be true, no.
21   Q.   **And you don't have an opinion as to whether**
22   **Mr. Marlowe was experiencing claudication when he saw**
23   **Dr. Cumagun in March of 2014; is that correct?**
24   A.   That's correct.
25   Q.   **Okay.  I want to fast forward to September of**

33

1  2014.
2      A.      Okay.
3      Q.      You performed an above-the-knee amputation on
4  Mr. Marlowe's right leg in September of '14, correct?
5      A.      I believe so.  Let me check the date real
6  quick.  That's September.  Sorry.  Give me just a
7  minute here.
8          MR. CHEEK:  You're fine.
9      A.      So I performed a right below-the-knee
10 amputation on August the 11th, 2014.
11     Q.      And then in September you performed an above-
12 the-knee amputation on the right leg?
13         MR. TIPLER:  The lower — what was the first
14     date you just gave?
15         THE DEPONENT:  August the 11th.
16         MR. TIPLER:  Okay.
17         THE DEPONENT:  August the 11th, 2014.  Right
18     below-the-knee amputation.  He was revised to an
19     above-the-knee amputation on September the 15th.
20     Q.      Okay.  And don't lose your place —
21     A.      Okay.
22     Q.      — because I want to ask you about October
23 2015; you performed an above-the-knee amputation on Mr.
24 Marlowe's left leg?
25     A.      What was the date you gave me?

34

1      Q.      October 2015.  I'm sorry.  It was actually
2  October 2014.
3      A.      October 10th, 2014.  Correct.
4      Q.      Are we sure it's 2014?
5          MR. TIPLER:  Yes.
6      A.      It was the same year.  Yeah.  It was
7  essentially a near amputation of both legs at the same
8  time.
9      Q.      And why did you perform the above-the-knee
10 amputations?
11     A.      Well, the original above — or the above-the-
12 knee amputation was a revision of his below-the-
13 knee amputation because he failed to heal with a below-the-
14 knee amputation so he was revised to an above-the-knee.
15     Q.      In the right leg?
16     A.      In the right leg.  That's correct.  The left
17 leg he went primarily to above knee because at that
18 point I thought of his rehabilitation potential or the
19 likelihood that he would walk with two prostheses was
20 extraordinarily low and so the benefit of saving the
21 knee with a contralateral above-the-knee amputation in
22 a patient like this was not worth the risk of
23 nonhealing and again coming back and having to revise
24 above the knee for that leg.
25     Q.      So do you agree that the reason that you do

35

1  an above-the-knee amputation is because you don't have
2  blood flow as well in big arteries, and those big
3  arteries are the ones that are more accessible to a
4  stent or an angioplasty or opening up?
5      A.      Could you repeat that question?  I'm sorry.
6      Q.      Do you agree that the reason that you do an
7  above-the-knee amputation is because you don't have
8  blood flow in the big arteries in the leg and those are
9  the ones that are most accessible to a stent or an
10 angioplasty or opening up?
11     A.      No, I wouldn't say that.  There's multiple
12 reasons you do an above-the-knee amputation.  Mostly
13 it's because of either the patient is not a rehab
14 candidate to use a prosthetic, to be able to use a
15 below-the-knee prosthetic, and sometimes you do it
16 because the perfusion is so poor that you have to go
17 above the knee in order to get a high likelihood of
18 healing.
19     Q.      I think I already asked you this but I just
20 need to make sure I'm — if a patient has diminished
21 dorsal pedal pulses, does that mean the patient has
22 peripheral artery disease?
23     A.      It's not necessarily.
24     Q.      That's not always the case.
25     A.      That's not always the case.  Correct.

36

1      Q.      If Dr. Cumagun had ordered a Doppler study or
2  referred him to a vascular surgeon or specialist in
3  March of 2014, would the amputations have been
4  necessary?
5      A.      I don't know.
6      Q.      Are ankle-brachial index and Doppler testing
7  the same thing?
8      A.      No.
9      Q.      They're different?
10     A.      They're different.
11     Q.      Would June 2014 have been too late to save
12 Mr. Marlowe's lower extremities?
13     A.      I don't know.
14     Q.      Would it — is it possible that had an ankle-
15 brachial index been done in March 2014 that it would
16 have been within a normal range?
17     A.      What is the date you gave me again?
18         MR. CHEEK:  March of 2014.
19     A.      I think it's very unlikely.
20     Q.      My question was is it possible.
21     A.      Yes, it's possible.
22     Q.      But not likely.
23     A.      Very unlikely.
24     Q.      Okay.  And you're a vascular surgeon,
25 correct?

**37**

1    A.    Correct.
2    Q.    Is there any way I can get a copy of your
3  C.V.?
4    A.    Yes.
5         MR. CHEEK:  I'm going to make a note just for
6  break.
7    Q.    And how long have you been a physician, Dr.
8  Taylor?
9    A.    I graduated — I guess since 2002.  I've been
10  a physician since 2002.
11    Q.    Where are you licensed?
12    A.    Well —
13    Q.    I'm sorry?
14    A.    I graduated medical school in 1997 so...
15    Q.    And where are you licensed?
16    A.    In Alabama.
17    Q.    You're Board Certified?
18    A.    Yes.
19    Q.    By which board?
20    A.    American Board of Surgery.
21    Q.    Let me back up.  Are you licensed anywhere
22  else?
23    A.    Not currently.
24    Q.    So have you ever been licensed anywhere else?
25    A.    Yes.

**38**

1    Q.    Where?
2    A.    Mississippi.
3    Q.    And your license is no longer active there?
4    A.    Correct.
5    Q.    Why?  You did a residency or internship
6  there?
7    A.    Correct and then didn't renew it because I
8  didn't go back.
9    Q.    You said American Board of Surgery —
10    A.    Yes.
11    Q.    — is where you're Board Certified?
12    A.    Correct.
13    Q.    Is that a member of the American Board of
14  Medical Specialties?
15    A.    Yes.
16    Q.    Do you take regular examinations as part of
17  your board certifications?
18    A.    Yes.
19    Q.    How long have you been Board Certified?
20    A.    Twelve years?  Thirteen years?
21    Q.    In March — I'm sorry.  In July/August of
22  2014, was your office located next to Dr. Bourgeois,
23  the dermatologist?
24    A.    Next to?  It wasn't next to it.  It was close
25  but not next to it.

**39**

1    Q.    I thought I had heard some testimony earlier
2  in this case that in my mind at least y'all were down
3  the hall from each other.
4    A.    No.  We were in different buildings.
5    Q.    Okay.  So he referred — Dr. Bourgeois
6  referred Dr. — I'm sorry, Mr. Marlowe to you
7  initially.
8    A.    Correct.
9    Q.    And by doing that, Mr. Marlowe had to come
10  from across the street to come see you?
11    A.    Yes.  He was actually admitted to the
12  hospital.  So he was admitted to the hospital through
13  the hospitalist and then I was consulted.
14    Q.    Okay.  So you didn't see him in your office
15  and then —
16    A.    Correct.
17    Q.    Did you draft an expert report or opinion
18  letter in this case?
19    A.    I don't believe so.
20         MR. TIPLER:  Is that number 4?  What number
21  are we?
22         MR. CHEEK:  3.
23         MR. TIPLER:  3?
24    Q.    Doctor, I'm going to show you what's been
25  marked as Defendant's Exhibit 3 and it's a memo or a

**40**

1  letter with a date of May 9th, 2016 at the top.  If you
2  would, please just take a minute to read this document
3  to yourself.
4    A.    Okay.
5    Q.    If you'll look with me at the very bottom, is
6  that your signature at the bottom?
7    A.    Yes.
8    Q.    Did you type this up or did someone else do
9  it for you?
10    A.    It was done by a transcriptionist.
11    Q.    Okay.  And that would be SGJ?  Someone with
12  the initials SGJ?
13    A.    I assume so.
14    Q.    Do you know who that is?
15    A.    No.
16    Q.    And did you sign this document on May 9th,
17  2016?
18    A.    It would have been subsequent to that.
19    Q.    Why do you say that?
20    A.    Because it takes a couple of days to get it
21  transcribed and back to me.
22    Q.    Is the report accurate?
23    A.    To my knowledge, yes.
24    Q.    Is it complete?  Anything else you need to
25  add to it?

41

1    A.    I don't think so.

2    **Q.    Is there anything that you want to change in**
3  **this letter dated May 9th of 2016?**

4    A.    It looks like a date is wrong here now that I
5  read it.

6         MR. CHEEK:  Okay.

7    A.    I have to double check it.  I think the same
8  problem.  We said 2015 where it should be 2014.  I'd
9  have to double check that but I think the last should
10  be October 7th, 2014.

11    **Q.    And you're talking four lines from the**
12  **bottom?**

13    A.    Correct.  I think that's just an incorrect
14  date.  Let me double check that real quick.  Yes.  It
15  should read 2014, not 2015.

16    **Q.    Anything else that needs to be changed?  And**
17  **just for the record, Dr. Taylor has made that**
18  **correction to Exhibit 3.**

19    A.    Nothing else that comes to mind, no.

20    **Q.    I want to start on the fourth line of this**
21  **document —**

22    A.    Mmm hmm.

23    **Q.    — where you say:  At that time he was an**
24  **eighty-year-old gentleman who had suffered from**
25  **worsening bilateral lower extremity wounds for the last**

43

1  evidence.

2         MR. CHEEK:  Sorry, I'm not trying to be a
3    jerk.

4         THE DEPONENT:  No.

5         MR. CHEEK:  I'm just reading it and it
6    sounded weird.

7    **Q.    In drafting this, do you know if you had seen**
8  **these photos that we had previously marked as Defense**
9  **Exhibit 2?**

10    A.    I had not seen those.

11    **Q.    Prior to drafting this letter, had you seen**
12  **Mr. Marlowe's VA medical records?**

13    A.    No.

14    **Q.    Doctor, I'm going to mark this as Defense**
15  **Exhibit No. 4.  I don't want you to necessarily read**
16  **everything in there but I want you to just sort of flip**
17  **through those and let me know if those happen to be the**
18  **documents that you were referencing earlier, the VA**
19  **documents that you reviewed with Mr. Tipler.**

20    A.    I don't remember if these are the exact
21  documents or not.

22    **Q.    Okay.  Don't ring a bell?**

23    A.    They do not.

24    **Q.    Do they look familiar at least?**

25    A.    They do not.

42

1  several weeks.

2    A.    Yes.

3    **Q.    Why is that significant?**

4    A.    This was an ongoing process.  I mean, this
5  wasn't an — an acute problem, I guess.

6    **Q.    And how — where did that information come**
7  **from that these lower extremities wounds had — he had**
8  **been suffering from them for the last several weeks?**

9    A.    From the patient himself, his wife and the
10  dermatologist who referred him to me.

11    **Q.    Did you review any medical records in**
12  **preparing this document?**

13    A.    This was done basically when I saw him in the
14  office.  This was a letter to his primary care doctor.
15  And so it would have been just the chart and what I
16  knew from treating the patient.

17    **Q.    And when you saw him, there's a couple lines**
18  **down you say, quote, he had clinic, I think you meant**
19  **clinical, evidence of decreased perfusion to both feet,**
20  **end quote.**

21    A.    Correct.

22    **Q.    That's based on your examination at that**
23  **point?**

24    A.    At the time I saw him in the hospital,
25  correct.  And you are correct, it should be clinical

44

1    **Q.    Okay.  In that set of VA medical records that**
2  **you reviewed with Mr. Tipler, did you review any**
3  **doctors' orders?  Do you remember if there were any**
4  **doctors' orders in that set?**

5    A.    I don't remember.

6    **Q.    Do you remember whether there was a schedule**
7  **of appointments in that set of medical records?**

8    A.    I don't remember.

9    **Q.    So you don't know if Mr. Marlowe would have**
10  **missed any scheduled appointments with the VA after**
11  **that March 2014 visit?**

12    A.    I don't know, no.

13    **Q.    In preparing Exhibit No. 3, did you review**
14  **any outside medical records prior to preparing that?**

15    A.    No.

16    **Q.    Prior to today, have you reviewed any records**
17  **of Mr. Marlowe's from the Coosa Valley Medical Center?**

18    A.    No.

19    **Q.    Prior to today, did you review any records**
20  **from Dr. Deborah Trujillo?**

21    A.    Not to my knowledge.

22    **Q.    Did you review Dr. Trujillo's emergency note,**
23  **emergency room note, from March 25th of 2014?**

24    A.    I don't recall reviewing anything from her.

25    **Q.    Prior to today, did you review any records**

45

1  from Podiatry Associates?

2      A.    Not to my knowledge.

3      Q.    Prior to today, did you review any records

4  from James Bowman?

5      A.    Not that I'm aware of, no.

6      Q.    Did you review Dr. Bowman's note from May

7  15th of 2014?

8      A.    No.

9      Q.    Prior to today, did you review any records

10  from the Craddock Health Center?

11      A.    No.

12      Q.    Prior to today, did you review any records

13  from Dr. Walter Pinson?

14      A.    No.

15      Q.    So you didn't review Dr. Pinson's note from

16  June 2nd of 2014?

17      A.    I may have but I don't recall reading that.

18      Q.    When would you have reviewed that note?

19      A.    If I would have reviewed it, it would have

20  been with Mr. Tipler.

21      Q.    Okay.  So sitting here today, you just don't

22  recall whether you saw that note or not?

23      A.    Specifically I don't.  It's been awhile ago.

24      Q.    And when did you have the meeting with Mr.

25  Tipler?

47

1  Goldhagen during that meeting?

2      A.    No.

3      Q.    During that meeting a couple months ago, did

4  you review any records from Southern Pain Specialists?

5      A.    No.

6      Q.    Prior to today — sorry.  Let me start anew.

7            During that meeting a couple months ago, did

8  you review any records from Dr. Kenneth Varley?

9      A.    No.

10      Q.    During that meeting, did you review — so you

11  didn't review Dr. Varley's note from May 22nd of 2014?

12      A.    That's correct.  I did not review his note.

13      Q.    Would you have liked to have seen those

14  records prior to coming in and testifying today?

15      A.    I suppose I would have, yes.

16      Q.    And why is that?

17      A.    Well, because frankly I have no idea what

18  you're asking me, so — I don't mean that to be

19  facetious.

20            MR. CHEEK:  I didn't take it that way.

21            THE DEPONENT:  Good.

22            MR. TIPLER:  Off the record.

23            (Off-record discussion)

24      Q.    I want you to assume with me that a

25  podiatrist had found decreased pedal pulses dating back

46

1      A.    Well, we had one maybe two or three months

2  ago, a brief one on a Saturday.  Before that, it was

3  sometime last year.  I don't know the exact time.

4      Q.    And when did you review those records?  Was

5  it —

6      A.    That would have been — that would have been

7  previous to — that would have been last year.

8      Q.    Okay.  Not the one from a couple months ago.

9      A.    No.  No.

10      Q.    Do you recall reviewing Dr. Pinson's note

11  from June 11th of 2014?

12      A.    I don't recall.

13      Q.    Did you review Dr. Pinson's note from July

14  16th — well, let me see if I can shorten — short

15  circuit this.

16      A.    Okay.

17      Q.    During that meeting a couple months ago, did

18  you review Dr. Pinson's notes from June 2nd, 2014, June

19  11th, 2014 or July 16th of 2014?

20      A.    To my best recollection, I think we just

21  reviewed the pictures.

22      Q.    During that meeting a couple months ago, did

23  you review any records from Bone and Joint Specialists?

24      A.    No.

25      Q.    Did you review any records from Dr. Paul

48

1  to February of 2012.

2      A.    Okay.

3      Q.    Would you have liked to have reviewed those

4  records prior to today?

5      A.    Yes.

6      Q.    Is it possible that those records would

7  change any of your opinions today?

8      A.    No, or I don't — I think it's very unlikely.

9      Q.    Let's assume that a podiatrist found

10  decreased pedal pulses in Mr. Marlowe in May of 2014, a

11  couple months after Dr. Cumagun treated him.  Would you

12  have liked to have reviewed those records prior to

13  today?

14      A.    I don't think it would have changed my

15  opinion necessarily.

16      Q.    But my question is, would you have liked to

17  have seen those records.

18      A.    Well, yes.

19      Q.    But you don't think it would have changed

20  your opinion.

21      A.    I don't believe so.

22      Q.    In your opinion, was Mr. Marlowe adversely

23  affected by having not been referred to you in March of

24  2014?

25      A.    Referred to me specifically or —

49

1    Q.    To a vascular surgeon.
2    A.    I don't know.  I can't say definitively.
3    Q.    In your opinion, was Mr. Marlowe adversely
4 affected by not having a Doppler performed in March of
5 2014?
6    A.    Possibly.
7    Q.    Can you say probably?
8    A.    I can't say probably.
9    Q.    Is it your opinion that Dr. Cumagun
10 misdiagnosed Mr. Marlowe in March of 2014?
11    A.    Well, I don't know what his diagnosis was so
12 I can't answer that.
13    Q.    Would looking at the record help clarify
14 that?
15    A.    Possibly.
16    MR. CHEEK:  I want to show you Defendant's
17 Exhibit No. 4.  It's Dr. Cumagun's note of March
18 14th, 2014.
19    MR. TIPLER:  What page is that down at the
20 bottom?
21    THE DEPONENT:  I guess 224.
22    MR. CHEEK:  It's cut off.
23    THE DEPONENT:  Looks like 224.
24    MR. TIPLER:  Thank you.
25    THE DEPONENT:  This says dermatitis —

51

1    MR. CHEEK:  That's what I'm trying to
2 clarify.
3    A.    Missed.  Like you missed it.  Yes.  I think
4 the dermatitis is incorrect.  I think these are the
5 ischemic lesions that we ultimately came to find out.
6 That's what I would say.
7    Q.    Let me ask you this question:  Let's assume
8 that Mr. Marlowe's feet, he was treated for dermatitis
9 and his feet cleared up of the redness.
10    A.    Okay.
11    Q.    Would that change your opinion?
12    A.    It would seriously make me question my
13 opinion, yes.
14    Q.    Okay.  If he had gone to all these outside
15 physicians, ER doctor, primary care doctor, podiatrist,
16 after this March 2014 visit —
17    A.    Mmm hmm.
18    Q.    And they didn't make any note about
19 dermatitis —
20    A.    Mmm hmm.
21    Q.    — or —
22    A.    Lesions on the feet?
23    Q.    Right.  Would that affect your opinion?
24    A.    I would say yes, that could affect my
25 opinion, yes.

50

1    MR. TIPLER:  Now we're on 225?
2    THE DEPONENT:  Correct.  It's kind of
3 difficult to tell.  Is this a new note?  I guess
4 it's the same one.
5    MR. CHEEK:  It continues on.
6    THE DEPONENT:  It continues on to here,
7 right?  Okay.
8    MR. TIPLER:  Do we go on to Page 226?
9    THE DEPONENT:  Yes.
10    MR. TIPLER:  Okay.
11    THE DEPONENT:  So I guess I would — so your
12 question again was do I disagree with his
13 diagnosis?
14    MR. CHEEK:  Do you mind reading it back?
15    (Whereupon the question is read back by the
16 reporter.)
17    A.    Well, I don't know if I would phrase it that
18 way.  What I would say is, he has multiple diagnoses
19 here.  It seems most of them I can't argue with or have
20 no concern with.  The diagnosis of dermatitis, I think
21 in hindsight I could say that I think that that's a
22 missed diagnosis.  I don't think his lesions are
23 dermatitis.
24    Q.    You think it's a missed diagnosis?
25    COURT REPORTER:  Mis or missed?

52

1    Q.    Do you have any opinions as to whether Dr.
2 Cumagun breached the standard of care in March 2014?
3    A.    Doesn't seem to have, no.
4    Q.    Do you have any opinions as to whether any VA
5 medical provider breached the standard of care in March
6 of 2014?
7    A.    As I've stated multiple times, I don't think
8 there was a breach of any standard of care.  I think
9 that this is a missed diagnosis, which happens
10 regularly.
11    COURT REPORTER:  Mis or missed?
12    THE DEPONENT:  Missed, as in a swing and a
13 miss.
14    A.    People make missed diagnoses all the time.
15 I've done it many times and it happens.  Nobody is
16 perfect and there's no way to expect perfection.  It's
17 an unfortunate problem.  If it was caught and dealt
18 with, it may have a better outcome than what he
19 suffered, but there's nothing that I see that raises
20 anything to the level of malpractice.
21    Q.    Okay.  So you don't think Dr. Cumagun
22 committed malpractice.
23    A.    I do not.
24    MR. CHEEK:  Let's take a break.
25    THE DEPONENT:  Okay.

53

1       (Recess 3:30 – 3:37 p.m.)
2       MR. CHEEK:  Back on.
3    Q.    All right.  Dr. Taylor, during the break you
4  were kind enough to get me a copy of your C.V.  I'm
5  going to mark that as Defendant's Exhibit No. 5.
6             Is there anything on here that needs to be
7  updated or changed?
8    A.    It was just recently updated.  It looks
9  correct.
10      MR. CHEEK:  Okay.
11      MR. TIPLER:  Could I see?
12      MR. CHEEK:  I can get another copy.
13      MR. TIPLER:  Are you going to use it or ask
14   about it?
15      MR. CHEEK:  No.  I'm just going to mark it as
16   an exhibit and include it with the depo.  I had
17   kind of hoped we didn't have to go through this,
18   but it is what it is.
19   Q.    I'm going to mark this record as Defendant's
20  Exhibit No. 6.  It is a medical note from the Coosa
21  Valley Medical Center Emergency Room from March 25th of
22  2014.  And if you'll recall, the care that's at issue
23  in this case is from eleven days or so earlier, March
24  14th of 2014, okay?
25   A.    Okay.

54

1    Q.    If you will, look at the third page of this
2  ER note and just take a moment to read the history,
3  subjective exam, objective and the findings at the end.
4    A.    Okay.
5    Q.    Do you see any reference to a rash or redness
6  on Mr. Marlowe's lower extremities in that note?
7    A.    There is.
8    Q.    Okay.  Tell me what it says, if you don't
9  mind.
10   A.    Extremity location, left lower extremity/pain
11  – tender – moderate, no obvious pus pocket/induration
12  appreciated/ — something I can't really read.
13   Q.    If you would just underline the part that
14  you're —
15   A.    Having trouble with?
16      MR. CHEEK:  Or just the whole part that
17   you're quoting.
18   A.    Oh.  Extremity exam.  Appearance mid-stage
19  healing.  Circular wound with mild surrounding
20  fluctuance, no streaking, small amount of white and
21  clear discharge.  Patient reports this is Neosporin
22  that he's been placing on it.
23           There's also up here a note referring to a
24  minor trauma that occurred to his leg resulting in
25  these wounds.

55

1    Q.    So I want to refer — I want to look back at
2  Defense Exhibit No. 2.
3    A.    Okay.
4    Q.    The first image on there.  You'll notice that
5  there are — I think we called these red lesions —
6    A.    Mmm hmm.
7    Q.    — on his feet but if you'll look up above
8  the ankle, there's a Band-Aid.
9    A.    Yes.
10   Q.    Would you agree?
11   A.    Yes.
12   Q.    Is that — is the note, Defendant's Exhibit
13  6, is it talking about the wound on — above the ankle?
14   A.    It appears to be, yes.
15   Q.    Does that note make any reference to
16  red lesions on Mr. Marlowe's feet?
17   A.    No.
18   Q.    I'm sorry I'm being a little disorganized but
19  I want to step back just a couple places.
20           Are you familiar with what happened after the
21  March 14th visit at the VA in terms of a dermatologist
22  at the VA treating him?
23   A.    No.  I'm not familiar with that.
24   Q.    So I want to just show you back in exhibit —
25  Defense Exhibit No. 4 that there's a March 20th, '14

56

1  note which was six days after Mr. Marlowe visited the
2  VA and saw Dr. Cumagun.
3    A.    Okay.
4    Q.    If you'll just take a minute to read that
5  dermatologist's note, I would appreciate it.
6    A.    Okay.
7    Q.    And —
8    A.    Wait.  Let me read — okay.
9    Q.    What did the dermatologist prescribe?
10   A.    Antifungal cream, looks like, and then — and
11  then the addendum says please notify patient regarding
12  above, discontinue both and ask him to use Nizoral
13  cream for at least a month.  I'm not familiar with
14  that.  Looks like another antifungal cream.
15   Q.    Not something you use very often as a
16  vascular surgeon.  All right.  So if we're following
17  along with the timeline, he goes to see Dr. Cumagun on
18  the 14th.  There's a telemedicine that dermatology
19  looks at the pictures and note and they prescribe some
20  creams to try to clear up what they believe is a rash.
21  Is that fair?
22   A.    Mmm hmm.  Yes.
23   Q.    And then that's on March 20th that the
24  dermatologist enters her note.
25   A.    Okay.

57

1    Q.    And then on March 25th, he goes — Mr.
2  Marlowe goes to the emergency room and there's no
3  reference to the lesions on the patient's feet.  Is
4  that fair?
5    A.    Yes.
6    Q.    Not talking about — we're not saying that
7  there's not reference to the wound above the ankle.
8    A.    Right.
9    Q.    And in fact, at one point the ER doctor says
10 that there are no signs or objective findings that are
11 life or limb threatening.
12   A.    (Deponent nods.)  Okay.  Sorry, I didn't mean
13 to nod.
14   Q.    And so I want to show you what is now marked
15 as Defendant's Exhibit No. 7 which is a May 15th of
16 2014 note from a podiatrist.
17   A.    Okay.
18   Q.    If you would, review this note and let me
19 know if you see any complaint or reference to lesions
20 on the patient's feet.
21   A.    It doesn't appear to be.  Well, to be honest
22 with you, I can't — I don't know what they're trying
23 to describe here.  Diabetes mellitus II.  I guess that
24 means peripheral disease?
25   Q.    And can you just underline the part that you

58

1  have a question about?
2    A.    ICD-10 code or an ICD-9 code, which I'm not
3  familiar with the code.  There's some abbreviations by
4  them.  It seems like it's Type II diabetes with
5  peripheral — I'm assuming peripheral vascular disease
6  but it doesn't say that.  It just says peripheral,
7  abbreviation DIS period.
8    Q.    Do you believe that that would indicate that
9  Mr. Marlowe has lesions on his feet at that — at that
10 visit?
11   A.    There's no specific — there's no specific
12 indication of the lesions on his feet.  There's nothing
13 that specifically states that he has lesions on his
14 feet.
15   Q.    I'm going to mark Defendant's Exhibit No. 8
16 which is a medical note from Southern Pain Specialists
17 dated May 22nd of 2014.  If you will please review that
18 and let me know if you see any reference to lesions on
19 his feet.
20   A.    Now, this is a procedure note, correct?  Yes.
21 This is a procedure note.  Makes no reference to any
22 lesions on his feet.
23   Q.    And I want to show you Defendant's Exhibit
24 No. 9 which is a note from June 2nd of 2014 from Dr.
25 Pinson who was another primary care physician who

59

1  treated Mr. Marlowe.  Please let me know if you see any
2  reference to lesions on his feet in that note.
3    A.    There are two notes here.
4          MR. CHEEK:  Oh, I'm sorry.
5    A.    There's nothing in this from June the 2nd,
6  2014.  There's no — no discussion of lesions on his
7  feet.
8    Q.    So you would agree up until dermatologists
9  prescribe some cream in March 20th of 2014, he goes and
10 sees an emergency room podiatrist, has a procedure done
11 at a pain specialty clinic, and goes to another primary
12 care physician, between March and June of 2014 that at
13 no point does any doctor make reference to lesions on
14 the patient's feet.
15   A.    That's correct.
16         MR. TIPLER:  Object.
17   Q.    And at no point does there seem to be any
18 indication that Mr. Marlowe complains of lesions on his
19 feet.
20         MR. TIPLER:  Object.
21   Q.    Do you see any indication of that in any of
22 those records?
23   A.    I do not.
24   Q.    Is it possible that during that time frame
25 Mr. Marlowe had experienced some sort of fungal foot

60

1  infection and the creams that were prescribed cleared
2  it up?
3    A.    I guess it's a possibility.
4    Q.    Okay.  Based on what you've reviewed, do you
5  have any thoughts on whether that's a reasonable
6  possibility?
7          MR. TIPLER:  Object.
8    A.    I don't think it likely.  I think it's
9  unlikely.
10         MR. CHEEK:  Okay.
11   A.    I think he continually had the problem and
12 either didn't bring it to the doctor's attention or
13 they were focusing on other problems.
14   Q.    Okay.  By other problems, even though at
15 several of those visits they were looking at his lower
16 extremities or feet, that still doesn't say to you that
17 it's — it's highly likely that this cleared up?
18   A.    I think it's unlikely that this cleared up.
19   Q.    Okay.  Is there a difference between
20 peripheral artery disease and peripheral vascular
21 disease?
22   A.    Peripheral vascular disease is a broader
23 category that includes arterial and venous.
24   Q.    Can you define the term "emboli"?
25   A.    It's basically particulate matter that

61

1  develops in one part of the body and travels through
2  the bloodstream to another part of the body.
3      Q.    And how do you diagnose that?
4      A.    It's a variety of ways.  It's clinical
5  suspicion, having risk factors for it.  And the way I
6  ultimately made his diagnosis is the findings that I
7  saw on arteriogram.
8      Q.    And how do you treat emboli?
9      A.    Well, there's a variety of ways to treat it,
10  depending on what it's embolized to, so what part of
11  the body the emboli went to.  Relief of the ischemia,
12  if the ischemia is still present, and then prevention
13  of further emboli.
14      Q.    Relief could be a bypass?
15      A.    Could be a bypass if it's ischemia.  It could
16  be a thrombectomy or embolectomy.  But removing of the
17  particulate matter.
18      Q.    And then what was the second part that you
19  said?  You said relief of the —
20      A.    Relief of the ischemia and then prevention of
21  further emboli.
22          MR. CHEEK:  Okay.
23      A.    So trying to find the cause and the source
24  and treating them appropriately.
25      Q.    Is anticoagulation medication one way to

62

1  treat emboli?
2      A.    Yes.
3      Q.    Was Mr. Marlowe on anticoagulation medication
4  in March of 2014?
5      A.    He was prescribed it, yes.
6      Q.    And if he had not been taking it according to
7  how it was prescribed, would that concern you?
8      A.    Yes.
9      Q.    Because it would make it more likely that he
10  would experience emboli?
11      A.    Yes.
12      Q.    I want to refer you back to Defense Exhibit
13  No. 2.  You've seen these pictures before?
14      A.    Mmm hmm.
15      Q.    Was that in the meeting you had with Mr.
16  Tipler a couple of months ago or the meeting that you
17  had a long, long time ago?
18      A.    A couple of months ago.  Relatively recently.
19      Q.    Relatively recently.  How did you view those
20  pictures?  Were they on a printout?  Computer screen?
21      A.    They were just like this [indicating].
22          MR. CHEEK:  For the record, the doctor is
23  pointing to — holding up Defense Exhibit 2.  So
24  they were printed out.
25          THE DEPONENT:  Yes.

63

1      Q.    Based on those photographs, did Mr. Marlowe
2  have emboli in his feet or lower extremities at that
3  time?
4      A.    I don't know definitively.
5      Q.    Based on those photographs, can you — can
6  you rule out that he had athlete's foot or some sort of
7  fungal infection?
8      A.    I cannot rule it out.
9      Q.    Is a rash a sign of peripheral artery
10  disease?
11      A.    Not a rash per se.  No.  A rash is a very
12  vague sort of —
13      Q.    Rash as distinguished from lesions.
14      A.    I mean, they're kind of the same, I think,
15  yeah.  Just not — yeah.  A rash, typically you think
16  more of an infectious etiology for it.  But the lesions
17  could look very similar and it be something other than
18  infection, I guess.
19      Q.    So just so I'm clear, your — your suspicion
20  that Mr. Marlowe was experiencing some sort of
21  microemboli in March of 2014 is based on the
22  photographs that you viewed of his feet?
23      A.    No.
24      Q.    Okay.  It's based on the diminished pedal
25  pulses that were documented by Dr. Cumagun?

64

1      A.    No.  It's mostly based on the arteriogram
2  that I performed and the amount of emboli that had been
3  there.  If you have that much emboli that occurs sort
4  of instantly or within a matter of days or weeks, the
5  foot is dead or close to dead.
6          MR. CHEEK:  Got you.  Okay.
7      A.    In fact, the —
8      Q.    That arteriogram was in August —
9      A.    Yeah.  It was a couple days before I did his
10  bypass.  Now, to have that much emboli build up and
11  have such relatively asymptomatic problems, again I
12  know he had tissue loss, but to have — to be able to
13  adapt to that much clot that's been going to your feet
14  tells me that it's been ongoing for quite some time,
15  which is one thing that makes this sort of difficult to
16  figure out what's going on.
17      Q.    So was this an unusual case?
18      A.    Yes.
19      Q.    Okay.  How so?  Like, is this like on an
20  extreme level in terms of what you saw in that
21  arteriogram?
22      A.    Yes.  Absolutely.
23      Q.    You would say it was an incredibly difficult
24  case to diagnose and —
25      A.    Yes, I would.

65

1     MR. CHEEK:  I don't want to put words in your
2  mouth.  I'm just trying to —
3     A.    No.  No.  You're not.  I think it was — it
4  was definitely one of the 10th or 90th percentile,
5  however you want to look at it.  But it was by no means
6  the normal situation.
7     **Q.    Can you please define for me the term**
8  **"ischemia"?**
9     A.    Lack of blood flow.  Or more specifically,
10  lack of oxygenation to the tissues.
11     **Q.    And based on the photographs depicted in**
12  **Exhibit 2, were Mr. Marlowe's feet showing signs of**
13  **ischemia?**
14     A.    It's not the pictures itself that tells me
15  that.
16     MR. CHEEK:  Okay.
17     A.    It's the pictures and the clinical exam of
18  decreased perfusion and the high suspicion that I have
19  for — for vascular disease.  All those together would
20  make me do the tests that I've discussed earlier.
21     **Q.    Everything combined.**
22     A.    Correct.
23     **Q.    If you were to look at those pictures in**
24  **isolation, can you say that he's exhibiting signs of**
25  **ischemia based on those pictures?**

66

1     A.    Not based solely on the look of the pictures.
2     **Q.    Okay.  The pictures in conjunction with the**
3  **decreased pedal pulses and the fact that he had**
4  **diabetes, is the whole — the whole picture, then you**
5  **make that —**
6     A.    Correct.
7     MR. CHEEK:  Okay.
8     A.    And the fact that I did his arteriogram and
9  I'm looking through a retro — looking through it after
10  knowing what happens.  That's why it's such an easy
11  thing to — to miss.
12     **Q.    Does ischemia resolve without medical**
13  **intervention?**
14     A.    Yes.
15     **Q.    It can?  Okay.**
16     A.    It can.
17     **Q.    Do you believe that he experienced ischemia**
18  **— I think I know the answer to this but I just want to**
19  **make sure.  Do you believe that he experienced ischemia**
20  **between March 14th of 2014 and when you treated him?**
21     A.    Sorry.  Maybe rephrase that a little bit.
22     **Q.    Is it your opinion that Mr. Marlowe**
23  **experienced ischemia or an ischemic event between March**
24  **of 2014 and when you treated him in August of 2014?**
25     A.    I think he was having ongoing microemboli

67

1  being showered to his feet for an extended period of
2  time.  Now, whether, you know, there were — I can't
3  say definitively whether there were actual emboli at
4  that — during that time frame, during those three
5  months or whatever.  My suspicion is there was, but
6  there's no way to know.
7     **Q.    But you wouldn't fault a provider if they**
8  **hadn't caught up — caught that?**
9     A.    No.  No, I would not.
10     MR. TIPLER:  I know my objection is late but
11  I object.
12     **Q.    Is it your opinion that Mr. Marlowe**
13  **experienced an embolization in his feet or lower**
14  **extremities in March of 2014?**
15     A.    I think he did experience emboli for an
16  extended period of time including likely the time frame
17  of March, the month of March in 2014.
18     **Q.    Those microemboli that we talked about?**
19     A.    Yes.  Sort of a continuous on and off sort of
20  thing.
21     **Q.    Is it your opinion that Mr. Marlowe**
22  **experienced a post-embolic event in his feet or lower**
23  **extremities in March of 2014?**
24     A.    I would give the same answer.  I don't know
25  the exact — I can't give you an exact time of when it

68

1  occurred.  I suspect that it was probably ongoing at
2  that month in 2014.
3     **Q.    Based solely on the photographs, can you rule**
4  **out that Mr. Marlowe had athlete's foot?**
5     A.    I could not rule that out.
6     **Q.    When you first saw Mr. Marlowe, and I think**
7  **you made reference to this at the beginning of the**
8  **deposition, did you initially believe that he was**
9  **misdiagnosed or had a missed diagnosis?**
10     A.    I think that he — I think the diagnosis of
11  emboli was not made until ultimately me and it wasn't
12  made by me until I did an arteriogram.  And so any
13  physicians that were specifically looking at his feet
14  or were treating these lesions, I think they thought it
15  was something other than emboli.
16     **Q.    But we've established that you do not fault**
17  **them.  You do not have any qualms with those physicians**
18  **for not diagnosing the emboli that we've talked about?**
19     MR. TIPLER:  Object.
20     A.    I do not think it is — I don't fault them
21  necessarily.  When I say fault them, I mean I do not
22  think that it's something that it's out of the unusual,
23  okay?  In other words —
24     **Q.    It's not malpractice.**
25     A.    It's not malpractice.

69

1      MR. TIPLER:  Object.

2      A.    It's a — it's something that happens.  It
3  happened in them — it happened to them, it happens to
4  every physician.  It's happened to me before.  So —

5      Q.    **In part — I'm sorry, I didn't mean to**
6  **interrupt.**

7      A.    So from that standpoint, it — I don't fault
8  them to the point of — to the level that I would
9  consider it to be malpractice, but by the same token,
10  anybody that is — that is in medicine and that wants
11  to strive to do the — to be the best they can be can
12  also accept the fact that sometimes you miss things.
13  And so I would — from that standpoint, I would say it
14  was a missed diagnosis.  In other words, they did not
15  make the correct diagnosis.

16      Q.    **Is part of your calculation into what**
17  **happened before you saw him the fact that this was such**
18  **an outlier of a case, such an extremely difficult case?**

19      A.    Yes.  That did make it difficult.  It's not
20  obvious.  And, in fact, again, like I've stated before,
21  I didn't make the diagnosis of embolization until I
22  actually angio'd him.

23      Q.    **Was it malpractice not to have an angio done**
24  **before?**

25      MR. TIPLER:  Object.  Again, why are we

70

1  asking him these questions when he is not an
2  internist?  He is a vascular specialist.  And I
3  think we're wasting his time to do this, Jason,
4  asking him questions that clearly are not — the
5  answers are not admissible.

6      MR. CHEEK:  I would just put on the record
7  that wasting a doctor's time would be scheduling a
8  deposition and not showing up for it, which is what
9  happened yesterday.  But you may answer the
10  question, Doctor.

11      MR. TIPLER:  Not showing up for it?  Me and
12  the court reporter were both here.  What are you
13  talking about now?

14      THE DEPONENT:  So could you repeat the
15  question for me, please?

16      MR. CHEEK:  Yes.

17      MR. TIPLER:  Note my objection, please.

18      (Whereupon the last question is read back by
19  the reporter.)

20      A.    I don't think it was malpractice, no.

21      Q.    **Okay, Doctor.  I'm going to show you your**
22  **medical records.**

23      A.    Okay.

24      Q.    **I'm going to mark them as Defense Exhibit No.**
25  **10.  If you would look at the very first page.**

71

1      A.    Okay.

2      Q.    **Under the History of Present Illness, there's**
3  **a line there that says:  Patient states he started**
4  **developing ulcers on both feet several weeks ago and**
5  **they have been getting progressively worse.  What are**
6  **ulcers on the feet indicative of?**

7      A.    Could be many things but the first thing that
8  comes to my mind is ischemia.

9      Q.    **And does the fact that the patient told you**
10  **that they started developing several weeks ago have any**
11  **— mean anything to you?  Is that significant?**

12      A.    No.  I don't — I'm not sure what you're
13  asking me, but no.

14      Q.    **So let's assume that the patient is correct**
15  **and that those ulcers — his feet had been fine and**
16  **then he started developing — let me back up.**

17      A.    Okay.

18      Q.    **Looking at Exhibit No. 2, are those ulcers?**

19      A.    Not — not at this point.

20      Q.    **Those are not ulcers.  Okay.  So those are**
21  **lesions.  Not ulcers.**

22      A.    Yes.  Correct.  Not ulcers.

23      Q.    **So if the patient tells you that I have these**
24  **ulcers that are on my feet, they developed — started**
25  **developing several weeks ago as opposed to I've had**

72

1  **them since March of this year, how — how is that —**

2      A.    Well, if he had lesions that were stable for
3  several months, then it would seem to be less of an
4  acute problem.  It wouldn't necessarily change what I
5  would do but it would just sort of lower my concern a
6  bit, I guess is the way to say it.

7      Q.    **Can a patient have gangrene, gangrenous toes,**
8  **for several months?**

9      A.    Oh, yes.

10      Q.    **And can that condition remain stable or does**
11  **it progress or does it just vary?**

12      A.    Well, it could be stable and a toe could also
13  — it could be very dry gangrene, almost mummified, and
14  then eventually it just falls off.  A minor trauma and
15  it just falls off.  Sort of auto amputation, as we call
16  it.

17      Q.    **You also mention in this consult note that —**
18  **and Doctor, if you'll look at the red page numbers at**
19  **the very bottom, I'm on Page No. 9.**

20      A.    Okay.

21      Q.    **You mention in this consult note that he has**
22  **tibioperoneal disease.  Is that correct?**

23      A.    That's correct.  My exam, he has
24  tibioperoneal disease which basically means I can feel
25  pulses clinically up to proximal or upstream so to

73

1 speak from the tibial vessels, is what that means.  So
2 in other words, I felt a popliteal pulse.
3          MR. TIPLER:  That's behind the knee?
4          THE DEPONENT:  Correct.
5      **Q.   Is tibioperoneal disease the same as**
6 **tibioperoneal occlusive disease?**
7      A.   Yes.  When I say it it is, I should say.
8      **Q.   Would you agree that tibioperoneal disease is**
9 **one of the more difficult disease processes to**
10 **successfully treat in vascular surgery?**
11     A.   Yes.
12     **Q.   Would you agree that the management of**
13 **tibioperoneal occlusive disease, or tibioperoneal**
14 **disease, is among one of the most medically and**
15 **surgically challenging problems in vascular surgery?**
16     A.   I would agree with that.
17     **Q.   I want to turn to Page 14 of Exhibit No. 10.**
18     A.   You said 14?
19     **Q.   Yes, sir.  You performed your bypass surgery**
20 **on Mr. Marlowe on August 6 of 2014, right?**
21     A.   Correct.
22     **Q.   And in that operative report — I'm sorry,**
23 **it's on the following page.  Number 15.**
24     A.   Mmm hmm.
25     **Q.   Indication for Procedure.  You state Mr.**

75

1 speak, like one event that sent that much thrombus down
2 the leg, I mean, it's going to be very apparent what's
3 going on.  The foot will essentially die very quickly.
4 Within hours, okay?  Just like if you — if I took a
5 person with normal blood flow and tied off his blood
6 vessels so there was no blood flow going beyond the
7 ankle, his foot would die in a matter of hours.  That's
8 not what happened in him.  And we're designed with an
9 incredible ability to adapt when things happen very
10 slowly.  And so he has this ongoing process that's been
11 happening for months and I would probably hazard a
12 guess years.  And so he can have occlusion of every
13 blood vessel that we have a name for below his ankle
14 and he still be able to walk around and his foot still
15 look like it may be just a fungal infection as opposed
16 to what it really is.  Does that — okay.  So if it
17 happens just all of a sudden, there's no doubt about
18 it.  His foot just turns black and it dies within
19 hours.  But when it happens slowly, very slowly, months
20 to years, you're very adaptable to it and you can get
21 unusual-looking lesions that can look like fungal
22 infections and still be able to walk around and not be
23 in such excruciating pain that he, you know, can't even
24 stand up, which is not the way he presented.
25          MR. CHEEK:  Okay.

74

1 **Marlowe is an eighty-year-old gentleman who about six**
2 **to eight weeks ago apparently had an episode of**
3 **significant bilateral lower extremity embolization.**
4          How does that statement mesh with these
5 microemboli that we've been talking about?
6      A.   It — this is — it was probably misstated in
7 this — in the — in this History of Present Illness.
8 And again, the reason I say that is because typically
9 the amount of emboli that he had, if that were to
10 happen as quickly as six to eight weeks ago, it would
11 have been much more apparent than it was in this
12 situation.
13     **Q.   So if you could reword that, how would you —**
14     A.   I would say chronic because I just really
15 have no idea how long it's been going on but it's
16 certainly been awhile.
17     **Q.   Okay.  So you'd take out the six to eight**
18 **weeks and say —**
19     A.   Just be more vague about it, yes.
20     **Q.   Well, can you tell me why — why you have**
21 **that change between then and now?**
22     A.   Well, the reason I say that I guess is
23 because — again, the way — the amount of emboli that
24 he had to both legs, and the amount that he had, if you
25 were going to have that as an all-in-one setting, so to

76

1      A.   So that's why I would say chronic.
2      **Q.   What's the amputation rate for patients like**
3 **say Mr. Marlowe who undergo bypass surgery?**
4      A.   It's hard for me to give you an exact number.
5 I can tell you if you're looking at patients that have
6 large — large acute embolic events, a third to a half
7 of those patients will lose their limb depending on
8 where they embolize to, okay?
9      **Q.   And would that be a description of — would**
10 **Mr. Marlowe fall into that bucket?**
11     A.   No.  So that would be — and this is such a
12 rare event that I'm not sure that you — as far as I'm
13 aware of, that you could really give any sort of
14 definitive numbers on somebody in this situation.  So I
15 can't tell you —
16     **Q.   And it being rare because of the microemboli?**
17     A.   Yeah, and this sort of low — slow process
18 that's gone on to wind up occluding all his tibial
19 vessels below the ankle.  You know, I don't know of any
20 definitive number that I can give you for that.
21          MR. TIPLER:  Are you getting close to the end
22     Jason?  Oh, no.  Doctor, let's take a break and
23     maybe he'll leave and I'll tear off those last
24     pages of notes and we can get you out of here.
25     **Q.   If Dr. Cumagun had referred Mr. Marlowe to**

1  you in March of 2014, you would have done the workup
2  that we had talked about before, the arteriogram, etc.,
3  etc.  Anything else?
4     A.    (Deponent nods).  I would note just the same
5  thing I did in this case.  I just would have done it
6  sooner.
7     Q.    Let me just make note for the record as I was
8  asking the question, the doctor was shaking his head
9  yes.  Is that fair?
10    A.    That's correct.
11    Q.    Thank you.  Who have you talked to in order
12 to prepare for your deposition today?
13    A.    Just Mr. Tipler is all.
14    Q.    And when did you talk to him?
15    A.    Well, we spoke last night and then we spoke
16 the time he came — those other times we discussed.
17 Those would be the times.
18    Q.    What have you reviewed to prepare for your
19 deposition today?
20    A.    Just the medical chart.  The ones you just
21 showed me.  My medical records.
22    Q.    Okay.  Nothing else?
23    A.    No, sir.
24    Q.    Have you ever reviewed Dr. — I'm sorry, Mr.
25 Marlowe's deposition transcript?

1        MR. CHEEK:  Okay.
2     A.    Well, I was on staff at UAB for about eight
3  years before I came here.  This is the only other place
4  that I've worked.  And I was an attending in the
5  department or the section of vascular surgery and we
6  also had an appointment at the VA as well so I
7  basically spent one day a week there.  I think it was
8  three eighths, back in the 8 system.
9     Q.    Two hatter.  Can you tell me roughly the
10 years that you were at the VA?
11    A.    Yes.  It was 2004 to 2012.
12    Q.    Do you have any bias related to the VA and
13 the care that it provides?
14    A.    No.
15    Q.    Have you ever testified at trial as an expert
16 witness?
17    A.    Not at trial.
18    Q.    Okay, but you've given depositions?
19    A.    Yes.
20    Q.    You've said two or three?
21    A.    Two or three.  Yes.
22    Q.    And for which party did you give those
23 depositions, the plaintiff or the defendant?
24    A.    Both.
25        MR. TIPLER:  Jason, I think you want to know

1     A.    No.
2     Q.    Have you reviewed Dr. Cumagun's transcript?
3     A.    No.  I have not reviewed any transcripts.
4     Q.    And by transcript, I'm talking about — so
5  you haven't reviewed any deposition transcript.
6     A.    Any depositions.  None.
7     Q.    When was the last time you saw Mr. Marlowe as
8  a patient?
9     A.    I don't know for sure.  Let me check.  I'm
10 not a hundred percent sure but I — I don't know for
11 sure.
12        MR. CHEEK:  Okay.  Don't worry about it.
13        MR. TIPLER:  You haven't seen him since 2014.
14        THE DEPONENT:  Yes.  That's correct.  I think
15    it's November 5th, 2014.
16        MR. CHEEK:  I think I'm almost finished.  Let
17    me just take a few moments to make sure.
18        THE DEPONENT:  Okay.
19    Q.    What's your home address?
20    A.    ██████████████████  █████████████████
   ██████
22    Q.    Have you ever worked for the VA?
23    A.    I have.
24    Q.    As a resident?
25    A.    As an attending physician.

1  this.  When he says he's testified as an expert
2  witness, I think he's speaking of as a treating
3  physician.
4     A.    I've done an expert as well as an expert.
5  I've given expert opinion as well during a deposition.
6     Q.    You've been retained —
7        MR. TIPLER:  About standard of care?
8     A.    Yes.
9     Q.    Okay.  And what kind of cases were those?
10    A.    Well, they were all vascular surgical type
11 cases.  Ruptured aneurysm was one.  And then a patient
12 that — two of them actually were ruptured aneurysms.
13    Q.    Okay, and you don't remember the third, if
14 there was a third one, what kind of case that was?
15    A.    Well, I think those are the only ones I was
16 actually deposed on.  All the other ones were more
17 chart review and opinion.
18    Q.    Got you.  Okay.  Uncomfortable questions but
19 I've got to ask them.  Have you ever been arrested?
20    A.    Yes.
21    Q.    Okay.  Roughly when was that?
22    A.    It would have been 1986.  No.  '88.
23        MR. CHEEK:  Okay.  Can we go off the record
24    for a second?
25        (Off-record discussion)

81

1     MR. CHEEK:  Back on the record.

2    **Q.   Have you ever been involved in any**

3 **litigation?**

4    A.  Yes.

5    **Q.   What kind?**

6    A.  I've just been served as a defendant in a

7 malpractice case for the first time.

8    MR. CHEEK:  Okay.  Well, congratulations.

9    THE DEPONENT:  Thank you.

10   **Q.   Okay.  So you were recently served with that?**

11   A.  Yes.

12   **Q.   And that's the only time you've been involved**

13 **in litigation professionally or personally?**

14   A.  That's correct.

15   **Q.   And that case is still in active litigation?**

16   A.  Yeah.  It's barely started.

17   **Q.   And you were sued in that case for medical**

18 **malpractice?**

19   A.  That's what's alleged.

20   **Q.   Okay.  Have you ever been disciplined or**

21 **reprimanded by an employer?**

22   A.  No.

23   **Q.   Have you ever been disciplined or reprimanded**

24 **by a state medical board or licensing official?**

25   A.  No.

---

82

1    **Q.   What's your date of birth?**

2    A.   ███████

3    MR. CHEEK:  That's all I have.  Thank you.

4    MR. TIPLER:  Can we go off the record a

5 minute?

6    MR. CHEEK:  Sure.

7    (Off-record discussion)

8    MR. TIPLER:  I don't have any questions.

9    MR. CHEEK:  All right.  Thanks, Doctor.

10    FURTHER THE DEPONENT SAITH NOT,

11    Deposition concluded 4:26 p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

83

1     C E R T I F I C A T E

2 STATE OF ALABAMA

3 COUNTY OF SHELBY

4    I, Karen Davis, hereby certify that the

5 above and foregoing deposition was taken down by me on

6 Computerized Stenotype, and the questions and answers

7 thereto were transcribed by me, and that the foregoing

8 represents a true and correct transcript of the

9 deposition given by said witness upon said hearing.

10    I further certify that I am neither of

11 counsel nor of kin to the parties in the action, nor am

12 I anywise interested in the result of said cause.

13

14    _/s/ KAREN DAVIS_____

15    KAREN DAVIS, CCR

16    ACCR #491

17    ACCR Expires 9/30/2019

18    Notary Commission Expires 1/31/2022

19

20

21

22

23

24

25

## 1

**1** *[4]* 3:12, 20:10, 20:16, 20:21
**1/31/2022** 83:18
**10** *[3]* 3:21, 70:25, 73:17
**100** 2:7
**104** 2:6
**10th** *[2]* 34:3, 65:4
**11th** *[5]* 33:10, 33:15, 33:17, 46:11, 46:19
**14** *[8]* 17:25, 18:12, 18:14, 30:1, 33:4, 55:25, 73:17, 73:18
**14th** *[6]* 30:17, 49:18, 53:24, 55:21, 56:18, 66:20
**15** 73:23
**15th** *[3]* 33:19, 45:7, 55:15
**16th** *[2]* 46:14, 46:19
**1801** 2:15
**1986** 80:22
**1997** 37:14
**1:17-CV-00309-VE** 1:9

## 2

**2** *[9]* 3:13, 30:16, 30:17, 43:9, 55:2, 62:13, 62:23, 65:12, 71:18
**20** 3:12
**2000** 18:14
**2002** *[2]* 37:9, 37:10
**2004** 79:11
**2012** *[2]* 48:1, 79:11
**2014** *[64]* 14:24, 17:24, 18:15, 23:10, 23:12, 26:4, 26:9, 26:11, 29:17, 30:10, 30:17, 32:23, 33:1, 33:10, 33:17, 34:2, 34:3, 34:4, 36:3, 36:11, 36:15, 36:18, 38:22, 41:8, 41:10, 41:15, 44:11, 44:23, 45:7, 45:16, 46:11, 46:18, 46:19, 46:19, 47:11, 48:10, 48:24, 49:5, 49:10, 49:18, 51:16, 52:2, 52:6, 53:22, 53:24, 57:16, 58:17, 58:24, 59:6, 59:9, 59:12, 62:4, 63:21, 66:20, 66:24, 66:24, 67:14, 67:17, 67:23, 68:2, 73:20, 77:1, 78:13, 78:15
**2015** *[4]* 33:23, 34:1, 41:8, 41:15
**2016** *[3]* 40:1, 40:17, 41:3
**2018** 1:22
**205** *[2]* 2:9, 2:17
**20th** *[3]* 55:25, 56:23, 59:9
**224** *[2]* 49:21, 49:23
**225** 50:1
**226** 50:8
**22nd** *[2]* 47:11, 58:17
**23rd** 2:6
**244-2104** 2:17
**25th** *[3]* 44:23, 53:21, 57:1
**2:20** 1:22
**2nd** *[5]* 1:20, 45:16, 46:18, 58:24, 59:5

## 3

**3** *[7]* 1:21, 3:14, 39:22, 39:23, 39:25, 41:18, 44:13
**30** 3:13
**328-6800** 2:9
**35203** 2:16
**35233** 2:8
**35242** 78:21

**3: 30** 53:1
**3: 37** 53:1

## 4

**4** *[6]* 3:4, 3:15, 39:20, 43:15, 49:17, 55:25
**4/2/2018** 3:12
**4/7/1969** 82:2
**4091** 78:20
**43** 3:15
**491** 83:16
**4:26** 82:11

## 5

**5** *[2]* 3:16, 53:5
**5/15/14** 3:18
**5/9/16** 3:14
**53** *[2]* 3:16, 3:17
**57** 3:18
**58** *[2]* 3:19, 3:20
**5th** 78:15

## 6

**6** *[4]* 3:17, 53:20, 55:13, 73:20
**6/2/14** 3:20
**632** 1:20

## 7

**7** *[2]* 3:18, 57:15
**70** 3:21
**7th** 41:10

## 8

**8** *[3]* 3:19, 58:15, 79:8
**88** 80:22

## 9

**9** *[3]* 3:20, 58:24, 72:19
**9/30/2019** 83:17
**90th** 65:4
**9th** *[3]* 40:1, 40:16, 41:3

## A

**abbreviation** 58:7
**abbreviations** 58:3
**ABI** *[2]* 19:14, 19:18
**ability** *[3]* 5:6, 25:25, 75:9
**able** *[5]* 27:4, 35:14, 64:12, 75:14, 75:22
**above-the** 34:11
**above-the-knee** *[9]* 33:3, 33:19, 33:23, 34:9, 34:14, 34:21, 35:1, 35:7, 35:12
**abrupt** 7:15
**absent** 27:7
**absolute** 28:3
**Absolutely** *[2]* 20:8, 64:22
**abundantly** 6:24
**accelerates** 7:12
**accept** 69:12
**accessible** *[2]* 35:3, 35:9
**According** 62:6
**ACCR** *[2]* 83:16, 83:17
**accumulate** *[2]* 11:11, 11:17
**accumulated** 11:25
**accurate** *[2]* 17:2, 40:22
**accurately** 5:7
**across** 39:10
**action** *[2]* 1:8, 83:11
**active** *[2]* 38:3, 81:15
**actual** 67:3
**acute** *[3]* 42:5, 72:4,

**adapt** *[2]* 64:13, 75:9
**adaptable** 75:20
**adapts** 7:13
**add** 40:25
**addendum** 56:11
**address** 78:19
**adequate** 27:4
**admissible** 70:5
**admitted** *[3]* 8:6, 39:11, 39:12
**adversely** *[2]* 48:22, 49:3
**affect** *[3]* 5:6, 51:23, 51:24
**affected** 48:23, 49:4
**afternoon** 4:3
**agree** *[8]* 11:12, 34:25, 55:6, 55:10, 59:8, 73:8, 73:12, 73:16
**ahead** *[3]* 19:5, 20:9, 20:11
**akin** 10:9
**Alabama** *[8]* 1:2, 1:19, 1:20, 1:21, 2:8, 2:16, 37:16, 83:2
**Alabaster** 1:21
**alive** 11:9
**all-in-one** 74:25
**alleged** 81:19
**allow** 4:25
**already** 35:19
**although** 18:1
**AMERICA** 1:11
**American** *[3]* 37:20, 38:9, 38:13
**among** 73:14
**amount** *[7]* 12:11, 19:20, 54:20, 64:2, 74:9, 74:23, 74:24
**amputation** *[17]* 5:25, 33:3, 33:10, 33:12, 33:18, 33:19, 33:23, 34:7, 34:12, 34:13, 34:14, 34:21, 35:1, 35:7, 35:12, 72:15, 76:2
**amputations** *[3]* 6:16, 34:10, 36:3
**aneurysm** *[2]* 10:25, 80:11
**aneurysms** *[2]* 10:24, 80:12
**anew** *[2]* 27:2, 47:6
**angio** *[2]* 22:15, 69:23
**angio'd** 69:22
**angiogram** *[2]* 19:22, 19:23
**angioplasty** *[2]* 35:4, 35:10
**ankle** *[9]* 12:5, 19:18, 36:14, 55:8, 55:13, 57:7, 75:7, 75:13, 76:19
**ankle-brachial** 36:6
**answers** *[4]* 4:18, 70:5, 83:6
**anticoagulation** *[2]* 61:25, 62:3
**antifungal** *[2]* 56:10, 56:14
**anywise** 83:12
**apologies** 26:24
**apparent** *[5]* 9:11, 9:23, 10:2, 74:11, 75:2
**apparently** 74:2
**appear** 57:21
**Appearance** 54:18
**APPEARING** *[2]* 2:3, 2:12
**appears** *[3]* 5:17, 21:3, 55:14
**appointment** 79:6
**appointments** *[2]* 44:7, 44:10
**appreciate** 56:5
**appreciated** *[2]* 7:6, 54:12
**appropriately** 61:24
**approximately** *[2]* 8:23, 14:3

**argue** 50:19
**arrested** 80:19
**arterial** 60:23
**arteries** *[4]* 26:13, 35:2, 35:3, 35:8
**arteriogram** *[9]* 12:7, 21:24, 61:7, 64:1, 64:8, 64:21, 66:8, 68:12, 77:2
**artery** *[6]* 10:16, 10:17, 29:16, 35:22, 60:20, 63:9
**aside** 13:25
**asking** *[12]* 6:6, 16:3, 24:13, 24:15, 25:5, 26:15, 32:17, 47:18, 70:1, 70:4, 71:13, 77:8
**assess** 27:4
**Assistant** *[2]* 2:14, 4:4
**Associates** *[2]* 3:18, 45:1
**assume** *[10]* 16:10, 17:1, 23:8, 28:10, 28:21, 40:13, 47:24, 48:9, 51:7, 71:14
**assuming** *[2]* 8:13, 58:5
**assumption** *[3]* 14:19, 14:20, 14:21
**assumptions** *[2]* 15:7, 15:10
**asymptomatic** *[2]* 29:13, 64:11
**athlete's** *[2]* 63:6, 68:4
**atlases** 14:17
**attempt** 5:25
**attempted** 5:20
**attending** *[2]* 78:25, 79:4
**attention** 60:12
**attorney** *[3]* 2:14, 4:4, 13:6
**August** *[6]* 33:10, 33:15, 33:17, 64:8, 66:24, 73:20
**auto** 72:15
**Avenue** 2:15
**awhile** *[2]* 45:23, 74:16

## B

**bad** 8:14
**Band-Aid** 55:8
**barely** 81:16
**basically** *[7]* 4:21, 9:18, 10:11, 42:13, 60:25, 72:24, 79:7
**bearing** *[2]* 17:15, 17:17
**become** 9:23
**beginning** 68:7
**BEHALF** *[2]* 2:3, 2:12
**behind** *[5]* 31:15, 31:18, 31:20, 32:2, 73:1
**bell** 43:22
**below-the** 34:13
**below-the-knee** *[4]* 33:9, 33:18, 34:12, 35:15
**benefit** 34:20
**best** *[4]* 11:25, 15:3, 46:20, 69:11
**better** *[4]* 7:3, 7:14, 19:19, 52:18
**beyond** 75:6
**bias** 79:12
**biased** 23:17
**bilateral** *[2]* 41:25, 73:4
**Birmingham** *[2]* 2:8, 2:16
**birth** 82:1
**bit** *[3]* 7:7, 66:21, 72:6
**black** 75:18
**blood** *[19]* 5:5, 10:12, 10:18, 11:5, 11:6, 11:8, 12:4, 19:6, 25:24, 30:22,

**area** *[3]* 35:17, 35:23, 65:9, 75:5, 75:5, 75:6, 75:13
**bloodstream** 61:2
**board** *[9]* 37:17, 37:19, 37:20, 38:9, 38:11, 38:13, 38:17, 38:19, 81:24
**body** *[4]* 7:13, 61:1, 61:2, 61:11
**Bone** 46:23
**bottom** *[5]* 40:5, 40:6, 41:12, 49:20, 72:19
**Bourgeois** *[2]* 38:22, 39:5
**Bowman** 45:4
**Bowman's** 45:6
**brachial** *[2]* 19:19, 36:15
**brackets** *[2]* 20:12, 20:20
**breach** *[2]* 26:11, 52:8
**breached** *[2]* 52:2, 52:5
**break** *[5]* 5:3, 37:6, 52:24, 53:3, 76:22
**breakdown** 19:25
**brief** 46:2
**bring** 60:12
**broader** 60:22
**bucket** 76:10
**build** 64:10
**buildings** 39:4
**builds** *[2]* 10:25, 11:4
**built** 10:20
**bypass** *[21]* 21:8, 21:25, 32:5, 32:6, 61:14, 61:15, 64:10, 73:19, 76:3
**bypassing** 32:4

## C

**C.V** *[3]* 3:16, 37:3, 53:4
**calculation** 69:16
**can't** *[20]* 12:14, 12:17, 12:18, 20:24, 21:12, 25:10, 25:17, 28:6, 29:20, 31:24, 49:2, 49:8, 49:12, 50:19, 54:12, 57:22, 67:2, 67:25, 75:23, 76:15
**candidate** 35:14
**cannot** *[2]* 26:22, 63:8
**care** *[29]* 15:12, 16:16, 24:9, 24:14, 24:16, 24:17, 24:17, 24:18, 24:25, 25:11, 25:13, 25:18, 26:8, 26:12, 26:16, 26:17, 26:22, 32:11, 32:13, 42:14, 51:15, 52:2, 52:5, 52:8, 53:22, 58:25, 59:12, 79:13, 80:7
**case** *[21]* 5:15, 5:16, 6:23, 11:20, 12:22, 15:19, 20:5, 35:24, 35:25, 39:2, 39:18, 53:23, 64:17, 64:24, 69:18, 69:18, 77:5, 80:14, 81:7, 81:15, 81:17
**cases** *[2]* 80:9, 80:11
**catastrophic** *[3]* 11:2, 11:12, 11:14
**category** 60:23
**catheter** 19:22
**caught** *[3]* 52:17, 67:8, 67:8
**cause** *[4]* 9:21, 9:25, 61:23, 83:12
**caused** 10:20
**CCR** *[3]* 1:18, 83:15
**Center** *[3]* 44:17, 45:10, 53:21
**certain** 31:16
**certainly** *[2]* 22:16, 74:16
**certifications** 38:17
**Certified** *[4]* 1:18, 37:17, 38:11, 38:19

*certify [2]* 83:20, 84:14
**challenging** 73:15
**change [8]** 20:3, 20:6, 20:21, 41:2, 48:7, 51:11, 72:4, 74:21
**changed [4]** 41:16, 48:14, 48:19, 53:7
*chart [3]* 42:15, 77:20, 80:17
**check [8]** 5:22, 27:10, 27:12, 33:5, 41:7, 41:9, 41:14, 78:9
*checking [2]* 27:1, 27:3
*Cheek [67]* 2:13, 3:4, 4:2, 4:4, 7:2, 7:5, 9:19, 10:14, 10:22, 14:6, 18:9, 19:5, 20:8, 20:15, 20:17, 21:14, 23:22, 24:20, 24:22, 25:9, 26:19, 29:23, 30:9, 30:12, 31:1, 31:19, 32:15, 32:19, 33:8, 36:18, 37:5, 39:22, 41:6, 43:2, 43:5, 47:20, 49:16, 49:22, 50:5, 50:14, 51:1, 52:24, 53:2, 53:10, 53:12, 53:15, 54:16, 59:4, 61:10, 61:22, 62:22, 64:6, 65:1, 65:16, 66:7, 70:6, 70:16, 75:25, 78:12, 78:16, 79:1, 80:23, 81:1, 81:8, 82:3, 82:6, 82:9
*chronic [5]* 5:18, 9:10, 12:8, 74:14, 76:1
**circuit** 46:15
*Circular* 54:19
*circulation [2]* 30:22, 31:12
*Civil [2]* 1:8, 1:17
**clarify [5]** 4:22, 18:10, 24:22, 49:13, 51:2
*claudication [3]* 32:12, 32:18, 32:22
**clear [4]** 6:24, 54:21, 56:20, 63:19
*cleared [4]* 51:9, 60:1, 60:17, 60:18
*clearly [8]* 16:13, 18:19, 19:1, 22:12, 22:13, 22:17, 27:22, 70:4
**clinic [4]** 18:13, 30:18, 42:18, 59:11
*clinical [7]* 29:6, 29:11, 29:12, 42:19, 42:25, 61:4, 65:17
*clinically* 72:25
*close [3]* 38:24, 64:5, 76:21
*clot [3]* 10:24, 10:25, 64:13
*code [3]* 58:2, 58:2, 58:3
**color** 3:13
**combined** 65:21
*comes [3]* 28:12, 41:19, 71:8
*coming [2]* 34:23, 47:14
**commencing** 1:22
**Commission** 83:18
*Commissioner* 1:19
**committed** 52:22
**complains** 59:18
**complaint** 57:19
**complaints** 29:12
*complete [3]* 4:25, 12:4, 40:24
*completely [2]* 28:4, 77:13
*Computer* 62:20
*Computerized* 83:6
*concern [4]* 19:6, 50:20, 62:7, 72:5
*concerned [2]* 18:16, 31:5
**concerning** 25:22
**concerns** 19:7
*concluded* 82:11

*conditioned [2]* 72:10
**confused [2]** 30:6, 30:10
**confusion** 30:7
**congenitally** 27:7
*congratulations* 81:8
**conjunction** 66:2
*consider [2]* 15:11, 69:9
*consult [2]* 72:17, 72:21
**consulted [2]** 8:7, 39:13
**continually** 60:11
*continues [2]* 50:5, 50:6
**continuous** 67:19
*contralateral* 34:21
*contrasting [2]* 19:21, 22:15
**contributed** 6:15
*Coosa [3]* 3:17, 44:17, 53:20
*correct [50]* 5:19, 5:11, 5:12, 5:23, 6:19, 7:1, 8:25, 14:20, 15:14, 18:23, 20:2, 23:5, 23:7, 30:11, 30:12, 32:23, 32:24, 33:14, 34:3, 34:16, 35:25, 36:25, 37:1, 38:4, 38:7, 38:12, 39:8, 39:16, 41:13, 42:21, 42:25, 42:25, 47:12, 50:2, 53:9, 58:20, 59:15, 65:22, 66:6, 69:15, 71:14, 71:22, 72:22, 72:23, 73:4, 73:21, 77:19, 77:24, 81:14, 83:8
**correction** 41:18
**correctly** 32:16
**counsel** 83:11
**COUNTY** 83:3
*couple [13]* 12:15, 40:20, 42:17, 46:8, 46:17, 46:22, 47:3, 47:7, 48:11, 55:19, 62:16, 62:18, 64:9
*couple [5]* 1:1, 1:18, 50:25, 52:11, 70:12
*Craddock* 45:10
*cream [4]* 56:10, 56:13, 56:14, 59:9
**creams [2]** 56:20, 60:1
*critical [2]* 5:19, 11:7
*CT* 19:22
*Cumagun [16]* 26:4, 26:7, 26:11, 26:14, 26:23, 29:17, 32:23, 36:14, 48:11, 49:19, 52:2, 52:21, 56:2, 56:17, 63:25, 76:25
*Cumagun's [2]* 49:17, 78:2
*currently [2]* 31:14, 37:23
*cut* 49:22

**D**

*date [10]* 14:25, 30:19, 33:5, 33:14, 33:25, 36:17, 40:1, 41:4, 41:14, 82:1
*dated [4]* 3:12, 3:20, 41:3, 58:17
*dating* 47:25
*Davis [4]* 1:18, 83:4, 83:14, 83:15
*dead [2]* 64:5, 64:5
**dealing** 7:11
**dealt** 52:17
**death** 11:13
*Deborah* 44:20
*decreased [8]* 18:1, 18:17, 31:6, 42:19, 47:25, 48:10, 65:18, 66:3
*defendant [5]* 1:13, 2:12, 4:5, 79:23, 81:6

39:25, 49:16, 53:5, 53:19, 55:12, 57:15, 58:15, 58:23
*Defense [7]* 43:8, 43:14, 55:2, 55:25, 62:12, 62:23, 70:24
*define [2]* 60:24, 65:7
**definitely** 65:4
**definition** 25:14
*definitive [3]* 21:22, 76:14, 76:20
*definitively [5]* 31:2, 31:21, 49:2, 63:4, 67:3
**delayed** 6:13
*department [2]* 24:19, 79:5
*depend [3]* 29:2, 29:6, 29:11
*depending [2]* 61:10, 76:7
**depends** 9:17
**depicted** 65:11
**depo** 53:16
*Deponent [30]* 19:16, 19:18, 20:13, 28:17, 28:19, 30:3, 30:11, 30:13, 33:15, 33:17, 43:4, 47:21, 49:21, 49:23, 49:25, 50:2, 50:6, 50:9, 50:11, 52:12, 52:25, 57:12, 62:25, 70:14, 73:4, 77:4, 78:14, 78:18, 81:9, 82:10
*deposed [2]* 4:8, 80:16
*deposition [12]* 1:15, 4:8, 68:8, 70:8, 72:2, 77:19, 77:25, 78:5, 80:5, 82:11, 83:5, 83:9
*depositions [3]* 78:6, 79:18, 79:23
*dermatitis [6]* 49:25, 50:20, 50:23, 51:4, 51:8, 51:19
*dermatologist [12]* 7:23, 7:25, 8:2, 8:18, 8:23, 13:20, 15:1, 38:23, 42:10, 55:21, 56:9, 56:24
*dermatologist's* 56:5
**dermatologists** 59:8
**dermatology** 56:18
**describe** 57:23
*description [3]* 20:5, 20:6, 76:9
**designed** 75:8
*detailed [3]* 21:20, 22:18, 23:2
*develop [2]* 9:15, 9:15
*developed [2]* 11:20, 71:24
*developing [4]* 71:4, 71:10, 71:16, 71:25
**develops** 61:1
*diabetes [3]* 57:23, 58:4, 66:4
*diag* 7:19
*diagnose [5]* 6:11, 9:2, 9:6, 61:3, 64:24
**diagnosed** 7:3
*diagnoses [2]* 50:18, 52:14
**diagnosing** 68:18
*diagnosis [17]* 6:13, 7:8, 7:8, 7:19, 7:21, 49:11, 50:13, 50:20, 50:22, 50:24, 52:9, 61:6, 68:9, 68:10, 69:14, 69:15, 46:10
*die [2]* 75:3, 75:7
*dies [2]* 12:9, 75:18
**difference** 60:19
*difficult [13]* 6:11, 7:8, 9:1, 9:6, 12:1, 23:16, 32:1, 50:3, 64:15, 64:23, 69:18, 69:19, 73:9
*diminished [18]* 8:15, 18:2, 18:24, 19:11,

23:18, 24:4, 24:10, 25:2, 27:14, 27:18, 28:11, 28:22, 29:5, 35:20, 63:24
*DIS* 58:7
*disagree [2]* 32:8, 50:12
**discharge** 54:21
*disciplined [2]* 81:20, 81:23
**disciplines** 24:1
**discoloration** 10:4
**discontinue** 56:12
*discussed [5]* 12:22, 12:24, 13:1, 65:20, 77:16
*discussion [4]* 47:23, 59:6, 80:25, 82:7
*disease [28]* 7:10, 7:14, 9:10, 10:1, 16:6, 16:23, 17:13, 17:15, 24:3, 25:22, 29:17, 31:22, 35:22, 57:24, 58:5, 60:20, 60:21, 60:22, 63:10, 65:19, 72:22, 72:24, 73:5, 73:6, 73:8, 73:9, 73:13, 73:14
**diseases** 10:6
**disorganized** 55:18
*distal [6]* 10:12, 21:8, 21:24, 21:25, 22:1, 22:2
**distinguished** 63:13
*DISTRICT [2]* 1:1, 1:2
*DIVISION* 1:3
*doctor [29]* 6:23, 18:10, 20:9, 20:19, 25:9, 27:13, 27:17, 28:13, 28:18, 28:24, 29:4, 30:5, 30:9, 30:15, 32:15, 39:24, 42:14, 43:14, 51:15, 51:15, 57:9, 59:13, 62:22, 70:10, 70:21, 72:18, 76:22, 77:8, 82:9
*doctor's [5]* 28:12, 28:23, 29:21, 60:12, 70:7
*doctors [2]* 44:3, 44:4
*document [4]* 40:2, 40:16, 41:21, 42:12
*documented [4]* 23:11, 24:11, 25:2, 63:25
*documents [3]* 43:18, 43:19, 43:21
*Doppler [13]* 22:22, 22:23, 22:24, 23:2, 23:3, 23:6, 26:12, 29:4, 32:12, 32:17, 36:1, 36:6, 49:4
*dorsal [5]* 27:1, 27:3, 27:7, 32:4, 35:21
*double [3]* 41:7, 41:9, 41:14
**doubt** 75:17
*downstream [3]* 10:12, 10:20, 11:1
*Dr [45]* 1:15, 3:14, 3:16, 3:20, 3:21, 4:3, 17:23, 18:11, 26:4, 26:7, 26:11, 26:14, 26:23, 29:17, 32:23, 36:1, 37:7, 38:22, 39:5, 39:6, 41:17, 44:20, 44:22, 45:6, 45:13, 45:15, 46:10, 46:13, 46:18, 46:25, 47:8, 47:11, 48:11, 49:9, 49:17, 52:1, 52:21, 53:3, 56:2, 56:17, 58:24, 63:25, 76:25, 77:24, 78:2
*draft* 39:17
*drafting [2]* 43:7, 43:11
*dry* 72:13
*duplex [6]* 19:14, 19:16, 22:20, 22:21, 22:25, 23:3

**E**

*earlier [7]* 13:20, 14:18, 22:19, 39:1, 43:18, 53:23, 65:20
*easier* 5:1
*easily* 19:1
*easy* 66:10
*eight [4]* 74:2, 74:10, 74:17, 79:2
*eighteen [2]* 12:16, 12:19
*eighths* 79:8
*eighty-year-old [2]* 41:24, 74:1
*either [6]* 18:17, 19:22, 22:7, 22:12, 35:13, 60:12
**eleven** 53:23
*Email* 3:12
**embolectomy** 61:16
*emboli [24]* 9:1, 9:13, 9:17, 9:20, 10:15, 12:12, 60:24, 61:8, 61:11, 61:13, 61:21, 62:1, 62:10, 63:2, 64:2, 64:3, 64:10, 67:3, 67:15, 68:11, 68:15, 68:18, 74:9, 74:23
**embolic** 76:6
*embolization [11]* 5:18, 6:10, 6:25, 7:12, 7:16, 9:12, 9:14, 67:13, 69:21, 74:3
**embolize** 76:8
**embolized** 61:10
*emergency [8]* 15:22, 16:11, 24:18, 44:22, 44:23, 53:21, 57:2, 59:10
*employer* 81:21
**enters** 56:24
*episode* 74:2
*ER [5]* 51:15, 54:2, 57:9
*essentially [2]* 34:7, 75:3
*established* 68:16
*etc [2]* 77:2, 77:3
*etiology* 68:16
*event [5]* 11:2, 66:23, 67:22, 75:1, 76:12
*events* 76:6
**eventually** 72:14
*everything [2]* 43:16, 65:21
*evidence [2]* 42:19, 43:1
*exact [5]* 43:20, 46:3, 67:25, 67:25, 76:4
*exactly* 21:11
*exam [7]* 19:16, 31:6, 32:17, 54:3, 54:18, 65:17, 72:23
*examination [5]* 3:3, 4:2, 22:18, 27:4, 42:22
**examinations** 38:16
*examined [2]* 16:13, 17:7
*examples* 28:8
*excruciating* 75:23
*excuse* 25:4
*exhibit [28]* 3:8, 3:11, 20:10, 20:21, 30:16, 30:17, 39:25, 41:18, 43:9, 43:15, 44:13, 49:17, 53:5, 53:16, 53:20, 55:2, 55:12, 55:24, 55:25, 57:15, 58:15, 58:23, 62:12, 62:23, 65:12, 70:24, 71:18, 73:17
*exhibiting* 65:24
**expect** 52:16
*expected* 21:22
*experience [3]* 52:5, 62:10, 67:15
*experienced [6]* 59:25, 66:17, 66:19, 66:23,

67:13, 67:22
*experiencing [2]* 32:22, 63:20
*expert [6]* 39:17, 79:15, 80:1, 80:4, 80:4, 80:5
*Expires [2]* 83:17, 83:18
*explain* 9:5
*express* 26:16
*extended [2]* 67:1, 67:16
*extensive [2]* 14:7, 31:16
*extraordinarily* 34:20
*extreme* 64:20
*extremely* 69:18
*extremities [11]* 5:18, 11:14, 15:22, 16:12, 36:12, 42:7, 54:6, 60:16, 63:2, 67:14, 67:23
*extremity [6]* 27:5, 27:11, 41:25, 54:10, 54:18, 74:3
*extremity/pain* 54:10

### F

*facetious* 47:19
*factors* 61:5
*failed* 34:13
*failure [3]* 5:24, 6:15, 7:19
*fair [5]* 13:16, 14:2, 56:21, 57:4, 77:9
*fall* 76:10
*falls [2]* 72:14, 72:15
*familiar [6]* 8:20, 43:24, 55:20, 55:23, 56:13, 58:3
*fast* 32:25
*fault [5]* 67:7, 68:16, 68:20, 68:21, 69:7
*February* 48:1
*Federal* 1:17
*feel [12]* 18:19, 22:13, 29:20, 29:25, 30:1, 30:2, 31:15, 31:19, 31:24, 32:1, 32:2, 72:24
*feeling* 22:9
*felt [2]* 18:21, 73:2
*femoral [2]* 10:16, 32:5
*figure* 64:16
*filled* 10:12
*finding* 29:22
*findings [4]* 21:21, 54:3, 57:10, 61:6
*fine [2]* 33:8, 71:15
*finished* 78:16
*flip* 43:16
*flow [8]* 11:8, 19:6, 31:17, 35:2, 35:8, 65:9, 75:5, 75:6
*fluctuance* 54:20
*focus* 6:18
*focusing* 60:13
*foot [11]* 12:9, 21:4, 32:4, 59:25, 63:6, 64:5, 68:4, 75:3, 75:7, 75:14, 75:18
*foregoing [2]* 83:5, 83:7
*formed* 17:18
*forming [7]* 12:25, 14:9, 14:19, 15:6, 15:19, 16:1, 16:2
*forward* 32:25
*fourth [2]* 1:15, 41:20
*frame [4]* 15:8, 59:24, 67:4, 67:16
*frankly [2]* 7:7, 47:17
*full* 5:10
*fungal [6]* 8:1, 8:4, 59:25, 63:7, 75:15, 75:21

### G

*gangrene [3]* 11:13,

*gangrenous* 72:7
*gave [3]* 33:14, 33:25, 36:17
*gentleman [2]* 41:24, 74:1
*gets* 11:6
*given [4]* 12:3, 79:18, 80:5, 83:9
*gives* 31:2
*giving* 19:24
*goes [7]* 11:1, 28:23, 56:17, 57:1, 57:2, 59:9, 59:11
*Goldhagen* 47:1
*gone [3]* 7:24, 51:14, 76:18
*gotten* 19:24
*graduated [2]* 37:9, 37:14
*groin [2]* 10:16, 10:18
*ground* 4:13
*guess [13]* 6:5, 11:25, 37:9, 42:5, 49:21, 50:3, 50:11, 57:23, 60:3, 63:18, 72:6, 74:22, 75:12

### H

*hadn't* 81:8
*half* 76:6
*half* 39:3
*Hang* 24:12
*happen [3]* 43:17, 74:10, 75:9
*happened [9]* 10:1, 15:8, 55:20, 69:3, 69:3, 69:4, 69:17, 70:9, 75:8
*happening* 75:11
*happens [8]* 12:8, 52:9, 52:15, 66:10, 69:2, 69:3, 75:17, 75:19
*happy* 4:15
*hatter* 79:9
*haven't [3]* 12:23, 78:5, 78:13
*having [11]* 9:24, 10:10, 11:7, 19:7, 25:8, 34:23, 48:23, 49:4, 54:15, 61:5, 66:25
*hazard* 75:11
*he'll* 76:23
*he's [6]* 23:25, 25:3, 54:22, 65:24, 80:1, 80:2
*heal* 34:13
*healing [2]* 35:18, 54:19
*Health* 45:10
*heard* 39:1
*hearing [2]* 22:24, 83:9
*held [2]* 25:20, 25:20
*helpful [3]* 17:8, 17:10, 17:13
*hereby* 83:4
*highly* 60:17
*himself [2]* 26:18, 42:9
*hindsight* 50:21
*history [3]* 54:2, 71:2, 74:7
*hmm [9]* 4:21, 16:14, 41:22, 51:17, 51:20, 55:6, 56:22, 62:14, 73:24
*hold [5]* 5:16, 5:22, 6:3, 12:21, 26:18
*holding* 62:23
*hone* 21:16
*honest [3]* 14:5, 26:21, 57:21
*honestly* 53:17
*hoped* 53:17
*hospital [4]* 8:6, 39:12, 39:12, 42:24
*hospitalist* 39:13
*hospitalists* 8:7
*hours [4]* 9:16, 75:4, 75:7, 75:19
*however* 65:5

### I

*ICD-10* 58:2
*ICD-9* 58:2
*idea [2]* 47:17, 74:15
*II [2]* 57:23, 58:4
*Illness [2]* 71:2, 74:7
*image* 55:4
*images* 23:4
*improve* 21:6
*include* 53:16
*includes* 60:23
*including* 67:16
*incorrect [2]* 41:13, 51:4
*incredible* 75:9
*incredibly* 64:23
*index [3]* 19:10, 36:6, 36:15
*indicate [4]* 30:22, 30:25, 31:2, 58:8
*indicating* 62:21
*indication [4]* 58:12, 59:18, 59:21, 73:25
*indicative* 71:6
*individual* 11:1
*infection [5]* 8:1, 60:1, 63:7, 63:18, 75:15
*infections* 75:22
*infectious* 63:16
*information [6]* 15:19, 16:1, 17:8, 17:12, 23:13, 42:6
*informed* 15:3
*initial* 7:17
*initially [7]* 6:25, 7:6, 7:22, 8:8, 8:24, 39:7, 68:8
*initials* 40:12
*instantly* 64:4
*institute* 21:5
*instituted* 18:19
*interested* 83:12
*interim [5]* 15:16, 15:23, 16:16
*internist [5]* 24:17, 25:19, 26:1, 26:15, 70:2
*internist's* 25:18
*internship* 38:5
*interrupt [3]* 18:10, 18:13, 69:6
*intervention [2]* 28:4, 66:13
*involved [2]* 81:2, 81:12
*ischemia [14]* 5:20, 7:15, 61:11, 61:12, 61:15, 61:20, 65:8, 65:13, 65:25, 66:12, 66:17, 66:19, 66:23, 71:8
*ischemic [5]* 8:5, 9:22, 10:5, 51:5, 66:23
*isolation* 65:24
*issue [4]* 6:3, 30:22, 31:12, 53:22
*itself [2]* 25:14, 65:14

### J

*James* 45:4
*Jason [6]* 2:13, 4:3, 25:5, 70:3, 76:22, 79:25
*Jason.cheek@usdo* 2:17
*jerk* 43:3
*JIMMY* 1:5
*job* 5:1
*Joint* 46:23
*journals [2]* 14:8, 14:14
*July [3]* 30:2, 46:13, 46:19
*July/August* 38:21
*June [8]* 36:11, 45:16, 46:11, 46:18, 46:18, 58:24, 59:5, 59:12

### K

*Karen [4]* 1:18, 83:4, 83:14, 83:15
*Karen's* 5:1
*Kenneth* 47:8
*kin* 83:11
*knee [13]* 10:17, 10:19, 31:15, 31:18, 31:20, 32:2, 34:12, 34:14, 34:17, 34:21, 34:24, 35:17, 73:3
*knowing [2]* 19:11, 66:10
*knowledge [6]* 5:8, 15:13, 15:15, 40:23, 44:21, 45:2
*known [2]* 15:18, 15:25

### L

*lack [4]* 12:4, 31:16, 65:9, 65:10
*larger [2]* 9:20, 9:20
*lasted* 12:15
*Law* 2:5
*leads [2]* 12:7, 12:12
*least [4]* 14:21, 39:2, 43:24, 56:13
*leave* 76:23
*leg [17]* 5:21, 5:22, 5:23, 5:25, 6:1, 12:5, 31:17, 33:4, 33:12, 33:24, 34:15, 34:16, 34:17, 34:24, 35:8, 61:24, 66:20, 66:23, 67:14, 67:17, 67:17, 67:23, 72:1, 77:1
*legal* 21:2
*legs [6]* 5:20, 18:3, 20:24, 21:18, 34:7, 74:24
*lesions [27]* 8:14, 18:8, 18:15, 19:8, 31:7, 50:22, 51:5, 51:22, 55:5, 55:16, 57:3, 57:19, 58:9, 58:12, 58:13, 58:18, 58:22, 59:2, 59:6, 59:13, 59:18, 63:13, 63:16, 68:14, 71:21, 72:2, 75:21
*less [2]* 10:20, 72:3
*let's [9]* 4:13, 17:1, 28:10, 28:21, 48:9, 51:7, 52:24, 71:14, 76:22
*letter [5]* 39:18, 40:1, 41:3, 42:14, 43:11
*level [3]* 52:20, 64:20, 69:8
*levels* 25:21
*license* 38:3
*licensed [4]* 37:11, 37:15, 37:21, 37:24
*licensing* 81:24
*liked [6]* 15:18, 15:25, 47:13, 48:3, 48:12, 48:16
*likelihood [2]* 34:19, 35:17
*likely [8]* 6:13, 18:2, 20:23, 36:22, 60:8, 60:17, 62:9, 67:16
*limb [5]* 5:19, 5:20, 6:1, 9:21, 57:11, 76:7
*lines [2]* 41:11, 42:17
*litigation [3]* 81:3, 81:13, 81:15
*local* 7:23
*located* 38:22
*location* 54:10
*longer* 38:3
*looking [13]* 7:10, 8:9, 18:11, 21:3, 22:25, 30:21, 49:13, 60:15, 66:9, 66:9, 68:13, 71:18, 76:5
*looks [7]* 21:10, 41:4, 49:23, 53:8, 56:10, 56:14, 56:19
*lose [2]* 33:20, 76:7

*lots [4]* 5:19, 7:13, 11:7, 64:12
*low [3]* 19:21, 34:20, 76:17
*lower [19]* 5:18, 11:13, 12:5, 15:22, 16:11, 27:5, 27:11, 33:13, 36:12, 41:25, 42:7, 54:6, 54:10, 60:15, 63:2, 67:13, 67:22, 72:5, 74:3

### M

*ma'am* 29:10
*makes [4]* 5:1, 26:2, 58:21, 64:15
*making* 30:13
*malpractice [9]* 52:20, 52:22, 68:24, 68:25, 69:9, 69:23, 70:20, 81:7, 81:18
*management* 73:12
*March [47]* 14:24, 15:8, 17:25, 18:12, 18:14, 23:10, 23:12, 26:3, 26:3, 26:9, 26:11, 29:17, 30:1, 30:10, 30:17, 32:23, 36:3, 36:15, 36:18, 38:21, 44:11, 44:23, 48:23, 49:4, 49:10, 49:17, 51:16, 52:2, 52:5, 53:21, 53:23, 55:21, 55:25, 56:23, 57:1, 59:9, 59:12, 62:14, 63:21, 66:20, 66:23, 67:14, 67:17, 67:17, 67:23, 72:1, 77:1
*mark [9]* 20:10, 20:11, 30:15, 43:14, 53:5, 53:15, 53:19, 58:15, 70:24
*marked [5]* 3:8, 3:11, 39:25, 43:8, 57:14
*Marlowe [42]* 1:5, 5:16, 8:17, 8:18, 14:24, 14:25, 16:21, 17:9, 17:11, 17:24, 23:9, 23:14, 26:8, 29:16, 32:22, 39:6, 39:9, 44:9, 48:10, 48:22, 49:3, 49:10, 56:1, 57:2, 58:9, 59:1, 59:18, 59:25, 62:3, 63:1, 63:20, 66:22, 67:12, 67:21, 68:4, 68:6, 73:20, 74:1, 76:3, 76:10, 76:25, 77:24
*Marlowe's [18]* 10:8, 11:20, 13:6, 16:6, 17:7, 18:3, 26:13, 30:16, 33:4, 33:24, 36:12, 43:12, 44:17, 51:8, 54:6, 55:16, 65:12, 77:25
*matter [11]* 4:6, 16:9, 16:12, 16:15, 16:18, 16:19, 16:20, 60:25, 61:17, 64:4, 75:7
*maybe [5]* 14:21, 23:11, 46:1, 66:21, 76:23
*meaning* 19:7
*means [5]* 22:8, 57:24, 65:5, 72:24, 73:1
*meant* 42:18
*medical [29]* 3:15, 6:3, 13:2, 13:2, 13:4, 13:17, 13:25, 14:13, 17:5, 21:2, 31:10, 37:14, 38:14, 42:11, 43:12, 44:1, 44:7, 44:14, 44:17, 52:5, 53:20, 53:21, 58:16, 62:17, 72:20, 77:20, 77:21, 81:17, 81:24
*medically* 73:14
*medication [2]* 61:25, 62:3
*medications* 5:3
*medicine [3]* 5:5, 24:1,

*experienced – medicine*

*meeting* **[14]** 13:12, 13:14, 13:17, 13:22, 13:25, 45:24, 46:17, 46:22, 47:1, 47:3, 47:7, 47:10, 62:15, 72:6
*mellitus* 57:23
*member* 38:13
*memo* **[2]** 3:14, 39:25
*mention* **[2]** 72:17, 72:21
*mentioned* **[2]** 9:1, 13:20
mesh 74:4
*microemboli* **[11]** 9:24, 10:9, 10:10, 11:10, 11:17, 11:19, 63:21, 66:25, 67:18, 74:5, 76:16
*microparticles* 10:19
*mid-stage* 54:18
*mild* 54:19
*mind* **[6]** 31:8, 39:2, 41:19, 50:14, 54:9, 71:8
*minor* **[2]** 54:24, 72:14
*minute* **[4]** 33:7, 40:2, 56:4, 82:15
*Mis* **[2]** 50:25, 52:11
*misdiagnosed* **[4]** 6:25, 7:1, 49:10, 68:9
*misdiagnosis* 7:18
*miss* **[3]** 52:13, 66:11, 69:12
*missed* **[15]** 6:13, 7:19, 7:21, 44:10, 50:22, 50:24, 50:25, 51:3, 51:3, 52:9, 52:11, 52:12, 52:14, 68:9, 69:14
*Mississippi* 38:2
*misstated* 74:6
*Mitchell* 5:10
*mmm* **[9]** 4:21, 16:14, 41:22, 51:17, 51:20, 55:6, 56:22, 62:14, 73:24
*moderate* 54:11
*moment* **[2]** 23:9, 54:2
*moments* 78:17
*month* **[10]** 7:24, 8:1, 8:9, 8:9, 8:24, 15:1, 15:8, 56:13, 67:17, 68:2
*months* **[24]** 9:16, 11:11, 11:17, 11:20, 11:24, 12:15, 12:15, 12:16, 12:16, 12:20, 46:1, 46:8, 46:17, 46:22, 47:3, 47:7, 48:11, 62:16, 62:18, 67:5, 72:3, 72:8, 75:11, 75:19
*morphology* 23:1
*mostly* **[2]** 35:12, 64:1
*mouth* **[2]** 6:21, 65:2
*multiple* **[4]** 17:5, 35:11, 50:18, 52:7
*mummified* 72:13
*myself* **[2]** 22:14, 26:21

## N

*N.E* 1:21
*named* 12:4
*nearly* 10:2
*necessarily* **[16]** 9:3, 10:6, 11:2, 20:23, 24:5, 25:20, 27:23, 27:24, 28:9, 29:14, 31:21, 35:23, 43:15, 48:15, 68:21, 72:4
*necessary* 36:4
*necessitate* 27:23
*needs* **[2]** 41:16, 53:6
*neither* 83:10
*Neosporin* 54:21
*Nizoral* 56:12
*Nobody* 52:15
*nod* 57:13
*nods* **[2]** 57:12, 77:4

*none* **[5]** 3:9, 12:6, 12:23, 12:23, 78:6
*nonhealing* 34:23
*noninvasive* **[3]** 19:13, 22:16, 22:19
*nor* **[2]** 83:11, 83:11
*normal* **[3]** 36:16, 65:6, 75:15
*North* 2:15
*NORTHERN* 1:2
*Notary* 83:18
*note* **[36]** 37:5, 44:22, 44:23, 45:6, 45:15, 45:18, 45:22, 46:10, 46:13, 47:11, 47:12, 49:17, 50:3, 51:18, 52:20, 54:2, 54:6, 54:23, 55:12, 55:15, 56:1, 56:5, 56:19, 56:24, 57:16, 57:18, 58:16, 58:20, 58:21, 58:24, 59:2, 70:17, 72:17, 72:21, 77:4, 77:7
*notes* **[3]** 46:18, 59:3, 76:24
*nothing* **[7]** 31:13, 31:13, 41:19, 52:19, 58:12, 59:5, 77:22
*notice* 55:4
*noticeable* 12:10
*notify* 56:11
*November* 78:15
*numbers* **[2]** 72:18, 76:14

## O

*object* **[16]** 23:20, 24:13, 24:21, 25:3, 26:14, 28:15, 29:1, 29:7, 32:13, 59:16, 59:20, 60:7, 67:11, 68:19, 69:11, 69:25
*objection* **[7]** 23:20, 23:23, 23:24, 27:19, 29:9, 67:10, 70:17
*objections* 28:16
*objective* **[2]** 54:3, 57:10
*obtain* 29:4
*obvious* **[2]** 54:11, 69:20
*obviously* **[2]** 23:17, 26:1
*occlude* 9:20
*occludes* **[2]** 10:18, 11:5
*occluding* 76:18
*occlusion* 75:12
*occlusive* **[7]** 7:10, 7:14, 9:10, 9:25, 31:22, 73:6, 73:13
*occur* 32:18
*occurred* **[7]** 7:19, 7:21, 8:16, 14:23, 14:24, 54:24, 68:1
*occurs* **[2]** 32:12, 64:3
*October* **[6]** 1:21, 33:22, 34:1, 34:2, 34:3, 41:10
*Off-record* **[3]** 47:23, 80:25, 82:7
*offered* 3:9
*office* **[6]** 1:20, 28:12, 28:24, 38:22, 39:14, 42:14
*Offices* 2:5
*official* 81:24
*ones* **[5]** 35:3, 35:9, 77:20, 80:15, 80:16
*ongoing* **[9]** 5:18, 12:13, 12:14, 12:19, 42:4, 64:14, 66:25, 68:1, 75:10
*onset* 7:15
*open* 28:5
*opening* **[2]** 35:4, 35:10
*operative* 73:22
*opinion* **[26]** 14:19, 16:22, 17:18, 17:22,

26:16, 29:21, 30:23, 39:7, 39:17, 48:15, 48:20, 48:22, 49:3, 49:9, 51:11, 51:13, 51:23, 51:25, 66:22, 67:12, 67:21, 80:5, 80:17
*opinions* **[20]** 5:14, 5:16, 6:2, 6:7, 6:18, 8:20, 12:21, 12:24, 12:25, 14:10, 15:16, 15:19, 16:1, 16:2, 16:3, 16:4, 16:5, 48:7, 52:1, 52:4
*opportunity* 32:3
*opposed* **[2]** 71:25, 75:15
*order* **[2]** 35:17, 77:11
*ordered* 36:1
*orders* **[2]** 44:3, 44:4
*original* 34:11
*others* 28:2
*outcome* **[2]** 22:2, 22:3, 52:18
*outlier* 69:18
*outside* **[2]** 44:14, 51:14
*oxygenation* 65:10

## P

*p.m* **[3]** 1:22, 53:1, 82:11
*pages* **[2]** 14:4, 76:24
*pain* **[6]** 3:19, 10:3, 47:4, 58:16, 59:11, 75:23
*palpable* **[3]** 19:1, 22:12, 22:13
*palpate* 22:17
*particles* 9:25
*particulate* **[2]** 60:25, 61:7
*parties* 83:11
*partner* **[2]** 8:3, 8:3
*party* **[3]** 15:12, 16:16, 79:22
*pathognomonic* 9:12
*patient* **[39]** 11:3, 15:4, 15:5, 16:4, 18:7, 18:15, 25:1, 25:6, 25:7, 25:23, 27:13, 27:17, 27:21, 27:22, 27:25, 28:7, 28:12, 28:13, 28:23, 28:24, 29:12, 30:5, 30:5, 31:25, 34:22, 35:13, 35:20, 35:21, 42:9, 42:16, 54:21, 56:11, 71:3, 71:9, 71:14, 71:23, 72:7, 78:8, 80:11
*patient's* **[6]** 27:11, 28:10, 28:21, 57:3, 57:20, 59:14
*patients* **[6]** 10:23, 28:8, 29:5, 76:2, 76:5, 76:7
*Paul* 46:25
*Paxton* 78:20
*pedal* **[18]** 18:1, 23:11, 24:10, 25:2, 27:1, 27:3, 27:7, 27:14, 27:18, 28:10, 28:21, 29:5, 32:4, 35:21, 47:25, 48:10, 63:24, 66:3
*per* 63:11
*percent* 78:10
*percentile* 65:4
*percutaneous* 28:5
*perfect* 52:16
*perfection* 52:16
*perform* **[2]** 5:20, 34:9
*performed* **[7]** 33:3, 33:9, 33:11, 33:23, 49:4, 64:2, 73:19
*perfusion* **[12]** 8:15, 11:8, 18:16, 19:20, 21:6, 21:11, 30:22, 31:8, 31:12, 35:16,

*perhaps* 31:12
*period* **[7]** 11:11, 15:16, 15:23, 16:17, 58:7, 67:1, 67:16
*periods* 10:11
*peripheral* **[21]** 26:13, 29:16, 35:22, 57:24, 58:5, 58:5, 58:6, 60:20, 60:20, 60:22, 63:9
*personally* **[2]** 23:17, 81:13
*photographs* **[5]** 63:1, 63:5, 63:22, 65:11, 68:3
*photos* **[5]** 3:13, 17:25, 18:11, 18:12, 43:8
*phrase* 60:17
*physician* **[16]** 11:4, 15:12, 15:22, 16:11, 16:16, 24:19, 25:17, 26:8, 32:14, 37:7, 37:10, 58:25, 59:12, 69:4, 78:25, 80:3
*physicians* **[5]** 8:11, 17:4, 51:15, 68:13, 68:17
*pictures* **[16]** 13:12, 19:11, 21:3, 30:15, 30:16, 30:21, 46:21, 56:19, 62:13, 62:20, 65:14, 65:17, 65:23, 65:25, 66:1, 66:2
*Pinson* **[3]** 3:20, 45:13, 58:25
*Pinson's* **[4]** 45:15, 46:10, 46:13, 46:18
*places* 55:19
*placing* 54:22
*plaintiff* **[3]** 1:7, 2:3, 79:23
*PLAINTIFF'S* 3:8
*please* **[12]** 4:25, 5:15, 6:19, 14:20, 29:10, 40:2, 56:11, 58:17, 59:1, 65:7, 70:15, 70:17
*pocket/inductio* 54:11
*podiatrist* **[9]** 15:16, 16:13, 23:9, 24:18, 47:25, 48:9, 51:15, 57:16, 59:10
*Podiatry* **[2]** 3:18, 45:1
*point* **[14]** 11:6, 11:7, 12:22, 21:4, 21:7, 21:9, 22:11, 34:18, 42:23, 57:9, 59:13, 59:17, 69:8, 71:19
*pointing* 62:23
*poor* 35:16
*popliteal* **[6]** 10:17, 10:24, 31:25, 32:4, 32:6, 73:2
*portion* **[2]** 20:12, 20:19
*possibility* **[2]** 60:3, 60:6
*possible* **[9]** 11:10, 11:16, 12:12, 21:25, 36:14, 36:20, 36:21, 48:6, 59:24
*Possibly* **[2]** 49:6, 49:15
*post-embolic* 67:22
*potential* 34:18
*practice* 14:13
*practitioner* 22:9
*prepare* **[2]** 77:12, 77:18
*preparing* **[3]** 42:12, 44:13, 44:14
*prescribe* **[3]** 56:9, 56:19, 59:9
*prescribed* **[3]** 60:1, 62:5, 62:7
*present* **[4]** 12:6, 61:12, 71:2, 74:7
*presentation* **[3]** 6:14, 9:4, 9:7
*presented* **[3]** 7:23, 29:17, 75:14

*presenting* **[3]** 6:12, 8:13, 29:2
*presents* 9:3
*pressure* **[2]** 5:5, 25:24
*prevention* **[2]** 61:12, 61:20
*previous* 46:7
*previously* 43:8
*primarily* 34:17
*primary* **[8]** 5:25, 15:12, 16:16, 26:8, 42:14, 51:15, 58:25, 59:11
*printed* 62:24
*printout* 62:20
*prior* **[14]** 15:19, 23:10, 43:11, 44:14, 44:16, 44:19, 44:25, 45:9, 45:9, 45:12, 47:6, 47:14, 48:4, 48:12
*private* 15:12
*probable* 11:19
*probably* **[9]** 6:9, 18:2, 20:23, 21:17, 49:7, 49:8, 68:1, 74:6, 75:11
*problem* **[16]** 6:25, 7:12, 8:4, 8:5, 9:11, 9:14, 9:23, 12:8, 12:19, 25:8, 31:9, 41:8, 42:5, 52:17, 60:11, 72:4
*problems* **[7]** 8:11, 8:12, 25:24, 60:13, 60:14, 64:11, 73:15
*procedure* **[7]** 1:18, 5:21, 28:5, 58:20, 58:21, 59:10, 73:25
*process* **[10]** 12:13, 12:15, 16:6, 16:17, 16:23, 17:13, 17:16, 42:4, 75:10, 76:17
*processes* 73:9
*profession* 24:24
*professionally* 81:13
*profoundly* 10:5
*progress* 72:11
*progressed* **[5]** 6:8, 16:23, 17:14, 17:16, 17:19
*progression* 16:6
*progressively* 71:5
*prohibitive* 28:3
*prostheses* 34:19
*prosthetic* **[2]** 35:14, 35:15
*provided* **[2]** 3:5, 13:10
*provider* **[2]** 52:5, 62:7
*providers* 17:5
*provides* 79:13
*proximal* 72:25
*publications* 14:9
*pulse* **[15]** 18:1, 18:19, 18:21, 22:9, 22:12, 22:13, 22:17, 27:3, 27:7, 27:10, 31:15, 31:20, 31:24, 32:2, 73:2
*pulses* **[31]** 18:17, 18:18, 18:18, 18:24, 19:7, 19:11, 22:5, 22:7, 22:8, 23:11, 23:18, 24:4, 24:10, 25:2, 27:14, 27:18, 28:10, 28:21, 29:5, 29:20, 29:25, 30:1, 30:2, 31:6, 31:25, 35:21, 47:25, 48:10, 63:25, 66:3, 72:25
*pursuant* 1:17
*pus* 54:11

## Q

*qualify* 19:19
*qualms* 68:17
*quantify* 19:19
*quick* **[2]** 33:6, 41:14
*quickly* **[5]** 9:23, 12:9, 12:9, 74:10, 75:3

*quite [3]* 7:6,
64:14
*quote [3]* 17:23, 42:18,
42:20
*quoting* 54:17

**R**

*raises* 52:19
*range* 36:16
*rare [2]* 76:12, 76:16
*rash [7]* 54:5, 56:20,
63:9, 63:11, 63:11,
63:13, 63:15
*rate* 76:2
*rather* 20:25
*reading [3]* 43:5,
45:17, 50:14
*real [2]* 33:5, 41:14
*realized* 7:11
*really [6]* 22:6, 22:10,
54:12, 74:14, 75:16,
76:13
*reason [4]* 34:25, 35:6,
74:8, 74:22
*reasonable [2]* 12:2,
60:5
*reasons* 35:12
*recently [4]* 53:8,
62:18, 62:19, 81:10
*Recess* 53:1
*recollect* 15:24
*recollection [4]* 13:14,
14:1, 15:3, 46:20
*record [18]* 3:17, 3:19,
3:20, 4:23, 18:11,
23:21, 28:16, 31:10,
41:17, 47:22, 49:13,
53:19, 62:22, 70:6,
77:7, 80:23, 81:1,
82:4
*records [37]* 3:15,
3:21, 8:22, 13:2,
13:4, 13:5, 13:9,
13:16, 13:17, 13:19,
13:24, 13:25, 14:3,
42:11, 43:12, 44:1,
44:7, 44:14, 44:16,
44:19, 44:25, 45:3,
45:9, 45:12, 46:4,
46:23, 46:25, 47:4,
47:8, 47:14, 48:4,
48:6, 48:12, 48:17,
59:22, 70:22, 77:21
*red [3]* 55:5, 55:16,
72:18
*redness [3]* 30:21,
51:9, 54:5
*refer [11]* 14:15,
14:16, 25:7, 27:13,
27:17, 27:25, 28:13,
28:24, 29:3, 55:1,
62:12
*reference [10]* 54:5,
55:15, 57:3, 57:7,
57:19, 58:18, 58:21,
59:2, 59:13, 68:7
*referencing* 43:18
*referral [5]* 24:6,
24:9, 24:25, 27:23,
32:11
*referred [9]* 23:14,
28:7, 36:2, 39:5,
39:6, 42:10, 48:23,
48:25, 76:25
*referring [2]* 26:5,
54:23
*regarding* 66:11
*regular* 38:16
*regularly* 52:10
*rehab* 35:13
*rehabilitation* 34:18
*related [5]* 5:16, 6:7,
8:22, 16:5, 79:12
*relatively [3]* 62:18,
62:19, 64:11
*relevant* 20:12
*relief [4]* 61:11,
61:14, 61:19, 61:20
*remain [2]* 28:22, 72:10
*remained* 28:11
*removing* 61:16

*renew* 74:4
*repeat [4]* 24:2, 28:19,
35:5, 70:14
*rephrase [2]* 4:16,
66:21
*report [4]* 3:18, 39:17,
40:22, 73:22
*reported* 22:4
*reporter [6]* 1:19,
50:16, 50:25, 52:11,
70:12, 70:19
*reports* 54:21
*represent [3]* 4:5,
26:7, 30:18
*represents* 83:8
*reprimanded [2]* 81:21,
81:23
*require [2]* 24:9,
24:25, 28:9
*requires* 32:11
*residency* 38:5
*resident* 78:24
*resolve* 66:12
*respect* 6:3
*result* 83:12
*resulted* 5:19
*resulting* 54:24
*retained* 80:6
*retro* 66:9
*review [26]* 14:8,
14:12, 42:11, 44:2,
44:13, 44:19, 44:22,
44:25, 45:3, 45:6,
45:9, 45:12, 45:15,
46:4, 46:13, 46:18,
46:23, 46:25, 47:4,
47:8, 47:10, 47:11,
47:12, 57:18, 58:17,
80:17
*reviewed [16]* 13:1,
13:4, 43:19, 44:2,
44:16, 45:18, 45:19,
46:21, 48:3, 48:12,
60:4, 77:18, 77:24,
78:2, 78:3, 78:5
*reviewing [2]* 44:24,
46:10
*revise* 34:23
*revised [2]* 33:18,
34:14
*revision* 34:12
*reword* 74:13
*ring* 43:22
*risk [3]* 28:4, 34:22,
61:5
*room [4]* 44:23, 53:21,
57:2, 59:10
*roughly [3]* 4:12, 79:9,
80:21
*routine* 7:10
*rude* 4:23
*rule [4]* 63:6, 63:8,
68:3, 68:5
*rules [2]* 1:17, 4:13
*ruptured [2]* 80:11,
80:12
*Rutherford* 14:15

**S**

*SAITH* 82:10
*salvage [2]* 5:21, 6:1
*salvageable [3]* 21:4,
21:9, 21:10
*salvaged* 22:22
*Saturday* 46:2
*save* 36:11
*saved [3]* 18:2, 20:24,
21:18
*saving* 34:20
*saying [4]* 7:4, 29:25,
30:1, 57:6
*says [7]* 49:25, 54:8,
56:11, 57:9, 58:6,
71:3, 80:1
*schedule* 44:6
*scheduled* 44:10
*scheduling* 70:7
*screen* 62:20
*se* 63:11
*section* 79:5
*seeing [3]* 23:4, 25:6,

*seem [3]* 52:3, 59:17,
72:3
*seems [2]* 50:19, 58:4
*sees* 59:10
*send* 31:11
*sense* 26:2
*sent* 75:1
*September [5]* 32:25,
33:4, 33:6, 33:11,
33:19
*seriously* 51:17
*served [2]* 81:6, 81:10
*setting* 44:14
*several [11]* 11:11,
11:17, 11:20, 42:1,
42:8, 60:15, 71:4,
71:10, 71:25, 72:3,
72:18
*severe* 10:20
*SGJ [2]* 40:11, 40:12
*shakes* 4:21
*shaking* 77:8
*SHELBY* 83:3
*short* 46:14
*shorten* 46:14
*showed [2]* 13:12, 77:21
*showered* 67:1
*showing [3]* 65:12,
70:8, 70:11
*sign [3]* 31:11, 40:16,
63:9
*signature* 40:6
*significant [4]* 31:22,
42:3, 71:11, 74:3
*signs [4]* 9:12, 57:10,
65:12, 65:24
*similar [5]* 8:11, 8:12,
10:23, 22:23, 63:17
*simple* 10:3
*single* 27:21
*sitting* 45:21
*situation [10]* 6:11,
10:2, 12:11, 27:22,
28:1, 29:8, 29:11,
65:6, 74:12, 76:14
*situations* 27:24
*six [5]* 12:15, 56:1,
74:1, 74:10, 74:17
*size* 9:17
*slow [3]* 12:13, 12:14,
76:17
*slowly [5]* 9:25, 10:25,
75:10, 75:19, 75:19
*slowly-progressi* 7:14
*solely [2]* 66:1, 68:3
*Solutions* 1:20
*somebody [2]* 28:3,
76:14
*someone [2]* 40:8, 40:11
*sometime* 46:3
*somewhat* 23:17
*sooner* 77:6
*sorry [24]* 18:13,
19:15, 23:3, 26:3,
26:24, 27:1, 27:15,
30:3, 30:25, 33:6,
34:1, 35:5, 37:13,
38:21, 39:6, 43:2,
47:6, 55:18, 57:12,
59:4, 66:21, 69:5,
73:22, 77:24
*sort [19]* 7:13, 9:12,
13:13, 19:24, 28:5,
31:11, 43:16, 59:25,
63:6, 63:12, 63:20,
64:3, 64:15, 67:19,
67:19, 72:5, 72:15,
76:13, 76:17
*sounded* 43:6
*sounds* 25:5
*source* 61:23
*sources* 14:12
*South* 2:6
*Southern [4]* 1:3, 3:19,
47:4, 58:16
*speak [3]* 10:16, 73:1,
75:1
*speaking [3]* 20:1,
23:22, 80:2
*specialist [17]* 23:19,
24:5, 24:6, 24:10,

*suspect* 65:1
*suspicion [7]* 24:3,
31:3, 31:4, 61:5,
63:19, 65:18, 67:5
*swing* 42:17
*Sworn* 4:1
*symptom* 29:2
*symptoms [4]* 6:12,
8:13, 10:20, 32:18
*system* 79:8

**T**

*taken [4]* 1:17, 30:18,
31:5, 83:5
*takes* 40:20
*taking* 62:6
*targets [4]* 21:8,
21:24, 22:1, 22:22
*Taylor [11]* 1:15, 3:14,
3:16, 3:21, 4:3, 5:10,
17:23, 18:11, 37:8,
41:17, 53:3
*tear* 76:23
*telemedicine* 56:18
*tells [3]* 64:14, 65:14,
71:23
*tender* 54:11
*term [2]* 60:24, 65:7
*terms [4]* 13:2, 16:22,
55:21, 64:20
*testified [2]* 79:15,
80:1
*testify [2]* 5:7, 20:5
*testifying* 47:14
*testimony* 39:1
*testing [2]* 26:12, 36:6
*tests [2]* 19:14, 65:20
*texts [2]* 13:2, 14:15
*Thank [7]* 4:20, 24:22,
28:18, 49:24, 77:11,
81:9, 82:3
*thanks [2]* 20:18, 82:9
*the-knee* 33:12
*there's [34]* 9:12,
9:23, 18:17, 18:18,
20:20, 21:5, 21:7,
21:12, 24:3, 25:16,
27:21, 27:21, 30:7,
31:12, 35:11, 42:17,
52:16, 52:19, 54:23,
55:8, 55:25, 56:18,
57:2, 57:7, 58:3,
58:11, 58:11, 58:12,
59:5, 61:9, 61:19,
67:6, 71:2, 75:17
*thereto* 83:7
*they're [4]* 36:9,
36:10, 57:22, 63:14
*thing [9]* 4:22, 13:13,
31:7, 36:7, 64:15,
66:11, 67:20, 71:7,
77:5
*third [6]* 15:12, 16:16,
54:1, 76:6, 80:13,
80:14
*Thirteen* 38:20
*though* 60:14
*thoughts* 60:5
*threatening* 57:11
*threshold* 19:21
*thrombectomy* 61:16
*thrombus* 75:1
*tibial [2]* 73:1, 76:18
*tibioperoneal [7]*
72:22, 72:24, 73:5,
73:6, 73:8, 73:13,
73:13
*tied* 75:5
*timeline [2]* 6:18, 56:17
*timeliness* 17:18
*Tipler [61]* 2:4, 2:5,
13:7, 13:9, 15:3,
17:22, 19:15, 19:17,
20:14, 20:16, 20:18,
23:20, 23:24, 24:12,
24:21, 25:3, 26:14,
27:19, 28:15, 28:18,
29:1, 29:7, 29:9,
29:24, 30:7, 32:13,
33:13, 33:16, 34:8,
39:20, 39:23, 43:19,

*Specialists [4]* 3:19,
46:23, 47:4, 54:18
*Specialties* 38:14
*specialty [2]* 26:17,
59:11
*specific [3]* 6:5,
58:11, 58:11
*specifically [6]* 16:3,
45:23, 48:25, 58:13,
65:9, 68:13
*spelled* 5:17
*spent* 79:7
*spoke [2]* 77:15, 77:15
*springtime* 17:24
*stable [3]* 72:2, 72:10,
72:12
*staff* 79:2
*stand* 75:24
*standard [21]* 24:9,
24:14, 24:15, 24:16,
24:17, 24:18, 24:25,
25:11, 25:13, 25:16,
25:18, 26:12, 26:16,
26:17, 26:22, 32:10,
32:13, 52:2, 52:5,
52:8, 80:7
*standpoint [3]* 29:14,
69:7, 69:13
*start [5]* 5:14, 11:7,
22:16, 27:1, 41:20,
47:6
*started [6]* 19:13,
71:3, 71:10, 71:16,
71:24, 81:16
*state [7]* 18:4, 18:6,
21:1, 27:15, 73:25,
81:24, 83:2
*stated [3]* 6:19, 52:7,
69:20
*statement [2]* 20:25,
74:4
*states [7]* 1:1, 1:11,
2:14, 4:4, 4:5, 58:13,
71:3
*status* 27:5
*Stenotype* 83:6
*stent [2]* 35:4, 35:9
*step* 55:19
*Steven [3]* 1:15, 2:4,
5:10
*steventipler@gma* 2:9
*straightforward [2]*
9:4, 9:7
*streaking* 54:20
*street [3]* 1:20, 2:6,
39:10
*strive* 69:11
*strong* 20:25
*studies [3]* 22:16,
22:19, 29:4
*subjective [2]* 29:21,
54:3
*subsequent* 40:18
*successfully* 73:10
*sudden* 75:17
*suddenly* 10:17
*sued* 81:17
*suffered [2]* 41:24,
52:19
*suffering* 42:8
*Suite* 2:7
*suppose* 47:15
*surgeon [13]* 20:1,
23:15, 24:6, 24:24,
25:1, 27:14, 27:18,
28:14, 28:25, 36:2,
36:24, 49:11, 56:14
*surgeons* 8:11
*surgery [9]* 14:14,
14:15, 37:20, 38:9,
73:10, 73:15, 73:19,
76:3, 79:5
*surgical [2]* 14:16,
80:10
*surgically* 73:15
*surprised* 7:7
*surrounding* 54:19

10032018

44:2, 45:20,
47:22, 49:19, 49:24,
50:1, 50:8, 50:10,
53:11, 53:13, 59:16,
59:20, 60:7, 62:16,
67:10, 68:19, 69:1,
69:25, 70:11, 70:17,
73:3, 76:21, 77:13,
78:13, 79:25, 80:7,
82:4, 82:8
**Tipler's** 20:4
**tissue [4]** 5:19, 7:13,
11:7, 64:12
**tissues [2]** 11:9, 65:10
**today [19]** 4:7, 5:4,
5:7, 13:1, 13:20,
44:16, 44:19, 44:25,
45:3, 45:9, 45:12,
45:21, 47:6, 47:14,
48:4, 48:7, 48:13,
77:12, 77:19
**toe** 72:12
**toes [2]** 11:13, 72:7
**token [2]** 25:23, 69:9
**tolerate** 28:5
**top** 40:1
**traditional** 19:22
**transcribed [2]** 40:21,
83:7
**transcript [5]** 77:25,
78:2, 78:4, 78:5, 83:8
**transcriptionist** 40:10
**transcripts** 78:3
**trauma [2]** 54:24, 72:14
**travels** 61:1
**treat [6]** 16:4, 25:25,
61:8, 61:9, 62:1,
73:10
**treated [7]** 7:25,
16:21, 48:11, 51:8,
59:1, 66:20, 66:24
**treating [7]** 17:9,
17:11, 42:16, 55:22,
61:24, 68:14, 80:2
**treatises** 14:9
**treatment [3]** 8:16,
8:23, 14:23
**trial [2]** 79:15, 79:17
**trouble** 54:15
**true [2]** 32:20, 83:8
**Trujillo** 44:20
**Trujillo's** 44:22
**truthfully** 5:7
**turn** 73:17
**turns** 75:18
**twelve [3]** 12:16,
12:19, 38:20
**twenty-five** 14:4
**type [4]** 22:21, 40:8,
58:4, 80:10
**typical** 14:14
**typically [4]** 14:12,
22:8, 63:15, 74:8

## U

**UAB** 79:2
**uh-uh** 4:21
**ulcers [8]** 71:4, 71:6,
71:15, 71:18, 71:20,
71:21, 71:22, 71:24
**ultimate** 6:14
**ultimately [4]** 6:15,
51:5, 61:6, 68:11
**ultrasound [4]** 19:16,
22:21, 22:25, 23:4
**unable** 28:4
**unaware** 15:17
**unchanged [2]** 28:12,
28:23
**Uncomfortable** 80:18
**undergo** 76:3
**underline [2]** 54:13,
57:25
**understand [6]** 4:15,
6:4, 16:19, 21:17,
28:17, 32:16
**understanding** 25:25
**unfortunate** 52:17
**United [5]** 1:1, 1:11,
2:14, 4:4, 4:5
**universal** 25:16

**unless [2]** 73:24, 74:1
**unlikely [5]** 36:19,
36:23, 48:8, 60:9,
60:18
**unsuccessful** 5:24
**unusual [2]** 64:17,
68:22
**unusual-looking** 75:21
**updated [2]** 53:7, 53:8
**upon** 83:9
**upstream** 72:25

## V

**VA [25]** 3:15, 8:11,
8:17, 8:21, 8:22,
13:17, 13:25, 14:2,
14:23, 15:4, 18:12,
26:8, 30:18, 43:12,
43:18, 44:1, 44:10,
52:4, 55:21, 55:22,
56:2, 78:22, 79:6,
79:10, 79:12
**vague [4]** 25:13, 25:14,
63:12, 74:19
**Valley [3]** 3:17, 44:17,
53:21
**variety [2]** 61:4, 61:9
**Varley** 47:8
**Varley's** 47:11
**vary** 72:11
**vascular [52]** 1:20,
10:7, 14:14, 14:15,
18:20, 18:22, 19:2,
19:8, 20:1, 21:5,
21:20, 21:20, 23:14,
23:19, 23:25, 24:3,
24:5, 24:5, 24:6,
24:10, 24:13, 24:16,
24:24, 25:1, 25:4,
25:4, 25:6, 25:7,
25:21, 25:22, 26:15,
27:4, 27:14, 27:18,
27:25, 28:13, 28:25,
29:13, 32:11, 36:2,
36:24, 49:1, 56:16,
58:5, 60:20, 60:22,
65:19, 70:2, 73:10,
73:15, 79:5, 80:10
**velocity** 23:1
**venous** 60:23
**verbal** 4:18
**vessel [2]** 23:1, 75:13
**vessels [9]** 9:21,
10:12, 10:18, 11:5,
11:6, 12:5, 73:1,
75:6, 76:19
**Vestavia** 78:20
**view** 62:19
**viewed [2]** 8:22, 63:22
**visit [7]** 18:12, 23:10,
23:12, 44:11, 51:16,
55:21, 58:10
**visited** 56:1
**visits [2]** 17:5, 60:15

## W

**Wait** 56:8
**walk [3]** 34:19, 75:14,
75:22
**Walter** 45:13
**wanted** 20:3
**wants** 69:10
**warning** 31:11
**warranted** 24:7
**wasting [2]** 70:3, 70:7
**wave** 23:1
**WAYNE** 1:5
**ways [2]** 61:4, 61:9
**we're [9]** 4:14, 5:2,
23:25, 26:25, 50:1,
56:16, 57:6, 70:3,
75:8
**we've [3]** 68:16, 68:18,
74:5
**wedged** 10:16
**Wednesday** 1:21
**week** 79:7
**weeks [10]** 9:16, 42:1,
42:8, 64:4, 71:4,

74:10, 74:18
**weird** 43:6
**weren't** 8:14
**what's [8]** 10:1, 39:24,
64:16, 75:2, 76:2,
78:19, 81:19, 82:1
**whatever** 67:5
**whenever [2]** 24:10,
25:1
**whereas** 22:24
**Whereupon [2]** 50:15,
70:18
**whether [14]** 12:14,
21:12, 21:22, 24:8,
25:11, 32:10, 32:21,
44:6, 45:22, 52:1,
52:4, 60:5, 67:2, 67:3
**whole [5]** 22:6, 31:6,
54:16, 64:4, 66:4
**whom** 17:7
**wife** 42:9
**wind** 76:18
**within [4]** 36:16, 64:4,
75:4, 75:18
**witness [3]** 79:16,
80:2, 83:9
**woman** 26:23
**won't** 7:1
**workup [7]** 18:20,
18:22, 19:2, 19:9,
21:5, 21:20, 77:1
**worry** 78:12
**worse** 71:5
**worsening** 41:25
**worth** 34:22
**wouldn't [6]** 5:6, 32:3,
32:7, 35:11, 67:7,
72:4
**wound [3]** 54:19, 55:13,
57:7
**wounds [3]** 41:25, 42:7,
54:25
**wrong [3]** 6:20, 14:20,
41:4

## Y

**y'all** 39:2
**yeah [8]** 18:15, 21:16,
34:6, 63:15, 63:15,
64:9, 76:17, 81:16
**yesterday** 70:9
**yet** 6:24
**you'd** 74:17
**you'll [6]** 40:5, 53:22,
55:4, 55:7, 56:4,
72:18
**yourself** 40:3