FILED
2018 Dec-03  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Attachment 19

Deposition Transcript of Dr. McLane

**Page 1**

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5  JIMMY WAYNE MARLOWE,

6

7      Plaintiff,

8                          CIVIL ACTION NO.:

9        VS.              1:17-CV-00309-VEH

10

11  UNITED STATES OF AMERICA,

12

13      Defendant.

14

15          **DEPOSITION OF DR. JERRY McLANE**

16

17         Taken pursuant to Federal Rules of Civil

18  Procedure before KAREN DAVIS, CCR, Certified Court

19  Reporter and Commissioner for Alabama at Large, at the

20  United States Attorney's Office, 1801 4th Street North,

21  Birmingham, Alabama, on Tuesday, June 5, 2018,

22  commencing at 2:26 p.m.

23

24

25

**Page 2**

1         A P P E A R A N C E S :

2

3  APPEARING ON BEHALF OF THE PLAINTIFF:

4      Mr. Steven D. Tipler

5      Tipler Law Offices

6      104 23rd Street South, Suite 100

7      Birmingham, Alabama  35233

8      (205) 328-6800 * steventipler@gmail.com

9

10

11  APPEARING ON BEHALF OF THE DEFENDANT:

12      Mr. Jason Cheek

13      Ms. Sarah Wilson

14      Assistant United States Attorneys

15      1801 Fourth Avenue North

16      Birmingham, Alabama  35203

17      (205) 244-2104 * Jason.Cheek@usdoj.gov

18      (205) 244-2140 * Sarah.Wilson2@usdoj.gov

19

20

21

22

23

24

25

**Page 3**

1               I N D E X

2

3  EXAMINATION BY:                    PAGE NO.

4  Mr. Cheek                              4

5

6           E X H I B I T S

7

8  PLAINTIFF'S EXHIBIT NO.             MARKED

9   (None offered.)

10

11  DEFENDANT'S EXHIBIT NO.            MARKED

12  1   Curriculum Vitae                 5

13  2   UpToDate article, Evaluation of the

14       Diabetic Foot                   8

15  3   UpToDate article, Overview of Lower

16       Extremity Peripheral Artery

17       Disease                         9

18  4   Deposition transcript of Dr. Cumagun   13

19  5   Office notes, Craddock Health Center   13

20  6   Shelby Baptist medical records    13

21  7   Expert report of Dr. Jerry McLane    34

22  8   Copies of photos                 73

23  9   Coosa Valley Medical Center records   109

24  10  Office note of Podiatry Associates

25       dated 5/15/14                  113

**Page 4**

1      **J E R R Y   T H O M A S   M C L A N E ,**

2  Having been duly sworn, testifies as follows:

3  **EXAMINATION BY MR. CHEEK:**

4      **Q.    Doctor, my name is Jason Cheek.  I'm an**

5  **Assistant United States Attorney.  Thank you for coming**

6  **in today to take your deposition.  Let me start by**

7  **asking you a few questions.  Have you ever been deposed**

8  **before?**

9      A.    Yes.

10     **Q.    How many times?**

11     A.    Five?

12     **Q.    When was the last time you were deposed?**

13     A.    Oh, probably six years ago or so.

14     **Q.    So you have a general understanding of what**

15  **the process is like.**

16     A.    Yes.  Yes.

17     **Q.    If you don't understand a question, just let**

18  **me know.  I'm happy to rephrase.**

19     A.    Okay.

20     **Q.    I will need verbal answers, so please don't**

21  **shake your head yes or no or say mmm hmm.  I'll need**

22  **verbal answers.  I'm not trying to be rude if I ask you**

23  **if that's a yes.**

24     A.    I know.

25     **Q.    Please allow me to complete my questions**

1  before I answer —
2      A.    Yes.
3      **Q.    Before you answer.  And importantly, if you**
4  **need a break at any point, you just let me know.**
5      A.    Okay.
6      **Q.    Doctor, are you on any medications today?**
7      A.    Yes.
8      **Q.    What medications?**
9      A.    I'm on Lunesta, two milligrams at night, and
10 I'm on Lexapro, five milligrams.
11     **Q.    And do those affect your ability to testify**
12 **accurately today?**
13     A.    Not at all.
14     **Q.    Do those affect your ability to testify**
15 **truthfully today?**
16     A.    Not at all.
17     **Q.    Doctor, the — one of the first things that**
18 **I'd like to discuss is, I served a subpoena on Mr.**
19 **Tipler.  I asked for your C.V.  Do you have a copy of**
20 **your most recent C.V.?**
21     A.    No, I don't.
22           MR. TIPLER:  I've got it.
23           MR. CHEEK:  So I'm going to mark this as
24     Defense Exhibit 1.
25           (Whereupon the C.V. is marked D-1 for

1      identification)
2      **Q.    If you would, Doctor, just take a moment and**
3  **look at that, please.  Let me know if that is your most**
4  **recent up-to-date C.V.**
5      A.    There should be one addition to this.
6           MR. CHEEK:  Okay.
7      A.    As of January the 8th, 2018, I started a
8  position as a hospitalist at UAB Medical West Hospital.
9  And I'm currently still working in my internal medicine
10 practice until new — two new doctors come in July
11 15th.
12     **Q.    And —**
13     A.    So —
14           MR. CHEEK:  I'm sorry.  I didn't mean to
15     interrupt.
16     A.    So still doing internal medicine but also
17 starting to change to exclusively as a hospitalist.
18     **Q.    Okay.  And why are you — let me rephrase.**
19           I take it when your — you mention working
20 with your current internal medicine practice, you're
21 referencing UAB West?
22     A.    Yes.
23     **Q.    Okay.  And why are you leaving that practice**
24 **or shutting it down or whatever you're doing?**
25     A.    I — my wife has an illness, and so with the

1  hospitalist, I'm able to work seven days on and seven
2  days off.
3           MR. CHEEK:  Okay.
4      A.    I also have a Down Syndrome son, so it offers
5  more off time.
6      **Q.    Okay.  Any other additions or changes you**
7  **think need to be made to your C.V.?**
8      A.    I did work part-time in the Jefferson County
9  Jail, in the Bessemer Jail, during 2010 and 2011, as a
10 doctor there got sick, Adam Robertson, and they needed
11 somebody to cover until they could find another doctor.
12     **Q.    Okay.  Anything else?**
13     A.    No, sir.
14     **Q.    Okay, thank you.  Doctor, did you bring any**
15 **treatises, articles or other reference materials that**
16 **you consulted in forming your opinions?**
17     A.    Yes, I did.
18     **Q.    Okay.  And please briefly tell me what**
19 **sources those are.**
20     A.    As a physician, I have UpToDate that —
21     **Q.    And just for the record, just tell us what**
22 **you're referring and holding up.**
23     A.    UpToDate is a —
24     **Q.    Well, no.  Just for the record, tell us what**
25 **you're holding in your hand right now.**

1      A.    This is a continuing medical education that
2  I've got for using UpToDate in the past for looking up
3  medical issues and problems that I subscribe to that's
4  $500.00 a year that you're able to get medical
5  education and look up medical topics that are — are
6  helpful with patient care.
7      **Q.    Okay.  For the record, I'll note that Mr.**
8  **Tipler has handed me two printouts from UpToDate.  One**
9  **seems to be titled Evaluation of a Diabetic Foot.  Is**
10 **that fair, Doctor?**
11     A.    Yes, sir.
12     **Q.    And it looks to be a sixteen-page printout**
13 **from UpToDate.**
14     A.    Yes.
15           MR. CHEEK:  I can do one of two things,
16     Doctor.  I can either mark this as an exhibit and
17     include it with the transcript, or if you want to
18     get this original back, I can have someone make a
19     copy briefly.  You already have your own copies.
20     So I'm going to mark Evolution of a Diabetic Foot
21     as Defense Exhibit No. 2.
22           THE DEPONENT:  Okay.
23           (Whereupon the document is marked D-2 for
24     identification.)
25     **Q.    And it's my understanding that you referenced**

**9**

1 that UpToDate article in forming your opinions.
2     A.    I referenced that article yesterday to —
3     MR. CHEEK: Okay.
4     A.    — to follow up with the opinions that I
5 already had.
6     Q.    Okay. So you did not reference that UpToDate
7 article prior to writing your expert opinion in this
8 case?
9     A.    No, I did not.
10     MR. CHEEK: Thank you. The second article
11 that Mr. Tipler handed me is also from UpToDate.
12 It is titled Overview of Lower Extremity Peripheral
13 Artery Disease, and I will mark this as Defense
14 Exhibit No. 3.
15     THE DEPONENT: Yes.
16     (Whereupon the document is marked D-3 for
17 identification.)
18     Q.    That's a nineteen-page printout from
19 UpToDate. And Doctor, is it fair to say that you also
20 referenced this article yesterday in preparing for your
21 deposition today?
22     A.    That's correct.
23     Q.    Did you reference this article prior to
24 writing your expert opinion in this case?
25     A.    No, I did not.

**10**

1     Q.    Doctor, did you bring any of the materials
2 that you reviewed prior to today that helped form your
3 opinions?
4     A.    Say again?
5     Q.    Did you bring any medical records that you
6 reviewed prior to today that you used to form your
7 opinions?
8     A.    Yes.
9     Q.    Okay. And can I see those, please?
10     A.    This is the deposition.
11     Q.    Okay. So for the record, Dr. McLane has
12 handed me a deposition transcript of Dr. Cumagun.
13     A.    Yes.
14     Q.    I see that exhibits, Plaintiff's Exhibits No.
15 1, 2 and 3, which are pictures of Mr. Marlowe's feet,
16 are also attached to that deposition transcript.
17     A.    Yes, they are.
18     Q.    In addition, Plaintiff's Exhibit No. 4 which
19 is a list of Department of Veterans Affairs medical
20 records are included with that deposition transcript.
21     A.    That's the Coumadin Clinic that he went to.
22 For his blood thinner.
23     Q.    And it also includes Plaintiff's Exhibit No.
24 5 and Plaintiff's Exhibit No. 6 from the Dr. Cumagun
25 deposition.

**11**

1     Doctor, do you mind if I mark this as an
2 exhibit or do you need a copy of this?
3     A.    I don't —
4     MR. TIPLER: You need to — I do. I want him
5 to — that — that's the original so if y'all can
6 give us that —
7     MR. CHEEK: We'll take a quick —
8     MR. TIPLER: Yeah, if we can just — if we
9 can make copies of these things.
10     MS. WILSON: I was going to say, that was the
11 original.
12     MR. TIPLER: You can be on the record with
13 this if you want to or not. You want to stay on
14 the record?
15     MR. CHEEK: Yes.
16     MR. TIPLER: The first thing is the — well,
17 let me just say this for the sake of y'all saving
18 time, effort and money. That — those — that's
19 the deposition of Dr. Cumagun and all the six
20 exhibits that were attached.
21     MR. CHEEK: Mmm hmm.
22     MR. TIPLER: And if y'all want to photocopy
23 them, that's fine, but I'm willing to stipulate
24 that's what it is. Y'all already have a copy.
25     MR. CHEEK: Right. Yeah, we'll just make a

**12**

1 quick photocopy and mark it as Defense Exhibit No.
2 3, and we'll get you —
3     MR. TIPLER: Can we do the same thing then
4 with the other two exhibits? Yeah, those two right
5 there.
6     MS. WILSON: Do you want the copies in color?
7     MR. CHEEK: Make them in color.
8     MR. TIPLER: You might want to — there's
9 some more —
10     MS. WILSON: Do you want me to go ahead and
11 make copies?
12     MR. CHEEK: Just hang tight for just a
13 second.
14     MR. TIPLER: That's what I thought. Hang
15 tight.
16     Q.    (BY MR. CHEEK:) Dr. McLane, did you review
17 any other medical records prior to forming your
18 opinions?
19     A.    Yes. I reviewed the records from the
20 Craddock Health Center. Dr. Pinson's three visits.
21     MR. CHEEK: Thank you, sir. So for clarity
22 of the record, I'm going to mark Dr. Cumagun's
23 deposition transcript and all of the attachments to
24 her, all the exhibits to her deposition, as Defense
25 Exhibit No. 4.

13

1       (Whereupon the document was marked for
2   identification.)
3       MR. CHEEK:  I'm going to mark the set of
4   records from Craddock Health Center for Dr. Pinson
5   as Defense Exhibit No. 5.  And Doctor, I see you
6   have some more documents in your hand.
7       THE DEPONENT:  Yeah, I have a discharge
8   summary from Shelby Baptist Medical Center for date
9   of admission 7/31/2014.
10      MR. CHEEK:  Okay.  Thank you.  And I'm going
11  to mark those notes as Defense Exhibit No. 6.
12      (Whereupon the document is marked D-6 for
13  identification.)
14  **Q.   Were there any other records you reviewed**
15  **prior to forming your opinions today?**
16  A.   No.
17      MR. CHEEK:  So we're going to go ahead and
18  make copies of those exhibits and — we can go off
19  the record for a second.
20      (Off-record, 2:40 - 2:41 p.m.)
21  **Q.   Okay, Dr. McLane.  Can you start by listing**
22  **your expert opinions in this case for me, please?**
23  A.   Listing in this case?
24      MR. CHEEK:  Yes, sir.
25  A.   The opinion that I have?

14

1       MR. CHEEK:  Any opinions that you have in
2   this case.  Yes, please.
3   A.   Yeah.  Well, my opinion was that upon
4   examination in March 14th, 2014, that the examination
5   of Jimmy Marlowe suggested a peripheral vascular
6   disease problem in a patient that was diabetic and had
7   atrial fibrillation, an irregular heartbeat, that he
8   was on anticoagulation, and that did not have
9   peripheral neuropathy on the basis of her examination
10  and had some red lesions on the foot that there was a
11  concern by them that this was related to a fungal
12  infection.
13      Secondarily, I was concerned that on the
14  basis of somebody with peripheral vascular disease
15  related to diminished posterior tibial pulses that —
16  on the basis of that examination, that additional
17  studies for peripheral artery disease was not done.
18      On the basis of that, that standard of care
19  suggests that to prevent complications from peripheral
20  artery disease, that arterial Dopplers or referral to
21  vascular surgery would have been done at that time to
22  assess the severity of the condition.
23      The lack of symptoms of claudication can
24  sometimes be associated with people that are older and
25  don't exercise or move around a lot, so the fact that

15

1   he did not have symptoms of pain in his legs with
2   walking or at rest doesn't take away from the fact that
3   diabetes is a major risk factor for peripheral artery
4   disease and limb loss and heart attack, and it's very
5   easy to do an arterial Doppler because it is a
6   noninvasive test that gives you an ankle-brachial
7   artery index, that that number tells you whether there
8   is a severe arterial problem or not a severe arterial
9   problem.
10      If you can't get an arterial index Doppler,
11  then if you refer the patient to a vascular surgeon,
12  generally they have those in their office or they are
13  the ones that read those tests and they're able to
14  evaluate on the basis of looking at the patient and
15  getting that test as to whether or not there is severe
16  vascular disease or not, because you can have mild
17  symptoms and you could have mild reduction in pulses
18  and still have a major arterial problem in the upper
19  arterial system that's amenable to placing an arterial
20  stent or something noninvasive that will replenish the
21  blood supply and protect the person from having
22  ischemic limb loss.
23      **Q.   Do you hold any other opinions in this case?**
24  A.   Well, I think that with his diabetes, atrial
25  fib and Coumadin, that those are all risk factors for

16

1   blood clots and other — other issues of having stroke,
2   heart attack, other issues that can cause death.
3       I was also concerned when I looked at the
4   chart as to one of the medicines the patient was on for
5   BPH that can cause you to have episodes of passing out
6   or sweating because it causes very severe drop in blood
7   pressure when you stand up from a sitting position to a
8   standing position.
9       **Q.   I'm sorry, what was that medication?**
10  A.   It was Hytrin, H-Y-T-R-I-N, 10 milligrams.
11  It's a medicine they give for prostate enlargement
12  because it relaxes the muscle around the prostate.  But
13  the side effect of relaxing the muscle around the
14  prostate, it relaxes the muscle around the peripheral
15  arteries so that standing up you don't get constriction
16  of that artery fast enough to not prevent drop in blood
17  pressure and it can lead to loss of consciousness and
18  — and near fainting so that there are better
19  medications for that.  So I was concerned looking at
20  that as well.
21      **Q.   And why — help me just understand.  Why were**
22  **you concerned about that medication and Mr. Marlowe,**
23  **the possibility of the patient fainting while on that**
24  **medication?**
25  A.   Well, he had an episode in the Coumadin

17

1  Clinic where he got lightheaded and sweaty and
2  diaphoretic and so I was concerned in the context of
3  that.  Maybe it was a reaction to that medication.
4      Q.   I see.  Thank you.  Do you hold any other
5  opinions in this case?
6      A.   Well, the other opinion I have in the case is
7  that the rash that he had didn't look like what you
8  normally see with a fungal infection in that most
9  fungal infections happen between the toes where you
10 have darkness and increased moisture.  And they were on
11 top of his foot that looked more like an irritant or
12 could be associated with a circulation problem, too.
13      The other thing I had a problem with, they
14 showed a picture where he had had a traumatic injury to
15 his tibia and on the picture they put a Band-Aid on it
16 when they sent it to the dermatologist.  And I couldn't
17 understand why they didn't open that up, because with
18 diabetics, you get a traumatic skin breakdown, then
19 that cannot heal and can cause infection.  And I think
20 if you're sending a picture to a dermatologist, you
21 should include an area that has been compromised.  And
22 they mentioned that it was two centimeters by two
23 centimeters which is fairly large area of skin opening
24 and breakdown that I think the dermatologist could have
25 helped him with, especially if that got infected or had

19

1  medications and that you don't have to do testing on
2  that better protects you from having a massive bleed,
3  which I've seen in the past, in the brain from the
4  Coumadin and the protime getting too prolonged, or
5  having a significant gastrointestinal bleed in — in
6  his age group because it looked at the Coumadin Clinic
7  like they weren't getting very good control of his
8  anticoagulation.
9      Q.   And why do you think they weren't getting
10 good control of its anticoagulation?
11      A.   Because in most people you don't.  I've been
12 using Coumadin for a long time and I'll have people
13 come in and their INR which should be 2 or greater to
14 adequately anticoagulate.  You can get one day and
15 it will be 2 and a half, and the next day they'll come
16 in and it will be like 1.4.  So it fluctuates from day
17 to day.  So you're dependent on that to protect you
18 from stroke and heart attack and embolization.  And it
19 can change if you eat greens.  If you take Cipro or if
20 you take Zithromax for an infection, then you have to
21 cut your Coumadin dose in half, otherwise your INR will
22 go up to 7, and I've seen several patients come in with
23 cerebral bleeds just because of that effect.  They come
24 into an urgent care, have an infection, get Cipro for a
25 urinary tract infection or a sinus infection and they

18

1  to go to a wound clinic, so I was concerned about that
2  as well.
3      Finally, I don't think that photodermatology
4  is a good way to manage dermatologic problems, in my
5  opinion.
6      Q.   And why not?
7      A.   Because you get — you don't get a 3D picture
8  of it.  You can't turn and look at the part that you're
9  looking at.  And he was having more problems with his
10 right foot than his left foot, and they took a picture
11 of his left foot, and he ultimately in the hospital had
12 an amputation of his right leg.  And the picture is of
13 his left foot, and they should have taken both feet if
14 they both had a rash.  So I would have been concerned
15 that they didn't give them more of the information that
16 they needed to help make a diagnosis.
17      Q.   Do you hold any other opinions?
18      A.   The other opinion I have is that I think
19 somebody with atrial fibrillation that's on Coumadin
20 has a difficult time of trying to maintain a protime
21 that protects you from stroke and embolic problems
22 because of its sensitivity to food and other
23 medications, so I was wondering — I was wondering why
24 he wasn't on a newer medication like Eliquis or Xarelto
25 that is less sensitive to interaction with other

20

1  end up with a protime that's extremely high and they
2  come in with a cerebral hemorrhage and die.
3      Q.   Does it matter if the patient is compliant
4  with their — taking their medications?
5      A.   Well, I think it — it certainly matters if
6  they're compliant with taking their medications because
7  with Coumadin, it affects four proteins in the liver to
8  work, and therefore, it takes about five days to get an
9  adequate anticoagulation.  With Eliquis and Xarelto,
10 it's a factor ten inhibitor, and factor ten is the last
11 cascade of platelet thrombus formation.  So when you
12 take an Eliquis or a Xarelto, within 24 hours you're
13 adequately anticoagulated.  So if you miss a dose,
14 you're still fairly well anticoagulated until the next
15 day because of its quick onset and quick offset.
16      In addition, if you have to have say a tooth
17 pulled or something like that that you need to be off
18 of something, with Coumadin you have to be on a subQ
19 heparin and you have to be off of that for about five
20 days.  With Eliquis or Xarelto, you just have to be off
21 for 24 or 48 hours and then hold 12 hours and restart
22 it and then you're adequately protected, especially
23 with afib.
24      MR. CHEEK:  Let me switch gears a little bit
25      and ask you about your opinions related to the

21

1   standard of care in this case.

2   **Q.    What opinions do you hold with respect to**

3   **whether Dr. Cumagun breached the standard of care in**

4   **this case?**

5   A.    I think she definitely breached the standard

6   of care by not getting Doppler testing on the

7   peripheral arteries of both feet of this person.

8         And I happen to have here on Evaluation of

9   the Diabetic Foot, Page 5 —

10        MR. CHEEK:  Let me just stop you there for a

11   second, Doctor.

12        THE DEPONENT:  All right.

13   **Q.    For the record, Dr. McLane is referring to**

14   **Defense Exhibit No. 2.  Page 5, you said?**

15   A.    Yes.

16        MR. CHEEK:  Okay.  Doctor, right now I just

17   want to get your opinions and then we'll get to

18   that.

19   **Q.    So what else did Dr. Cumagun or the VA do in**

20   **your opinion that breached the standard of care?**

21   A.    Well, being an internal medicine doctor for

22   36 years, I always check pulses in all my patients,

23   whether they're diabetic or not.  And I think part of

24   the deficiency that I see in the documentation is the

25   fact that there are two pulses in the foot; there's a

22

1   posterior tibial and there's a dorsal pedal pulse.  And

2   the only one that she made any remark about was the

3   dorsal pedal pulse was diminished.

4         I don't think that's adequate examination to

5   be able to assess the vascular status of a lower

6   extremity.  And I was real surprised that she didn't

7   mention a popliteal artery that's behind the knee

8   because that's a common artery that you use for bypass.

9   And then the femoral artery in the — in the inguinal

10   canal always should be palpated and you listen to it to

11   see if you hear a noise called a bruit because a bruit

12   is an indicator that there is turbulent flow that could

13   be occluded.

14        So in her examination, she did a sensory exam

15   with a monofilament to see if there was any diabetic

16   issues related to the nervous system going down to the

17   legs, but there was an incomplete examination of the

18   lower extremity documented.  So I always check the

19   pulses in all of those — all of those patients on

20   every visit, whether they're diabetic or not.  So...

21   **Q.    And what do you mean by "those patients"?**

22   **For every patient who comes to see you, you check?**

23   A.    Initially, yeah.

24   **Q.    Okay, well, let me — let me clarify.  For**

25   **every patient that comes and sees you, even if it's a**

23

1   **thirty-year-old generally healthy individual, you check**

2   **the posterior tibial pedal pulse?**

3   A.    Yes.

4   **Q.    And for every one of those patients, you**

5   **check the dorsal — you'll have to help me here.**

6   A.    Dorsal pedal.  P-E-D-A-L.

7   **Q.    Dorsal pedal pulse on all of those patients?**

8   A.    Every patient.

9   **Q.    Even the femoral ——**

10   A.    I don't do the femoral.

11        MR. CHEEK:  Okay.

12   A.    So if the dorsal pedal and the posterior

13   tibial pulses are normal —

14        MR. CHEEK:  Okay.

15   A.    Then that's where I stop in anybody.

16        MR. CHEEK:  Okay.

17   A.    But I train nurse practitioners and — and I

18   train PA students at UAB, and I show them to feel

19   pulses on every patient that comes in.

20        MR. CHEEK:  Well, let me ask you about the

21   standard of care.

22        THE DEPONENT:  Okay.

23   **Q.    What — what does the standard of care**

24   **require?  Are you saying that the standard of care**

25   **required — requires a doctor to check the dorsal**

24

1   **pedal, the posterior tibial, and the femoral pulse on**

2   **every single patient that walks in the door?**

3   A.    That is not what I'm saying.

4        MR. CHEEK:  Okay.

5   A.    What I'm saying is that every patient that

6   walks in the door, if you're an internal medicine

7   doctor, not an urgent care doctor, not a primary care

8   doctor, but as an internal medicine doctor, in the —

9   if you're going to check the dorsal pedal pulse, it's

10   congenitally absent in some people.  And so the

11   posterior tibial pulse is never congenitally absent.

12   So if you're going to check a pulse, you should check

13   the posterior tibial pulse.  That's the one that's most

14   important.  And so that wasn't mentioned in the exam.

15   I do that on every patient.

16   **Q.    And but just because you do something, that**

17   **doesn't mean it's the standard of care; you would agree**

18   **with that?**

19   A.    I wouldn't agree with that.

20   **Q.    So everything that you do is the standard of**

21   **care.**

22   A.    As an internal — as an internal medicine

23   doctor — well, if you're going to check a pulse, then

24   you should check the posterior tibial pulse if you're

25   just going to check one.

**25**

1    Q.    And so what's the basis for you, Dr. McLane,
2  saying that the standard of care requires that?
3    A.    Well, I think if you're assessing a patient,
4  then you want to know about the circulatory system
5  because that's what causes catastrophic problems.  So,
6  you know, if — if you don't feel a pulse, even in a
7  young person, then they may be able to give you the
8  information that they had a fracture.  It may have
9  caused an absence of a pulse or some other condition
10  that makes you not as concerned that they don't have a
11  pulse.  Like, if they've had a significant fracture of
12  the ankle, sometimes you don't feel the pulse in the
13  dorsal pedal area but you should feel it in the
14  posterior tibial unless there's been a lot of damage,
15  at which point you look at what we call a capillary
16  refill.
17        MR. CHEEK:  Mmm hmm.
18    A.    So you touch the toes and see if that redness
19  turns white and when you let go it turns back red
20  again.  And you want to feel that the foot is warm and
21  not cold.
22    Q.    Mmm hmm.  But what I'm trying to get at,
23  where the source — where the standard of care for that
24  treatment is defined.  Is it —
25    A.    In our training.  It's defined in our

**26**

1  training.  I've trained at UAB.
2        MR. CHEEK:  Okay.
3    A.    And also rotated through the VA Center at UAB
4  when I was a medical student.  And part of our training
5  in physical examination is that we do that on every
6  patient.
7    Q.    Can you identify or point to today or any
8  journal article or treatises that talk about the
9  standard of care requiring a popliteal, tibial, a
10  dorsal pedal and a femoral pulse in virtually every
11  patient that comes in to an internal medicine office?
12    A.    I cannot.
13    Q.    Okay.  I want to step back.  You mentioned
14  that — and please, I don't want to put words — please
15  correct me if I'm wrong.
16    A.    Okay.
17    Q.    That effectively Dr. Cumagun breached the
18  standard of care by not obtaining a Doppler study or
19  referring Mr. Marlowe to a vascular surgeon.  Is that
20  fair?
21    A.    That's correct.
22    Q.    And what — what's the source of the standard
23  of care for that?  Is there some sort of UpToDate or
24  journal article that says when you have a patient like
25  Mr. Marlowe —

**27**

1    A.    That's why I looked that up this morning,
2  because I knew that that's what I do all the time.  And
3  I know that I've sent plenty of patients to vascular
4  surgery because it's real easy to do that, to —
5  especially, I use the brachial index a lot.  I also go
6  to nursing homes.  So when we have wounds that don't
7  heal, we have a vascular tech that will come out to the
8  nursing home and they'll actually do vascular Doppler
9  on feet in the nursing home to assess what that
10  brachial index is in that if it's 0.9 or less, you know
11  you have a severe circulatory problem.  If it's 1 or
12  greater, then you know you've got adequate blood flow
13  and — and you feel comfortable that that's all you
14  need at this point in time to be able to treat the
15  patient and know that they're safe.
16    Q.    But you didn't review the UpToDate article
17  prior to writing your opinion in this case?
18    A.    No.
19    Q.    So when you wrote in your opinion that she
20  breached the standard of care by failing to refer to a
21  vascular surgeon or to get a Doppler study, what was
22  the basis for that opinion?
23    A.    That was on the basis of my 31 years
24  experience and covering for eight other internists that
25  I've in the past been in practice with, and also being

**28**

1  in the hospital for over thirty years and taking care
2  of other people's patients and unattached patients that
3  come into the hospital, that when I don't feel pulses
4  or have risk factors for coronary disease, that I go
5  ahead and get Dopplers on these patients.
6    Q.    Now you just said something interesting, that
7  you get Doppler on patients where you don't feel
8  pulses.
9    A.    Or they're diminished.
10    Q.    Okay.  I just wanted to clarify that.  So do
11  you get Doppler studies on all patients who have
12  diminished pedal pulses?
13    A.    Every one of them.  And especially if they're
14  diabetic.
15    Q.    Okay.  And do you hold any other opinions
16  related to whether Dr. Cumagun or the VA breached the
17  standard of care in this case?
18    A.    Well, I think the — the other opinion that I
19  have is that — that I think that the rash that they
20  were so worried about treating as to whether it was
21  fungus or whether it was eczema, which is a condition
22  where you don't make enough oil to keep your skin from
23  being dried out, that they were in the process of
24  giving topical treatment that can be an irritant to the
25  skin and so they could have created more of a problem

29

1   by giving antifungal cream for a condition that they
2   weren't sure was present.  And also the lack of
3   follow-up for the traumatic injury to the tibia and the
4   wound that I wasn't able to see to determine whether
5   that was going to heal, especially with the patient
6   having an A1C that was 8.9.  And therefore, that's
7   associated with poor diabetic control.
8       Q.    So you mentioned that they could have,
9   because they were treating the rash or the fungus with
10  certain creams, they could have actually made his
11  condition worse.  Is it your opinion that they did make
12  his condition worse?
13      A.    I — I would not know if that did make it
14  worse or not.  I just have concerns that by using a
15  picture that they were treating a problem without a
16  specialist looking at the problem or looking at the
17  patient directly.
18      Q.    Okay.  So is it fair to say one of your
19  opinions is that teledermatology is just a bad idea?
20  Maybe you can state it more eloquently than that but...
21      A.    I think that's not a good idea.
22      Q.    Okay.  Is it a breach in the standard of care
23  to use teledermatology?
24      A.    I wouldn't know.
25      Q.    You don't have an opinion one way or another

30

1   on that?
2       A.    I don't know if it's a breach in the standard
3   of care.  It's not something that — that I would do.
4   And based on the pictures, quality of the pictures and
5   based on them being incomplete, I don't know how a
6   dermatologist would have accepted that as adequate
7   pictorial information to be able to prescribe something
8   in my opinion.
9       Q.    Okay.  So you can't sit here today and say
10  that it was a breach to use teledermatology.  You can't
11  say otherwise either.
12      A.    I can't say that.  I can't say that.
13      Q.    Fair enough.  You mentioned quality of the
14  pictures.  How did you look at the pictures of Mr.
15  Marlowe's feet that were attached to Dr. Cumagun's
16  deposition?
17      A.    I looked at them on that paper.
18      Q.    So you saw a printout of the pictures.
19      A.    That would be correct.
20      Q.    You didn't see an actual — you didn't see
21  them on a computer screen.
22      A.    No.
23      Q.    Okay.  You also mentioned that the lack of
24  follow-up with respect to the wound on Mr. Marlowe's
25  tibia —

31

1       A.    Correct.
2       Q.    — was concerning.  Was there a breach in the
3   standard of care in treating that wound?
4       A.    I wouldn't know because I didn't see the
5   picture of it.  But the fact that it was two
6   centimeters by two centimeters is a very large opened
7   wound.
8           MR. CHEEK:  Okay.
9       A.    And I'd be very concerned if I had a patient
10  that had that with the comorbid conditions that this
11  particular patient had that I didn't follow up on that
12  in a couple of weeks, make sure that it was healing and
13  make sure that it wasn't getting infected and to make
14  sure that he didn't need wound care, hyperbaric oxygen,
15  antibiotics or whatever.
16      Q.    But is it fair to say —
17          THE DEPONENT:  Do y'all have — I didn't eat
18  lunch.  Do y'all have any soft drinks or anything
19  up here?  Tea or —
20          MR. CHEEK:  We have a vending machine on the
21  first floor.
22          THE DEPONENT:  Okay, well, that's all right.
23          MR. CHEEK:  I mean, if you need to take a
24  break to get something from the vending machine,
25  that's perfectly acceptable.  Let me just finish a

32

1   couple of these questions before we do that.
2           THE DEPONENT:  Okay.
3       Q.    So you just can't say whether — what you can
4   say is that the follow-up or lack of follow-up of the
5   wound on the tibia is concerning, but you can't say
6   that there was a breach in the standard of care with
7   respect to that.
8       A.    No, I cannot.
9       Q.    Okay.  All right.  Do you hold any other
10  opinions as to whether Dr. Cumagun breached the
11  standard of care?
12      A.    Not that I can think of.
13          MR. CHEEK:  Okay.  Thank you.  Now let's take
14  a quick break so that Dr. McLane can go get
15  something to eat and drink.
16          (Recess, 3:13 – 3:18 p.m.)
17          MR. CHEEK:  Back on the record.
18      Q.    (BY MR. CHEEK:)  Dr. McLane, you drafted an
19  expert report in this case?
20      A.    Yes, I did.
21      Q.    And did you use a computer to type it?
22      A.    I wrote it out in longhand and had somebody
23  else type it because I can't type.
24      Q.    Who typed it?
25      A.    I think your person typed it for you.

33

1    Q.    And just for the record —
2    A.    Sorry.
3    Q.    — Dr. McLane is referring to Mr. Tipler —
4    A.    Mr. Tipler.
5    Q.    — who nodded his head yes.
6          MR. TIPLER:  Yes.
7    Q.    And do you have a copy of the handwritten
8    version of that report?
9    A.    No.  I left it with them.
10         MR. CHEEK:  Do you happen to have a copy of
11   that, Mr. Tipler?
12         MR. TIPLER:  No.
13   Q.    Was the report that's typed out verbatim?
14   Word for word what you handwrote?  Or were there some
15   changes to it?
16   A.    I think that we went over — there were some
17   dates that we changed because I didn't know what the
18   dates were for, like, when Dr. Pinson saw the patient.
19   So we added some stuff that he thought would be helpful
20   from a standpoint of dates and stuff like that, that
21   would be helpful for the document.  And there was also
22   some misspelling in the original one.  That was
23   supposed to be Doppler.  They put D-O-P-L-A-R.
24         MR. CHEEK:  All right.  Mr. Tipler, I'm
25   giving you a copy of what I'm going to mark as

34

1    Defense Exhibit 7.
2          (Whereupon Defendant's Exhibit 7 was
3    marked for identification.)
4    Q.    Doctor, would you please take a moment and
5    just read through the exhibit that I handed you?
6    A.    Yes.
7          MR. CHEEK:  And I believe — I don't know
8    that there's a difference but I believe this is the
9    exhibit that I handed you, Doctor.
10         THE DEPONENT:  I, Jerry McLane, am an
11   internist —
12         MR. CHEEK:  I'm sorry, you don't have to read
13   it for the record.  Just read through it yourself.
14   Sorry.
15         THE DEPONENT:  Okay.  I've reviewed it.
16         MR. CHEEK:  Okay.  If you'll turn to the
17   second page, please.
18         THE DEPONENT:  Okay.
19   Q.    Is that your signature at the end of this
20   document?
21   A.    Yes.
22   Q.    And just help me understand how the process
23   worked.  You handwrote your opinions on a sheet of
24   paper.
25   A.    Right.

35

1    Q.    You then gave that to Mr. Tipler?
2    A.    Yes.
3    Q.    And then to the best of your knowledge
4    someone from his office typed this up?
5    A.    And sent it for my review.
6          MR. TIPLER:  We had to add some things,
7    Jason, to comply with the rules.  Like, we had to
8    add that part about how much he's charging per
9    hour.  I don't think that was originally — some of
10   that stuff wasn't in there but we were trying to
11   comply with the rules so...
12         MR. CHEEK:  Yeah, and I'm just trying to
13   determine what Dr. McLane wrote versus what your
14   office may have written.
15   Q.    For example, Dr. McLane, in your handwritten
16   summary, did you start out by writing, "I, Jerry Thomas
17   McLane"?
18   A.    Oh, no.  Oh, no.
19   Q.    Okay.  Did you write, "Regarding the Jimmy
20   Marlowe matter, I reviewed the deposition of Dr.
21   Cumagun", and continue on?
22   A.    No.  What I had written is that I had
23   reviewed the deposition of Dr. Cumagun and the
24   photographs and then we together added whatever he felt
25   was more in legal terms as far as dates that might be

36

1    helpful to you.
2    Q.    Okay.  Well, I want to — I want to go to the
3    third full paragraph beginning with, "It is my
4    opinion".
5    A.    Okay.
6    Q.    Is that — did you write that, handwrite that
7    language there in your handwritten summary or your
8    handwritten opinion?
9    A.    What I wrote was, is that they did not follow
10   the standard of care.  And — and he added based on my
11   training and many years of experience as an internal
12   medicine doctor.  I didn't know that that was
13   important, but...
14   Q.    Did you write, "The standard of care was to
15   refer the patient to a vascular specialist"?
16   A.    Absolutely.  Or do — or do an
17   arterial Doppler.  And the reason I say that is because
18   some people don't know how to interpret an arterial
19   Doppler.  And being in a community setting, this
20   physician, I wouldn't assume that she would know what I
21   would know in the way of what those numbers would mean.
22   So that's why I said vascular surgeon or — I wouldn't
23   refer him to a vascular surgeon.  I would do the
24   arterial Doppler.  If the arterial Doppler or the
25   brachial index was 1 or greater, I wouldn't worry about

37

1  it.

2    Q.    **Well, but it says here that the standard of**
3  **care was to refer the patient to a vascular specialist.**
4  **But now you're saying —**

5    A.    What I would have done would have been an
6  arterial Doppler.  I said based on her training and
7  based on the deposition that I read from her, I didn't
8  see enough confidence or knowledge in her deposition to
9  make me think that she would have been able to
10  interpret an arterial Doppler.  So I —

11          MR. CHEEK:  Well, I'm not asking about —
12          THE DEPONENT:  Okay.
13          MR. CHEEK:  — her, what she did.  I'm asking
14  about your opinions at this point, and we'll get to
15  that.
16          THE DEPONENT:  Okay.
17          MR. CHEEK:  So I just want to focus on the
18  questions I'm asking.

19    Q.    **Let's just go through this.  So you did not**
20  **handwrite the first paragraph of this summary; that's**
21  **fair to say?**

22    A.    Yes.

23    Q.    **And did you write this sentence:  Regarding**
24  **the Jimmy Marlowe matter, I reviewed the deposition of**
25  **Dr. Cumagun along with the six exhibits to that**

---

38

1  **deposition which include 1, 2 and 3, three photographs**
2  **of Mr. Marlowe's left lower extremity, taken I**
3  **understand on March 14th, 2014.**

4          Is that your hand — did you write that in
5  your handwriting?

6    A.    No.

7    Q.    **Okay.  Did you write:  For the Sylacauga VA**
8  **Medical Clinic records concerning Mr. Marlowe from it**
9  **appears March 6 through November 8, 2014?**

10    A.    No.

11    Q.    **Did you write number 5:  Dermatologist Dr.**
12  **Henderson's office note of 7/9/14?**

13    A.    I just wrote Dr. Henderson's office note.

14    Q.    **Okay.  Thank you.  And that's what I'm**
15  **looking for, to figure out what you wrote versus —**

16    A.    Okay.

17    Q.    **Did you write number 6:  Dermatologist Dr.**
18  **Bourgeois' office note of 7/31/13?**

19    A.    I just said Dr. — I just said Dr. Bourgeois'
20  dermatology note.

21    Q.    **Okay.  Did you write everything starting**
22  **with, "I have also been told", continuing through the**
23  **end of that paragraph?**

24    A.    Yeah, I was — I was — I had been told
25  before I wrote this that my — that Mr. Tipler had said

---

39

1  that the patient said his right foot was worse than his
2  left foot and that they took a picture of his left
3  foot.

4    Q.    **But did you handwrite:  "I have also been**
5  **told and considered, the following:  [1] that on March**
6  **14th, 2014, Mr. Marlowe's right foot looked much the**
7  **same as his left, as seen in the three photos, but that**
8  **under his toenails on his right foot, it was a darker**
9  **red"?**

10    A.    Right.

11    Q.    **Did you handwrite that in your written**
12  **opinion?**

13    A.    No.  That was when we went over what I had
14  written.

15    Q.    **Did you handwrite number 2, that Mr. Marlowe**
16  **had diabetes and his INR was often subtherapeutic?**

17    A.    I did write that.

18    Q.    **Did you write number 3, that in addition to**
19  **seeing Dr. Cumagun at the VA Clinic in Sylacauga,**
20  **continuing through number 4?**

21          MR. TIPLER:  You said continuing on what?
22          MR. CHEEK:  Through number 4.

23    A.    Yeah, I did write that — that Dr. Pinson was
24  seeing him primarily for leg cramps that were assumed
25  to be nocturnal muscle cramps and that he had that

---

40

1  plantar wart that he had taken off.

2    Q.    **Okay, but did you also write he saw Dr.**
3  **Pinson again on 7/16/14 who thought he had severe**
4  **dermatitis on his feet or possible fungal dermatitis?**

5    A.    Yeah, and he also thought he had cellulitis.

6    Q.    **That's not in your —**

7    A.    Correct.

8    Q.    **That's not in this typed report.**

9    A.    Correct.  And when I looked at it before this
10  deposition, I observed that he had mentioned
11  cellulitis, too.

12    Q.    **So let me just make sure I'm clear.  There**
13  **are some things that you handwrote in your handwritten**
14  **opinion that are not in this typed report.**

15    A.    No, that — that I just noticed yesterday
16  when I was look — when I was reviewing for this
17  deposition.  I was just going over everything again.

18    Q.    **In your handwritten opinion, you didn't say**
19  **cellulitis?**

20    A.    No, I did not.

21    Q.    **So did you handwrite number 4, that Mr.**
22  **Marlowe says that neither Dr. Pinson nor Dr. Henderson**
23  **checked the pulses in Mr. Marlowe's feet, leg or groin**
24  **area?**

25    A.    Well, I commented that that wasn't on the —

41

1 that wasn't on the physical examination.  And so Mr.
2 Tipler said that the patient said that they did not
3 check the pulses.
4      **Q.    So but my question is, is number 4, is that**
5 **your language?  Is that something that you handwrote in**
6 **your handwritten report?**
7      A.    No.
8      **Q.    Number 5.  Dr. Cumagun did not check for the**
9 **pulse in the groin behind the knee or behind his ankle**
10 **bone.  Is that something that —**
11      A.    I said — that is my — I put posterior pulse
12 and I put popliteal.  And then we decided that it would
13 be better to make it less medical and make it more
14 understandable.
15      **Q.    Okay.  Number 6.  Was number 6 handwritten in**
16 **your initial handwritten report that Dr. Bourgeois**
17 **immediately sent Mr. Marlowe to Shelby Baptist**
18 **Hospital?**
19      A.    My hand report was Dr. Bourgeois referred to
20 Shelby Baptist Hospital.  And initially I didn't say
21 "immediately".  But I did say for the vascular — for a
22 vascular assessment.
23      **Q.    Okay.  And with respect to number 7, that the**
24 **vascular surgeon, after having the appropriate studies**
25 **performed, CT angiogram, was all that in your**

42

1 **handwritten report?**
2      A.    Actually, my report was longer than that.
3          MR. CHEEK:  Okay.
4      A.    And we condensed it to CT angiogram,
5 arteriogram and the tibioperoneal occlusive disease
6 because he tried to do a popliteal dorsal pedal bypass.
7      **Q.    So your handwritten summary was longer.  What**
8 **was taken out of the handwritten summary?**
9      A.    Well, I had what the arteriogram showed.  I
10 had what the CT showed.  I had what the — the ischemic
11 changes on top of the foot showed.  So we condensed it
12 to this.
13      **Q.    And so how was that done?  Was it you turned**
14 **in the handwritten summary to Mr. Tipler and then, you**
15 **know, y'all had a conversation, y'all worked out the**
16 **wording on this, or did he just send you a copy of this**
17 **typed up summary and you signed it?**
18      A.    Oh, no, no.  We — we went over it and then
19 he said, well, let's see what this sounds like.  So we
20 probably went back and forth on this document four or
21 five times.
22      **Q.    Okay.  So he would email you a copy of this**
23 **and you would make some changes?**
24      A.    Correct.
25      **Q.    But you don't use a computer, right?**

43

1      A.    No, I do email.
2      **Q.    You do email.**
3      A.    Yeah.  See, I would make changes like that,
4 written [indicating].
5      **Q.    Okay.  On what date did you sign this**
6 **document?**
7      A.    It was pretty much the last date that we had
8 to have it in.
9          MR. TIPLER:  I don't —
10      A.    I've got it.  You want me to —
11          MR. CHEEK:  Sure.  That would be great.
12      A.    I'm looking at my email.  Friday, March 30th,
13 8:25 a.m.
14      **Q.    And you signed it, scanned a copy and emailed**
15 **it back to Mr. Tipler?  Is that how you know?**
16      A.    I think I — well, he was texting me and so I
17 faxed it over.
18          MR. TIPLER:  I think I picked it up.
19      A.    Oh, you picked it up, yeah.  "Let me know
20 when I can come by and pick up" and he said pick up
21 your C.V.  So that was 6:33 in the a.m. and he came by
22 that morning, March 30th, which was a Friday.
23      **Q.    You've had an opportunity to read this report**
24 **again today; is that fair?**
25      A.    Yes.

44

1      **Q.    Is this report accurate?**
2      A.    Yes.
3      **Q.    Anything you want to change?**
4      A.    No.  I think it's an accurate document.
5      **Q.    Are there any opinions that we have not**
6 **discussed up until this point relevant to this case**
7 **that you hold which are not contained in this report?**
8      A.    Not that I can think of.
9      **Q.    All right.  If you will look with me at the**
10 **bottom of the first page on Exhibit No. 7.  When you**
11 **signed this report, was that handwriting present?**
12      A.    What?
13      **Q.    The very bottom of the first page there's**
14 **some handwriting.**
15      A.    Yes.
16      **Q.    Was that present when you signed the report?**
17      A.    No.  No.  This was my copy.  Before I got it
18 back.
19      **Q.    What do you mean?**
20      A.    So I said there was a — there was a
21 typographical error.  I signed it and then I read
22 through it again and saw that there was a typographical
23 error and so I said we need to correct the
24 typographical error.
25      **Q.    But this was after Mr. Tipler had picked it**

45

1  up?
2  A.  Oh, no, no, no, no.
3  Q.  Okay.  So you signed it, then you noticed
4  that 'Doppler' was misspelled at the bottom of the
5  first page?
6  A.  Yes.  That was a couple of days before he
7  picked it up.
8  Q.  Okay, so whose handwriting is that?
9  A.  Mine.
10  MR. TIPLER:  I got tired of retyping it.
11  Q.  So rather than you retyping 'Doppler', you
12  just made handwritten edits on the document, is what
13  you're saying.
14  MR. TIPLER:  Yeah.
15  A.  Right.
16  Q.  And you handwrote Doppler a couple days
17  before —
18  A.  Right.
19  Q.  — — you signed or — you signed it but it
20  was a couple days before the March 30th or whatever
21  that Friday deadline was.
22  A.  Right.
23  MR. CHEEK:  Okay.  If you'll turn to the
24  second page for me.
25  THE DEPONENT:  Okay.

46

1  Q.  There is, not including your signature,
2  there's handwriting in at least two places on this
3  document.
4  A.  Right.
5  Q.  Both of those are your handwriting?
6  A.  That's correct.
7  Q.  And did you make those additions at the same
8  time you added the correct spelling of Doppler?
9  A.  No.
10  Q.  Okay.  Let's start with the first
11  handwriting.  Read to me if you will the handwriting at
12  the top of the second page.
13  A.  [Reading:] Also question as to symptoms of
14  pain in legs with walking suggesting claudication.
15  Q.  Okay.  And when did you add that?
16  A.  I added that right before he was going to
17  pick it up.
18  Q.  And why did you add that?
19  A.  Well, I was just looking at it, thinking that
20  that would be something that would — I was just
21  thinking that that would be something in addition, and
22  then when we talked about it and I got to thinking
23  about it, I thought, well, that's really not going to
24  make any difference whether the patient had
25  claudication or not.

47

1  Q.  Why wouldn't that make any difference?
2  A.  Because of the lack of pulses that the
3  patient had in the leg.  So whether he had symptoms or
4  whether he didn't have symptoms would not change what
5  you would do for evaluation.
6  Q.  Is it your understanding that Mr. Marlowe
7  lacked pulses when he saw Dr. Cumagun?
8  A.  I mean — sorry.  Diminished.  I don't know
9  about — yeah.  Diminished pulses.
10  Q.  Let me ask, is there a difference between
11  lack of pulses and diminished pulses?
12  A.  Oh, yes.
13  Q.  Okay.  When Dr. — when Mr. Marlowe saw Dr.
14  Cumagun in March of 2014, did he have pedal pulses?
15  A.  He had a dorsal pedal pulse.
16  MR. CHEEK:  Okay.
17  A.  That was diminished.
18  Q.  And it's your opinion that because that
19  dorsal pedal pulse was diminished, at a minimum,
20  Doppler should have — a Doppler study should have been
21  performed?
22  A.  Correct.  When you feel a pulse, you can feel
23  a bounding pulse that almost knocks your finger off.
24  And then if you can barely feel a pulse, then that's
25  diminished.  And sometimes they're hard to find because

48

1  sometimes pulses instead of being in the middle of the
2  foot are a little bit lateral or a little bit medial.
3  So that's why you may not feel a pulse.  And I've done
4  Dopplers on patients that I thought was diminished
5  pulses and when I got the Doppler back, they had some
6  anatomy that was a little bit different and they had
7  great pulses.  So that's why you can't always tell with
8  an examination.
9  MR. CHEEK:  Okay.
10  A.  But if they were diminished enough for her to
11  write it in her chart, then — then being a physician,
12  she recognized that there was some abnormality in the
13  foot or she wouldn't have put that in there.
14  Q.  And it's your opinion the standard of care
15  required her to at least refer him for a Doppler study
16  at that point.
17  A.  Right.  Or vascular surgery.
18  Q.  Fair enough.  Is — is the look — does the
19  look of his feet factor into your analysis or opinion
20  as to whether vascular surgery or Doppler should have
21  been referred, or are you basing your opinion solely on
22  the presence of or the diminished pedal pulse?
23  A.  Well, if I — if I had seen a picture that
24  showed cyanosis or —
25  Q.  What is cyanosis?

49

1    A.    Blue color instead of red color.
2    Q.    Got you.
3    A.    I think the other aspects of peripheral
4 vascular disease is — one aspect that you know
5 somebody doesn't have good vascular disease is lack of
6 hair.  Because you'll look on their feet or you'll look
7 on the calf —
8        MR. TIPLER:  I think you said have good
9     vascular disease, and I think you meant to say good
10    vascular perfusion.
11    A.    That's correct.  People that have good pulses
12 — people that have poor circulation have an absence of
13 hair.  They have reduced pulses.  And you can — you
14 can look at somebody and if they don't have any hair
15 growing below their calf, then likely they have
16 peripheral vascular disease.
17    Q.    And if you have a patient that doesn't have
18 hair on their feet or where you normally see hair, does
19 that require a Doppler or vascular surgery referral?
20    A.    Absolutely not.
21        MR. CHEEK:  Okay.
22    A.    Unless I don't feel pulses or there could be
23 other causes that they wouldn't have hair.
24    Q.    So it's the diminished pedal pulse that's
25 really critical.

50

1    A.    Correct.
2    Q.    Okay.  Thank you.  And on this — still on
3 the second page of your typed up report, there's
4 another handwriting.  Can you just read that to me for
5 the record, please?
6    A.    Yeah.  It says, either way, the patient, Mr.
7 Marlowe — and I added, with early revascularization,
8 would not have lost his legs.
9    Q.    Okay.  And when was that handwritten entry
10 written?
11    A.    Same time as the other one, the day before he
12 picked up the document.
13    Q.    Same time as the other one —
14    A.    The one above.
15    Q.    The claudication —
16    A.    Also questioned, yes, claudication.
17        MR. CHEEK:  All right.
18        MR. TIPLER:  Did you make this an exhibit?
19        MR. CHEEK:  Yes.
20        MR. TIPLER:  What number is it?
21        MR. CHEEK:  No. 7.
22    Q.    Prior to handwriting your opinion and someone
23 from Mr. Tipler's office typing it up and you signing
24 it, did you consult with any written materials to
25 prepare that opinion?

51

1    A.    Oh, I — I had looked at my — my medical
2 textbooks that I had.  I have two general medical
3 textbooks.  I was looking to see what they said about
4 peripheral vascular disease, however, they were — they
5 were about five or six years old.
6    Q.    Did those textbooks that you're referring to
7 help you in forming your opinions?
8    A.    No, I was just looking to see what they said.
9 I was — I was —
10    Q.    But —
11    A.    — doing my medical opinion based on my
12 practice.
13    Q.    Okay.  But my question is, did those
14 textbooks help you in forming your opinions.
15    A.    No, they did not.
16    Q.    Okay.  Did you consult with any other
17 physicians or individuals —
18    A.    No, I did not.
19        MR. CHEEK:  And just let me just finish the
20    question so we're clear.
21        THE DEPONENT:  Sorry.
22    Q.    Did you consult with any individuals or
23 physicians aside from Mr. Tipler in preparing your
24 opinion?
25    A.    No, I did not.

52

1    Q.    You mentioned peripheral vascular disease.
2 PVD?
3    A.    PAD.
4    Q.    PAD.  Is that different than PVD?
5    A.    Well, probably the same thing.  We just
6 always use PAD —
7        MR. CHEEK:  Okay.
8    A.    — at the hospital.
9    Q.    And that would stand for peripheral arterial
10 disease?
11    A.    Right.
12    Q.    But is peripheral vascular disease synonymous
13 with peripheral arterial disease?
14    A.    Well, you could have venous disease, too.  So
15 you can have venous insufficiency which is part of
16 peripheral vascular disease.  But I think what you're
17 saying is the same.  PAD and PVD are —
18        MR. CHEEK:  So let me just make sure because
19    I don't understand.
20        THE DEPONENT:  Okay.
21    Q.    Peripheral vascular disease is like the
22 umbrella term that would include peripheral arterial
23 disease and peripheral venous disease?
24    A.    No.  I'm talking about the — the using of
25 the letters PVD —

53

1    MR. CHEEK:  Okay.

2    A.    — perhaps could be related to venous disease
3 or arterial disease such that I don't use it — see it
4 usually used as PVD.  I usually see it used as PAD.

5    MR. CHEEK:  Okay.

6    A.    And that's part of the coding thing that we
7 use.  It's PAD in the ICD-10 code.  There's not a PVD.

8    MR. CHEEK:  Okay.  So let's use the
9 abbreviation PAD.

10    THE DEPONENT:  Okay.

11    Q.    **Is it your opinion that Mr. Marlowe had PAD**
12 **in March of 2014 when he presented to the VA?**

13    A.    Yes, it is.

14    Q.    **And tell me why you hold that opinion.**

15    A.    Because of the diminished peripheral pulses
16 and the multiple risk factors that he had, and his age.

17    Q.    **And what are the risk factors that you're**
18 **talking about?**

19    A.    He is diabetic.  He's on lipid-lowering
20 agents so I suspect that he had some cholesterol
21 issues.  He fortunately was a lifelong nonsmoker, which
22 is a non-issue, but diabetics, as a risk factor, is the
23 same as people that have had an MI.  There's no
24 difference in risk factors for people that have had an
25 MI and people that are diabetic and have not had an MI

54

1 as far as peripheral vascular disease is concerned.
2 That's why you're so concerned about diabetics.  And
3 diabetics are a class of people that have to have
4 coronary monitoring because oftentimes with their lack
5 of sensation, they don't have chest pain with angio.
6 So it's just a very complex group of patients to deal
7 with because they don't present all the times with —
8 with symptomology.

9    MR. CHEEK:  Okay.

10    A.    So I would more — worry more about somebody
11 that had diabetes developing peripheral vascular
12 disease than I would somebody that was a non-diabetic.

13    Q.    **Okay.  When was the last time you checked a**
14 **pedal pulse?**

15    A.    Yesterday.

16    Q.    **And how often in your practice do you check**
17 **pedal pulses?**

18    A.    Every day.  Every patient.

19    Q.    **And in every patient you check that dorsal**
20 **pedal?**

21    A.    Dorsal pedal and posterior tibial pulse.

22    Q.    **Every patient?**

23    A.    Every patient.

24    Q.    **And the patients you see range from what**
25 **ages?**

55

1    A.    30 to 106.  I will say this, that I check
2 those things while I'm talking to the patient.  So I
3 have them on an exam table.  While I'm talking to them
4 and getting their information, I'm checking their
5 pulses and I'm looking at their feet if they're
6 diabetics because every diabetic that has — can have
7 peripheral neuropathy and we're monitored by Medicare
8 and such to focus on foot inspections.  And that's part
9 of our electronic medical record that we have is
10 whether you did a foot inspection or not, whether you
11 checked for pulses or not, whether you checked for
12 sensation with the monofilament like she did.  That's
13 part of what the Medicare guidelines that we do as part
14 of the UAB medical record that —

15    MR. CHEEK:  Okay.

16    A.    We do that.

17    Q.    **And is it — well, if you're checking those**
18 **pedal pulses in all of your patients, you're examining**
19 **their foot one way or another, correct?**

20    A.    Not necessarily.

21    MR. CHEEK:  Okay.

22    A.    So you can check a pedal pulse and a dorsal
23 pedal pulse on somebody that had socks.

24    MR. CHEEK:  Okay.

25    A.    So if you feel it, then fine.  If you don't,

56

1 I make them take their shoes and socks off.

2    Q.    **Okay.  And I understand that that is your**
3 **practice, Dr. McLane, but does the standard of care**
4 **require every internal medicine physician to check the**
5 **dorsal pedal and the posterior tibial pulse in every**
6 **patient?**

7    A.    I think if you feel a good pulse in either
8 place that you don't have to check both of them.  But I
9 — I think it does require it because it's so simple to
10 do.

11    MR. CHEEK:  Okay.

12    A.    And there's — there's no reason why you
13 shouldn't.

14    Q.    **And so to make sure we're on the same page**
15 **here with respect to Mr. Marlowe —**

16    A.    Right.

17    Q.    **Because he had a diminished pedal pulse, the**
18 **standard of care required Dr. Cumagun to check the dors**
19 **— the posterior tibial pulse.**

20    A.    Correct.

21    Q.    **And if the pulses are diminished, I think**
22 **we've gone over this a few times; I just want to make**
23 **sure.**

24    Let me ask it this way:  Is there a one-size-
25 fits-all approach for when you have a patient that has

57

1  a diminished dorsal pedal or posterior tibial pulse?
2      A.    I don't know if there's a one size fits all.
3  I think that it's important at some point on a yearly
4  basis that if you have diminished pulses as part of
5  your physical examination, that you should at least
6  take a stethoscope and listen in the femoral artery and
7  see if you hear a bruit.  I think every —
8      Q.    Is that the standard of care?
9      A.    The standard of care is — is that.
10         MR. CHEEK:  Okay.
11      A.    The standard of care is to listen for bruits
12  in the neck as part of your cardiovascular exam.
13  Because — and the standard of care is also that you
14  listen for abdominal bruits when you're listening for
15  bowel sounds to see if you hear any abnormal noises
16  that would alert you to an abdominal aneurysm, to alert
17  you to diminished blood flow and other catastrophic
18  things.  As a doctor, that's your responsibility.
19      Q.    What is an arterial Doppler?  Is it a
20  sonogram kind of machine?
21      A.    There are two forms.
22         MR. CHEEK:  Okay.
23      A.    There's — there's — a Doppler is just a
24  sound wave machine that is able to hear the presence or
25  absence of a pulse that you can't feel.  So you're able

58

1  to, for instance, at the hospital, if you can't feel
2  anything, they have portable Dopplers that you just put
3  on the foot and like you would listen to a baby's
4  heartbeat, you'd hear this noise that would depict an
5  arterial pulse.
6      Q.    You said something that caught my attention a
7  little bit.  You said at a hospital.  You're currently
8  at UAB West.
9      A.    Right.
10      Q.    That's a hospital or is that a clinic space?
11      A.    I'm in the clinic across the street from the
12  hospital.
13         MR. CHEEK:  Okay.
14      A.    But I also admit hospital patients.  But some
15  clinics have Dopplers in their clinics —
16         MR. CHEEK:  Okay.
17      A.    — where you can, while you're there, because
18  we used to have one which was given to us, and you just
19  put some gel on the foot, punch — push the button and
20  see if you hear an arterial sound.  And then you can
21  tell from the sound how loud it is or how diminished it
22  is.
23         But arterial Dopplers, if you get a brachial
24  index, what you do is you put blood pressure cuffs on
25  various aspects of the leg and you look to see if you

59

1  see a differential between say the knee and the ankle
2  or the thigh and the upper extremity.  So that arterial
3  Doppler that gives you a brachial index is able to not
4  only tell you whether it's diminished, but it also
5  gives you an idea of whether there's femoral artery
6  occlusion, whether there's popliteal behind the knee
7  artery occlusion, whether or not there's the — the
8  dorsal pedal or posterior tibial artery disease.
9      Q.    Does the standard of care require that the
10  clinic have a Doppler machine?
11      A.    Not at all.
12      Q.    Have you ever performed an arterial Doppler
13  on a patient?
14      A.    Yes.
15      Q.    Or — so it doesn't require like a special
16  technician or whatever?
17      A.    No.  No.
18      Q.    When was the last time you did such a thing?
19      A.    When my Doppler worked.  About five years
20  ago.
21      Q.    And so now you just refer it out to whomever.
22      A.    Yes.
23      Q.    What's tinea pedis?
24      A.    Yeah.  Tinea pedis is — is a different type
25  of fungus that usually is in the toenails and you'd use

60

1  a different antifungal for tinea pedis, which is
2  Lamisil.
3      Q.    And is it — is it the same as athlete's foot
4  or is it different?
5      A.    Totally different.
6      Q.    And do you believe that — is it your opinion
7  that Mr. Marlowe had tinea pedis?
8      A.    I wouldn't know.  Usually — his nails were
9  certainly — certainly thickened, and usually thickened
10  nails go with tinea pedis.  But you can't tell it's
11  tinea pedis unless you scrape the nails and put
12  potassium hydroxide on the nail which will dissolve the
13  nail and then you look under a microscope and see if
14  you see these hyphae, which are part of a fungus, and
15  then you kind of know whether that's tinea pedis or
16  not.
17      Q.    Okay.  Is it your opinion that Mr. Marlowe
18  had some sort of foot fungal infection?
19      A.    Most diabetics do.
20         MR. CHEEK:  And let me just clarify.  I'm
21  talking about the March 2014 time frame.
22      A.    Yeah.  I think he could have had it in his
23  toenail, but I don't think that had anything to do with
24  the red lesions on his foot.
25         MR. CHEEK:  Okay.

61

1    A.    That certainly was not tinea pedis.

2    **Q.    In your opinion, what was that, the red**
3 **lesions on his foot?**

4    A.    I don't know.  He could have rubbed his leg
5 against something or rubbed his foot against something.
6 I have no idea what that is.

7    **Q.    If you had seen a patient with the redness on**
8 **his foot similar to that, how would you have treated**
9 **it?**

10    A.    I would have probably treated it with just a
11 steroid cream, not a — not an antifungal.  So I would
12 have used what she used, which was triamcinolone cream.
13 I think she was correct in using that.

14    MR. CHEEK:  Okay.

15    A.    That's what I would have used.

16    **Q.    So it's your opinion that Dr. Cumagun was**
17 **correct in ordering the triamcinolone cream?**

18    A.    Yes.

19    **Q.    But your concern with her care is the fact**
20 **that she did not get a Doppler study or refer him to a**
21 **vascular surgeon certain based on the diminished pedal**
22 **pulse?**

23    A.    And the comorbid conditions that he had for
24 peripheral artery disease.

25    MR. CHEEK:  Okay.

62

1    MR. TIPLER:  I think he said vascular
2 specialist versus vascular surgeon.

3    MR. CHEEK:  Okay.  And I'm — I'll —

4    MR. TIPLER:  Yeah, I —

5    MR. CHEEK:  — make the distinction between
6 those —

7    MR. TIPLER:  Okay.

8    **Q.    So if — if Dr. Cumagun treated this as you**
9 **would in terms of the cream that she applied — let me**
10 **rephrase.**

11    You don't have any problems with the cream
12 that she prescribed to him.  It's just the follow-up.
13 She did not — she should have referred him to a
14 vascular specialist or for a Doppler.  That's what your
15 concern is.

16    A.    That's correct.

17    **Q.    Okay.  So your concern is not so much how she**
18 **treated the red spots on his foot.  It's how she**
19 **responded to the diminished pedal pulses.**

20    A.    Correct, because vascular — peripheral
21 artery disease is a progressive problem.  So you have a
22 time window where you kind of monitor that on a three
23 to four month basis.

24    MR. CHEEK:  Okay.

25    A.    And so that — that's why I would be

63

1 concerned so that I went ahead and got that out of the
2 way.  And like I said, I would be concerned as to
3 whether the patient had had a stress test, but that
4 wasn't part of — of this thing.  And she might have —
5 he might have had a stress test.  I don't know.  I
6 didn't get any information on that.

7    **Q.    If you will look at your report, Doctor.  I**
8 **want to see if I can make sense of this one part.  The**
9 **last sentence on the first page says, quote, the**
10 **standard of care was to refer the patient to a vascular**
11 **specialist or, at least, send the patient for an**
12 **arterial Doppler after it was determined that he had a**
13 **decreased, but, not absent, pedal pulse in both feet**
14 **and his feet looked as they did in the photographs,**
15 **Exhibits 1, 2 and 3.**

16    So what I hear you saying today, Doctor, is
17 that it's not really how his feet looked that matters
18 so much with respect to your opinion that he should
19 have been referred to a vascular specialist or for
20 Doppler.

21    A.    Well, I don't — I don't think those — the
22 locations of that redness was pathognomonic.

23    **Q.    What does that mean?**

24    A.    That means the location of the redness is not
25 necessarily associated with an ischemic problem.

64

1    MR. CHEEK:  Okay.

2    A.    So it's not associated with arterial flow.

3    **Q.    So the redness in the pictures from March of**
4 **2014 in your opinion don't indicate a blood perfusion**
5 **or circulation issue.  Is that fair?**

6    A.    That's fair.

7    **Q.    So why does that sentence include the phrase,**
8 **"and his feet looked as they did in the photographs"?**

9    A.    Well, I think the fact that you have redness
10 in his feet and you don't know what caused it, that you
11 can have circulation problems that when you have shoes
12 on and stuff like that can create pressure.  And in
13 diabetics, that doesn't get better.  And so that could
14 be an assessment of his blood flow.  It could be an
15 assessment of his diabetic control.  It could be an
16 assessment of too tight shoes.  But something that you
17 want to make sure your arterial system is functioning
18 fine.

19    **Q.    But for our purposes today, the main thing**
20 **is, I just want to understand —**

21    THE DEPONENT:  Okay.

22    **Q.    — what you're opining on, is that you're not**
23 **saying that the standard of care was breached with**
24 **respect to the treatment of the red lesions or redness**
25 **on his feet.**

65

1    A.    No.  Not in my opinion.

2    **Q.    The standard of care was not breached.**

3    A.    No.

4    **Q.    That's correct?**

5    A.    Correct.

6    **Q.    Let me rephrase because I'm asking the**
7    **sentence — I'm asking the question poorly.**

8          Was the standard of care breached with
9    respect to the treatment of the red spots on his feet?

10   A.    No.

11   **Q.    Okay.  Can you define for me the standard of**
12   **care in treating someone who has reduced or diminished**
13   **pedal pulses?**

14   A.    Well, the standard of care is that you should
15   be on aspirin therapy or an appropriate anticoagulant.
16   You should be on exercise so that you're trying to
17   improve your capacity in your peripheral arterial
18   system.  You should be on a cholesterol or anti-lipid
19   medication, even if your cholesterol is normal because
20   it has a tendency to reverse peripheral artery disease,
21   which was the Lipitor that he was on.  So he's on the
22   appropriate medicine for that.  The Diltiazem that he's
23   on was a calcium channel blocker that improves
24   peripheral blood flow because it dilates arteries.
25   That was appropriate.  You should be on an ACE

66

1    inhibitor like the Lisinopril that he's on because that
2    — that helps arteries not be damaged by pulsations and
3    it reduces atherosclerosis and it's the only medication
4    that you can take, if you look at studies, that reduces
5    myocardial infarctions.  So that was appropriate.

6          So I think that the medical management was —
7    was okay.  I think certainly you want better diabetic
8    control, and that's related to your nutrition and what
9    you eat, and it's related to the medications that you
10   take.  And you certainly don't want in an older person
11   for them to get hypoglycemic or have too low of blood
12   sugar.  You will have more problems with that.

13         And as a diabetic, his A1C was 8.6.  And
14   standard of care is if it's 9 or less, you're probably
15   in the ballpark of adequate diabetic control.

16         MR. CHEEK:  Okay.

17   A.    Great diabetic control is 7 or less.  So I
18   think she was doing fine with that at the moment.

19   **Q.    When does the standard of care require a**
20   **patient be referred to a vascular specialist or surgeon**
21   **related to decreased pedal pulses?**

22   A.    When does the standard of care —

23   **Q.    So, yeah.  What I'm getting at is, it's your**
24   **opinion that Dr. Cumagun should have either referred**
25   **him for Doppler or a vascular specialist.  It sounds to**

67

1    me, and please correct me if I'm wrong, that Doppler
2    is, probably at least in your practice, the easiest to
3    get.

4    A.    Yes.

5    **Q.    When would you refer a patient to a vascular**
6    **specialist that had some of the similar conditions as**
7    **Mr. Marlowe?**

8    A.    Well, it would depend on your clinical
9    setting.

10         MR. CHEEK:  Okay.

11   A.    If — if — if you're not accessible to easy
12   arterial Dopplers with a close hospital —

13         MR. CHEEK:  Okay.

14   A.    Then that would be an issue.  If you were
15   with the VA and they're not going to pay for you to go
16   to another hospital and they want you to come to their
17   hospital, that would be number 2.  And number 3, if you
18   don't know how to interpret that test once you get it
19   back because you're not used to getting it, then it
20   might be simpler just to refer him to the VA in
21   Birmingham, to a vascular surgeon here, who probably
22   would be able to get the test and if something was
23   abnormal, have a plan of care.  Because if she got an
24   abnormal Doppler that came back and she recognized it,
25   then the next step would be to go to a vascular

68

1    surgeon.

2          MR. CHEEK:  Okay.

3    A.    But those — those are tests that should be
4    sequentially monitored.  So you have to have a plan or
5    knowledge as to if you get it now, when do you repeat
6    it.  So...

7    **Q.    You're talking about the Doppler?**

8    A.    Correct.

9          MR. CHEEK:  Okay.

10   A.    If you get a Doppler now, even if they're not
11   having symptoms, when do you repeat that test.  Is it
12   three months?  Is it six months?  Is it yearly?  So I
13   don't know that there's a standard of care that tells
14   you that.

15   **Q.    Okay.  It depends —**

16   A.    Yes.

17   **Q.    — is sort of the — okay.  What — what if**
18   **you have a patient who has diminished or decreased**
19   **pedal pulses for a year or so?**

20   A.    I've had those.

21   **Q.    Okay.  And, you know, what if you had a**
22   **patient who had diminished pedal pulses and then they**
23   **come into your care, they never had a Doppler or**
24   **whatever.  At that point are you like, oh my gosh, you**
25   **need to go get an arterial Doppler immediately, or can**

69

1  you manage that condition knowing that it's a stable
2  condition?
3      A.    I — I order those within 48 hours.
4          MR. CHEEK:  Okay.
5      A.    When I see a patient, they're done within 48
6  hours.
7          MR. CHEEK:  Okay.
8      A.    Initially.
9          MR. CHEEK:  Okay.  All right.  Let me take a
10  quick bathroom break.
11          THE DEPONENT:  Okay.
12              (Recess 4:17 – 4:20 p.m.)
13  (BY MR. CHEEK:)
14      Q.    All right, Dr. McLane.  Did the standard of
15  care require Dr. Cumagun in March of 2014 to check Mr.
16  Marlowe's pulse in his groin?
17      A.    Yes.  Oh.  No.  It — it did on the basis of
18  the diminished — the diminished dorsal pedal pulse.
19      Q.    Okay.  So she shouldn't have just started out
20  checking the pulse in his groin; the fact that he had a
21  diminished pedal pulse —
22      A.    I think the fact that she documented that
23  fact, that he had a diminished pulse is —
24      Q.    Pedal pulse.
25      A.    Pedal pulse.

70

1          MR. CHEEK:  Okay.
2      A.    That she should document the other pulses
3  that were also going down to the lower extremity.  And
4  she may have felt them.  I don't know.  Sometimes you
5  do things that you don't put in the chart.  So I don't
6  know that she didn't do it.  I'm just saying if I
7  document pulses, then I document the other pulses.
8          MR. CHEEK:  Okay.
9      A.    Because I had somebody that came in with a
10  hip fracture that didn't have any pulses in their foot
11  and they didn't have any behind their leg and they had
12  a loud bruit in their femoral artery.  And so before we
13  fixed the hip, we were able to restore blood flow to
14  the — to the limb.  So it [snaps fingers] doesn't take
15  but a second to do it.
16      Q.    Okay.  But it's your opinion that the
17  standard of care required her — once she felt a
18  diminished pedal pulse, the standard of care required
19  her to check the pulse in the groin.
20      A.    Yes, and it's very easy to check the pulse in
21  the groin because all you have to do is lower the belt
22  and just put your hand there and see if you — if you
23  feel a pulse.  So, I mean, you don't have to get him
24  totally undressed to do it.
25      Q.    And did the standard of care require Dr.

71

1  Cumagun in March of 2014 to check the pulse behind his
2  knee after she felt a diminished pedal pulse in his
3  foot?
4      A.    Yes, and the reason why is because that's a
5  common artery that you do a bypass to.  So if you
6  didn't feel a pulse behind the knee, then you would be
7  certain that you've got an extensive lack of blood flow
8  to the leg so that you wouldn't have an opportunity for
9  bypassing the foot with a popliteal to dorsal pedal
10  bypass and that you might have to have a femoral
11  popliteal bypass, which is a much more involved
12  condition.  So you'd want to know that at the onset so
13  that serially you can kind of see in diabetics whether
14  they have what we call macrovascular problems, which
15  are large arteries, like the femoral artery, like the
16  popliteal artery, versus microangiopathic disease which
17  is small vessel disease that you can't do anything
18  about.
19      Q.    So but in terms of determining whether there
20  are circulation issues, the pulse is just one thing
21  that a physician would look at.
22      A.    The most important.
23      Q.    Okay.  Physicians would also look at the
24  color of the skin, I think you had referenced earlier.
25      A.    Capillary refill.  Touch the toes and see if

72

1  you're getting adequate blood flow to the toes and the
2  foot.  And that would tell you whether you have an
3  immediate medical urgency versus non-immediate medical
4  urgency that you can do the thing — you can do the
5  workup as an outpatient versus putting the patient in
6  the hospital.
7      Q.    So if you have a patient who has good
8  capillary refill, coloring looks pretty good, but then
9  you have a diminished pedal pulse, still have to be
10  referred — that patient still has to be referred for a
11  Doppler at a minimum?
12      A.    Absolutely.
13      Q.    Okay.  And I think you answered this.  Let me
14  just make sure I understand.
15          The — because of the diminished pedal pulse,
16  the standard — it's your opinion that the standard of
17  care required Dr. Cumagun to check Mr. Marlowe's pulse
18  behind his ankle bone?
19      A.    Correct.  Posterior tibial.
20      Q.    Posterior tibial.  Yes.  Thank you.
21          And it's your opinion that Dr. Cumagun did
22  not follow the standard of care on March 14th of 2014?
23      A.    It is.
24      Q.    And I believe you specifically opined the
25  standard of care was to refer the patient to a vascular

73

1  specialist or at least send the patient for an arterial
2  Doppler after it was determined that he had a decreased
3  but not absent pedal pulse in both feet and his feet
4  looked as they did in the photographs.
5      A.    Yes.  Less concern about the feet, how they
6  looked in the photographs.
7      Q.    When you referenced photographs in your
8  report, you're talking about — about those three
9  photographs attached to Dr. Cumagun's deposition,
10  correct?
11     A.    Correct.
12     Q.    I'm going to mark this as Defense Exhibit No.
13  8.  These are the three photographs of Mr. Marlowe's
14  feet that were taken in March of 2014.
15         (Whereupon Defendant's Exhibit No. 8 was
16  marked for identification.)
17     Q.    Do those photographs that I've just handed
18  you, Dr. McLane, look any different than the ones you
19  reviewed that were attached to Dr. Cumagun's
20  deposition?
21     A.    They look the same.
22         MR. TIPLER:  Wait.  Let's — I just want you
23  to look at them because they — photocopies
24  sometimes are a little different.  So I'm just —
25  they're obviously the same photographs but the

75

1  paper where you don't see any skin at all.  It's all
2  gone.  So —
3      Q.    So it may be athlete's foot, it may not be?
4      A.    Could be.  You would have to look between the
5  toes.
6      Q.    Is — are these red spots on this foot, is
7  that a sign of peripheral artery disease in your
8  opinion?
9      A.    You know, I — I would say that I don't
10  really have an expert opinion on what peripheral artery
11  disease and skin changes showed because you can have
12  what you call vasculitis where you have inflammation of
13  your artery.  It can show redness in your feet.  It's
14  not related to peripheral vascular disease but an
15  inflammatory condition of the foot and that's why I
16  said you want to because those people have what you
17  call palpable purpura, where you can — they are raised
18  above the skin.
19         So on this kind of picture, you can't run
20  your hand across and see if it's raised above the skin
21  or if it's flat or if it's below the skin.  Certainly
22  there's some scaling on his feet, but mine look like
23  that.  So I don't know how a dermatologist would have
24  been able to make a diagnosis of fungus on the basis of
25  this.

74

1  color kind of comes at you differently.
2         THE DEPONENT:  Okay.
3      Q.    Does the coloring look any different in the
4  pictures I've just handed you —
5      A.    No.
6      Q.    — versus the ones that are in Dr. Cumagun's
7  deposition?
8      A.    No.
9      Q.    So these pictures look virtually the same as
10  the ones you previously reviewed.
11     A.    Correct.
12     Q.    And I think you testified earlier that you're
13  not entirely clear what this condition was related to
14  the red spots on his foot, but you would have treated
15  it with a steroid?
16     A.    Correct, because he was on Coumadin and so
17  you can bleed under the skin and have redness from
18  bleeding from Coumadin, so I wouldn't — I wouldn't
19  have treated fungus on the basis of these pictures.
20     Q.    Based on these pictures, can you rule out
21  that Mr. Marlowe had athlete's foot?
22     A.    No because most — most athletes feet would
23  be between the toes and there's no image where you've
24  spread the toe apart and looked to see.  Because you
25  would see whiteness.  It would look almost like yellow

76

1      Q.    Are you a dermatologist?
2      A.    No.
3      Q.    Did you have any dermatology training?
4      A.    I certainly did.
5      Q.    You did?
6      A.    Yes.
7      Q.    How long?
8      A.    One month.
9      Q.    One month.  Okay.  But you wouldn't consider
10  yourself an expert in dermatology.
11     A.    Absolutely not.
12     Q.    You're not giving an opinion on the standard
13  of care related to the dermatologist in this case, are
14  you?
15     A.    No, I'm not.
16     Q.    Okay.  Is it your opinion that Mr. Marlowe
17  was experiencing claudication during his March 14th,
18  2014 visit to the VA?
19     A.    Well, I don't think that's documented.  It's
20  not documented in the record.  But I think somebody
21  that's — that has other medical problems and doesn't
22  walk very far to — to get claudication, you'd have to
23  have loss of blood flow to the calf and you would have
24  to have enough exertional activity to have symptoms of
25  calf pain.

77

```
 1      Q.    Are you saying he lived — to your knowledge
 2  he lived a sedentary life and probably didn't have
 3  enough —
 4      A.    I don't know.
 5      Q.    Is it just fair to say you don't have an
 6  opinion —
 7      A.    I don't.
 8      Q.     — as to whether he was experiencing
 9  claudication in March of 2014?
10      A.    I do not.
11      Q.    Okay.  You don't hold an opinion.
12      A.    I do not.
13      Q.    Okay.  Thank you.  And is it your opinion
14  that the standard of care requires referral to a
15  vascular specialist or for a Doppler study before
16  claudication occurs?
17      A.    If you feel diminished pulses, absolutely.
18      Q.    So again, getting back to that diminished
19  pedal pulses is the critical triggering event for a
20  Doppler or vascular specialist referral.
21      A.    Yes.
22      Q.    Did Mr. Marlowe's feet show signs of gangrene
23  in the pictures that are in Exhibit No. 8?
24      A.    No, they do not.
25      Q.    Does gangrene resolve without medical
```

78

```
 1  intervention?
 2      A.    No, it does not.
 3      Q.    In those pictures in Exhibit No. 8, did his
 4  feet show signs of an embolic event?
 5      A.    No.
 6      Q.    Does an embolism resolve without medical
 7  intervention?
 8      A.    No.
 9      Q.    If he had an embolism, is it your opinion
10  that he went — well, it's your opinion that he's not
11  experiencing an embolism in those pictures.
12      A.    Right.
13      Q.    If a patient did experience an embolism —
14  strike that.
15            In those pictures in Exhibit No. 8, do Mr.
16  Marlowe's feet demonstrate or show signs of ischemia in
17  your opinion?
18      A.    No.
19      Q.    All right.  Are you an expert in vascular
20  issues?
21      A.    I'm an expert in internal medicine issues.
22            MR. CHEEK:  Okay.
23      A.    But I'm not a vascular surgeon.
24      Q.    Would you consider yourself an expert in
25  vascular issues such as how to treat a patient that had
```

79

```
 1  diminished pedal pulses like Mr. Marlowe had?
 2      A.    Yes, I would.
 3      Q.    So educate me as to where the line is.
 4  You're certainly not a vascular surgeon so if he
 5  required a bypass surgery, you wouldn't be able to give
 6  an opinion on that sort of —
 7      A.    No.
 8      Q.     — stuff.  Is that fair?
 9      A.    Correct.
10      Q.    Are you able to give an opinion on whether
11  bypass surgeries would prove successful?
12      A.    Well, you can't give an opinion on that
13  unless you know what the anatomy is and unless you're
14  doing an arteriogram so I don't think anybody can give
15  you an expert opinion on that without anatomic data on
16  arterial blood flow.
17      Q.    So someone would have to see the imaging
18  studies —
19      A.    Correct.
20      Q.     — to determine whether bypass would be
21  successful on a patient like Mr. Marlowe.
22      A.    Right.  Right.
23      Q.    If Dr. Cumagun had referred Mr. Marlowe to a
24  vascular specialist or surgeon in March of 2014, what
25  do you think would have happened?
```

80

```
 1      A.    Well, I think if they had referred him to a
 2  vascular surgeon in March, since it was almost four
 3  months afterwards that he had issues with gangrene,
 4  then in that window of time, had he had a blockage in
 5  his femoral artery that could have been opened with an
 6  angioplasty or if he had a vascular study that showed
 7  other issues with his popliteal artery, then at that
 8  point he could have been referred to noninvasive
 9  revascularization, if indicated.
10      Q.    And what do you mean by noninvasive?
11      A.    Stents, angioplasty where you put a balloon
12  in the artery and open it up which is noninvasive,
13  nonoperative procedures.  And that's basically what
14  you're looking for, is to see if there's an easy way to
15  — to do that.  And the way they do that is if they
16  find an abnormal Doppler, then they put some contrast
17  in the femoral artery and then they look at blood flow
18  all the way from the femoral artery down.  So it
19  doesn't require much dye so it's a safe procedure
20  because you worry about diabetics and going into renal
21  failure with any kind of dye load.  And then it's also
22  a procedure that doesn't take ten minutes to do.  And
23  then you kind of have an idea of what the arterial
24  artery caliber is all the way from the top to the
25  bottom.
```

81

1    MR. TIPLER:  Are we talking about an
2    arteriogram at this point?
3    THE DEPONENT:  Yes.
4    MR. TIPLER:  Okay.
5    **Q.    Can you give an opinion that angioplasty or a**
6    **stent procedure in March of 2014 would have prevented**
7    **Mr. Marlowe from undergoing any amputations of his**
8    **lower extremities?**
9    A.    I've had similar patients before that have
10   had angioplasty and stents that have gone five years
11   without having any problems.
12   **Q.    Have you had patients that have gone the**
13   **other way?**
14   A.    I have.
15   **Q.    Okay.  So can you say that it's your opinion**
16   **that had the angioplasty or the stent procedure been**
17   **performed in March of 2014, that he would have — he**
18   **would not have undergone the amputations?**
19   A.    I — ask that again.
20   (Whereupon the last question is read back by
21   the reporter.)
22   A.    My opinion is he still could have undergone
23   the amputation.
24   **Q.    So you can't be sure that an angioplasty**
25   **would have saved Mr. Marlowe's limbs.**

82

1    A.    Well, without data, no, you can't say that.
2    **Q.    And you can't be sure that a stent procedure**
3    **would have saved Mr. Marlowe's limbs.**
4    A.    I can't say a hundred percent.  No.
5    **Q.    But you can't also give an opinion here today**
6    **that it more likely than not would have saved his**
7    **limbs.**
8    A.    Well, if he had a — if he had had a major
9    femoral artery or iliac artery, then I think a hundred
10   percent it would have saved his limb.  But I think —
11   **Q.    My question is based on your knowledge —**
12   A.    Yes.
13   **Q.    — of the record.  Can you give that opinion**
14   **today?**
15   A.    No.
16   MR. TIPLER:  Excuse me.  You cut him off when
17   he was saying something about the iliac artery.  Is
18   that what you said?
19   THE DEPONENT:  Mmm hmm.
20   MR. TIPLER:  If it was a good iliac artery or
21   something?
22   MS. WILSON:  I'm going to —
23   **Q.    (BY MR. CHEEK:)  Okay.  So in forming your**
24   **opinion, Dr. McLane, you — we had talked about the**
25   **sentence in your report that said that he should have**

83

1    **been referred for a Doppler or vascular surgeon based**
2    **on the decreased pedal pulses as well as the way the**
3    **feet looked in the photographs.  But we've sort of set**
4    **the way the feet looked in the photographs to the side**
5    **for those —**
6    A.    Less concerning.
7    **Q.    Yeah.  Your concern was the decreased pedal**
8    **pulse.**
9    A.    That's correct.
10   **Q.    And in forming that opinion, you looked at**
11   **several records from the VA Clinic in Sylacauga,**
12   **correct?**
13   A.    Yes.
14   **Q.    And in your opinion, what was the cause of**
15   **Mr. Marlowe's blood circulation issues in March of**
16   **2014?**
17   A.    What was the question?
18   MR. CHEEK:  Can you read it back?
19   (Whereupon the last question is read back by
20   the reporter.)
21   A.    I think that he had atherosclerosis or
22   hardening of the arteries that caused diminished pulses
23   in his legs.  I think that he was on Coumadin, so that
24   pretty well protects you from a lot of emboli or
25   embolic problems.  So the assessment is based on his

84

1    age and risk factors that he clearly — clearly had an
2    artery atherosclerotic problem, the extent of which was
3    not diagnosed because of absence of testing that could
4    have given you an idea of whether or not you could have
5    improved his blood flow and restored his pulses back to
6    his feet.
7    **Q.    Didn't you testify earlier, however, that**
8    **Coumadin was not the best way to manage afib or did I**
9    **misunderstand?**
10   A.    I said on the basis of — of his going up and
11   down and the interaction with other medication, and
12   being in the VA system where you're seeing other
13   doctors that don't have access to what your protimes
14   are running, that that was a dangerous medication for
15   him.
16   **Q.    What — you say your — he's in the VA system**
17   **who don't have access to what his protimes are running.**
18   A.    If you went to an urgent care or something
19   like that.  So I'm saying if he went with a cold or
20   something somewhere else —
21   **Q.    To a non-VA facility?  Is that what you're**
22   **saying?**
23   A.    Correct.  If he'd been sick and he went to
24   American Family Care or something like that.
25   MR. CHEEK:  Okay.

85

1    A.    And they gave him Cipro.
2         MR. CHEEK:  Mmm hmm.
3    A.    Then he could bleed out or have a problem.
4  Or, if he took another medication that caused his
5  protime to go down, then he would lose his protective
6  therapeutic —
7    Q.    **But is that — is that the VA's**
8  **responsibility or is it the patient's responsibility if**
9  **he goes to an outside facility to inform or educate**
10 **that outside provider what his INR is doing?**
11   A.    Well, I think it's the VA's responsibility to
12 give him the best medication available to keep him out
13 of that situation where he could get himself into
14 trouble and to optimize.  So most people now are not
15 using Coumadin —
16        MR. CHEEK:  Okay.
17   A.    — at all for atrial fib.  I can't remember
18 the last time I saw somebody started on Coumadin for
19 atrial fib over the last four or five years.
20   Q.    **Okay.  And I don't remember if I've asked you**
21 **this so I apologize if I have:  Is it your opinion that**
22 **afib, atrial fibrillation, the standard of — let me**
23 **rephrase it.**
24        Is it your opinion that the standard of care
25 requires the atrial fibrillation be treated with a

86

1  different medication other than Coumadin?
2    A.    I don't think that's the standard of care
3  yet.
4    Q.    **Okay.  Was it the standard of care in 2014?**
5    A.    No.
6    Q.    **I want to step back to March of 2014.  Is it**
7  **your opinion that Mr. Marlowe's legs could have been**
8  **saved if the standard of care had been met?**
9    A.    I think it's — my opinion is that — that it
10 is — would have been his best opportunity to save his
11 legs if something had been done to see if there was an
12 arterial problem that was amenable to a procedure that
13 would have restored blood flow to his legs.
14   Q.    **Can you say that more likely than not his**
15 **legs would have been saved had the standard of care**
16 **been met in March of 2014?**
17   A.    In my opinion, it would have.
18   Q.    **Okay.  More likely than not it would have?**
19   A.    Yes.
20   Q.    **Okay.  You would have liked to have seen the**
21 **imaging studies of his lower extremities to better**
22 **opine on that.  Is that fair?**
23   A.    Well, that would have been great —
24   Q.    **But —**
25   A.    — to have — I would have been happy with

87

1  just the Dopplers first, because I think the Dopplers
2  give you an idea of where the problem is, whether it's
3  in the larger arteries or the smaller arteries.  And
4  then the angiogram just gives you the hundred percent
5  this is what — what it is, that he's got a blockage
6  here, he's got a blockage there.  And so I think the
7  angiogram would have been best, but a Doppler would
8  have been very helpful as to whether he needed an
9  angiogram or not.
10   Q.    **The standard of care did not require that he**
11 **receive an angiogram in March of 2014.**
12   A.    Not at all.
13        MR. CHEEK:  Okay.
14        MR. TIPLER:  Again, we've used terms here,
15 angiogram and arteriogram.
16        THE WITNESS:  Same thing.
17        MR. TIPLER:  I just want to be sure that
18 we're all communicating.  You used the word
19 arteriogram and he used the word angiogram, and I
20 want to be sure y'all are communicating.
21        MR. CHEEK:  All right, Doctor.  If you would
22 please refer to your report.  Thank you.
23        I want you to turn to the first page and I
24 want to talk about the second paragraph on that
25 page.

88

1         THE DEPONENT:  Okay.
2    Q.    **I asked you to bring any medical records that**
3  **you reviewed in forming your opinions to this**
4  **deposition and you kindly did so.  You provided a copy**
5  **of Dr. Cumagun's deposition, which has various VA**
6  **medical records, and I believe your report actually**
7  **says you reviewed medical records from March 6th**
8  **through November 28th of 2014 from the VA.  Is that**
9  **fair?**
10   A.    Whatever is in that — [indicating].
11   Q.    **Whatever is in that, and you're referring to**
12 **the attachments?**
13   A.    To the attachments that I gave you.
14   Q.    **And you also reviewed Dr. Bourgeois' note of**
15 **7/31/2014 which is attached to this deposition?**
16   A.    Yes.
17   Q.    **You also reviewed Dr. Henderson's note of**
18 **7/9/2014 which is attached to this deposition?**
19   A.    Yes.
20   Q.    **And you reviewed all those medical records**
21 **prior to writing out your opinion?**
22   A.    That's right.
23   Q.    **Separately, Exhibit 5 are medical records**
24 **from Dr. Pinson.  Did you review those medical records**
25 **before writing your opinion?**

89

1    A.    Yes.
2    Q.    And Exhibit 6 are records from Shelby Baptist
3  Medical Center.  Did you review those records before
4  writing your opinion?
5    A.    Yes.
6          MR. CHEEK:  Let's take a break.
7          (Recess, 4:53 - 4:56 p.m.)
8  (BY MR. CHEEK:)
9    Q.    Okay.  So we talked about VA records, Dr.
10  Henderson's records, Dr. Bourgeois' records and Dr.
11  Pinson's records.  Did you review any other medical
12  records that we haven't talked about in forming your
13  opinions?
14   A.    No.
15   Q.    And is it fair to say that there are
16  approximately twenty-five pages of VA medical records
17  that are attached to Dr. Cumagun's deposition?
18   A.    Yes.
19   Q.    Okay.  Are you aware that that set of records
20  does not include a record dated July 9th of 2014 that
21  refers to an appointment from the preceding day, July
22  8th of 2014, where Mr. Marlowe failed to keep that
23  appointment?
24   A.    At — failed to keep —
25   Q.    He failed to keep a July 8th, 2014

90

1  appointment.
2    A.    For the VA?
3          MR. CHEEK:  Correct.
4    A.    I saw that he had a July 9th appointment
5  where he saw somebody.  A dermatologist.  Saw the
6  dermatologist on July 9th.  So I don't know what
7  happened July 8th.
8    Q.    Are you aware that there is a note from July
9  9th of 2014 referencing the fact that he missed an
10  appointment from the preceding day at the VA?  You can
11  look in those records if you want but it's not there.
12  I just wanted to note if you're aware of that.
13   A.    I was not aware of that.
14   Q.    Did you review any consult requests from the
15  VA prior to forming your opinion?
16   A.    I just reviewed this [indicating].
17   Q.    So if the consult request is not in there,
18  you didn't review it?
19   A.    Didn't know about it.
20   Q.    Okay.  And if there — so you wouldn't have
21  reviewed any lab results from March of 2014 because
22  they're not in that set of records.  Is that fair?
23   A.    Fair.
24   Q.    And you wouldn't have reviewed any doctor's
25  orders because they're not in that twenty-five page set

91

1  of records, correct?
2    A.    Correct.
3    Q.    Prior to today —
4          MR. TIPLER:  Any doctor's orders that are not
5    in the twenty-five pages.  He obviously reviewed
6    the doctor's orders within the twenty-five pages.
7    I'm sorry.  I have an objection to the form of your
8    question because of that, about the —
9          MR. CHEEK:  That's fine.  That's fine.
10         MR. TIPLER:  The way you worded it.
11   Q.    Well, do you know what doctor's orders are?
12   A.    Sure.  Sure.
13   Q.    Are they — do you see any doctor's orders in
14  those — those twenty-five pages of medical records
15  that are attached to Dr. Cumagun's deposition
16  transcript?
17   A.    No, I do not.
18         MR. CHEEK:  Thank you.
19   Q.    Prior to today, have you had an opportunity
20  to review any records from the Coosa Valley Medical
21  Center?
22   A.    No.
23   Q.    Prior to today, did you review any records
24  from Dr. Deborah Trujillo?
25   A.    No.

92

1    Q.    So it's fair to say you did not review Dr.
2  Trujillo's emergency room note from March 25th of 2014?
3    A.    No, I did not.
4    Q.    Prior to today, did you review any records
5  from Podiatry Associates?
6    A.    No.
7    Q.    Prior to today, did you review any records
8  from James — Dr. James Bowman?
9    A.    No.
10   Q.    Did you review Dr. Bowman's note from May
11  15th of 2014?
12   A.    No.
13   Q.    Prior to today, did you review any records
14  from the Craddock Health Center?  I think we've
15  established that you did.
16   A.    Yes.
17   Q.    And can you tell me which dates of the
18  medical notes that you reviewed?
19   A.    6/2, 6/11, and 7/16.
20   Q.    All from the year 2014.
21   A.    Correct.
22   Q.    Prior to today, did you review any records
23  from Bone and Joint Specialists?
24   A.    No.
25   Q.    Prior to today, did you review any records

93

1 from Dr. Paul Goldhagen?

2    A.    No.

3    Q.    Prior to today, did you review any records

4 from Southern Pain Specialists?

5    A.    No.

6    Q.    Prior to today, did you review any records

7 from Dr. Kenneth Varley?

8    A.    No.

9    Q.    Did you review Dr. Varley's note from May

10 22nd of 2014?

11    A.    No.

12    Q.    Is it possible that reviewing all these

13 records I've referenced would change the opinions that

14 you gave here today?

15    A.    It wouldn't change the opinion that there

16 were diminished pulses from March 14th, and some type

17 of testing needed to be done to evaluate the vascular

18 status of this patient.

19    Q.    Okay.  Would you have liked to have seen

20 those records prior to today?

21    A.    If they ordered vascular studies, I would.

22    Q.    What about if they did not order vascular

23 studies but they examined or reviewed Mr. Marlowe's

24 lower extremities?  Would you have liked to have seen

25 those records?

---

95

1 things in forming your opinions?

2    A.    Well, that didn't necessarily — I didn't

3 rely on that to form my opinion.

4        MR. CHEEK:  Okay.

5    A.    It was the physical examination of the

6 primary doctor.  I was just told this as information as

7 to what was going on since I didn't talk to the

8 patient.

9    Q.    So you're saying the physical examination

10 that Dr. Cumagun did in March was what formed the basis

11 of your opinions.

12    A.    That's correct.

13    Q.    So your opinion doesn't depend on these seven

14 things being true?

15    A.    No.

16    Q.    And so if one of them — one of these seven

17 things were untrue, it still wouldn't change your

18 opinion.

19    A.    No.

20    Q.    Well, let me make sure I understand your

21 answer.  If one of these things were inaccurate, would

22 your opinion change?

23    A.    To me —

24    Q.    I just want to ask about these seven things

25 and then you can explain what you wanted to explain.

---

94

1    A.    I was fine with the records that I saw.

2    Q.    Have you reviewed Mr. Marlowe's deposition

3 prior to today?

4    A.    No.

5    Q.    Have you spoken with Mr. Marlowe or examined

6 him prior to today?

7    A.    Never.

8        MR. CHEEK:  I'll grab those back from you.

9        THE DEPONENT:  Oh.  Sorry.

10    Q.    All right, Doctor, going back to your opinion

11 which is Exhibit No. 7.  So in the second full

12 paragraph, there's a sentence that begins, "I have also

13 been told" and then you list seven numbered things that

14 appear to have been told to you.  Is that fair?

15    A.    Where is this?

16        MR. CHEEK:  [Indicating].

17        THE DEPONENT:  Yes.  Yes.

18    Q.    Okay.  And you didn't number these seven

19 things that you were told; I take it someone from Mr.

20 Tipler's office did?

21    A.    Yes.

22    Q.    And who told you these seven things that are

23 listed in this report?

24    A.    Mr. Tipler.

25    Q.    And you relied specifically on those seven

---

96

1 But if one of these seven things were inaccurate, would

2 that change your opinions?

3    A.    No.

4    Q.    Okay.  Is there something else you wanted to

5 add?

6    A.    The only addition I have is that I think as a

7 primary care doctor, it's your responsibility to take

8 care of the patient no matter if they go to other

9 people or not.

10        MR. CHEEK:  Okay.

11    A.    So that's all I was going to say.

12    Q.    Okay.  Did you verify whether these seven

13 things are true or not?

14    A.    No.  For instance, was the right foot darker

15 than the other.  I was just told that.

16        MR. CHEEK:  Okay.

17    A.    And they took a picture of the wrong one.  So

18 to me, that didn't make any difference except that for

19 the dermatologist, they should have taken both

20 pictures.  But again...

21    Q.    But you're not providing an opinion about the

22 dermatology —

23    A.    No.

24    Q.    — and whether there was a breach in the

25 standard of care there.

97

1    A.    No.

2    Q.    I want to talk about number 2. Well,
3 actually, you didn't rely on these seven things in
4 forming your opinions, fair?

5    A.    Fair.

6    Q.    I want to talk about number 4. Let me
7 actually clarify one thing here. When you signed this
8 report, you agree with everything that's in this
9 report. Is that a fair assessment? Fair statement?

10    A.    I mean, I agree that it was true based on the
11 information I had. Yes.

12    Q.    And then does it matter to you — number 4.
13 You say that Mr. Marlowe says that neither Dr. Pinson
14 or Dr. Henderson checked the pulses in Mr. Marlowe's
15 feet, legs or groin area. Does that matter to you, to
16 your opinions?

17         MR. TIPLER:  As to whether Dr. Cumagun
18         violated the standard of care or not?

19         MR. CHEEK:  To any of his opinions that he's
20         given here today.

21    A.    Yeah, I mean, I think that whether or not a
22 dermatologist feels pulses or not or documents whether
23 they feel pulses or not, that's two or three months
24 after — after Dr. Cumagun saw the patient. So we're
25 still talking about three months or four months that we

98

1 had an opportunity to get something done.

2         MR. CHEEK:  Well, but my question — that's
3         not my question.

4         THE DEPONENT:  Okay.

5    Q.    My question is, does it matter to your
6 opinions the fact that Mr. Marlowe says that neither
7 Dr. Pinson nor Dr. Henderson checked the pulses in Mr.
8 Marlowe's feet, legs or groin.

9         MR. TIPLER:  I object to the form of the
10         question. I think he answered that very question
11         as best he possibly could with his previous answer.

12         MR. CHEEK:  Okay. You can answer, Doctor.

13    A.    Yeah, I mean I — it's — it somewhat bothers
14 me that they didn't do it.

15         MR. CHEEK:  Okay.

16    A.    But like I said, the primary care person or
17 the dermatologist, if they're referred and they have —
18 so they may assume that because they're going to the VA
19 that somebody else is doing all that.

20         MR. CHEEK:  Okay.

21    A.    Personally, I would have checked the pulses.

22    Q.    Okay. Did Dr. — well, you're not opining on
23 whether Dr. Henderson breached the standard of care by
24 failing to check the pulses on Mr. Marlowe's feet, legs
25 or groin area?

99

1    A.    No.

2    Q.    Is that fair?

3    A.    That's fair.

4    Q.    Do you believe that Dr. Pinson violated the
5 standard of care in not checking the pulses in Mr.
6 Marlowe's feet, legs or groin area?

7    A.    I think that — I think that that's difficult
8 to say.

9         MR. CHEEK:  Okay.

10    A.    I think that standard of care is that — that
11 you check pulses. If you're seeing somebody for
12 another problem, say back pain or urinary tract
13 infection or something like that, then — and you know
14 that they have a primary doctor, then I think standard
15 of care is that you don't do a full exam on them.

16         MR. CHEEK:  Okay.

17    A.    Unless you're the primary care person. It's
18 your responsibility as the primary care person to do
19 that. So...

20    Q.    Who — who do you believe was Mr. Marlowe's
21 primary care physician?

22    A.    Well, he was a VA patient so I assume that
23 Dr. Cumagun was his primary care doctor.

24    Q.    So if Dr. Pinson was the doctor he saw more
25 regularly, would that alter your opinions today?

100

1    A.    I — I think that — that — I don't know if
2 he saw the patient more regularly. If he saw the
3 patient before March and had been seeing him before,
4 that would be concerning as to why he didn't check
5 pulses.

6    Q.    So assume with me —

7    A.    Okay.

8    Q.    — that Dr. Pinson was the primary care
9 physician that Mr. Marlowe saw on a more regular basis
10 than Dr. Cumagun.

11    A.    Mmm hmm.

12    Q.    If — if that's the case, does that alter
13 your opinions that you've given related to Dr.
14 Cumagun's care today?

15    A.    Shouldn't make any difference on — on her
16 responsibility since — since she felt diminished
17 pulses.

18         MR. CHEEK:  Okay.

19    A.    Because he may have checked the pulses and
20 didn't have the expertise to know whether they were
21 diminished or not. I don't know. Again, I said
22 abnormal physical finding on her chart that says she's
23 got the expertise to recognize that that's abnormal —

24         MR. CHEEK:  Mmm hmm.

25    A.    And — and would have followed up on it.

101

1 Now, she may be a better doctor than Dr. Pinson in
2 finding that —
3     Q.    And that's the point I'm trying to get at.
4 Because Dr. Pinson didn't check the pedal pulses, does
5 — does he get a free pass?
6     A.    Well, see — yeah, I don't know if he checked
7 them and didn't document it, or — I think that's part
8 of the medical record problem that we have today, is
9 that — and it didn't look like he used an electronic
10 medical record.  It looked like he used an old
11 fashioned kind of I'm dictating a note, you know, fast
12 enough.  So.
13    Q.    Well but —
14    A.    But I don't think anybody gets a free pass,
15 to answer your question.  The man lost his legs, so,
16 ultimately he lost his legs.  So, you know, if — if he
17 would had checked them before that time or after that
18 time, I mean, whoever checks them, I think kind of
19 everybody has responsibility.
20    Q.    So did Dr. Pinson breach the standard of care
21 in failing to check pedal pulses on June 2nd of 2014?
22    A.    June 2nd.
23          MR. CHEEK:  Let me —
24          THE DEPONENT:  Oh, I see.  I got it.
25          MR. CHEEK:  Let me help you out, Doctor.

102

1     I'll give you the medical record.  I'll give you
2 Exhibit 5 which should have that medical record.
3     A.    So I think looking at his visit, it says
4 office visit established.  And chief complaint was
5 nocturnal leg cramps, recurrent back problems.  And he
6 documented his atrial fibrillation, heart failure, low
7 back pain and nocturnal muscle cramps.
8          So as an established patient, like I said, if
9 he had checked his pulses sometime in the last year on
10 charts that I don't have, then I don't think he would
11 have breached the standard of care if he'd have checked
12 them before and on this visit did not check them
13 because he had checked them before.  Again, I would
14 check them every time.
15    Q.    But you're saying the standard of care only
16 requires that they be checked once every however many
17 — how often?
18    A.    Yeah, that's — that's what I'm saying.  I
19 think you at least check them yearly.
20          MR. CHEEK:  Okay.
21    A.    Because you have a yearly wellness exam that
22 we're responsible for doing where you do a total
23 evaluation of the patient.  So Medicare —
24    Q.    And who does that yearly wellness exam of the
25 patient?

103

1     A.    The primary care doctor.
2     Q.    Okay.  And if you have a patient who's seeing
3 multiple primary care physicians, who does that?
4     A.    Well, that's what I said.  I mean, it's your
5 responsibility yourself to do it once a year.  It
6 doesn't matter whether you — whether five people see
7 him.  Somebody should do that once a year.
8     Q.    Each of those primary care physicians —
9     A.    Correct.
10    Q.    — needs to be doing that thorough wellness
11 exam.
12    A.    Correct.
13    Q.    Thank you.  Number 6 on your opinion says
14 that on 7/31/14 dermatologist Dr. Bourgeois immediately
15 sent Mr. Marlowe to Shelby Baptist Hospital and asked
16 for a vascular consult.
17    A.    Yeah.  He had gangrene.
18    Q.    Okay.  And what's the significance of — that
19 — number 6 doesn't factor into the opinions you're
20 giving here today; is that fair?
21    A.    No.  No.  It does not.
22    Q.    And that's a fair statement, what I just
23 said.
24    A.    Yeah.
25    Q.    What's the significance of No. 7 in your

104

1 report which reads that the vascular surgeon, after
2 having the appropriate studies performed, CT angiogram,
3 arteriogram, etc., determined Mr. Marlowe suffered with
4 significant tibioperoneal occlusive disease bilaterally
5 that he then attempted revascularization with a below
6 the knee popliteal artery to dorsalis pedis artery
7 bypass?
8     A.    Yes.
9     Q.    That the attempts at revascularization were
10 unsuccessful, and both of Mr. Marlowe's extremities
11 above the knee had to be amputated between August 11th
12 and October 7th of 2014.  What's the significance of
13 that?
14    A.    Glad you asked that question.
15          MR. CHEEK:  Okay.
16    A.    Because I think that — that if you have
17 diminished blood flow proximal to that or higher up in
18 the arterial system, had you been able to restore blood
19 flow, then you would have had more blood going behind
20 the knee and you would had more blood going down
21 to the ankle.  So that being said, that would have
22 dilated your arterial system.  So even if you had an
23 episode of gangrene, then you would have had a better
24 artery to bypass in the context of an ischemic problem
25 and that you might have had less of a problem with limb

105

1  loss.  Because if you remember, he did a below the knee
2  amputation and then he had to have an above the knee
3  amputation.  And the reason that you do an above the
4  knee amputation is because you don't have blood flow as
5  well in these big arteries.  And they're the ones that
6  are more accessible to a stent or an angioplasty or
7  opening up.
8      Q.    **The ones above the knee?**
9      A.    The ones above the knee in the groin.
10         MR. CHEEK:  Okay.
11     A.    So the femoral arteries which are the major
12 blood supply.  So your aorta divides into two major
13 arteries and goes down the iliac into the femoral canal
14 which is the top of the groin, okay, where you have
15 your hernia repairs and stuff like that.
16         MR. CHEEK:  Mmm hmm.
17     A.    So that's where the artery is at its maximum
18 caliber.  And so it diminishes in size as it's going
19 down, all the way down to the dorsal pedal pulse.  So
20 had we had a ninety percent blockage or an eighty
21 percent blockage or something like that back three or
22 four months ago, and had we opened that artery up so
23 that we had good blood flow, because it's clear that
24 that's one of the arteries that's involved or you would
25 have been fine with a below-the-knee amputation if he

106

1  had just had small vessel disease.  So that tells me
2  that he had some big vessel disease, too.  And so
3  that's what really concerned me about earlier
4  evaluation.
5      Q.    **So are you suggesting that he lost a chance**
6  **to save those two limbs because Dr. Cumagun didn't catch it**
7  **early enough or didn't notice —**
8      A.    I'm saying that is right.
9      Q.    **Okay.  Which limb was amputated first?**
10     A.    The right.
11     Q.    **Why was the left limb amputated in October**
12 **2014 which was approximately two months after the first**
13 **right limb amputation?**
14     A.    Why was the left?
15         MR. CHEEK:  Yes, sir.
16     A.    I mean, it had vascular disease and
17 compromise as well.
18     Q.    **Okay.  And you're saying that relates back to**
19 **Dr. Cumagun in March of 2014, in your opinion?**
20     A.    Well, I'm saying that you — if she had gone
21 to a vascular surgeon, they would have checked both
22 sides and they would have been able to evaluate the
23 circulatory system but — and been able to see which
24 side was worse, and being able to see exactly whether
25 he might have needed an aortobifemoral bypass, so that

107

1  would have been a bypass from the aorta to both femoral
2  arteries.
3         So he could have possibly had a more major
4  procedure, but it would have supplied both femoral
5  arteries, aortofemoral bypass, and well before we got
6  the time three or four months later of gangrene and
7  ischemia and recurrent amputation.  Certainly might
8  have made a big difference.  If that would have been my
9  dad, that would have been important.
10     Q.    **Is it your opinion that more likely than not**
11 **had Dr. Cumagun ordered a Doppler study or referred him**
12 **to a vascular surgeon in March of 2014, that that**
13 **October 2014 amputation would not have been necessary?**
14     A.    I think that that would have been his only
15 opportunity based on the sequence of events that could
16 have prevented it.  It's clear doing nothing didn't
17 help but I think that based on my years of practice,
18 I've seen aortobifemoral bypasses markedly help for ten
19 years as far as blood flow to the legs.  I think every
20 patient, obviously, is different.
21         MR. CHEEK:  Mmm hmm.  Sure.
22     A.    But I think they missed the window of
23 opportunity.
24     Q.    **Okay.  Does a patient — Mr. Marlowe**
25 **presented to the VA in March of 2014.  His concern,**

108

1  **among a couple, were the redness on his feet.  Dr.**
2  **Cumagun then prescribed triamcinolone?**
3      A.    Triamcinolone.
4      Q.    **And let's assume that the condition did not**
5  **get better.  Does the patient have an obligation at**
6  **that point to go back and say hey, you know, I've been**
7  **taking this medication, things still haven't improved?**
8  **Is there any responsibility on the part of a patient?**
9      A.    Well, I think there's a responsibility on the
10 part of the patient and I think also the surprising
11 thing to me is the fact that he's going to a Coumadin
12 clinic where there's nurses and people evaluating
13 things.  If he had had a wound on that tibial area, I
14 mean, I would have told my people, hey, when he comes
15 back for his protime, look at his feet, look at his
16 legs, because you can't always depend on — on patient
17 compliance —
18         MR. CHEEK:  Okay.
19     A.    — to take care of their medical problems
20 because especially men tend to avoid situations of care
21 because they don't want — they don't want something —
22 they think if they avoid it, it will get better and
23 they're — they just assume whoever they see is going
24 to do the right thing and they don't ask questions and
25 they're really in a hurry to get out of the office.

109

1    Q.    But as a physician treating a patient, is it
2    your opinion that the patient does bear some sort of
3    responsibility, if they're coming back to your clinic
4    but not seeing you, that a condition is not improved?
5    That they have an obligation to at least tell you about
6    it, or is it just on the medical facility staff to
7    figure that out?
8    A.    Well, I think — I think that's why when
9    people don't show up we call them.
10   Q.    And did the VA do that?
11   A.    I don't know.
12   Q.    Okay.  Would that change your opinion if they
13   did call him?
14   A.    Well, I think it would help if they — that
15   wouldn't change an opinion on whether they got this
16   story or not but I would feel better if somebody was
17   calling and checking on him, especially that open wound
18   that they put tape on —
19        MR. CHEEK:  Okay.
20   A.    — that you didn't see.
21   Q.    You mean a Band-Aid.
22   A.    Yeah.  Yeah.  Band-Aid.
23   Q.    All right, Doctor.  I'm going to show you
24   what's been marked as Defendant's Exhibit No. 9.
25        (Whereupon the document was marked D-9 for

110

1        identification.)
2        MR. CHEEK:  This is a medical record from the
3    Coosa Valley Medical Center from March 25th of
4    2014.  You're welcome to read the whole thing if
5    you want but really the thing I'm most interested
6    in are the MD notes which start on Page 3.
7        THE DEPONENT:  Is this emergency room or what
8    — what —
9        MR. CHEEK:  That's my understanding.  Yes,
10   Doctor.  And —
11        THE DEPONENT:  So this is an ER, not a
12   clinic.
13        MR. CHEEK:  That's my understanding.  Yes,
14   sir.
15        THE DEPONENT:  Okay.  So it's a wound check.
16   Q.    Did Dr. Trujillo or someone at the Coosa
17   Valley Medical Center check Mr. Marlowe's pedal pulses
18   on March 25th of 2014?
19   A.    The electronic medical record, it's — it's
20   mentioned.
21   Q.    And what does it say?
22   A.    Says pulses —
23        MR. TIPLER:  What page are you on now?
24        MR. CHEEK:  On Page 3.
25        THE DEPONENT:  3.

111

1        MR. TIPLER:  Page 3?
2    A.    It says pulses 2+ dorsal pedal/posterior
3    tibial.
4    Q.    And so does that mean that someone in the
5    emergency department checked on top of the foot and
6    behind the ankle?
7    A.    It says that they — they put that in the
8    chart.
9        MR. CHEEK:  Okay.
10        MR. TIPLER:  What line are we on?  I'm still
11   looking for that particular notation.  Thank you.
12   Q.    Do you have any reason to dispute the
13   accuracy of that?
14   A.    Well, I've seen in these electronic medical
15   records where everything pops up Normal, and then you
16   have to put in what's abnormal that — that they get
17   things wrong.
18   Q.    Have you seen that in Coosa Valley Medical
19   Center's electronic notes?
20   A.    I've never seen a Coosa Valley Medical Center
21   note before.
22   Q.    Okay.  So do you have an opinion as to
23   whether this note is wrong, inaccurate?
24   A.    Well, I think — I don't know whether it's
25   wrong or inaccurate.  I suspect it is, in that I take

112

1    more credence in the note where somebody says they're
2    diminished than I do somebody on electronic medical
3    record says that they're normal.
4    Q.    So you have a bias against electronic medical
5    charts.  Is that fair?
6        MR. TIPLER:  I second that.
7    A.    That's fair.  And I have a bias — bias that
8    ER notes are not accurate.  That's why I go down and
9    see patients.  But clearly, the lesion on the leg did
10   get infected that I was worried would happen.  Somebody
11   needed to follow up on it.
12   Q.    And so did you — in all the medical records
13   that you reviewed, did you see a note where Mr. Marlowe
14   went back to the VA for treatment of that lesion on the
15   calf that just wasn't improving?
16   A.    No, I didn't.
17   Q.    And does it — it appears that he went to the
18   Coosa Valley Medical Center approximately a week and a
19   half after he visited the VA and complained about that
20   wound on his leg.  Is that fair?
21   A.    That's fair.
22   Q.    I want you to look at the last line by Dr.
23   Trujillo on Page 3 where it says:  No symptoms or
24   objective findings that are life or limb threatening.
25        Do you — you believe — you have reason to

113

1  question the accuracy of that statement?
2      A.    No.  I think that the pictures that we saw
3  that showed how pink his feet were, you know, if they
4  glanced at his feet and saw that they were red like
5  they were before, then they wouldn't have any problems
6  at that point in time as an acute problem whether the
7  abscess was causing a limb loss.
8      Q.    So let me ask you this:  Did Dr. Trujillo
9  breach the standard of care by failing to refer Mr.
10 Marlowe for a Doppler study at this appointment or this
11 visit?
12     A.    As an ER doctor?
13           MR. CHEEK:  Yes, sir.
14     A.    Oh, no.
15     Q.    And after reviewing that note, does it change
16 any of the opinions you've given here today?
17     A.    No.
18           MR. CHEEK:  Okay.  Thank you.  Doctor, I'm
19     going to mark a record from Podiatry Associates
20     dated May 15, 2014 as Exhibit 10.
21           (Whereupon a document was marked D-10 for
22     identification by the reporter.).
23           MR. TIPLER:  Thank you, sir.
24           MR. CHEEK:  Just take a moment and let me
25     know when you're done reviewing this note.

114

1            THE DEPONENT:  Okay.
2      Q.    What kind of physician is Dr. Bowman?
3      A.    A podiatrist.
4      Q.    And what did he do at this appointment?
5      A.    He cut his toenails.
6      Q.    Is it fair to say that Dr. Bowman would have
7  examined Mr. Marlowe's feet at that appointment?
8      A.    Yes.
9      Q.    And did he check Mr. Marlowe's pedal pulses
10 at that appointment?
11     A.    It says "has decreased pedal pulses".
12           MR. TIPLER:  Where is this?  What page are
13     you getting that?  Okay.  Thank you.
14     Q.    Is it your understanding that he would have
15 checked the pedal pulses at that appointment based on
16 that notation?
17     A.    Yes.
18     Q.    Does this note give you any reason to believe
19 that Dr. Bowman believed that Mr. Marlowe was having
20 blood perfusion or circulation in his lower extremities
21 at that time?
22     A.    Well, he believed he was having perfusion
23 problems because he said he had reduced pedal pulses.
24     Q.    And is it your opinion that Dr. Bowman
25 breached the standard of care by not referring Mr.

115

1  Marlowe for a Doppler study or a vascular specialist?
2            MR. TIPLER:  Let me object.  You're asking an
3     internal medicine specialist about the standard of
4     care of a podiatrist.
5            MR. CHEEK:  Okay.
6            MR. TIPLER:  Pursuant to Alabama law, that's
7     — I don't think he can speak to the standard of
8     care of a podiatrist or a dermatologist.
9            MR. CHEEK:  I understand.  Doctor, you can
10     answer.
11     A.    Yeah, I mean I think because he knows that he
12 has peripheral vascular disease because it's in his —
13 he says patient has a history of peripheral vascular
14 disease.  Patient has decreased pedal pulses.  So he
15 may have assumed since he's seeing him just to cut his
16 toenails that somebody's already ordered that.
17     Q.    What if Dr. Bowman had seen Mr. Marlowe for
18 years before dating back to 2011?
19     A.    Hmm.
20     Q.    And had diagnosed or noted Mr. Marlowe had
21 decreased pedal pulses way back then?
22     A.    Yeah.
23     Q.    Is that significant?
24     A.    That is significant.
25     Q.    How so?

116

1      A.    Well, it — it means that the ER doctor was
2  wrong.  And — and it means that as a podiatrist he
3  recognized with the absence of hair that he had
4  circulatory problems.  I'm just not sure what a
5  podiatrist's responsibility would be or whether they're
6  even able to order Doppler tests.  I don't know.  Can
7  they order?  I don't know.  I mean —
8      Q.    Let's assume that Mr. Marlowe had decreased
9  pedal pulses mid 2011.  It was documented multiple
10 times by multiple providers.  Does that affect your
11 opinions that you give today?
12     A.    Well, I mean, somebody somewhere should have
13 ordered a Doppler.  You know, like I said, I think that
14 — that —
15     Q.    So why is it Dr. Cumagun that should have
16 ordered the Doppler as opposed to Dr. Pinson or Dr.
17 Bowman or Dr. Trujillo or —
18           MR. TIPLER:  We're not here — we're not here
19     judging —
20           MR. CHEEK:  Thank you for the speaking —
21           MR. TIPLER:  — Dr. Pinson or Dr. Bowman.
22           MR. CHEEK:  Thank you for the speaking
23     objection, counsel.
24           MR. TIPLER:  That's not the issue.
25           MR. CHEEK:  I'm asking for your expert's

117

1    opinion on why it's Dr. Cumagun's responsibility.

2          THE DEPONENT:  Well, that's the chart I was

3    asked to look at.  So — so it should have been

4    ordered.  So...

5    **Q.    And Dr. Pinson didn't have — it's not your**

6    **opinion that Dr. Pinson breached the standard of care**

7    **based on what you looked at from his chart.**

8    A.    Well, like I said, I looked at — looked at

9    his chart from a standpoint of nocturnal leg cramps and

10   other things.  So I think that — that you're — you're

11   correct; you would think that the podiatrist would

12   communicate with somebody that I don't feel any pulses

13   here or they're reduced.

14   **Q.    So you're concerned that the podiatrist**

15   **didn't refer for a Doppler.**

16   A.    No.  I'm not — I don't know that he —

17         MR. CHEEK:  Okay.

18   A.    I don't know — I would think the podiatry

19   note would go to someone.  I don't know who that is.

20   I don't know if that note goes to Dr. Cumagun or Dr.

21   Pinson or who that note goes to.  But whoever sees the

22   note should be seeing a concern about peripheral

23   vascular disease.

24   **Q.    So what if that note goes to Dr. Pinson and**

25   **not Dr. Cumagun?  Does it then become Dr. Pinson's**

118

1    **responsibility to call the patient, seek a Doppler or**

2    **vascular consult?**

3    A.    I think it's both people.

4    **Q.    Even though Dr. Cumagun may not have known**

5    **about this specific note?**

6    A.    Yeah.  I don't know.

7          MR. CHEEK:  Okay.

8    A.    I mean, it sounds like she's a good doctor

9    because she picked it up in her note.  And she's the

10   only one that I feel comfortable examined the feet and

11   wrote down, you know, to her possible discredit, I

12   mean, you know, she sounds like she recognized that he

13   had a problem and she was trying to get help.  But she

14   was going the dermatology route instead of the vascular

15   route.

16   **Q.    What do you make of — I think earlier in**

17   **your testimony you referenced the visit where Mr.**

18   **Marlowe became weak on his feet.  In fact, let's just**

19   **pull that note.  This is a note from June 23rd of 2014**

20   **from the VA that's contained in Exhibit No. 4.**

21   A.    I remember that note because they got

22   orthostatic blood pressures on him and —

23         MR. CHEEK:  I'm going to have to look on with

24   the doctor because this is the only copy I have.

25   **Q.    This note indicates that on June 23rd of**

119

1    **2014, which would have been approximately three months**

2    **after that March 2014 visit, Mr. Marlowe presented for**

3    **his INR.**

4    A.    Mmm hmm.

5          MR. CHEEK:  This note doesn't specifically

6    reference it but if you look at this note from the

7    same date, it talks about laboratory note, INR

8    note.

9          THE DEPONENT:  Yeah.  It says present —

10   **Q.    And then the nurse notes that upon entering**

11   **the clinic the patient became very unstable, felt like**

12   **his legs were giving out, and there's all sorts of**

13   **other notations but it says at the end:  Discussed with**

14   **PCP, primary care physician, who wanted to further**

15   **examine but patient opted to go home.  Feeling better**

16   **already on feet at discharge.**

17         MR. TIPLER:  What's that number right there?

18         THE DEPONENT:  21.

19         MR. CHEEK:  But it's cut off.

20   **Q.    I mean, when you have a patient that — does**

21   **this note affect your opinion about Dr. Cumagun and**

22   **what she did or should have done?**

23   A.    Well, it — it looks like by virtue of the O2

24   sat being 98 percent, and they did an EKG, they did

25   orthostatic blood pressures, that this may have been

120

1    related to his back, and — and connection between the

2    nerve and the muscle in his back that made him feel

3    like his legs were giving out.  I don't think that was

4    a vascular problem.  I think that was a neuromuscular

5    problem.  And then I think once he kind of got stood up

6    and his back and everything kind of got in line, he

7    felt better.  But I still would be concerned if I was

8    this guy's son that I would want him to see the doctor

9    while he's still there.

10   **Q.    And you didn't review the deposition**

11   **transcript of Nurse Nancy Hansen, did you?**

12   A.    No.

13   **Q.    But the fact that Dr. Cumagun wanted to**

14   **examine Mr. Marlowe at that appointment but he opted to**

15   **go home instead, that that — that doesn't concern you**

16   **about the patient's responsibility?**

17   A.    Well, I mean, that — that concerns me

18   somewhat but we're still three months past the original

19   evaluation of diminished pulses, and, you know, a

20   simple 5-minute diagnostic test wasn't done.  Yes, that

21   concerns me about the patient for sure.

22   **Q.    I want to refer you to Defendant's Exhibit**

23   **No. 5.  Let's first focus on the note from 6/2 of 2014.**

24   **It's Dr. Pinson's note.**

25         In this note, does Dr. Pinson make any

1 reference to blood flow or circulation issues in Mr.
2 Marlowe's extremities?
3         MR. TIPLER:  Can you give me 5?  I don't have
4   a 5.
5         MS. WILSON:  I'm sorry.
6         THE DEPONENT:  Yeah, the only thing —
7         MR. CHEEK:  Let me clarify for you, Mr.
8   Tipler, that note is the transcribed note versus
9   Exhibit 5 is I guess the computer note.
10        THE DEPONENT:  So this is the note that I'm
11  looking at, right?
12        MR. CHEEK:  Yes, sir.  My question was —
13  Karen, can you please read that question?
14        MR. TIPLER:  We're talking about number —
15        MR. CHEEK:  We're talking about June 2nd of
16  2014.
17        THE DEPONENT:  What was his question?
18        (Whereupon the last question is read back by
19  the reporter.)
20   A.    The only note that he makes is that he
21  doesn't have any peripheral edema or swelling in his
22  legs.
23   **Q.    And does that indicate to you that there are**
24  **blood flow or circulation issues?**
25   A.    No.  It indicates based on the fact that he

1   gave him Xanaflex for his back and Norco for his pain,
2   and Xanax to help him sleep, that he was treating his
3   low back pain and nocturnal muscle cramps and that that
4   wasn't a complete examination.
5   **Q.    Is it your opinion that on June 2nd, 2014 Mr.**
6   **Marlowe was experiencing claudication at that**
7   **appointment?**
8   A.    Well, usually claudication is not nocturnal
9   leg cramps.  Usually nighttime leg cramps are more of
10  an electrolyte problem like potassium or magnesium or
11  related to his back.  That's why he was putting him on
12  a — Xanaflex is a central nervous system muscle
13  relaxant that really helps nighttime cramps so I think
14  he was treating a musculoskeletal problem.
15  **Q.    So it's not your opinion — well, let me**
16  clarify.  **It's not your opinion that anything in this**
17  **note suggests that Mr. Marlowe was experiencing**
18  **claudication at that point in time?**
19  A.    No.
20        MR. CHEEK:  Let me rephrase that because that
21  was a poorly-worded question.  My apologies.
22  **Q.    Is it your opinion that anything in this note**
23  **from 6/2/2014 suggests that Mr. Marlowe was**
24  **experiencing claudication?**
25  A.    No.

1   **Q.    After reviewing this note, is it your opinion**
2   **that Dr. Pinson breached the standard of care by**
3   **failing to refer Mr. Marlowe for a Doppler study or a**
4   **vascular consult?**
5   A.    There's nothing in this note to suggest that
6   he examined him to the extent that he — he actually
7   checked his feet for pulses to know whether to set him
8   up for vascular studies.
9   **Q.    Should he have checked Mr. Marlowe's pedal**
10  **pulses in this visit in your opinion?**
11  A.    In my opinion, yes, I think he should have.
12  **Q.    Did he breach the standard of care in failing**
13  **to do so?**
14  A.    Well, again, if he was just seeing him for a
15  — a quick muscle spasm problem, then not necessarily.
16  **Q.    So what if in March of 2014 Dr. Cumagun was**
17  **seeing Mr. Marlowe for a quick problem?  Why does she**
18  **have an obligation to check pedal pulses then?**
19        MR. TIPLER:  Object to that.  That's not what
20  she was doing.  She was checking his feet.  He came
21  in complaining of his feet.  I don't think you have
22  to answer that.  I mean, that's not even the facts.
23  Jason, come on.
24        MR. CHEEK:  So — can you re-read my
25  question?

1         (Whereupon the last question is read back by
2   the reporter.)
3         MR. TIPLER:  A quick problem?  I object to
4   the form.
5         MR. CHEEK:  Yes, you can answer.
6   A.    I think it's not a question of whether she
7   should have or didn't have to.  The fact that she did
8   and found an abnormality is — is more the — the issue
9   at hand.  And that — that could mean that she's a
10  better doctor.
11  **Q.    So if she had not checked those pedal pulses,**
12  **we may not be sitting here today.**
13  A.    Correct.
14  **Q.    Okay.  We're actually going to look at the**
15  **next Dr. Pinson note which is still within Defense**
16  **Exhibit No. 5.  It's the visit from 6/11/2014.**
17        Does that note reference anything about Mr.
18  Marlowe complaining about foot pain or — or, you know,
19  lesions or redness on his feet?
20  A.    Yes, it does.
21  **Q.    Does it make any reference to Mr. Marlowe**
22  **having circulation or blood perfusion issues in his**
23  **lower extremities?**
24  A.    Again there's no note of examination except
25  for peripheral edema.

125

1   Q.   And is it your opinion that Dr. Pinson
2 breached the standard of care on 6/11/2014 by failing
3 to refer Mr. Marlowe for a Doppler study or for a
4 vascular consult?
5       A.   Well, he mentions that he didn't have any
6 lesions between his toes so that's why he was thinking
7 as well that he didn't have a fungal infection of his
8 foot.
9            I was trying to look and see if his physical
10 exam was the same as the last one but they are
11 different so it looks like he's dictating kind of what
12 he's seeing or doing or anything else.
13           So it looks like the only thing, while he did
14 some debridement of the bottom of his foot for a
15 plantar wart, it does bother me that you'd be doing a
16 procedure on somebody's foot without checking pulses
17 because you'd worry about healing, especially if you're
18 breaking the skin.  And this was about six weeks or so
19 before he went in with the digital necrosis and
20 ischemia.
21           MR. CHEEK:  But my question was different.
22 Do you mind reading it back?
23           (Whereupon the last question is read back by
24 the reporter.)
25      A.   I think he breached the standard of care by

126

1 not documenting what his circulation was.  So I think
2 his examination was not in the standard of care.
3       Q.   He breached the standard of care by failing
4 to check pedal pulses.
5       A.   Or documenting the pedal pulses.
6       Q.   What's the difference?
7       A.   Well, I mean, he could have checked them and
8 just didn't write down what they were.
9            MR. CHEEK:  Okay.
10      A.   They could have been diminished when he
11 checked them.  But he didn't write it down so you don't
12 know if he checked them or didn't check them.  So to me
13 he breached the standard of care, especially doing a
14 procedure on the foot without documenting the presence
15 or absence or diminished or good pulses or not.
16      Q.   Do you have reason to believe that Dr. Pinson
17 checked pedal pulses during that visit?
18      A.   I don't know Dr. Pinson.
19      Q.   You don't know one way or another.
20      A.   No.
21      Q.   Okay.  I want to move on to Dr. Henderson's
22 note which is included —
23      A.   In the back, too.
24      Q.   — as an exhibit to Defendant's Exhibit No.
25 4.

127

1            MR. TIPLER:  I'll let him look at this copy
2 that way you can keep looking at yours.  Is it the
3 last one?
4            MR. CHEEK:  Dr. Henderson's note.
5            MR. TIPLER:  No. 5.
6            MR. CHEEK:  Will be the second to last note.
7 It's a note from 7/9 of 2014.
8            MR. TIPLER:  Plaintiff's Exhibit No. 5 to
9 Cumagun's deposition?
10           MR. CHEEK:  Yes.  And Exhibit No. 4 to this
11 deposition.
12           MR. TIPLER:  Right.
13      Q.   You're not — I think we covered this but I
14 just want to make sure I'm clear on this:  You're not
15 opining on whether any dermatologist breached the
16 standard of care in this case.
17      A.   Right.
18      Q.   So you're not opining about whether Dr.
19 Henderson should have referred Mr. Marlowe for a
20 Doppler study or a vascular surgery consult.
21      A.   Correct.
22      Q.   Okay.  The fact that at the top of this
23 dermatology note it says his complaint was for rash and
24 then it's handwritten that it was on both feet,
25 cracked, red, painful, one month, does that mean

128

1 anything to you?
2       A.   Yes.
3       Q.   What does it mean to you?  What's the
4 significance?
5       A.   Well, tinea pedis is not painful.  And it's
6 not red.
7       Q.   Are you saying that tinea pedis was not, in
8 your opinion, not the proper diagnosis here?
9       A.   Correct.
10      Q.   Okay.  So what do you think was going on
11 here?
12      A.   Yeah, I think — so I think he was either
13 having cellulitis or ischemia then.
14      Q.   And what's the basis for your opinion on
15 that?  Why do you believe he was having cellulitis or
16 ischemia on 7/9 of 2014?
17      A.   Because infection causes redness and pain,
18 and lack of blood flow can cause redness and pain.
19      Q.   But the basis of your opinion is, on this
20 7/9/2014 note, it says "painful and red".
21      A.   Right.
22      Q.   And based on that, you're opining that he had
23 cellulitis or — I'm sorry, I forgot the second term
24 you said.
25      A.   Ischemia.

129

1    Q.    Ischemia.  And that's what you're basing your
2  opinion on, those two words.  Red and painful.
3    A.    Right.
4    Q.    What do you make of the notation that — of
5  one month that's handwritten under "red and painful"?
6    A.    That — that he thinks it's a fungus.
7    Q.    Is it possible that Mr. Marlowe did have a
8  fungus in March 2014, that it cleared up and that it
9  came back?  Would that make sense because of the
10 notation that this rash had been present for one month?
11   A.    Well, a fungus is not going to be cured by a
12 topical cream.
13        MR. CHEEK:  Okay.
14   A.    A fungus is only going to be cured by a pill
15 or something that's systemic that kills the fungus.  So
16 — and tinea pedis generally refers to the nails, the
17 toenails, not the skin.
18   Q.    But here his chief complaint was a rash.
19   A.    Well, that was the reason he went to the
20 dermatologist was for a rash.
21   Q.    Mmm hmm.  But nevertheless, the dermatologist
22 still diagnosed him with tinea pedis.
23   A.    Yeah.  [Laughs and shakes head].
24   Q.    Why do you shake your head?
25   A.    Because you're not going to get a fungus on

130

1  both feet and because we know he's got peripheral
2  vascular disease.
3        MR. CHEEK:  Okay.
4    A.    And we know that dermatologists spend five
5  minutes with patients.
6    Q.    You don't have a high opinion of
7  dermatologists.
8    A.    Not at all.
9    Q.    So you don't —
10        MR. TIPLER:  Wait a minute.  Wait a minute.
11 According to my calculations, it's seven minutes,
12 when we deposed Dr. Henderson.
13   Q.    So you don't believe that Dr. Henderson met
14 the standard of care here.
15   A.    Maybe for dermatology.
16   Q.    You wouldn't go see Dr. Henderson.
17   A.    No, I wouldn't.
18        MR. CHEEK:  Okay.
19        MR. TIPLER:  I did — this is off the record.
20        (Off-record discussion)
21   Q.    I want to ask you, Doctor, about Dr. Pinson's
22 note of 7/16/2014 which is included at the very end of
23 Defendant's Exhibit No. 4.
24   A.    Oh, yeah, yeah.
25        MR. CHEEK:  Sorry.

131

1        THE DEPONENT:  Dr. — you said Pinson?
2        MR. CHEEK:  Yes, sir.
3        THE DEPONENT:  Well, this — oh.
4        MR. CHEEK:  I'm sorry.
5        MR. TIPLER:  Bourgeois.
6        MR. CHEEK:  I gave you the wrong exhibit.  My
7  mistake.  I'm sorry.
8        MR. TIPLER:  This is July 16th note.
9        MR. CHEEK:  This Defendant's Exhibit No. 5,
10 which is the July 16th of 2014 note from Dr.
11 Pinson.
12        THE DEPONENT:  I was wondering why you didn't
13 ask me about that before.
14        MR. TIPLER:  He's going by day.  He's
15 organized.
16        THE DEPONENT:  I see.
17        MR. TIPLER:  That's what I like about this
18 guy.  He's organized.
19   Q.    (BY MR. CHEEK:) What was going on with Mr.
20 Marlowe at this point in time?
21   A.    His feet were more painful and more sore.
22 And sores on the tips of both big toes and several
23 lesions on the top of his feet.
24   Q.    And you reviewed this note prior to forming
25 in handwriting your opinion, correct?

132

1    A.    Yes.
2    Q.    Does anything in this note suggest to you
3  that Mr. Marlowe was experiencing circulation or blood
4  perfusion issues in his lower extremities?
5    A.    Yes.
6    Q.    What?
7    A.    The pain.  The ulcerations on his feet.  And
8  it's hard to tell the difference between cellulitis
9  around a toe and an ischemic foot.  And the fact that
10 he's got denuded skin on the dorsum of both feet.
11   Q.    What is denuded skin and the dorsum?
12   A.    So that's the bottom of his feet that the
13 skin has separated and there are open areas in the
14 bottom of his feet.
15        MR. TIPLER:  Off the record.
16        (Off-record discussion)
17   A.    Another thing that bothers me about this was
18 the fact that he gave him a steroid shot, not an
19 antibiotic shot.  And he gave him Keflex, which is an
20 oral antibiotic that's pretty good for skin for ten
21 days and said return in one week if not markedly
22 improved.
23   Q.    Okay.  And to your knowledge, did Mr. Marlowe
24 return in one week?
25   A.    No.

133

1    Q.   Did — is it your opinion that Dr. Pinson had
2  an obligation to check pedal pulses at this
3  appointment?
4    A.   Well, if — if he had that much redness and
5  cellulitis, there would — there might be concomitant
6  swelling and he may not be able to feel them.  A lot of
7  times when you've got cellulitis and this much
8  inflammatory response in the foot, it raises up the
9  skin well above where you feel the pulses and you might
10 not be able to feel them.  But you should recognize
11 that that's — especially that, that that's serious.
12   Q.   But my question is, did the standard of care
13 — is it your opinion that Dr. Pinson breached the
14 standard of care in failing to take pedal pulses at
15 this appointment?
16   A.   Yes.  I would have put him in the hospital.
17   Q.   If Mr. Marlowe, leading up to that March 2014
18 — let me ask this before we — did the VA breach the
19 standard of care with respect to Mr. Marlowe outside of
20 that March 14th appointment?
21   A.   No.
22   Q.   If years prior to that March 2014 appointment
23 that we've been focusing a lot on today he had
24 documented diminished pedal pulses, does that affect
25 your opinion?

134

1         MR. TIPLER:  I think he already answered
2    that, didn't he?  You asked him about 2011, 2012
3    earlier.
4         MR. CHEEK:  I don't remember.
5         MR. TIPLER:  Go ahead.  I just thought this
6    had been addressed.
7         THE DEPONENT:  Yeah.  Yeah.
8    Q.   My question is, let's assume that he had
9  diminished pedal pulses for a couple of years prior to
10 that March 2014 visit and it had been a stable
11 condition.  Does that affect your opinion?
12   A.   No because as I — as I said before, that
13 many people have asymptomatic and no symptoms and the
14 standard of care is still if you've got diminished
15 pulses that you get an arterial Doppler or some type of
16 noninvasive study, especially in a diabetic that
17 doesn't have feeling in their feet.
18   Q.   Doctor, do you see patients every day of the
19 week?  Every weekday?
20   A.   Not on Friday.
21   Q.   Okay.  So you just see patients Monday
22 through Thursday.
23   A.   Correct.
24   Q.   Approximately how many?
25   A.   Now?

135

1    Q.   Fifty a day?
2    A.   Oh, gosh, no.  Sixteen a day.
3    Q.   Okay.  Thank you.  Are you board certified?
4    A.   Yes.
5    Q.   Are you enrolled in any maintenance of that
6  board certification?
7    A.   I'm grandfathered in.
8    Q.   So you don't have to take regular
9  recertification exams as part of your board
10 certification.
11   A.   That's correct.
12   Q.   And you currently split your time, at least
13 it's my understanding, between UAB West, Southern
14 Hospice, Plantation Manor Nursing Home and Naphcare?
15   A.   Yes.
16   Q.   Are there any other facilities or — that you
17 split your time between?
18   A.   I see my patients in — I mean, I was seeing
19 my patients in the hospital.
20   Q.   Which hospital?
21   A.   Medical West.
22   Q.   And approximately how much time percentage-
23 wise do you spend at each of these facilities on a
24 given week?
25   A.   So hospice is an hour a month.  I have what

136

1  we call an IDT meeting where we go over all the
2  patients.  Otherwise, I'm on call, on telephone call.
3    Q.   So you don't really see patients at the
4  hospice.
5    A.   Occasionally I'll make a home visit.
6    Q.   How many in a year?
7    A.   Six.
8    Q.   Okay.  What about the nursing home?  How
9  often in any given week do you spend over there?
10   A.   So I go there on Saturday.  So I'll see
11 fifteen patients weekly on Saturday.
12   Q.   And Naphcare.  What is that?
13   A.   That's my brother's company.  That's a health
14 care company for prisons and jails.
15        MR. CHEEK:  Okay.
16   A.   So that's my brother's company.  So the only
17 thing I do for Naphcare is there's a monthly mortality
18 and morbidity conference where we go over the people
19 that have died and we go over what we could have done
20 better to prevent mortality and morbidity.  And so he's
21 got three other doctors, so I just kind of go over
22 there just from an internal medicine standpoint,
23 because we have an attorney that runs the conference.
24        MR. CHEEK:  Okay.
25   A.   And so it's just about an hour type thing.

137

1    Q.   One hour a month?
2    A.   Yeah.
3    Q.   But you don't treat any prisoners through
4  that.
5    A.   No.
6    Q.   Is that a no?
7    A.   Yes, I do not treat prisoners.
8    Q.   So the — fair to say that the vast majority
9  of your time as a physician is spent at UAB West in the
10  hospital?
11    A.   Correct.  And the office.
12    Q.   Which — when I say UAB West, I'm referring
13  to your office but —
14    A.   Okay.
15    Q.   — is it different?
16    A.   Well, I don't start seeing patients in my
17  office until 10 because I see my hospital patients from
18  7 to 10 or whatever.
19    MR. CHEEK:  Okay.
20    A.   So if I have five or six or seven patients in
21  the hospital, I'd see them first and then start clinic
22  at 10.
23    Q.   Got you.  Have you ever been disciplined or
24  sanctioned?
25    A.   No.

138

1    Q.   And your medical license is up to date?
2    A.   Yes.
3    Q.   Have you ever been arrested?
4    A.   No.
5    Q.   And you mentioned you've worked for the VA in
6  the past?
7    A.   No.  I rotated through the VA as part of my
8  medical training.
9    Q.   And you went to medical school —
10    A.   At UAB.  Here in town.  So the VA down here.
11    Q.   Okay.  So you did a rotation through there of
12  how many months?
13    A.   Three months.
14    Q.   What was your impression of the VA?
15    A.   Good.
16    Q.   Okay.  And what's your home address?
17    A.   I just moved to a garden home.
18    MR. CHEEK:  Okay.
19    A.   So it's ███████████████████████████.
20  That's on the basis of my wife's illness.
21    Q.   Okay.  And did you previously live at ████
███████████████████?
23    A.   Still have that house for sale.
24    Q.   And do you have any outstanding tax
25  liability?

139

1    A.   Not anymore.
2    Q.   Okay.  What do you mean by "not anymore"?
3    A.   I had an offer of compromise for my taxes and
4  my last payment was May.
5    Q.   And how much did you owe in terms of tax
6  liability at that point in time?
7    A.   $126,000.00 was the offer in compromise.
8    Q.   And in May you paid off that whole amount?
9    A.   Correct.  Correct.
10    Q.   And how did you — did you make a lump sum
11  payment of $126,000.00?
12    A.   No.  I paid $26,000 a month.
13    Q.   For how long?
14    A.   Five months?
15    Q.   So starting at the end of last year or the
16  beginning of this year?
17    A.   No.  Starting — my last payment was May so
18  starting January, I guess.
19    Q.   Starting in January of 2018?
20    A.   '18.  Yeah.
21    Q.   You made — how much were the payments each
22  month?
23    A.   Well, the total was $126,000.
24    Q.   And it was just divided by four?
25    A.   Well, five.

140

1    Q.   Or five.
2    A.   It was five months.  But I had already paid
3  something so the first month's I had already paid.
4    Q.   Did the IRS ever levy or garnish any wages?
5    A.   Yes.
6    Q.   And when did they do that?
7    A.   Last year.
8    Q.   How long did they garnish those wages?
9    A.   Well, it was not the IRS.  The state.  The
10  IRS did not garnish any wages.
11    Q.   You're saying the state of Alabama did?
12    A.   Correct.
13    Q.   How much did they take out of your paycheck?
14    A.   Well, I paid them as soon as they took
15  something out of my paycheck so I think they took a
16  thousand or something like that.
17    Q.   For how long?
18    A.   One month.
19    Q.   And then you just —
20    A.   It was five thousand dollars I owed or
21  something like that.  It wasn't much.
22    Q.   And you never defaulted on the payment plan
23  with the IRS?
24    A.   No.
25    Q.   Did you meet with an IRS revenue officer as

141

1  part of this agreement?
2      A.    My CPA did.
3      Q.    Okay.  And what was that IRS agent's name?
4      A.    She's in Louisiana.  I don't remember her
5  name offhand.
6      Q.    Don't remember her first name, last name?
7      A.    Didn't do anything with it.  My — my — my
8  accountant at Warren Averett, I gave her Power of
9  Attorney and she dealt with them.
10     Q.    Okay.  Did the IRS ever take an enforced
11 collection activity on your property?
12     A.    Uh-uh.
13     Q.    Is that a no?
14     A.    No.
15     Q.    Have you filed federal income tax returns for
16 each tax year since 2010?
17     A.    Well, that was part of the problem.  They
18 said I didn't in 2012 but I've got the — the — Warren
19 Averett's done all my taxes since '99.  So apparently
20 they did something electronically there then that got
21 mixed up or something.
22     Q.    So IRS said you didn't file.
23     A.    Correct.
24     Q.    But you disagree with that?
25     A.    Well, I didn't disagree.  I had my tax form

142

1  that Warren Averett had given me.
2      Q.    But it's your position that you did file
3  those taxes.
4      A.    Yeah.
5          MR. TIPLER:  That Warren Averett filed them
6      for you.
7          THE DEPONENT:  Yeah.
8      Q.    And did any of the money you received in this
9  case go towards paying off any outstanding tax
10 liability?
11     A.    No.  Only — I've only gotten $600.00 for
12 this case.
13     Q.    Okay.  And —
14         MR. TIPLER:  But Jason is going to write you
15     a check today before you leave.
16         MR. CHEEK:  I think you grossly overestimate
17     how much money I make, Mr. Tipler.
18         MR. TIPLER:  Well, Sarah can cover it.
19     Q.    As part of you agreeing to testify in this
20 case, there's no agreement about paying any of that tax
21 liability off because it's already been paid off.
22     A.    Correct.
23     Q.    You're free and clear.
24     A.    Correct.
25     Q.    Do you believe that in March of 2014 Dr.

143

1  Cumagun should have screened Mr. Marlowe for peripheral
2  artery disease?
3      A.    Yes.
4      Q.    Okay.  And is that at its core really where
5  you're finding the issues with her care?
6      A.    Yes.
7      Q.    She failed to screen for PAD.
8      A.    Correct.
9      Q.    And the standard of care required that she
10 screen for PAD in that March 2014 visit.
11     A.    Right.
12     Q.    And does UpToDate support that position?
13     A.    Yes, it does.
14     Q.    Okay.  And does it support that position in
15 any of the documents you've given me?
16     A.    Yes.
17     Q.    Okay.  Which one are you looking at?
18     A.    I'm looking at Evaluation of the Diabetic
19 Foot.  Page 5.
20     Q.    Do you have the original, Doctor?  Okay.
21 Show me where on Page 5 of Exhibit 2 that —
22     A.    Where it says physical signs of peripheral
23 artery disease.
24         MR. CHEEK:  Okay.
25         It says that [Reading:] The feet should be

144

1  examined for signs of peripheral artery disease such as
2  diminished pulses, decrease in skin temperature, thin
3  skin, lack of skin hair, and bluish skin color.
4  However, qualitative signs are less sensitive and not
5  specific enough to guide further management to be
6  helpful in an individual patient.  More useful
7  quantitative clinical tests include measure of venous
8  filling time, Doppler examination of lower limb pulses,
9  and leg blood pressure measurement, i.e., ankle-
10 brachial pressure index.
11     Q.    And so you're reading that paragraph to say
12 the standard of care required the Doppler at a minimum.
13     A.    Well, another — second paragraph after that:
14 Patients with clinical evidence of peripheral artery
15 disease should have ABA testing.
16     Q.    ABI?
17     A.    I mean ABI.
18     Q.    And that is?  That stands for?
19     A.    Arterial-Brachial Index.
20     Q.    Okay.  And to you, that, that's the standard
21 of care.
22     A.    And on Page 8 of that same paper, fourth from
23 the bottom.  [Reading:] Screen for peripheral artery
24 disease by asking about history of claudication and
25 assessing the pedal pulses.  Ankle-brachial pressure

145

1 index should be performed in patients with clinical
2 evidence of peripheral artery disease.
3     Q.    In March of 2014, did Mr. Marlowe present
4 with clinical evidence of peripheral artery disease?
5     A.    Well, the clinical evidence was the reduced
6 pulses.  That was the clinical part.  So, yes, he did.
7     Q.    So solely on the basis of the reduced,
8 diminished, pedal pulses, that triggered ankle-brachial
9 pressure index testing?
10     A.    Yes.  And go to Page 11 which has a risk
11 classification based on the comprehensive foot
12 examination.
13         MR. CHEEK:  Okay.
14     A.    And if you'll look at risk category number 2,
15 where it says PAD plus or minus lower peripheral
16 symptoms, [Reading:] Consider prescription of
17 accommodative footwear.  Consider vascular consultation
18 for combined follow-up.  And suggested follow-up is
19 every two to three months by specialist.
20     Q.    Had he been diagnosed with peripheral artery
21 disease in March of 2014?
22     A.    Yes because he had diminished dorsal pedal
23 pulses.
24     Q.    So there's nothing — so that alone means
25 that he has PAD, peripheral artery disease.

146

1     A.    Yes.  And going to the second paper which is
2 Overview of Lower Extremity Peripheral Artery Disease
3 —
4         MR. CHEEK:  I'm going to — give me just one
5     minute, Doctor.  I want to look through this one
6     second.
7         THE DEPONENT:  Okay.
8     Q.    Is this the — so we're referencing Exhibit
9 No. 3 which is the UpToDate overview of peripheral
10 artery disease?
11     A.    We were — we did Evaluation of the Diabetic
12 Foot.
13     Q.    We were previously referencing that one which
14 was Exhibit No. 2, but now I think we're on to Exhibit
15 No. 3?
16     A.    Okay.  You're with me now?
17     Q.    Yes, sir.  Is this the complete printout of
18 this UpToDate article?
19     A.    Yes.
20     Q.    And you wanted to — I think you wanted to
21 say something.
22     A.    Yeah.  I was just going to point out a few
23 things in Overview of Lower Extremity Peripheral Artery
24 Disease because it has something on the asymptomatic
25 patient.

147

1     Q.    Okay.  Where are you?
2     A.    On Page 7.  And it says, [Reading:] Although
3 those with asymptomatic PAD may not report exertional
4 pain, lower extremity function may nonetheless be
5 impaired as evidence by slow walking speed or poor
6 balance.  Whether these patients — whether those with
7 asymptomatic PAD should undergo repeat brachial index
8 testing and with what frequency has not been
9 established, but repeat testing should be useful in
10 higher risk patients.  It's important to note that some
11 asymptomatic PAD patients, particularly those with
12 diabetes, can develop limb-threatening ischemia without
13 an anteceding history of claudication.
14     Q.    So this one, this sentence, one of the
15 sentences you just read says whether those asymptomatic
16 make — [Reading:] Whether those with asymptomatic PAD
17 should undergo repeat brachial index testing and with
18 what frequency has not been established.
19     A.    Correct.
20     Q.    So help me figure out how we get from there
21 to Dr. Cumagun breached the standard of care.
22     A.    No.  What it says is, once you've done a
23 Doppler and it's abnormal, but it's not bad enough to
24 refer to vascular surgery, then it hasn't been
25 established whether you should repeat it in six months

148

1 or a year or — or what that would be.
2     Q.    Do — do either Defendant's Exhibit 2 or 3
3 talk about Doppler as being the standard of care when
4 you have diminished pedal pulses?
5     A.    Well, the presence of diminished pedal pulses
6 tells you that you've got peripheral artery disease.
7         MR. CHEEK:  Okay.
8     A.    So that's the clinical.  That's your clinical
9 sign that there's a circulatory problem.  To understand
10 the significance of it is the reason that you have the
11 arterial Doppler test.
12     Q.    But my question was, do either of these
13 exhibits, 2 or 3, say Doppler is the standard of care
14 when you have diminished pedal pulses; there's no other
15 way that you can clinically manage or treat PAD?
16     A.    What it says is, if you have clinical
17 evidence of peripheral artery disease, you should do a
18 Doppler.
19     Q.    Okay.  And show me where that is, please.
20     A.    So on Page 5 of your Evaluation of a Diabetic
21 Foot, it says, [Reading:] The feet should be examined
22 for peripheral artery disease such as diminished foot
23 pulses.  Which this patient had.
24         MR. CHEEK:  Mmm hmm.
25     A.    [Reading:] However, that test is less

149

151

1 sensitive and not specific enough to guide further
2 management to be helpful in an individual patient.
3 More useful tests are venous filling time, Doppler
4 examination of lower pulses and leg blood pressure
5 measurement, which is the ABI.
6     **Q.    Okay.  And so based on those —**
7     A.    And then underneath that —
8     **Q.    — sentences —**
9     A.    It says, [Reading:] Patients with clinical
10 evidence of peripheral artery disease should have ABI
11 testing.
12    **Q.    Okay.  So based on — but that does not say**
13 **Doppler.**
14    A.    ABI testing and Doppler are the same thing.
15    **Q.    They are the same thing.**
16    A.    Yeah.
17    **Q.    So why in that sentence, in the preceding**
18 **sentence, it says, [Reading:] More useful quantitative**
19 **clinical tests include measurement of venous filling**
20 **time, Doppler examination of lower limb pulses, and leg**
21 **blood pressure measurements, (eg, ABI)?  Like, if**
22 **they're synonymous with one another, I just don't**
23 **understand.**
24    A.    So if you have somebody with reduced pulses,
25 then you could put a Doppler on it.  And the Doppler

1     A.    Well, I formed my opinion before I looked at
2 that, so —
3         MR. CHEEK:  Okay.
4     A.    My opinion was based on my years of clinical
5 experience dealing with diabetics, dealing with
6 peripheral artery disease, feeling pulses, and that was
7 — this is what everybody that I know does in patients
8 with suspected significant peripheral artery disease
9 where you don't have claudication.
10        MR. CHEEK:  Okay.
11    A.    So if they have claudications, it's easy
12 because you know you need to do something fast or get
13 them to a vascular surgeon.  So if they had
14 claudication, I just automatically send to a vascular
15 surgeon.  I don't fool with —
16    **Q.    So the fact that he did not have claudication**
17 **made his case a little bit more complex; is that fair?**
18    A.    Well, I think the fact that you don't know
19 what his exercise tolerance was or anything else, so I
20 think the fact that he was — what was he, 80?  I think
21 the fact that — that he was older, the length of time
22 that he's had diabetes and his age and his — and his
23 risk stratification would tell you that it would be
24 helpful in him to have arterial-brachial index.  He
25 should have a stress test because he has —

150

152

1 would tell you whether there's a strong pulse or not a
2 strong pulse but it's not a quantitative measurement.
3         MR. CHEEK:  Okay.
4     A.    So the only thing that would tell you, that
5 one of those two tests was normal — abnormal, then you
6 would do the test that gives you the ankle-brachial
7 index.  So regardless —
8     **Q.    So they're not the same.  Doppler and ABI are**
9 **not the same.**
10    A.    No.  But the only way that you can quantitate
11 the severity, because you have a number, remember I
12 said 0.9, less than 1, tells you that you've already
13 got severe disease.  If it's 1.3 or greater, don't
14 worry about it, you are fine.  And if it's between
15 those other two numbers, you're kind of in between.
16    **Q.    Does the American College of Physicians have**
17 **a recommendation for a screening test related to PAD?**
18    A.    I don't know.
19    **Q.    Do you know if this UpToDate that you're**
20 **referencing here today in Exhibit No. 2 was in effect**
21 **in March of 2014?**
22    A.    I don't know.
23    **Q.    Would it change your opinion if this critical**
24 **language you're talking about was not present in the**
25 **UpToDate back in March of 2014?**

1     **Q.    But my question was, and I'm sorry to**
2 **interrupt, Doctor, but my question was a little**
3 **different.  It was just simply the fact that he wasn't**
4 **showing signs of claudication, did that make his case a**
5 **little bit more complex than if he were showing signs**
6 **of claudication?**
7     A.    Well, I don't think it makes it more complex
8 —
9         MR. CHEEK:  Okay.
10    A.    — in that he shouldn't have had an arterial
11 brachial index.
12    **Q.    That he should have had that.**
13    A.    Should have had that.
14        MR. CHEEK:  Okay.
15    A.    Versus urgent vascular surgery evaluation.
16 So if he was having claudication, I'd be calling the
17 vascular surgeon on the phone —
18        MR. CHEEK:  Okay.
19    A.    — and saying this guy needs to be seen
20 within a week.  If he was not having symptoms, then I
21 would set the brachial index up myself and just see
22 what it showed.  And then knowing, you know, that a
23 vascular surgeon is going to be reading it, but also
24 knowing what it tells me, and the report says what the
25 brachial index says, but it also gives you a

153

1  quantitative index of — there's a high grade femoral
2  stenosis of less than eighty percent or greater than
3  eighty percent, popliteal —
4      MR. CHEEK:  I understand — my impression of
5  you, Doctor, today, is that you're very attentive
6  to your patients, you know, particularly when
7  you're talking about checking for pedal pulses.
8  I've been to the doctor a few times in my life.  I
9  don't think I've ever had a pedal pulse checked.
10     THE DEPONENT:  I've heard that before.
11     Q.    And you said that your opinions were based on
12 your 31 years, 31-plus years of experience as an
13 internal medicine physician.  Just because you, Dr.
14 McLane, do something, that isn't necessarily the
15 standard of care.  Is that a fair statement?
16     A.    Correct.
17     Q.    Okay.  And because you would have checked
18 both the pedal and popliteal tibial pulses in each of
19 your patients doesn't necessarily mean that that was
20 the standard of care.
21     A.    I think it's pretty much the standard of care
22 in your medical school training and your residency and
23 internship that part of the physical examination of a
24 patient includes doing that.
25     MR. CHEEK:  Okay.

154

1      A.    So I think if you go to any medical school
2  and you look and see what are parts of the physical
3  examination that you have to do to show that you know
4  how to do them is checking the pulses.
5      MR. CHEEK:  Okay.
6      A.    So I think the fact that — that I would have
7  checked the popliteal and I would have checked the
8  femoral pulse doesn't take away the fact that — that
9  that's part of the physical examination.  And if you're
10 charging somebody for a physical examination and then
11 you're noting that you've got reduced pulses in the
12 foot, then you're obligated at that time to, especially
13 with the fact that you're at greater risk for
14 peripheral vascular disease, coronary disease, carotid
15 disease, that you do the appropriate evaluation to
16 assure that you're not going to have something bad
17 happen.
18     Q.    If — let's just assume the American College
19 of Physicians did not have a recommendation related to
20 screening of PAD.  Does that affect your opinion on
21 what the standard of care required with respect to Mr.
22 Marlowe in March of 2014?
23     A.    No because I practiced in March of 2014 and
24 like I said, I was doing brachial indexes then.  I was
25 doing them in my nursing home.  I was doing them in my

155

1  office.
2      Q.    But we've also, I think you agreed, that just
3  because you, Dr. McLane, do something, that doesn't
4  necessarily mean that you're equating it with the
5  standard of care.
6      A.    Well, I'm equating it with every other
7  internal medicine doctor that I share call with, that I
8  see their patients when they come into the hospital and
9  those people have had arterial-brachial indexes and
10 Dopplers and stuff done associated with foot
11 inspection, pulse checking.
12     Q.    So am I — I'm sorry.  I think — maybe I'm
13 — are you saying that everything that you do, you do
14 stuff by the standard of care.  So whenever you check
15 the pulses in the patient, wherever, you're following
16 the standard of care.  That is the standard of care.
17 Is that what you're saying?
18     MR. TIPLER:  I think he said that he —
19     A.    I —
20     MR. CHEEK:  I'm trying to clarify.
21     A.    What I'm trying to say is, you know, I don't
22 know what standard of care might be in Colorado or
23 California or something like that.  I'm talking about
24 our medical community in Alabama —
25     MR. CHEEK:  Okay.

156

1      A.    — that we live, and what we have available
2  in the way of diagnostic testing.  And the fact that I
3  rotated through the VA Hospital and the fact that I
4  rotated through UAB, and the fact that this looks like
5  a pretty good doctor because she's checked the pulses,
6  that I'm surprised that — that she didn't get an
7  arterial-brachial index.
8      Now, again, I don't know what her medical
9  school training was but it sounded like she did some
10 infectious disease and additional training so she
11 seemed like a well-trained physician.
12     But I think the ultimate outcome is that this
13 guy continued to decline and show evidence of
14 progressive peripheral artery disease.  And hindsight
15 is 20/20, you know, obviously.
16     Q.    But did Dr. Cumagun witness that —
17     MR. TIPLER:  Object.
18     Q.    — continual decline?
19     MR. TIPLER:  I think he was trying to answer
20 your question and you interrupted him.
21     Q.    My question is, you're talking about his
22 condition continually declining.
23     A.    Yeah.
24     Q.    Do the records that you've looked at today
25 from the Coosa Valley Medical Center, from the

157

1 podiatrist, from Dr. Pinson, from Dr. Henderson, do
2 they all suggest a decline in the condition of his
3 lower extremities?
4     A.    Yes.
5     Q.    All of them?
6     A.    Yes.
7     Q.    Okay.  And did Dr. Cumagun have an
8 opportunity to see Mr. Marlowe after that March 2014
9 visit?
10    A.    No but she had the opportunity to evaluate
11 him and perhaps prevent that further progression.
12    Q.    Did she ask to see him in June of 2014?
13    A.    Yeah, she did, but that would have probably
14 been too late.
15    Q.    Okay.  Okay.  If — if UpToDate in 2014 did
16 not say anything about recommendations related to
17 Doppler and ABI, as being, you know, what should be
18 done in terms of screening for PAD, that still doesn't
19 change your opinion here today.
20    A.    Correct.
21    Q.    That the standard of care — is the standard
22 of care in 2014 basically the same as it is today?
23    A.    Yeah, I think from a standpoint of the
24 availability of those tests, and I think that the —
25 the quantification of what the problem is was available

159

1 stuff like that; B, you would have quantitated whether
2 he had a femoral problem, an iliac problem, a popliteal
3 problem, because the only thing that was checked was
4 the foot.  So there's a lot of artery between the aorta
5 and the bottom of the foot.  So with that brachial
6 index, if they saw that his femoral artery had eighty
7 percent or ninety percent stenosis, then they would
8 have known that by doing an arteriogram to see what the
9 disease looked like, and they could have put a stent
10 into that artery or done an aortobifem to help both
11 arteries.  Then they would have had a restorative
12 circulation to his legs as he was a nonsmoker, his
13 diabetes wasn't that bad, and his A1C wasn't that bad.
14 And even though he was overweight, I think the femoral
15 artery is very easy to get to and the stent is
16 endoscopic, so it's essentially a noninvasive procedure
17 to do.
18    Q.    So my question to you is, where are you
19 getting that as being the standard of care, the fact
20 that if he had scored poorly on the ABI, a vascular
21 surgery consult was required?  What's the source for
22 the standard of care there?
23    A.    That — that's what I said.  I mean, that's
24 what I've been doing for ten years.
25    Q.    But is there anything else like the American

158

1 in 2014 versus now.  I don't think that's any
2 different.
3     Q.    The fact that multiple physicians saw this
4 patient face to face, whereas you're looking at records
5 after the fact, does that not give you pause in saying
6 that multiple medical providers breached the standard
7 of care with respect to Mr. Marlowe?
8     A.    I think it's concerning, their level of care.
9     Q.    You don't believe that their care was up to
10 par; is that what you're saying?
11    A.    Correct.
12    Q.    Let's assume that he had gotten a poor result
13 from the ABI.  What should have — what should Mr.
14 Marlowe have — what should have been done with Mr.
15 Marlowe at that point?
16    A.    Well, they should have sent him to vascular
17 surgery at UAB or VA.
18    Q.    Okay.  He should have gone straight to
19 vascular surgery at that point.
20    A.    Correct.  Yeah.
21    Q.    And what's the basis for you saying that is
22 the requirement?
23    A.    Because you would have gotten an idea on the
24 — on the brachial index that, A, he would never have
25 healing of anything on his feet like the abscess and

160

1 College of Physicians, for example?  Is there anything
2 else that you can point to aside from your —
3     A.    No.  I just did this yesterday.  I did
4 UpToDate yesterday —
5          MR. CHEEK:  Okay.
6     A.    — just to see if there was anything else and
7 didn't look at the American College or anything else.
8 I thought that I would just glance at — because I use
9 this for patient care currently so it's a very helpful
10 tool for kind of knowing if you're up to date on — on
11 medical care.
12         MR. TIPLER:  Off the record.
13         (Off-record discussion)
14         (Recess, 6:59 – 7:03 p.m.)
15         MR. CHEEK:  A couple of quick things and then
16 we can get out of here.
17    Q.    (BY MR. CHEEK:)  Is it possible in March 2014,
18 had an ABI been done, that it would have been within a
19 normal range?
20    A.    I don't think I — I don't think I have the
21 expertise to answer that.  I think a vascular surgeon
22 would be better to answer that question.  I mean, I'm
23 just being honest with you.
24    Q.    So fair to say you just don't know.  You
25 don't have the expertise to —

161

```
 1      A.    Correct.
 2      Q.    Okay.  Is a rash on someone's feet a sign of
 3 peripheral artery disease?
 4      A.    It can be.
 5      Q.    Is the rash on Mr. Marlowe's feet that's
 6 pictured —
 7            MR. TIPLER:  In the photographs.
 8      Q.     — in Exhibit No. 8 a sign of peripheral
 9 artery disease?
10      A.    Not in my opinion.
11      Q.    That rash on those pictures is not a sign of
12 peripheral artery disease?
13      A.    Not in my opinion.
14      Q.    Despite that, the standard of care in your
15 opinion still required a Doppler, etc.
16      A.    Based on the — the good clinical physical
17 examination by the physician.
18      Q.    Is it your opinion that the clinical
19 examination that Dr. Cumagun performed in March of 2014
20 was good?
21      A.    Yes.
22            MR. CHEEK:  Thank you for your time.
23            FURTHER THE DEPONENT SAITH NOT,
24            Deposition concluded 7:05 p.m.
25
```

162

```
 1              C E R T I F I C A T E
 2 STATE OF ALABAMA
 3 COUNTY OF SHELBY
 4            I, Karen Davis, hereby certify that the
 5 above and foregoing deposition was taken down by me on
 6 Computerized Stenotype, and the questions and answers
 7 thereto were transcribed by me, and that the foregoing
 8 represents a true and correct transcript of the
 9 deposition given by said witness upon said hearing.
10            I further certify that I am neither of
11 counsel nor of kin to the parties in the action, nor am
12 I anywise interested in the result of said cause.
13
14     _/s/ KAREN DAVIS_____
15     KAREN DAVIS, CCR
16     ACCR #491
17     ACCR Expires 9/30/2018
18     Notary Commission Expires 1/31/2022
19
20
21
22
23
24
25
```

**$**

*$126,000* 139:23
*$126,000.00 [2]* 139:7, 139:11
*$26,000* 139:12
*$500.00* 8:4
*$600.00* 142:11

**0**

*0.9 [2]* 27:10, 150:12

**1**

*1 [9]* 3:12, 5:24, 10:15, 27:11, 36:25, 38:11, 39:5, 63:15, 150:12
*1.3* 150:13
*1.4* 19:16
*1/31/2022* 162:18
*10 [6]* 3:24, 16:10, 113:20, 137:17, 137:18, 137:22
*100* 2:6
*104* 2:6
*106* 55:1
*109* 3:23
*11* 145:10
*113* 3:25
*11th* 104:11
*12* 20:21
*13 [3]* 3:18, 3:19, 3:20
*14th [7]* 14:4, 38:3, 39:6, 72:22, 76:17, 93:16, 133:20
*15* 113:20
*15th [2]* 6:11, 92:11
*16th [2]* 131:8, 131:10
*18* 139:20
*1801 [2]* 1:20, 2:15
*1988* 138:21
*1:17-CV-00309-VE* 1:9

**2**

*2 [18]* 3:13, 8:21, 10:15, 19:13, 19:15, 21:14, 38:1, 39:15, 63:15, 67:17, 97:2, 111:2, 143:21, 145:14, 146:14, 148:2, 148:13, 150:20
*20/20* 156:15
*2010 [2]* 7:9, 141:16
*2011 [4]* 7:9, 115:18, 116:9, 134:2
*2012 [3]* 134:2, 141:18
*2014 [71]* 14:4, 38:3, 38:9, 39:6, 47:14, 53:12, 60:21, 64:4, 69:15, 71:1, 72:22, 73:14, 76:18, 77:9, 79:24, 81:6, 81:17, 83:16, 86:4, 86:6, 86:16, 87:11, 88:8, 89:20, 89:22, 89:25, 90:9, 90:21, 92:2, 92:11, 92:20, 93:10, 101:21, 104:12, 106:12, 106:19, 107:12, 107:13, 107:25, 110:4, 110:18, 113:20, 118:19, 119:1, 119:2, 120:23, 121:16, 122:5, 123:16, 127:7, 128:16, 129:8, 131:10, 133:17, 133:22, 134:10, 142:25, 143:10, 145:3, 145:21, 150:21, 150:25, 154:22, 154:23, 157:8, 157:12, 157:15, 157:22, 158:1, 160:17, 162:3
*2018 [3]* 1:21, 6:7, 139:19
*205 [3]* 2:8, 2:17, 2:18

**2 (col 2)**

*21* 93:10
*22nd* 93:10
*23rd [3]* 2:6, 118:19, 118:25
*24 [2]* 20:12, 20:21
*244-2104* 2:17
*244-2140* 2:18
*25th [3]* 92:2, 110:3, 110:18
*2720* 138:19
*28th* 88:8
*2:26* 1:22
*2:40* 13:20
*2:41* 13:20
*2nd [4]* 101:21, 101:22, 121:15, 122:5

**3**

*3 [17]* 3:15, 9:14, 10:15, 12:2, 38:1, 39:18, 63:15, 67:17, 110:6, 110:24, 110:25, 111:1, 112:23, 146:9, 146:15, 148:2, 148:13
*30* 55:1
*30th [3]* 43:12, 43:22, 45:20
*31 [2]* 27:23, 153:12
*31-plus* 153:12
*328-6800* 2:8
*34* 3:21
*35203* 2:16
*35233* 2:7
*35243* 138:19
*36* 21:22
*3: 13* 32:16
*3:18* 32:16
*3D* 18:7

**4**

*4 [14]* 3:4, 3:18, 10:18, 12:25, 39:20, 39:22, 40:21, 41:4, 97:6, 97:12, 118:20, 126:25, 127:10, 130:23
*46 [3]* 20:21, 69:3, 69:5
*491* 162:16
*4: 53* 89:7
*4:17* 69:12
*4:20* 69:12
*4:56* 89:7
*4th* 1:20

**5**

*5 [22]* 1:21, 3:12, 3:19, 10:24, 13:5, 21:9, 21:14, 38:11, 41:8, 88:23, 102:12, 120:23, 121:3, 121:4, 121:9, 124:16, 127:5, 127:8, 131:9, 143:19, 143:21, 148:20
*5-minute* 120:20
*5/15/14* 3:25

**6**

*6 [10]* 3:20, 10:24, 13:11, 38:9, 38:17, 41:15, 41:15, 89:2, 103:13, 103:19
*6/11* 92:1
*6/11/2014 [2]* 124:16, 125:2
*6/2 [2]* 92:19, 120:23
*6/2/2014* 122:23
*6: 59* 160:14
*6:33* 43:21
*6th* 88:7

**7**

*7 [12]* 3:21, 19:22, 34:1, 34:2, 41:23, 44:10, 50:21, 66:17, 94:11, 103:25, 137:18,

*7/16* 92:19
*7/16/14* 40:3
*7/16/2014* 130:22
*7/31/13* 38:18
*7/31/14* 103:14
*7/31/2014 [2]* 13:9, 88:15
*7/9 [2]* 127:7, 128:16
*7/9/14* 38:12
*7/9/2014 [2]* 88:18, 128:20
*73* 3:22
*7:03* 160:14
*7:05* 161:24
*7th* 104:12

**8**

*8 [10]* 3:14, 3:22, 38:9, 73:13, 73:15, 77:23, 78:3, 78:15, 144:22, 161:8
*8.6* 66:13
*8.9* 29:6
*80* 151:20
*8:25* 43:13
*8th [4]* 6:7, 89:22, 89:25, 90:7

**9**

*9 [4]* 3:17, 3:23, 66:14, 109:24
*9/30/2018* 162:17
*98* 119:24
*99* 141:19
*9th [4]* 89:20, 90:4, 90:6, 90:9

**A**

*a.m [2]* 43:13, 43:21
*A1C [2]* 29:6, 66:13, 159:13
*ABA* 144:15
*abbreviation* 53:9
*abdominal [2]* 57:14, 57:16
*ABI [11]* 144:16, 144:17, 149:5, 149:10, 149:14, 149:21, 150:8, 157:17, 158:13, 159:20, 160:18
*ability [2]* 5:11, 5:14
*able [24]* 7:1, 8:4, 15:13, 22:5, 25:7, 27:14, 29:4, 30:7, 37:9, 57:24, 57:25, 59:3, 67:22, 70:13, 75:24, 79:5, 79:10, 104:18, 106:22, 106:23, 106:24, 116:6, 133:6, 133:10
*abnormal [9]* 57:15, 67:23, 67:24, 80:16, 100:22, 100:23, 111:16, 147:23, 150:5
*abnormality [2]* 48:12, 124:8
*abscess [2]* 113:7, 158:25
*absence [6]* 25:9, 49:12, 57:25, 84:3, 116:3, 126:15
*absent [4]* 24:10, 24:11, 63:13, 73:3
*absolutely [6]* 36:16, 36:16, 49:20, 72:12, 76:11, 77:17
*acceptable* 31:25
*accepted* 30:6
*access [2]* 84:13, 84:17
*accessible [2]* 67:11, 105:6
*accommodative* 145:17
*According* 130:11
*accountant* 141:8
*ACCR [2]* 162:16, 162:17
*accuracy [2]* 111:13, 113:1

*accurate [3]* 44:4, 112:8
*accurately* 5:12
*ACE* 65:25
*across [2]* 58:11, 75:20
*action [2]* 1:8, 162:11
*activity [2]* 76:24, 141:11
*actual* 30:20
*acute* 113:6
*Adam* 7:10
*add [5]* 35:6, 35:8, 46:15, 46:18, 96:5
*added [6]* 33:19, 35:24, 36:10, 46:8, 46:16, 50:7
*addition [6]* 6:5, 10:18, 20:16, 39:18, 46:21, 96:6
*additional [2]* 14:16, 156:10
*additions [2]* 7:6, 46:7
*address* 138:16
*addressed* 134:6
*adequate [6]* 20:9, 22:4, 27:12, 30:6, 66:15, 72:1
*adequately [3]* 19:14, 20:13, 20:22
*admission* 13:9
*admit* 58:14
*Affairs* 10:19
*affect [7]* 5:11, 5:14, 116:10, 119:21, 133:24, 134:11, 154:20
*affects* 20:7
*afib [2]* 20:23, 84:8, 85:22
*afterwards* 80:3
*against [3]* 61:5, 61:5, 112:4
*age [4]* 19:6, 53:16, 84:1, 151:22
*agent's* 141:3
*agents* 53:20
*ages* 54:25
*agree [4]* 24:17, 24:19, 97:8, 97:10
*agreed* 155:2
*agreeing* 142:19
*agreement [2]* 141:1, 142:20
*ahead [5]* 12:10, 13:17, 28:5, 63:1, 134:5
*Alabama [9]* 1:2, 1:19, 1:21, 2:7, 2:16, 115:6, 140:11, 155:24, 162:2
*alert [2]* 57:16, 57:16
*allow* 4:25
*alone* 145:24
*already [10]* 8:19, 9:5, 11:24, 115:16, 119:16, 134:1, 140:2, 140:3, 142:21, 150:12
*alter [2]* 99:25, 100:12
*Although* 147:2
*amenable [2]* 15:19, 86:12
*AMERICA* 1:11
*American [5]* 84:24, 150:16, 154:18, 159:25, 160:7
*among* 108:1
*amount* 139:8
*amputated [3]* 104:11, 106:9, 106:11
*amputation [9]* 18:12, 81:23, 105:2, 105:3, 105:4, 105:25, 106:13, 107:7, 107:13
*amputations [2]* 81:7, 81:18
*analysis* 48:19
*anatomic* 79:15
*anatomy [2]* 48:6, 79:13
*aneurysm* 57:16
*angio* 54:5
*angiogram [9]* 41:25, 42:4, 87:4, 87:7, 87:9, 87:11, 87:15, 87:19, 104:2

*angioplasty [7]* 80:6, 80:11, 81:5, 81:10, 81:16, 81:24, 105:16
*ankle [7]* 25:12, 41:9, 59:1, 72:18, 104:21, 111:6, 144:9
*ankle-brachial [4]* 15:6, 144:25, 145:8, 150:6
*answered [3]* 72:13, 98:10, 134:1
*answers [3]* 4:20, 4:22, 162:6
*anteceding* 147:13
*anti-lipid* 65:18
*antibiotic [2]* 132:19, 132:20
*antibiotics* 31:15
*anticoagulant* 65:15
*anticoagulate* 19:14
*anticoagulated [2]* 20:13, 20:14
*anticoagulation [4]* 14:8, 19:8, 19:10, 20:9
*antifungal [3]* 29:1, 60:1, 61:11
*anymore [2]* 139:1, 139:2
*anywise* 162:12
*aorta [3]* 105:12, 107:1, 159:4
*aortobifem* 159:10
*aortobifemoral [2]* 106:25, 107:18
*aortofemoral* 107:5
*apart* 74:24
*apologies* 122:21
*apologize* 85:21
*apparently* 141:19
*appear* 94:14
*APPEARING [2]* 2:3, 2:11
*appears [2]* 38:9, 112:17
*applied* 62:9
*appointment [16]* 89:21, 89:23, 90:1, 90:4, 90:10, 113:10, 114:4, 114:7, 114:10, 114:15, 120:14, 122:7, 133:3, 133:15, 133:20, 133:22
*approach* 56:25
*appropriate [7]* 41:24, 65:15, 65:22, 65:25, 66:5, 104:2, 154:15
*approximately [6]* 89:16, 106:12, 112:18, 119:1, 134:24, 135:22
*areas* 132:13
*arrested* 138:3
*arterial [39]* 14:20, 15:5, 15:8, 15:8, 15:10, 15:18, 15:19, 15:19, 36:17, 36:18, 36:24, 36:24, 37:6, 37:10, 52:9, 52:13, 52:22, 53:3, 57:19, 58:5, 58:20, 58:23, 59:2, 59:12, 63:12, 64:2, 64:17, 65:17, 67:12, 68:25, 73:1, 79:16, 80:23, 86:12, 104:18, 104:22, 134:15, 148:11, 152:13
*arterial-brachia [4]* 144:19, 151:24, 155:9, 156:7
*arteries [15]* 16:15, 21:7, 65:24, 66:2, 71:15, 83:22, 87:3, 87:3, 105:5, 105:11, 105:13, 105:24, 107:2, 107:15, 159:11
*arteriogram [8]* 42:5, 42:9, 79:14, 81:2, 87:15, 87:19, 104:3, 159:8
*artery [66]* 3:16, 9:13, 14:17, 14:20, 15:3, 15:7, 16:16, 22:7, 22:8, 22:9, 57:6, 59:5, 59:7, 59:8,

61:24, 62:21,
70:12, 71:5, 71:15,
71:16, 75:7, 75:10,
75:13, 80:5, 80:7,
80:12, 80:17, 80:18,
80:24, 82:9, 82:9,
82:17, 82:20, 84:2,
104:6, 104:6, 104:24,
105:17, 105:22, 143:2,
143:23, 144:1, 144:14,
144:23, 145:2, 145:4,
145:20, 145:25, 146:2,
146:10, 146:23, 148:6,
148:17, 148:22,
149:10, 151:6, 151:8,
156:14, 159:4, 159:6,
159:10, 159:15, 161:3,
161:9, 161:12

**article [12]** 3:13,
3:15, 9:1, 9:2, 9:7,
9:10, 9:20, 9:23,
26:8, 26:24, 27:16,
146:18

**articles** 7:15

**aside [2]** 51:23, 160:2

**asking [9]** 4:7, 37:11,
37:13, 37:18, 65:6,
65:7, 115:2, 116:25,
144:24

**aspect** 49:4

**aspects [2]** 49:3, 58:25

**aspirin** 65:15

**assess [3]** 14:22, 22:5,
27:9

**assessing [2]** 25:3,
144:25

**assessment [6]** 41:22,
64:14, 64:15, 64:16,
83:25, 97:9

**Assistant [2]** 2:14, 4:5

**associated [6]** 14:24,
17:12, 29:7, 63:25,
64:2, 155:10

**Associates [3]** 3:24,
92:5, 113:19

**assume [10]** 36:20,
98:18, 99:22, 100:6,
108:4, 108:23, 116:8,
134:8, 154:18, 158:12

**assumed [2]** 39:24,
115:15

**assure** 154:16

**asymptomatic [7]**
134:13, 146:24, 147:3,
147:7, 147:11, 147:15,
147:16

**atherosclerosis [2]**
66:3, 83:21

**atherosclerotic** 84:2

**athlete's [3]** 60:3,
74:21, 75:3

**athletes** 74:22

**atrial [8]** 14:7, 15:24,
18:19, 85:17, 85:19,
85:22, 85:25, 102:6

**attached [9]** 10:16,
11:20, 30:15, 73:9,
73:19, 88:15, 88:18,
89:17, 91:15

**attachments [3]** 12:23,
88:12, 88:13

**attack [3]** 15:4, 16:2,
19:18

**attempted** 104:5

**attempts** 104:9

**attention** 58:6

**attentive** 153:5

**attorney [3]** 4:5,
136:23, 141:9

**Attorney's** 1:20

**Attorneys** 2:14

**August** 104:11

**automatically** 157:14

**availability** 157:24

**available [3]** 85:12,
156:1, 157:25

**Avenue** 2:11

**Averett [3]** 141:8,
142:1, 142:5

**Averett's** 141:19

**avoid [2]** 108:20,
108:22

---

## B

**baby's** 58:3

**bad [5]** 29:19, 147:23,
154:16, 159:13, 159:13

**balance** 147:6

**balloon** 80:11

**ballpark** 51:9

**Band-Aid [3]** 17:15,
109:21, 109:22

**Baptist [6]** 3:20, 13:8,
41:17, 41:20, 89:2,
103:15

**barely** 47:24

**basically [2]** 80:13,
157:22

**basing [2]** 48:21, 129:1

**bathroom** 69:10

**bear** 109:2

**became [2]** 118:18,
119:11

**become** 117:25

**beginning [2]** 36:3,
139:16

**begins** 94:12

**BEHALF [2]** 2:3, 2:11

**behind [10]** 22:7, 41:9,
41:9, 59:6, 70:11,
71:1, 71:6, 72:18,
104:19, 111:6

**believed [2]** 114:19,
114:22

**below-the-knee** 105:25

**belt** 70:21

**Bessemer** 7:9

**best [6]** 35:3, 84:8,
85:12, 86:10, 87:7,
98:11

**better [16]** 16:18,
19:2, 41:13, 64:13,
66:7, 86:21, 101:1,
104:23, 108:5, 108:22,
109:16, 119:15, 120:7,
124:10, 136:20, 160:22

**bias [3]** 112:4, 112:7,
112:7

**bilaterally** 104:4

**Birmingham [4]** 1:21,
2:7, 2:16, 67:21

**bit [7]** 20:24, 48:2,
48:2, 48:6, 58:7,
151:17, 152:5

**bleed [4]** 19:2, 19:5,
74:17, 85:3

**bleeding** 74:18

**bleeds** 19:23

**blockage [5]** 80:4,
87:5, 87:6, 105:20,
105:21

**blocker** 65:23

**blood [40]** 10:22,
15:21, 16:1, 16:6,
16:16, 27:12, 57:17,
58:24, 64:4, 64:14,
65:24, 66:11, 70:13,
71:7, 72:1, 76:23,
79:16, 80:17, 83:15,
84:5, 86:13, 104:17,
104:18, 104:19,
104:20, 105:4, 105:12,
105:23, 107:19,
114:20, 118:22,
119:25, 121:1, 121:24,
124:22, 128:18, 132:3,
134:19, 149:4, 149:21

**Blue** 49:1

**bluish** 144:3

**board [3]** 135:3, 135:6,
135:9

**bone [3]** 41:10, 72:18,
92:23

**bother** 125:15

**bothers [2]** 98:13,
132:17

**bottom [9]** 44:10,
44:13, 45:4, 80:25,
125:14, 132:12,
132:14, 144:23, 159:5

**bounding** 47:23

**Bourgeois [8]** 38:18,
38:19, 41:16, 41:19,

131:5

**bowel** 57:15

**Bowman [8]** 92:8, 114:2,
114:6, 114:19, 114:24,
115:17, 116:17, 116:21

**Bowman's** 92:10

**BPH** 16:5

**brachial [14]** 27:5,
27:10, 36:25, 58:23,
59:3, 144:10, 147:7,
147:17, 152:11,
152:21, 152:25,
154:24, 158:24, 159:5

**brain** 19:3

**breach [10]** 29:22,
30:2, 30:10, 31:2,
32:6, 96:24, 101:20,
113:9, 123:12, 133:18

**breached [23]** 21:3,
21:5, 21:20, 26:17,
27:20, 28:16, 32:10,
64:23, 65:2, 65:8,
98:23, 102:11, 114:25,
117:6, 123:2, 123:12,
125:25, 126:3, 126:16,
127:15, 133:13,
147:21, 158:6

**break [5]** 5:4, 31:24,
32:14, 69:10, 89:6

**breakdown [2]** 17:18,
17:24

**breaking** 125:18

**briefly [2]** 7:18, 8:19

**bring [4]** 7:14, 10:1,
10:5, 88:2

**Brook** 138:22

**brother's [2]** 136:13,
136:16

**bruit [4]** 22:11, 22:11,
57:7, 70:12

**bruits [2]** 57:11, 57:14

**button** 58:19

**bypass [13]** 22:8, 42:6,
71:5, 71:10, 71:11,
79:5, 79:11, 79:20,
104:7, 104:24, 106:25,
107:1, 107:5

**bypasses** 107:18

**bypassing** 71:9

---

## C

**C.V [6]** 5:19, 5:20,
5:25, 6:4, 7:7, 43:21

**calcium** 65:23

**calculations** 130:11

**calf [5]** 49:7, 49:15,
76:23, 76:25, 112:15

**caliber [2]** 80:24,
105:18

**California** 155:23

**calling [2]** 109:17,
152:16

**can't [23]** 15:10, 18:8,
30:9, 30:10, 30:12,
30:12, 32:3, 32:5,
32:23, 48:7, 57:25,
58:1, 60:10, 71:17,
75:19, 79:12, 81:24,
82:1, 82:2, 82:4,
82:5, 85:17, 108:16

**canal [2]** 22:10, 105:13

**cannot [3]** 17:19,
26:12, 32:8

**capacity** 65:17

**capillary [2]** 25:15,
71:25, 72:8

**cardiovascular** 57:12

**care [138]** 8:6, 14:18,
19:24, 21:1, 21:3,
21:6, 21:20, 23:21,
23:23, 23:24, 24:7,
24:7, 24:17, 24:21,
25:2, 25:23, 26:9,
26:18, 26:23, 27:20,
28:11, 28:17, 29:22,
30:3, 31:3, 31:14,
32:6, 32:11, 36:10,
36:14, 37:3, 48:14,
53:3, 56:18, 57:8,
57:9, 57:11, 57:13,

64:23, 65:2, 65:8,
65:12, 65:14, 66:14,
66:19, 66:22, 67:23,
68:13, 68:23, 69:15,
70:17, 70:18, 70:25,
72:17, 72:22, 72:25,
76:13, 77:14, 84:18,
84:24, 85:24, 86:2,
86:4, 86:8, 86:15,
87:10, 96:7, 96:8,
96:25, 97:18, 98:16,
98:23, 99:5, 99:10,
99:15, 99:17, 99:18,
99:21, 99:23, 100:8,
100:14, 101:20,
102:11, 102:15, 103:1,
103:3, 103:8, 108:19,
108:20, 113:9, 114:25,
115:4, 115:8, 117:6,
119:14, 123:2, 123:12,
125:22, 125:25, 126:2,
126:3, 126:13, 127:16,
130:14, 133:12,
133:14, 133:19,
133:14, 136:14, 143:5,
143:9, 144:12, 144:21,
147:21, 148:3, 148:13,
153:15, 153:20,
153:21, 154:21, 155:5,
155:14, 155:16,
155:16, 155:22,
157:21, 157:22, 158:7,
158:8, 158:9, 159:19,
159:22, 160:9, 160:11,
161:14

**carotid** 154:14

**cascade** 20:11

**case [22]** 9:8, 9:24,
13:22, 13:23, 14:2,
15:23, 17:5, 17:6,
21:1, 21:4, 27:17,
28:17, 32:19, 44:6,
76:13, 100:12, 127:16,
142:9, 142:12, 142:20,
151:17, 152:4

**catastrophic [2]** 25:5,
57:17

**catch** 106:6

**category** 145:14

**caught** 58:6

**cause [6]** 16:2, 16:5,
17:19, 83:14, 128:18,
162:12

**caused [4]** 25:9, 64:10,
83:22, 85:4

**causes [4]** 16:6, 25:5,
49:23, 128:17

**causing** 113:7

**CCR [2]** 1:18, 162:15

**cellulitis [9]** 40:5,
40:11, 40:19, 128:13,
128:15, 128:23, 132:8,
133:5, 133:7

**Center [14]** 3:19, 3:23,
12:20, 13:4, 13:8,
26:3, 89:3, 91:21,
92:14, 110:3, 110:17,
111:20, 112:18, 156:25

**Center's** 111:19

**centimeters [4]** 17:22,
17:23, 31:16, 31:6

**central** 122:12

**cerebral [2]** 19:23,
20:2

**certain [3]** 29:10,
61:21, 71:7

**certainly [10]** 20:5,
60:9, 60:9, 61:1,
66:7, 66:10, 75:21,
76:4, 79:4, 107:7

**certification [2]**
135:6, 135:10

**certified [2]** 1:18,
135:3

**certify [2]** 162:4,
162:10

**chance** 106:5

**change [14]** 6:17,
19:19, 44:3, 47:4,
59:13, 93:15, 95:17,
95:22, 96:2, 109:12,

131:5 (already listed above — column)

9:15, 113:15,
150:23, 157:19

**changed** 33:17

**changes [6]** 7:6, 33:15,
42:11, 42:23, 43:3,
75:11

**channel** 65:23

**charging [2]** 35:8,
154:10

**chart [8]** 16:4, 48:11,
70:5, 100:22, 111:8,
117:2, 117:7, 117:9

**charts [2]** 102:10,
112:5

**check [43]** 21:22,
22:18, 22:22, 23:1,
23:5, 23:25, 24:9,
24:12, 24:12, 24:23,
24:24, 24:25, 41:3,
41:8, 54:16, 54:19,
55:1, 55:22, 56:4,
56:8, 56:18, 69:15,
70:19, 70:20, 71:1,
72:17, 98:24, 99:11,
100:4, 101:4, 101:21,
102:12, 102:14,
102:19, 110:15,
110:17, 114:9, 123:18,
126:4, 126:12, 133:2,
142:15, 155:14

**checked [30]** 40:23,
54:13, 55:11, 55:11,
97:14, 98:7, 98:21,
100:19, 101:6, 101:17,
102:9, 102:11, 102:13,
102:16, 106:21, 111:5,
114:15, 123:7, 123:9,
124:11, 126:7, 126:11,
126:12, 126:17, 153:9,
153:17, 154:7, 154:7,
156:5, 159:3

**checking [10]** 55:4,
55:17, 69:10, 99:5,
109:17, 123:20,
125:16, 153:7, 154:4,
155:11

**checks** 101:18

**Cheek [194]** 2:12, 3:4,
4:3, 4:4, 5:23, 6:6,
6:14, 7:3, 8:15, 9:3,
9:10, 11:7, 11:15,
11:21, 11:25, 12:7,
12:12, 12:16, 12:21,
13:3, 13:10, 13:17,
13:24, 14:1, 20:24,
21:10, 21:16, 23:11,
23:14, 23:16, 23:20,
24:4, 25:17, 26:2,
31:8, 31:20, 31:23,
32:13, 32:17, 33:8,
33:10, 33:24, 34:7,
34:12, 34:16, 35:12,
37:11, 37:13, 37:17,
39:22, 42:3, 43:11,
45:23, 47:16, 48:9,
49:21, 50:17, 50:19,
50:21, 51:19, 52:7,
52:18, 53:1, 53:5,
53:8, 54:9, 55:15,
55:21, 55:24, 56:11,
57:10, 57:22, 58:13,
58:16, 60:20, 60:25,
61:14, 61:25, 62:3,
62:5, 62:24, 64:1,
66:16, 67:10, 67:13,
68:2, 68:9, 69:4,
69:7, 69:9, 69:13,
70:1, 70:8, 78:22,
82:23, 83:18, 84:25,
85:2, 85:16, 87:13,
87:21, 89:6, 89:8,
90:3, 91:9, 91:18,
94:8, 94:16, 95:4,
96:10, 96:16, 97:19,
98:2, 98:12, 98:15,
98:20, 99:9, 99:16,
100:18, 100:24,
101:23, 101:25,
102:20, 104:15,
105:10, 105:16,
106:3, 108:9, 108:14,
108:18, 109:19, 110:2,

110:9, 110:13, 110:22,
111:9, 113:13, 113:18,
113:24, 115:5, 115:9,
116:20, 116:22,
116:25, 117:17, 118:7,
118:23, 119:5, 119:19,
121:7, 121:12, 121:15,
122:20, 122:24, 124:5,
125:21, 126:9, 127:4,
127:6, 127:10, 129:13,
130:3, 130:18, 130:25,
131:2, 131:4, 131:6,
131:9, 131:19, 134:4,
136:15, 136:24,
137:19, 138:18,
142:16, 143:24,
145:13, 146:4, 148:7,
148:24, 150:3, 151:3,
151:10, 152:9, 152:14,
152:18, 153:4, 153:25,
154:5, 155:20, 155:25,
160:5, 160:15, 160:17,
161:22
**chest** 54:5
**chief [2]** 102:4, 129:18
**cholesterol [3]** 53:20,
65:18, 65:19
**Cipro [3]** 19:19, 19:24,
85:11
**circulation [13]** 17:12,
49:12, 64:5, 64:11,
71:20, 83:15, 114:20,
121:1, 121:24, 124:22,
126:1, 132:3, 159:12
**circulatory [5]** 25:4,
27:11, 106:23, 116:4,
148:9
**Civil [2]** 1:8, 1:17
**clarify [7]** 22:24,
28:10, 60:20, 97:7,
121:7, 122:16, 155:20
**clarity** 12:21
**class** 54:3
**classification** 145:11
**claudication [21]**
14:23, 46:14, 46:25,
50:15, 50:16, 76:17,
76:22, 77:9, 77:16,
122:6, 122:8, 122:18,
122:24, 144:24,
147:13, 151:9, 151:14,
151:16, 152:4, 152:6,
152:16
**claudications** 151:11
**clear [7]** 40:12, 51:20,
74:13, 105:23, 107:16,
127:14, 142:23
**cleared** 129:8
**clearly [3]** 84:1, 84:1,
112:9
**clinic [15]** 10:21,
17:11, 18:1, 19:6,
38:8, 39:19, 58:10,
58:11, 59:10, 83:11,
108:12, 109:3, 110:12,
119:11, 137:21
**clinical [15]** 67:8,
144:7, 144:14, 145:1,
145:4, 145:5, 145:6,
148:8, 148:8, 148:16,
149:9, 149:19, 151:4,
161:16, 161:18
**clinically** 148:15
**clinics [2]** 58:15,
58:15
**close** 67:12
**clots** 16:1
**code** 53:7
**coding** 53:6
**cold [2]** 25:21, 84:19
**collection** 141:11
**College [4]** 150:16,
156:18, 160:1, 160:7
**color [7]** 12:6, 12:7,
49:1, 49:1, 71:24,
74:1, 144:3
**Colorado** 155:22
**coloring [2]** 72:8, 74:3
**combined** 145:18
**comes [6]** 22:22, 22:25,
23:19, 26:11, 74:1,
108:14

combines [2] ...,
118:10
**coming [2]** 4:5, 109:3
**commencing** 1:22
**commented** 40:25
**Commission** 162:18
**Commissioner** 1:19
**common [2]** 22:8, 71:5
**communicate** 117:12
**communicating [2]**
87:18, 87:20
**community [2]** 36:19,
155:24
**comorbid [2]** 31:10,
61:23
**company [3]** 136:13,
136:14, 136:16
**complained** 112:19
**complaining [2]** 123:21,
124:18
**complaint [3]** 102:4,
127:23, 129:18
**complete [3]** 4:25,
122:4, 146:17
**complex [4]** 54:6,
151:17, 152:5, 152:7
**compliance** 108:17
**compliant [2]** 20:3,
20:6
**complications** 14:19
**comply [2]** 35:7, 35:11
**comprehensive** 145:11
**compromise [3]** 106:17,
139:3, 139:7
**compromised** 17:21
**computer [4]** 30:21,
32:21, 42:25, 121:9
**Computerized** 162:6
**concern [9]** 14:11,
61:19, 62:15, 62:17,
73:5, 83:7, 107:25,
177:22, 120:15
**concerned [16]** 14:13,
16:3, 16:19, 16:22,
17:2, 18:1, 18:14,
25:10, 31:9, 54:1,
54:2, 63:1, 63:2,
106:3, 117:14, 120:7
**concerning [6]** 31:2,
32:5, 38:8, 83:6,
100:4, 158:8
**concerns [3]** 29:14,
120:17, 120:21
**concluded** 161:24
**concomitant** 133:5
**condensed [2]** 42:4,
42:11
**condition [16]** 14:22,
25:9, 28:21, 29:1,
29:11, 29:12, 69:1,
69:2, 71:12, 74:13,
75:15, 108:4, 109:4,
134:11, 156:22, 157:2
**conditions [3]** 31:10,
61:23, 67:6
**conference [2]** 136:18,
136:23
**confidence** 37:8
**congenitally [2]** 24:10,
24:11
**connection** 120:1
**consciousness** 16:17
**consider [4]** 76:9,
78:24, 145:16, 145:17
**considered** 39:5
**constriction** 16:15
**consult [11]** 50:24,
51:16, 51:22, 90:14,
90:17, 103:16, 118:2,
123:4, 125:4, 127:20,
159:21
**consultation** 145:17
**consulted** 7:16
**contained [2]** 44:7,
118:20
**context [2]** 17:2,
104:24
**continual** 156:18
**continually** 156:22
**continue** 35:21
**continued** 156:3
**continuing [4]** 8:1,

contractor [2] ...,
contrast 80:16
**control [7]** 19:7,
19:10, 29:7, 64:15,
66:8, 66:15, 66:17
**conversation** 42:15
**Cocas [8]** 3:23, 91:20,
110:3, 110:16, 111:18,
111:20, 112:18, 156:25
**copies [6]** 3:22, 8:19,
11:9, 12:6, 12:11,
13:18
**core** 143:4
**coronary [2]** 28:4,
54:4, 154:14
**correct [63]** 9:22,
26:15, 26:21, 30:19,
31:1, 40:7, 40:9,
42:24, 44:23, 46:6,
46:8, 47:22, 49:11,
50:1, 55:19, 56:20,
61:13, 61:17, 62:16,
62:20, 65:4, 65:5,
67:1, 68:8, 72:19,
73:10, 73:11, 74:11,
74:16, 79:9, 79:19,
83:9, 83:12, 84:23,
90:3, 91:1, 91:2,
92:21, 95:12, 103:9,
103:12, 117:11,
124:13, 127:21, 128:9,
131:25, 134:23,
135:11, 137:11, 139:9,
139:9, 140:12, 141:23,
142:22, 142:24, 143:8,
147:19, 153:16,
157:20, 158:11,
158:20, 161:1, 162:8
**couldn't** 17:16
**Coumadin [18]** 10:21,
15:25, 16:25, 18:19,
19:4, 19:6, 19:12,
19:21, 20:7, 20:18,
74:16, 74:18, 83:23,
84:8, 85:15, 85:18,
86:1, 108:11
**counsel [2]** 116:23,
162:11
**County [2]** 7:8, 162:3
**couple [8]** 31:12, 32:1,
45:6, 45:16, 45:20,
108:1, 134:9, 160:15
**Court [3]** 1:1, 1:18,
138:19
**cover [2]** 7:11, 142:18
**covered** 127:13
**covering** 27:24
**CPA** 141:2
**cracked** 127:25
**Craddock [4]** 3:19,
12:20, 13:4, 92:14
**cramps [9]** 39:24,
39:25, 102:5, 102:7,
117:9, 122:3, 122:9,
122:9, 122:13
**Crandall** 138:19
**cream [7]** 29:1, 61:11,
61:12, 61:17, 62:9,
62:11, 129:12
**creams** 29:10
**create** 64:12
**created** 28:21
**credence** 112:1
**critical [3]** 49:25,
77:19, 150:23
**CT [4]** 41:25, 42:4,
42:10, 104:2
**cuffs** 56:3
**Cumagun [46]** 3:18,
10:12, 10:24, 11:19,
21:3, 21:19, 26:17,
28:16, 32:10, 35:21,
35:23, 37:25, 39:19,
41:8, 47:7, 47:14,
56:18, 61:16, 62:8,
66:24, 69:15, 71:1,
72:17, 72:21, 79:23,
95:10, 97:17, 97:24,
99:23, 100:10, 106:6,
106:19, 107:11, 108:2,
117:20, 117:25, 118:4, 119:21,

147:21, 156:16, 157:7,
161:19
**Cumagun's [11]** 12:22,
30:15, 73:9, 73:19,
74:6, 88:5, 89:17,
91:15, 100:14, 117:1,
127:9
**cured [2]** 129:11,
129:14
**current** 6:20
**currently [4]** 6:9,
58:7, 135:12, 160:9
**Curriculum** 3:12
**cut [5]** 19:21, 82:16,
114:5, 115:15, 119:19
**cyanosis [2]** 48:24,
48:25

## D

**D-1** 5:25
**D-10** 113:21
**D-2** 8:23
**D-3** 9:16
**D-6** 13:12
**D-9** 109:25
**D-O-P-L-A-R** 33:23
**dad** 25:14
**damage** 25:14
**damaged** 66:2
**dangerous** 84:14
**darker [2]** 39:18, 96:14
**darkness** 17:10
**date [2]** 79:15, 82:1
**date [6]** 13:8, 43:5,
43:7, 119:7, 138:1,
160:10
**dated [3]** 3:25, 89:20,
113:20
**dates [5]** 33:17, 33:18,
33:20, 35:25, 92:17
**dating** 115:18
**Davis [4]** 1:18, 162:4,
162:14, 162:15
**deadline** 45:21
**deal** 54:6
**dealing [2]** 151:5,
151:5
**dealt** 141:9
**death** 16:2
**Deborah** 91:24
**debridement** 125:14
**decided** 41:12
**decline [3]** 156:13,
156:18, 157:2
**declining** 156:22
**decrease** 144:2
**decreased [10]** 63:13,
66:21, 68:18, 73:2,
83:2, 83:7, 114:11,
115:14, 115:21, 116:8
**defaulted** 140:22
**Defendant [2]** 1:13,
2:11
**Defendant's [9]** 3:11,
34:2, 73:15, 109:24,
120:22, 126:24,
130:23, 131:9, 148:2
**Defense [11]** 5:24,
9:21, 9:13, 12:1,
12:24, 13:5, 13:11,
21:14, 34:1, 73:12,
124:15
**deficiency** 21:24
**define** 65:11
**defined [2]** 25:24,
25:25
**definitely** 21:5
**demonstrate** 78:16
**denuded [2]** 132:10,
132:11
**department [2]** 10:19,
111:5
**depend [3]** 67:8, 95:13,
108:16
**dependent** 19:17
**depends** 68:15
**depict** 58:4
**DEPONENT [47]** 8:22,
9:15, 13:7, 21:12,
23:22, 31:17, 31:22,

32:2, 34:10, 34:15,
34:18, 37:12, 37:16,
45:25, 51:21, 52:20,
53:10, 64:21, 69:11,
74:2, 81:3, 82:19,
88:1, 94:9, 94:17,
98:4, 101:24, 110:7,
110:11, 110:15,
110:25, 114:1, 117:2,
119:9, 119:18, 121:6,
121:10, 121:17, 131:1,
131:3, 131:12, 131:16,
134:7, 142:7, 146:7,
153:10, 161:23
**deposed [3]** 4:7, 4:12,
130:12
**deposition [37]** 1:15,
3:18, 4:6, 9:21,
10:10, 10:12, 10:16,
10:20, 10:25, 11:19,
12:23, 12:24, 30:16,
35:20, 35:23, 37:7,
37:8, 37:24, 38:1,
40:10, 40:17, 73:9,
73:20, 74:7, 88:4,
88:5, 88:15, 88:18,
89:17, 91:15, 94:2,
120:10, 127:9, 127:11,
161:24, 162:5, 162:9
**dermatitis [2]** 40:4,
40:4
**dermatologic** 18:4
**dermatological [19]**
17:16, 17:20, 17:24,
30:6, 38:11, 38:17,
75:23, 76:1, 76:13,
90:5, 90:6, 96:19,
97:22, 98:17, 103:14,
115:8, 127:15, 129:20,
129:21
**dermatologists [2]**
130:4, 130:7
**dermatology [7]** 38:20,
76:3, 76:10, 96:22,
118:14, 127:23, 130:15
**Despite** 161:14
**determine [3]** 29:4,
35:13, 79:20
**determined [3]** 63:12,
73:2, 104:3
**determining** 71:19
**develop** 147:12
**developing** 54:11
**diabetes [7]** 15:3,
15:24, 39:16, 54:11,
147:12, 151:22, 159:13
**diabetic [22]** 3:14,
8:9, 8:20, 14:6, 21:9,
21:23, 22:15, 22:20,
28:14, 29:7, 53:19,
53:25, 55:6, 64:15,
66:7, 66:13, 66:15,
66:17, 134:16, 143:18,
146:11, 148:20
**diabetics [10]** 17:18,
53:22, 54:2, 54:3,
55:6, 60:19, 64:13,
71:13, 80:20, 151:5
**diagnosed [4]** 84:3,
115:20, 129:22, 145:20
**diagnosis [3]** 18:16,
75:24, 128:8
**diagnostic [2]** 120:20,
156:2
**diaphoretic** 17:2
**dictating [2]** 101:11,
125:11
**die** 20:2
**died** 136:19
**difference [10]** 34:8,
46:24, 47:1, 47:10,
53:24, 96:18, 100:15,
107:8, 126:6, 132:8
**differential** 59:1
**differently** 74:1
**difficult [2]** 18:20,
99:7
**digital** 125:19
**dilated** 104:22
**dilates** 65:24
**Diltiazem** 65:22
**diminished [57]** 14:15,

22:3, 28:9, 29:2, 34:9,
47:8, 47:9, 47:11,
47:17, 47:19, 47:25,
48:4, 48:10, 48:22,
49:24, 53:15, 56:17,
56:21, 57:1, 57:4,
57:17, 58:21, 59:4,
61:21, 62:19, 65:12,
68:18, 68:22, 69:18,
69:18, 69:21, 69:23,
70:18, 71:2, 72:9,
72:15, 77:17, 77:18,
79:1, 83:22, 93:16,
100:16, 100:21,
104:17, 112:2, 120:19,
126:10, 126:15,
133:24, 134:9, 134:14,
144:2, 145:8, 145:22,
148:4, 148:5, 148:14,
148:22

**diminishes** 105:18
**directly** 29:17
**disagree [2]** 141:24,
141:25
**discharge [2]** 13:7,
119:16
**disciplined** 137:23
**discredit** 118:11
**discuss** 5:18
**discussed [2]** 44:6,
119:13
**discussion [3]** 130:20,
132:16, 160:13
**disease [73]** 3:17,
9:13, 14:6, 14:14,
14:17, 14:20, 15:4,
15:16, 28:4, 42:5,
49:4, 49:5, 49:9,
49:16, 51:4, 52:1,
52:10, 52:12, 52:13,
52:14, 52:16, 52:21,
52:23, 52:23, 53:2,
53:3, 54:1, 54:12,
59:8, 61:24, 62:21,
65:20, 71:16, 71:17,
75:7, 75:11, 75:14,
104:4, 106:1, 106:2,
106:16, 115:12,
115:14, 117:23, 130:2,
143:2, 143:23, 144:1,
144:15, 144:24, 145:2,
145:4, 145:21, 145:25,
146:2, 146:10, 146:24,
148:6, 148:17, 148:22,
149:10, 150:13, 151:6,
151:8, 154:14, 154:14,
154:15, 156:10,
156:14, 159:9, 161:3,
161:9, 161:12
**dispute** 111:12
**dissolve** 60:12
**distinction** 62:5
**DISTRICT [2]** 1:1, 1:2
**divided** 139:24
**divides** 105:12
**DIVISION** 1:3
**doctor [58]** 4:4, 5:6,
5:17, 6:2, 7:10, 7:11,
7:14, 8:10, 8:16,
9:19, 10:1, 11:1,
13:5, 21:11, 21:16,
21:21, 23:25, 24:7,
24:7, 24:8, 24:8,
24:23, 34:4, 34:9,
36:12, 57:18, 63:7,
63:16, 87:21, 94:10,
95:6, 96:7, 98:12,
99:14, 99:23, 99:24,
101:1, 101:25, 103:1,
109:23, 110:10,
113:12, 113:18, 115:9,
116:1, 118:8, 118:24,
120:8, 124:10, 130:21,
134:18, 143:20, 146:5,
152:2, 153:5, 153:8,
155:7, 156:5
**doctor's [5]** 90:24,
91:4, 91:6, 91:11,
91:13
**doctors [3]** 6:10,
84:13, 136:21
**document [18]** 8:23,

33:21, 34:20, 42:20,
43:6, 44:4, 45:12,
46:3, 50:12, 70:2,
70:7, 70:7, 101:7,
109:25, 113:21
**documentation** 21:24
**documented [7]** 22:18,
69:22, 76:19, 76:20,
102:6, 116:9, 133:24
**documenting [3]** 126:1,
126:5, 126:14
**documents [3]** 13:6,
97:22, 143:15
**dollars** 140:20
**door [2]** 24:2, 24:6
**Doppler [77]** 15:5,
15:10, 21:6, 26:18,
27:6, 27:21, 28:7,
28:11, 33:23, 36:17,
36:19, 36:24, 36:24,
37:6, 37:10, 45:4,
45:11, 45:16, 46:8,
47:20, 47:20, 48:5,
48:15, 48:20, 49:19,
57:19, 57:23, 59:3,
59:10, 59:12, 59:19,
61:20, 62:14, 63:12,
63:20, 66:25, 67:1,
67:24, 68:7, 68:10,
68:23, 68:25, 72:11,
73:2, 77:15, 77:20,
80:16, 83:1, 87:7,
107:11, 113:10, 115:1,
116:6, 116:13, 116:16,
117:15, 118:1, 123:3,
125:3, 127:20, 134:15,
144:8, 144:12, 147:23,
148:3, 148:11, 148:13,
148:18, 149:3, 149:13,
149:14, 149:20,
149:25, 149:25, 150:8,
157:17, 161:15
**Dopplers [10]** 14:20,
28:5, 48:4, 58:2,
58:15, 58:23, 67:12,
87:1, 87:1, 155:10
**dors** 56:18
**dorsal [24]** 22:1, 22:3,
23:5, 23:6, 23:7,
23:12, 23:25, 24:9,
25:13, 26:10, 42:6,
47:15, 47:19, 54:19,
54:21, 55:22, 56:5,
57:1, 59:8, 69:18,
71:9, 105:19, 111:2,
145:22
**dorsalis** 104:6
**dorsum [2]** 132:10,
132:11
**dose [2]** 19:21, 20:13
**Dr [153]** 1:15, 3:18,
3:21, 10:11, 10:12,
10:24, 11:19, 12:16,
12:20, 12:22, 13:4,
13:21, 21:3, 21:13,
21:19, 25:1, 26:17,
28:16, 30:15, 32:10,
32:14, 32:18, 33:3,
33:18, 35:13, 35:15,
35:20, 35:23, 37:25,
38:11, 38:13, 38:17,
38:19, 38:19, 39:19,
39:23, 40:2, 40:22,
40:22, 41:8, 41:16,
41:19, 47:7, 47:13,
47:13, 56:3, 56:18,
61:16, 62:8, 66:24,
69:14, 69:15, 70:25,
72:17, 72:21, 73:9,
73:18, 73:19, 74:6,
79:23, 82:24, 88:5,
88:14, 88:17, 88:24,
89:9, 89:10, 89:10,
89:17, 91:15, 91:24,
92:1, 92:8, 92:10,
93:1, 93:7, 93:9,
95:10, 97:13, 97:14,
97:17, 97:24, 98:7,
98:7, 98:22, 98:23,
99:4, 99:23, 99:24,
100:8, 100:10, 100:13,

103:14, 106:6, 106:19,
107:11, 108:1, 110:16,
112:22, 113:8, 114:2,
114:6, 114:19, 114:24,
115:17, 116:15,
116:16, 116:16,
116:17, 116:21,
116:21, 117:1, 117:5,
117:6, 117:20, 117:20,
117:24, 117:25,
117:25, 118:4, 119:21,
120:13, 120:24,
120:25, 123:2, 123:16,
124:15, 125:1, 126:16,
126:18, 126:21, 127:4,
127:18, 130:12,
130:12, 131:1, 131:10,
133:1, 133:13, 142:25,
147:21, 153:13, 155:3,
156:16, 157:1, 157:1,
157:7, 161:19
**drafted** 32:18
**dried** 28:23
**drink** 32:15
**drinks** 31:18
**Drive** 138:22
**drop [2]** 16:6, 16:16
**duly** 4:2
**dye [2]** 80:19, 80:21

---

## E

**earlier [6]** 71:24,
74:12, 84:7, 106:3,
118:16, 134:3
**easiest** 67:2
**easy [7]** 15:5, 27:4,
67:11, 70:20, 80:14,
151:11, 159:15
**eat [4]** 19:19, 31:17,
32:15, 66:9
**eczema** 28:21
**edema [2]** 121:21,
124:25
**edits** 45:12
**educate [2]** 79:3, 85:9
**education [2]** 8:1, 8:5
**effect [3]** 16:13,
19:23, 150:20
**effectively** 26:17
**effort** 11:18
**eg** 149:21
**eight** 27:24
**eighty [4]** 105:20,
153:2, 153:3, 159:6
**either [8]** 8:16, 30:11,
50:6, 56:7, 66:24,
128:12, 148:2, 148:12
**EKG** 119:24
**electrolyte** 122:10
**electronic [7]** 55:9,
101:9, 110:19, 111:14,
111:19, 112:2, 112:4
**electronically** 141:20
**Eliquis [4]** 18:24,
20:9, 20:12, 20:20
**eloquently** 29:20
**email [4]** 42:22, 43:1,
43:2, 43:12
**emailed** 43:14
**emboli** 83:24
**embolic [3]** 18:21,
78:4, 83:25
**embolism [4]** 78:6,
78:9, 78:11, 78:13
**embolization** 19:18
**emergency [3]** 92:2,
110:7, 111:5
**endoscopic** 159:16
**enforced** 141:10
**enlargement** 16:11
**enrolled** 135:5
**entering** 119:10
**entirely** 50:9
**entry** 50:9
**episode [2]** 16:25,
104:23
**episodes** 16:5
**equating [2]** 155:4,
155:6

113:12, 116:1
**error [3]** 44:21, 44:23,
44:24
**especially [12]** 17:25,
20:22, 27:5, 28:13,
29:5, 108:20, 109:17,
125:17, 126:13,
133:11, 134:16, 154:12
**essentially** 159:16
**established [6]** 92:15,
102:4, 102:8, 147:9,
147:18, 147:25
**etc [2]** 104:3, 161:15
**evaluate [4]** 15:14,
93:17, 106:22, 157:10
**evaluating** 108:12
**evaluation [28]** 3:3,
4:3, 14:4, 14:4, 14:9,
14:16, 22:14, 22:14,
22:17, 26:5, 41:1,
48:8, 57:5, 95:5,
95:9, 122:4, 124:24,
126:2, 144:8, 145:12,
149:4, 149:20, 153:23,
154:3, 154:9, 154:10,
154:15, 161:12
**evaluations** 118:6
**evaluator [24]** 3:3,
94:5, 114:7, 118:10,
123:6, 144:1, 148:21
**examining** 55:18
**example [2]** 35:15,
160:1
**exams** 135:9
**except [2]** 96:18,
124:24
**exclusively** 6:17
**Excuse** 82:16
**exercise [3]** 14:25,
65:16, 151:19
**exertional [2]** 76:24,
147:3
**exhibit [50]** 3:8, 3:11,
5:24, 8:16, 8:21,
9:14, 10:18, 10:23,
10:24, 11:2, 12:1,
12:5, 13:5, 13:11,
21:14, 34:1, 34:2,
34:5, 34:9, 44:10,
50:18, 73:12, 73:15,
77:23, 78:3, 78:15,
88:23, 89:2, 94:11,
102:2, 109:24, 113:20,
118:20, 120:22, 121:9,
124:16, 126:24,
126:24, 127:8, 127:10,
130:23, 131:6, 131:9,
143:21, 146:8, 146:14,
146:14, 148:2, 150:20,
161:8
**exhibits [9]** 10:14,
10:14, 11:20, 12:4,
12:24, 13:18, 37:25,
63:15, 148:13
**experience [5]** 27:24,
36:11, 78:13, 151:5,
153:12
**experiencing [7]** 76:17,

---

**EV [4]** 87:3, 113:7,
113:12, 116:1
**expert [11]** 3:21, 9:7,
9:24, 13:22, 32:19,
75:10, 76:10, 78:19,
78:21, 78:24, 79:15
**expert's** 116:25
**expertise [4]** 100:20,
100:23, 160:21, 160:25
**Expires [2]** 162:17,
162:18
**explain [2]** 95:25,
95:25
**extensive** 71:7
**extent [2]** 84:2, 123:6
**extremely** 20:1
**extremities [9]** 81:8,
86:21, 93:24, 104:10,
114:20, 121:2, 124:23,
132:4, 157:3
**extremity [10]** 3:16,
9:12, 22:6, 22:18,
38:2, 59:2, 70:3,
146:2, 146:23, 147:4

---

## F

**face [2]** 158:4, 158:4
**facilities [2]** 135:16,
135:23
**facility [3]** 84:21,
85:9, 109:6
**factor [6]** 15:3, 20:10,
20:10, 48:19, 53:22,
103:13
**factors [6]** 15:25,
28:4, 53:16, 53:17,
53:24, 84:1
**facts** 123:22
**failed [4]** 89:22,
89:24, 89:25, 143:7
**failing [9]** 27:20,
98:24, 101:21, 113:9,
123:3, 123:12, 125:2,
126:3, 133:14
**failure [2]** 80:21,
102:6
**fainting [2]** 16:18,
16:23
**fair [37]** 8:10, 9:19,
26:20, 29:18, 30:13,
31:16, 37:21, 43:24,
48:18, 64:5, 64:6,
77:5, 79:8, 86:22,
88:9, 89:15, 90:22,
90:23, 92:1, 94:14,
97:4, 97:5, 97:9,
97:9, 99:2, 99:3,
103:20, 103:22, 112:5,
112:7, 112:20, 112:21,
114:6, 137:8, 151:17,
153:15, 160:24
**fairly [2]** 17:23, 20:14
**Family** 84:24
**fashioned** 101:11
**fast [3]** 16:16, 101:11,
151:12
**faxed** 43:17
**federal [2]** 1:17,
141:15
**feel [28]** 23:18, 25:16,
25:12, 25:13, 25:20,
27:13, 28:3, 28:7,
47:22, 47:22, 47:24,
48:3, 49:22, 55:25,
56:7, 57:25, 58:1,
70:23, 71:6, 77:17,
97:23, 109:16, 117:12,
118:10, 120:2, 133:6,
133:9, 133:10
**feeling [3]** 119:15,
134:17, 151:6
**feels** 97:22
**felt [7]** 35:24, 70:4,
70:17, 71:2, 100:16,
119:11, 120:7
**femoral [23]** 22:9,
23:9, 23:10, 24:1,
26:10, 57:6, 59:5,
70:12, 71:10, 71:15,
80:5, 80:17, 80:18,
82:9, 105:11, 105:13,

107:1, 107:4, 154:8, 159:2, 159:6, 159:14

**fib [3]** 15:25, 85:17, 85:19

**fibrillation [5]** 14:7, 18:19, 85:22, 85:25, 102:6

**fifteen** 136:11

**Fifty** 135:11

**figure [3]** 38:15, 109:7, 147:20

**file [2]** 141:22, 142:2

**filed [2]** 141:15, 142:5

**filling [3]** 144:8, 149:3, 149:19

**Finally** 18:3

**finding [3]** 100:22, 101:2, 143:5

**findings** 112:24

**fine [9]** 11:23, 55:25, 64:18, 66:18, 91:9, 91:9, 94:1, 105:25, 150:14

**finger** 47:23

**fingers** 70:14

**finish [2]** 31:25, 51:19

**fits** 57:2

**fits-all** 56:25

**five [17]** 4:11, 5:10, 20:8, 20:19, 42:21, 51:5, 59:19, 81:10, 85:19, 103:6, 130:4, 137:20, 139:14, 139:25, 140:1, 140:2, 140:20

**fixed** 70:13

**flat** 75:21

**floor** 31:21

**floor [22]** 22:12, 27:12, 57:17, 64:22, 64:14, 65:24, 70:13, 71:7, 72:1, 76:23, 79:16, 80:17, 84:5, 86:13, 104:17, 104:19, 105:4, 105:23, 107:19, 121:1, 121:24, 128:18

**fluctuates** 19:16

**focus [3]** 37:17, 55:8, 120:23

**focusing** 133:23

**follow [5]** 9:4, 31:11, 36:9, 72:22, 112:11

**follow-up [7]** 29:3, 30:24, 32:4, 32:4, 62:12, 145:18, 145:18

**followed** 100:25

**follows** 4:2

**fool** 151:15

**foot [59]** 3:14, 8:9, 8:20, 14:10, 17:11, 18:10, 18:10, 18:11, 18:13, 21:9, 21:25, 25:20, 39:1, 39:2, 39:3, 39:6, 39:8, 42:11, 48:2, 48:13, 55:8, 55:10, 55:19, 58:3, 58:19, 60:3, 60:18, 60:24, 61:3, 61:5, 61:8, 62:18, 70:10, 71:3, 71:9, 72:14, 74:21, 75:3, 75:6, 75:15, 96:14, 111:5, 124:18, 125:8, 125:14, 125:16, 126:14, 132:9, 133:8, 143:19, 145:11, 146:12, 148:21, 148:22, 154:12, 155:10, 159:4, 159:5

**footwear** 145:17

**foregoing [2]** 162:5, 162:7

**forgot** 128:23

**formation** 20:11

**formed [2]** 95:10, 151:1

**forming [14]** 7:16, 9:1, 12:17, 13:15, 51:7, 51:14, 82:23, 83:10, 88:3, 89:12, 90:15, 95:1, 97:4, 131:24

**forms** 57:21

**fore** 23:21

**fortunately** 53:21

**fourth [2]** 2:15, 144:22

**fracture** 25:8, 25:11, 70:10

**frame** 60:21

**free [3]** 101:5, 101:14, 142:23

**frequency [2]** 147:8, 147:18

**Friday [4]** 43:12, 43:22, 45:21, 134:20

**full [3]** 36:3, 94:11, 99:15

**function** 147:4

**functioning** 64:17

**fungal [6]** 14:11, 17:8, 17:9, 40:4, 60:18, 125:7

**fungus [12]** 28:21, 29:9, 59:25, 60:14, 74:19, 75:24, 129:6, 129:8, 129:11, 129:14, 129:15, 129:25

### G

**gangrene [6]** 77:22, 77:25, 80:3, 103:17, 104:23, 107:6

**garden** 138:17

**garnish [3]** 140:4, 140:18, 141:10

**gastrointestinal** 19:5

**gave [9]** 35:1, 85:11, 88:13, 93:14, 122:1, 131:6, 132:18, 132:19, 141:8

**gears** 20:24

**gel** 58:19

**general [2]** 4:14, 51:2

**generally [3]** 15:12, 23:1, 129:16

**gets** 101:14

**given [10]** 58:18, 84:4, 97:20, 100:13, 113:16, 135:24, 136:9, 142:1, 143:15, 162:9

**gives [6]** 15:6, 59:3, 59:5, 87:4, 150:6, 152:25

**giving [7]** 28:24, 29:1, 33:25, 76:12, 103:20, 119:12, 120:3

**Glad** 104:14

**glance** 160:8

**glanced** 113:4

**goes [5]** 85:9, 105:13, 117:20, 117:21, 117:24

**Goldhagen** 93:1

**gone [6]** 56:22, 75:2, 81:10, 81:12, 106:20, 158:18

**gosh [2]** 68:24, 135:2

**gotten [3]** 142:11, 158:12, 158:23

**grab** 94:8

**grade** 153:1

**grandfathered** 135:7

**greater [6]** 19:13, 27:12, 36:25, 150:13, 153:2, 154:13

**greens** 19:19

**groin [12]** 40:23, 41:9, 69:16, 69:20, 70:19, 70:21, 97:15, 98:8, 98:25, 99:6, 105:9, 105:14

**grossly** 142:16

**group [2]** 19:6, 54:6

**growing** 49:15

**guess [2]** 121:9, 139:18

**guide [2]** 144:5, 149:1

**guidelines** 55:13

**guy's** 120:8

### H

**H-Y-T-R-I-N** 16:10

**hair [8]** 49:6, 49:13, 49:14, 49:18, 49:18,

**half [3]** 19:15, 19:21, 112:19

**handed [7]** 8:8, 9:11, 10:12, 34:5, 34:9, 73:17, 74:4

**handwrite [6]** 36:6, 37:20, 39:4, 39:11, 39:15, 40:21

**handwriting [11]** 38:5, 44:11, 44:14, 45:8, 46:2, 46:5, 46:11, 46:11, 50:4, 50:22, 131:25

**handwritten [17]** 33:7, 35:15, 36:7, 36:8, 40:13, 40:18, 41:6, 41:15, 41:16, 42:1, 42:7, 42:8, 42:14, 45:12, 50:9, 127:24, 129:5

**handwrote [5]** 33:14, 34:23, 40:13, 41:5, 45:16

**hang [2]** 12:12, 12:14

**Hansen** 120:11

**happen [5]** 17:9, 21:8, 33:10, 112:10, 154:17

**happened [2]** 79:25, 90:7

**happy [2]** 4:18, 86:25

**hardening** 83:22

**hasn't** 147:24

**haven't [2]** 89:12, 108:7

**having [18]** 4:2, 15:21, 16:1, 18:9, 19:2, 19:5, 29:6, 41:24, 68:11, 81:11, 104:2, 114:19, 114:22, 124:22, 128:13, 128:15, 152:16, 152:20

**he'd [2]** 84:23, 102:11

**he's [22]** 35:8, 53:19, 65:21, 65:22, 66:1, 78:10, 84:16, 87:5, 87:6, 97:19, 108:11, 115:15, 120:9, 125:11, 125:12, 130:1, 131:14, 131:14, 131:18, 132:10, 136:20, 151:22

**heal [3]** 17:19, 27:7, 29:5

**healing [3]** 31:12, 125:17, 158:25

**health [5]** 3:19, 12:20, 13:4, 92:14, 136:13

**healthy** 23:1

**hear [7]** 22:11, 57:7, 57:15, 57:24, 58:4, 58:20, 63:16

**heard** 136:19

**hearing** 162:9

**heart [4]** 15:4, 16:2, 19:18, 102:6

**heartbeat [2]** 14:7, 58:4

**helped [2]** 10:2, 17:25

**helpful [9]** 8:6, 33:19, 33:21, 36:1, 87:8, 144:6, 149:2, 151:24, 160:9

**helps [2]** 66:2, 122:13

**hemorrhage** 20:2

**Henderson [9]** 40:22, 97:14, 98:7, 98:23, 127:19, 130:12, 130:13, 130:16, 157:1

**Henderson's [6]** 38:12, 38:13, 88:17, 89:10, 126:21, 127:4

**heparin** 20:19

**hereby** 162:4

**hernia** 105:15

**hey [2]** 108:6, 108:14

**higher [2]** 104:17, 147:10

**himself** 85:13

**hindsight** 156:14

**hip [2]** 70:10, 70:13

**history [3]** 115:13, 144:24, 147:13

**hell [10]** 24:22, 24:24, 25:17, 25:22, 82:19, 85:2, 100:11, 100:24, 105:16, 107:21, 115:19, 119:4, 129:21, 148:24

**hold [10]** 15:23, 17:4, 18:17, 20:21, 21:2, 28:15, 32:9, 44:7, 53:14, 77:11

**holding [2]** 7:22, 7:25

**homes** 27:6

**honest** 160:23

**hospice [3]** 135:14, 135:25, 136:4

**hospital [25]** 6:8, 18:11, 28:1, 28:3, 41:18, 41:20, 52:8, 58:1, 58:7, 58:10, 58:12, 58:14, 67:12, 67:16, 67:17, 72:6, 103:15, 133:16, 135:19, 135:20, 137:10, 137:17, 137:21, 155:18, 156:3

**hospitalist [3]** 6:8, 6:17, 7:1

**hour [4]** 35:9, 135:25, 136:25, 137:1

**hours [5]** 20:12, 20:21, 20:21, 69:3, 69:6

**however [5]** 51:4, 84:7, 102:16, 144:4, 148:25

**hundred [2]** 82:4, 82:9, 87:4

**hurry** 108:25

**hydroxide** 60:12

**hyperbaric** 31:14

**hyphae** 60:14

**hypoglycemic** 66:11

**Hytrin** 16:10

### I

**i.e** 144:9

**ICD-10** 53:7

**idea [12]** 29:19, 29:21, 59:5, 61:6, 80:23, 84:4, 87:2, 158:23

**identification [9]** 6:1, 8:24, 9:17, 13:2, 13:13, 34:3, 73:16, 110:1, 113:22

**identify** 26:7

**IDT** 136:1

**iliac [5]** 82:9, 82:17, 82:20, 105:13, 159:2

**illness [2]** 6:25, 138:20

**image** 74:23

**imaging [2]** 79:17, 86:21

**immediate** 72:3

**immediately [4]** 41:17, 41:21, 68:25, 103:14

**impaired** 147:5

**importantly** 5:3

**impression [2]** 138:14, 153:4

**improve** 65:17

**improved [4]** 84:5, 108:7, 109:4, 132:22

**improves** 65:23

**improving** 112:15

**inaccurate [4]** 95:21, 96:1, 111:23, 111:25

**include [8]** 8:17, 17:21, 38:1, 52:22, 64:7, 89:20, 144:7, 149:19

**included [3]** 10:20, 126:22, 130:22

**includes [2]** 10:23, 153:24

**including** 46:1

**income** 141:15

**incomplete [2]** 22:17, 30:5

**increased** 17:10

**index [22]** 15:7, 15:10, 27:5, 27:10, 36:25, 58:24, 59:3, 144:1,

4:19, 145:1, 145:9, 147:7, 147:17, 150:7, 151:24, 152:11, 152:21, 152:25, 153:1, 156:7, 158:24, 159:6

**indexes [2]** 154:24, 155:9

**indicate [2]** 64:4, 121:23

**indicated** 80:9

**indicates [2]** 118:25, 121:25

**indicating [4]** 43:4, 88:10, 90:16, 94:16

**indicator** 22:12

**individual [3]** 23:1, 144:6, 149:2

**individuals [2]** 51:17, 51:22

**infarctions** 66:5

**infected [5]** 17:25, 31:13, 112:10

**infection [11]** 14:12, 17:8, 17:19, 19:20, 19:24, 19:25, 19:25, 60:18, 99:13, 125:7, 128:17

**infections** 17:9

**infectious** 156:10

**inflammation** 75:12

**inflammatory [2]** 75:15, 133:8

**inform** 85:9

**information [7]** 18:15, 25:8, 30:7, 55:4, 63:6, 95:6, 97:11

**inguinal** 22:9

**inhibitor [2]** 20:10, 66:1

**initial** 41:16

**initially [3]** 22:23, 41:20, 69:8

**injury [2]** 17:14, 29:3

**INR [6]** 19:13, 19:21, 39:16, 85:10, 119:3, 119:7

**inspection [2]** 55:10, 155:11

**inspections** 55:8

**instance [2]** 58:1, 96:14

**instead [4]** 48:1, 49:1, 118:14, 120:15

**insufficiency** 52:15

**interaction [2]** 18:25, 84:11

**interested [2]** 110:5, 162:12

**interesting** 28:6

**internal [16]** 6:9, 6:16, 6:20, 21:21, 24:6, 24:18, 24:22, 24:22, 26:11, 36:11, 56:4, 78:21, 115:3, 136:22, 153:13, 155:7

**internist** 34:11

**internists** 27:24

**internship** 153:23

**interpret [3]** 36:18, 37:10, 67:18

**interrupt [2]** 6:15, 152:2

**interrupted** 156:20

**intervention [2]** 78:1, 78:7

**involved [2]** 71:11, 105:24

**irregular** 14:7

**irritant [2]** 17:11, 28:24

**IRS [8]** 140:4, 140:9, 140:10, 140:23, 140:25, 141:3, 141:10, 141:22

**ischemia [8]** 78:16, 107:7, 125:20, 128:13, 128:16, 128:25, 129:1, 147:12

**ischemic [5]** 15:22, 42:10, 63:25, 104:24, 132:9

**isn't** 153:14

*issue [4]* 64:5, 116:2,
116:24, 123:8
*issues [17]* 8:3, 16:1,
16:2, 22:16, 53:21,
71:20, 78:20, 78:21,
78:25, 80:3, 80:7,
83:15, 121:1, 121:24,
124:22, 132:4, 143:5

## J

*Jail [2]* 7:9, 7:9
*jails* 136:14
*James [2]* 92:8, 92:8
*January [3]* 6:7,
139:18, 139:19
*Jason [5]* 2:12, 4:4,
35:7, 123:23, 142:14
*Jason.cheek@usdo* 2:17
*Jefferson* 7:8
*Jerry [4]* 1:15, 3:21,
34:10, 35:16
*Jimmy [4]* 1:5, 14:5,
35:19, 37:24
*Joint* 92:23
*journal [2]* 26:8, 26:24
*judging* 116:19
*July [10]* 6:10, 89:20,
89:21, 89:25, 90:4,
90:6, 90:7, 90:8,
131:8, 131:10
*June [8]* 1:21, 101:21,
101:22, 118:19,
118:25, 121:15, 122:5,
157:12

## K

*Karen [5]* 1:18, 121:13,
162:4, 162:14, 162:15
*Keflex* 132:19
*Kenneth* 93:7
*kills* 129:15
*kin* 162:11
*kindly* 88:4
*knee [14]* 22:7, 41:9,
59:1, 59:6, 71:2,
71:16, 104:16, 104:11,
104:20, 105:1, 105:2,
105:4, 105:8, 105:9
*knocks* 47:23
*knowing [4]* 69:1,
152:22, 152:24, 160:10
*knowledge [6]* 35:3,
37:8, 68:5, 77:1,
82:11, 132:23
*known [2]* 118:4, 159:8
*knows* 115:11

## L

*lab* 90:21
*laboratory* 119:7
*lack [11]* 14:23, 29:2,
30:23, 32:4, 47:2,
47:11, 49:5, 54:4,
71:7, 128:18, 144:3
*lacked* 47:7
*Lamisil* 60:2
*language [3]* 36:7,
41:5, 150:24
*larger* 87:3
*later* 107:6
*lateral* 48:2
*Laughs* 129:23
*law [2]* 2:5, 115:6
*lead* 16:17
*leading* 133:17
*least [9]* 46:2, 48:15,
57:5, 63:11, 67:2,
73:1, 102:19, 109:5,
135:12
*leave* 142:15
*leaving* 6:23
*leg [17]* 18:12, 39:24,
40:23, 47:3, 58:25,
61:4, 70:11, 71:8,
102:5, 112:9, 112:20,
117:9, 122:9, 122:9,
144:9, 149:4, 149:20
*legal* 35:25

*legs [9]* 39:18, 46:10,
46:14, 50:8, 83:23,
86:7, 86:11, 86:13,
86:15, 97:15, 98:8,
99:6, 101:15, 101:16,
107:19, 108:16,
119:12, 120:3, 121:22,
159:12
*length* 151:21
*lesion [2]* 112:9,
112:14
*lesions [7]* 14:10,
60:24, 61:3, 64:24,
124:19, 125:6, 131:23
*less [12]* 15:25, 27:10,
41:13, 66:14, 66:17,
73:5, 83:6, 104:25,
144:4, 148:25, 150:12,
153:2
*let's [14]* 32:13,
37:19, 42:19, 46:10,
53:8, 73:22, 89:6,
108:4, 116:8, 118:18,
120:23, 134:8, 154:18,
158:12
*letters* 52:25
*level* 158:8
*levy* 140:4
*Lexapro* 5:10
*Li-ka* 149:21
*liability [4]* 138:25,
139:6, 142:10, 142:21
*license* 138:1
*lifelong* 53:21
*lightheaded* 17:1
*liked [3]* 86:20, 93:19,
93:24
*likely [5]* 49:15, 82:6,
86:14, 86:18, 107:10
*limb [12]* 15:14, 15:22,
70:14, 82:10, 104:25,
106:9, 106:11, 106:13,
112:24, 113:7, 144:8,
149:20
*limb-threatening*
147:12
*limbs [4]* 81:25, 82:3,
82:7, 106:6
*lipid-lowering* 53:19
*Lipitor* 65:21
*Lisinopril* 66:1
*listed* 94:23
*listen [5]* 22:10, 57:6,
57:11, 57:14, 58:3
*listening* 57:14
*listing [2]* 13:21,
13:23
*lived [2]* 77:1, 77:2
*liver* 20:7
*load* 80:21
*location* 63:24
*locations* 63:22
*longer [2]* 42:2, 42:7
*longhand* 32:22
*looking [20]* 8:2,
15:14, 16:19, 18:9,
29:16, 29:16, 38:15,
43:12, 46:19, 51:3,
51:8, 55:5, 80:14,
102:3, 111:11, 121:11,
127:2, 143:17, 143:18,
158:14
*looks [6]* 8:12, 72:8,
119:23, 125:11,
125:13, 156:4
*lose* 85:5
*loss [6]* 15:4, 15:22,
16:17, 76:23, 105:1,
113:7
*lost [4]* 50:8, 101:15,
101:16, 106:5
*loud [2]* 58:21, 70:12
*Louisiana* 141:4
*low [3]* 66:11, 102:6,
122:3
*lower [21]* 3:15, 9:12,
22:5, 22:18, 38:2,
70:3, 70:21, 81:8,
86:21, 93:24, 114:20,
124:23, 132:4, 144:8,
145:15, 146:2, 146:23,
147:4, 149:4, 149:20,

*lump* 139:10
*lunch* 31:18
*Lunesta* 5:9

## M

*machine [5]* 31:20,
31:24, 57:20, 57:24,
59:10
*macrovascular* 71:14
*magnesium* 122:10
*main* 64:19
*maintain* 18:20
*maintenance* 135:5
*major [6]* 15:3, 15:18,
82:8, 105:11, 105:12,
107:3
*majority* 137:8
*makes [3]* 25:10,
121:20, 152:7
*manage [4]* 18:4, 69:1,
84:8, 148:15
*management [3]* 66:6,
144:5, 149:2
*Manor* 135:14
*March [54]* 14:4, 38:3,
38:9, 39:5, 43:12,
43:22, 45:20, 47:14,
53:12, 60:21, 64:3,
69:15, 71:1, 72:22,
73:14, 76:17, 77:9,
79:24, 80:2, 81:6,
81:17, 83:15, 86:6,
86:16, 87:11, 88:7,
90:21, 92:2, 93:16,
95:10, 100:3, 106:19,
107:12, 107:25, 110:3,
110:18, 119:2, 123:16,
129:8, 133:17, 133:20,
133:22, 134:10,
142:25, 143:10, 145:3,
145:21, 150:21,
150:25, 154:22,
154:23, 157:8, 160:17,
161:19
*mark [12]* 5:23, 8:16,
8:20, 9:13, 11:1,
12:1, 12:22, 13:3,
13:11, 33:25, 73:12,
113:19
*marked [12]* 3:8, 3:11,
5:25, 8:23, 9:16,
13:1, 13:12, 34:3,
73:16, 109:24, 109:25,
113:21
*markedly [2]* 107:18,
132:21
*Marlowe [65]* 1:5, 14:5,
16:22, 26:19, 26:25,
35:20, 37:24, 38:8,
39:15, 40:22, 41:17,
47:6, 47:13, 50:7,
53:11, 56:15, 60:7,
60:17, 67:7, 74:21,
76:16, 79:1, 79:21,
79:23, 81:7, 89:22,
94:5, 97:13, 98:6,
100:9, 103:15, 104:3,
107:24, 112:13,
113:10, 114:19, 115:1,
115:17, 115:20, 116:8,
118:18, 119:2, 120:14,
122:6, 122:17, 122:23,
123:3, 123:17, 124:18,
124:21, 125:3, 127:19,
129:7, 131:20, 132:3,
132:23, 133:17,
133:19, 143:1, 145:3,
154:22, 157:8, 158:7,
158:14, 158:15
*Marlowe's [29]* 10:15,
30:15, 30:24, 38:2,
39:6, 40:23, 69:16,
72:17, 73:13, 77:22,
78:16, 81:25, 82:3,
83:15, 86:7, 93:23,
94:2, 97:14, 98:8,
98:24, 99:6, 99:20,
104:10, 110:17, 114:7,
119:1, 121:2, 123:9,
161:5

*Lenovo...* 161:19
*materials [3]* 7:15,
10:1, 50:24
*matter [8]* 20:3, 35:20,
37:24, 96:8, 97:12,
97:15, 98:5, 103:6
*matters [2]* 20:5, 63:17
*maximum* 105:17
*maybe [4]* 17:3, 29:20,
130:15, 155:12
*McLane [20]* 1:15, 3:21,
10:11, 12:16, 13:21,
21:13, 25:1, 32:14,
32:18, 33:3, 34:10,
35:13, 35:15, 35:17,
56:3, 69:14, 73:18,
82:24, 153:14, 153:3
*MD* 110:6
*means [4]* 63:24, 116:1,
116:2, 145:24
*meant* 49:9
*measure* 144:7
*measurement [4]* 144:9,
149:5, 149:19, 150:2
*measurements* 149:21
*medial* 48:2
*medical [65]* 3:20,
3:23, 6:8, 8:1, 8:3,
8:4, 8:5, 10:5, 10:19,
12:17, 13:8, 26:4,
38:8, 41:13, 51:1,
51:2, 51:11, 55:9,
55:14, 66:6, 72:3,
72:3, 76:21, 77:25,
78:6, 88:2, 88:6,
88:7, 88:20, 88:23,
88:24, 89:3, 89:11,
89:16, 91:14, 91:20,
92:18, 101:18, 101:10,
102:1, 102:2, 108:19,
109:6, 110:2, 110:3,
110:17, 110:19,
111:14, 111:18,
111:20, 112:2, 112:4,
112:12, 112:18,
135:21, 138:1, 138:8,
138:9, 153:22, 154:1,
154:25, 156:8, 156:25,
156:8, 160:11
*Medicare [3]* 55:7,
55:13, 102:23
*medication [13]* 16:9,
16:22, 16:24, 17:3,
18:24, 65:19, 66:3,
84:11, 84:14, 85:4,
85:12, 86:1, 108:7
*medications [8]* 5:6,
16:9, 16:19, 18:23,
19:1, 20:4, 20:6, 66:9
*medicine [17]* 6:9,
6:16, 6:20, 16:11,
21:21, 24:6, 24:7,
24:22, 26:11, 36:12,
56:4, 65:22, 78:21,
115:3, 136:22, 153:13,
155:7
*medicines* 16:4
*meet* 140:25
*meeting* 136:1
*mention [2]* 6:19, 22:7
*mentioned [10]* 17:22,
24:14, 26:13, 29:8,
30:13, 30:23, 40:10,
52:1, 110:20, 138:5
*mentions* 125:5
*met [3]* 86:8, 86:16,
130:13
*MI [3]* 53:23, 53:25,
53:25
*microangiopathic* 71:16
*microscope* 60:13
*mid* 116:9
*middle* 48:1
*mild [2]* 15:16, 15:17
*milligrams [3]* 5:9,
5:10, 16:10
*mind [2]* 11:1, 125:22
*mine [2]* 45:9, 75:22
*minimum [3]* 47:19,
72:11, 144:12
*minus* 145:15
*minute [3]* 130:10,

*Lenovo...* 130:10, 146:5
*minutes [3]* 80:22,
130:5, 130:11
*miss* 20:13
*missed [2]* 90:9, 107:22
*misspelled* 45:4
*misspelling* 33:22
*mistake* 131:7
*misunderstand* 84:9
*mixed* 141:21
*mmm [13]* 4:21, 11:21,
25:17, 25:22, 82:19,
85:2, 100:11, 100:24,
105:16, 107:21, 119:4,
129:21, 148:24
*moisture* 17:10
*moment [6]* 6:2, 34:4,
66:18, 113:24
*Monday* 134:21
*money [3]* 11:18, 142:8,
142:17
*monitor* 62:22
*monitored [2]* 55:7,
68:4
*monitoring* 54:4
*monofilament [2]* 22:15,
55:12
*month [11]* 62:23, 76:8,
76:9, 127:25, 129:5,
129:10, 135:25, 137:1,
139:12, 139:22, 140:18
*month's* 140:3
*monthly* 136:17
*months [17]* 68:12,
68:12, 80:3, 97:23,
97:25, 97:25, 105:22,
106:12, 107:6, 119:1,
120:18, 138:12,
138:13, 139:14, 140:2,
145:19, 147:25
*morbidity [2]* 136:18,
136:20
*morning [2]* 27:1, 43:22
*mortality [2]* 136:18,
136:20
*move [2]* 14:25, 126:21
*moved* 138:17
*multiple [6]* 53:16,
103:3, 116:9, 116:10,
158:3, 158:6
*muscle [9]* 16:12,
16:13, 16:14, 39:25,
102:7, 120:2, 122:3,
122:12, 123:15
*musculoskeletal* 122:14
*myocardial* 66:5
*myself* 152:21

## N

*nail [2]* 60:12, 60:13
*nails [4]* 60:8, 60:10,
60:11, 129:16
*Nancy* 120:11
*Naphcare [3]* 135:14,
136:12, 136:17
*necessarily [7]* 55:20,
63:25, 95:2, 123:15,
153:14, 153:19, 155:4
*necessary* 107:13
*neck* 57:12
*necrosis* 125:19
*needed [6]* 7:10, 18:16,
87:8, 93:17, 106:25,
112:11
*needs [2]* 103:10,
152:15
*neither [4]* 40:22,
97:13, 98:6, 162:10
*nerve* 120:2
*nervous [2]* 22:16,
122:12
*neuromuscular* 120:4
*neuropathy [2]* 14:9,
55:7
*nevertheless* 129:21
*newer* 18:24
*nighttime [2]* 122:9,
122:13
*nineteen-page* 9:18
*ninety [2]* 105:20,
159:7

**nocturnal [6]** 5:19,
102:5, 102:7, 117:9,
122:3, 122:8
**nodded** 33:5
**noise [2]** 22:11, 58:4
**noises** 57:15
**non-diabetic** 54:12
**non-immediate** 72:3
**non-issue** 53:22
**non-VA** 84:21
**None** 3:9
**nonetheless** 147:4
**noninvasive [7]** 15:6,
15:20, 80:8, 80:10,
80:12, 134:16, 159:16
**nonoperative** 80:13
**nonsmoker [2]** 53:21,
159:12
**nor [4]** 40:22, 98:7,
162:11, 162:11
**Norco** 122:1
**normal [6]** 23:13,
65:19, 111:15, 112:3,
150:5, 160:19
**normally [2]** 17:8,
49:18
**North [2]** 1:20, 2:15
**NORTHERN** 1:2
**Notary** 162:18
**notation [4]** 111:11,
114:16, 129:4, 129:10
**notations** 119:13
**note [64]** 3:24, 8:7,
38:12, 38:13, 38:18,
38:20, 88:14, 88:17,
90:8, 90:12, 92:2,
92:10, 93:9, 101:11,
111:21, 111:23, 112:1,
112:13, 113:15,
113:25, 114:18,
117:19, 117:20,
117:21, 117:22,
117:24, 118:5, 118:9,
118:19, 118:19,
118:21, 118:25, 119:5,
119:6, 119:7, 119:8,
119:21, 120:23,
120:24, 120:25, 121:8,
121:8, 121:9, 121:10,
121:20, 122:17,
122:22, 123:1, 123:5,
124:15, 124:17,
124:24, 126:22, 127:4,
127:6, 127:7, 127:23,
128:20, 130:22, 131:8,
131:10, 131:24, 132:2,
147:10
**noted** 115:20
**notes [7]** 3:19, 13:11,
92:18, 110:6, 111:19,
112:8, 119:10
**nothing [3]** 107:16,
123:5, 145:24
**notice** 106:7
**noticed [2]** 40:15, 45:3
**noting** 154:11
**November [2]** 38:9, 88:8
**numbered** 94:13
**numbers [2]** 36:21,
150:15
**nurse [3]** 23:17,
119:10, 120:11
**nurses** 108:12
**nursing [6]** 27:6, 27:8,
27:9, 135:14, 136:8,
154:25
**nutrition** 66:8

**O**

**O2** 119:23
**object [5]** 98:9, 115:2,
123:19, 124:3, 156:17
**objection [2]** 91:7,
116:23
**objective** 112:24
**obligated** 154:12
**obligation [4]** 108:5,
109:5, 123:18, 133:2
**observed** 40:10
**obtaining** 26:18
**obviously [4]** 73:25,

**Occasionally** 136:5
**occluded** 22:13
**occlusion [2]** 59:6,
59:7
**occlusive [2]** 42:5,
104:4
**occure** 77:16
**October [3]** 104:12,
106:11, 107:13
**Off-record [4]** 13:20,
130:20, 132:16, 160:13
**offer [2]** 139:3, 139:7
**offered** 3:9
**offers** 7:4
**offhand** 141:5
**office [18]** 1:20, 3:19,
3:24, 15:12, 26:11,
35:4, 35:14, 38:12,
38:13, 38:18, 50:23,
94:20, 102:4, 108:25,
137:11, 137:13,
137:17, 155:1
**officer** 140:25
**Offices** 2:5
**offset** 20:15
**oftentimes** 54:4
**oil** 28:22
**older [3]** 14:24, 66:10,
151:21
**one-size** 56:24
**ones [7]** 15:13, 73:18,
74:6, 74:10, 105:5,
105:8, 105:9
**onset [2]** 20:15, 71:12
**open [4]** 17:17, 80:12,
109:17, 132:13
**opened [3]** 31:6, 80:5,
105:22
**opening [2]** 17:23,
105:7
**opine** 86:22
**opined** 72:24
**opining [5]** 64:22,
98:22, 127:15, 127:18,
128:22
**opinion [117]** 9:7,
9:24, 13:25, 14:3,
17:6, 18:5, 18:18,
21:20, 27:17, 27:19,
28:18, 28:18, 29:11,
29:25, 30:8, 36:4,
36:8, 39:12, 40:14,
40:18, 47:18, 48:14,
48:19, 48:21, 50:22,
50:25, 51:11, 51:24,
53:11, 53:14, 60:6,
60:17, 61:2, 61:16,
63:18, 64:4, 65:1,
66:24, 70:16, 72:16,
72:21, 75:8, 75:10,
76:12, 76:16, 77:6,
77:11, 77:13, 78:9,
78:10, 78:17, 79:6,
79:10, 79:12, 79:15,
81:5, 81:15, 81:22,
82:5, 82:13, 82:24,
83:10, 83:14, 85:21,
85:24, 86:7, 86:9,
86:17, 88:21, 88:25,
89:4, 90:15, 93:15,
94:10, 95:3, 95:13,
95:18, 95:22, 96:21,
103:13, 106:13,
107:10, 109:2, 109:12,
109:15, 111:22,
114:24, 117:1, 117:6,
119:21, 122:5, 122:15,
122:16, 122:22, 123:1,
123:10, 123:11, 125:1,
123:8, 128:14, 128:19,
129:2, 130:6, 131:25,
133:1, 133:13, 133:25,
134:1, 150:23, 157:19,
161:10, 161:13,
161:15, 161:18
**opinions [39]** 7:16,
9:1, 9:4, 10:3, 10:7,
12:18, 13:15, 13:22,
14:1, 15:23, 17:5,
18:17, 20:25, 21:2,

**peeding** [16] 29:22,
32:10, 34:23, 37:14,
44:5, 51:7, 51:14,
88:3, 89:13, 93:13,
95:1, 95:11, 96:2,
97:4, 97:16, 97:19,
98:6, 99:25, 100:13,
103:19, 113:16,
116:11, 153:11
**opportunity [9]** 43:23,
71:8, 86:10, 91:19,
98:1, 107:15, 107:23,
157:8, 157:10
**opposed** 116:16
**opted [2]** 119:15,
120:14
**optimize** 85:14
**oral** 132:20
**order [4]** 69:3, 93:22,
116:6, 116:7
**ordered [6]** 93:21,
107:11, 115:16,
116:13, 116:16, 117:4
**ordering** 61:17
**orders [5]** 90:25, 91:4,
91:6, 91:11, 91:13
**organized [2]** 131:15,
131:18
**original [6]** 8:18,
11:5, 11:11, 33:22,
120:18, 143:20
**originally** 35:9
**orthostatic [2]** 118:22,
119:25
**otherwise [3]** 19:21,
30:11, 136:2
**outcome** 156:12
**outpatient** 72:5
**outside [3]** 85:9,
85:10, 133:19
**outstanding [2]** 138:24,
142:9
**overestimate** 142:16
**overview [5]** 3:15,
9:12, 146:2, 146:9,
146:23
**overweight** 159:14
**owe** 139:5
**owed** 140:20
**oxygen** 31:14

**P**

**P-E-D-A-L** 23:6
**p.m [7]** 1:22, 13:20,
32:16, 69:12, 89:7,
160:14, 161:24
**PA** 23:18
**PAD [20]** 52:3, 52:4,
52:6, 52:17, 53:4,
53:7, 53:9, 53:11,
134:7, 143:10, 145:15,
145:25, 147:3, 147:7,
147:11, 147:16,
148:15, 150:17,
154:20, 157:18
**pages [4]** 89:16, 91:5,
91:6, 91:14
**paid [6]** 139:8, 139:12,
140:2, 140:3, 140:14,
142:21
**pain [14]** 15:1, 46:14,
54:5, 76:25, 93:4,
99:12, 102:7, 122:1,
122:3, 124:18, 128:17,
128:18, 132:7, 147:4
**painful [6]** 127:25,
128:5, 128:20, 129:2,
129:5, 131:21
**palpable** 75:17
**palpated** 22:10
**par** 158:10
**paragraph [7]** 36:3,
37:20, 38:23, 87:24,
94:12, 144:11, 144:13
**part-time** 7:8
**particular [2]** 31:11,
111:11
**particularly [2]**
147:11, 153:6
**parties** 162:11
**pass [2]** 101:5, 101:14

**pedal/posterior** 111:2
**pedis [13]** 59:23,
59:24, 60:1, 60:7,
60:10, 60:11, 60:15,
61:1, 104:6, 128:5,
128:7, 129:16, 129:22
**people's** 28:2
**per** 35:8
**percent [10]** 82:4,
82:10, 87:4, 105:20,
105:21, 119:24, 153:2,
153:3, 159:7, 159:7
**percentage** 135:22
**perfectly** 31:25
**performed [7]** 41:25,
47:21, 59:12, 81:17,
104:2, 145:1, 161:19
**perfusion [6]** 49:10,
64:4, 114:20, 114:22,
124:22, 132:4
**perhaps [2]** 53:2,
157:11
**peripheral [63]** 3:16,
9:12, 14:5, 14:9,
14:14, 14:17, 14:19,
15:3, 16:14, 21:7,
49:3, 49:16, 51:4,
52:1, 52:9, 52:12,
52:13, 52:16, 52:21,
52:22, 52:23, 53:15,
54:1, 54:11, 55:7,
61:24, 62:20, 65:17,
65:20, 65:24, 75:7,
75:10, 75:14, 115:12,
115:13, 117:22,
121:21, 124:25, 130:1,
143:1, 143:22, 144:1,
144:14, 144:23, 145:2,
145:4, 145:15, 145:20,
145:25, 146:2, 146:9,
146:23, 148:6, 148:17,
148:22, 149:10, 151:6,
151:8, 154:14, 156:14,
161:3, 161:8, 161:12
**Personally** 98:21
**photocopies** 73:23
**photocopy [2]** 11:22,
12:1
**photodermatology** 18:3
**photographs [14]** 35:24,
64:8, 64:18, 73:4,
73:4, 73:6, 73:7,
73:9, 73:13, 73:17,
73:25, 83:3, 83:4,
161:7
**photos [2]** 3:22, 39:7
**phrase** 64:7
**physical [13]** 26:5,
41:1, 57:5, 95:5,
95:9, 100:22, 125:9,
143:22, 153:23, 154:2,
154:9, 154:10, 161:16
**physician [14]** 7:20,
36:20, 48:11, 56:4,
71:21, 99:21, 100:9,
109:1, 114:2, 119:14,
137:9, 153:13, 156:11,
161:17
**physicians [9]** 51:17,
51:23, 71:23, 103:3,
103:8, 150:16, 154:19,
156:13, 160:1
**pick [3]** 43:20, 43:20,
46:17
**picked [6]** 43:18,
43:19, 44:25, 45:7,
50:12, 118:9
**pictorial** 30:7
**pictured** 161:6
**pictures [18]** 10:15,
30:4, 30:4, 30:14,
30:14, 30:18, 64:3,
74:4, 74:9, 74:19,
74:20, 77:23, 78:3,
78:11, 78:15, 96:20,
113:2, 161:11
**pill** 129:14
**pink** 113:3
**Pinson [31]** 13:4,
33:18, 39:23, 40:3,
40:22, 88:24, 97:13,
98:7, 99:4, 99:24,

060518                                                                                              Pages 1 to 162

100:8, 101:1,
101:20, 116:16,
116:21, 117:5, 117:6,
117:21, 117:24,
120:25, 123:2, 124:15,
125:1, 126:16, 126:18,
131:1, 131:11, 133:1,
133:13, 157:1
**Pinson's [5]** 12:20,
89:11, 117:25, 120:24,
130:21
**places** 46:2
**placing** 15:19
**Plaintiff [2]** 1:7, 2:3
**Plaintiff's [6]** 3:8,
10:14, 10:18, 10:23,
10:24, 127:8
**plan [3]** 67:23, 68:4,
140:22
**plantar [2]** 40:1,
125:14
**Plantation** 135:14
**platelet** 20:11
**please [16]** 4:20, 4:25,
6:3, 7:18, 10:9,
13:22, 14:2, 26:14,
26:14, 34:4, 34:17,
50:5, 67:1, 87:22,
121:13, 148:19
**plenty** 7:17
**plus** 145:15
**podiatrist [7]** 114:3,
115:4, 115:8, 116:2,
117:11, 117:14, 157:1
**podiatrist's** 116:5
**podiatry [4]** 3:24,
92:5, 113:19, 117:18
**point [21]** 5:4, 25:15,
26:7, 27:14, 37:14,
44:6, 48:16, 57:3,
68:24, 80:8, 81:2,
101:3, 108:6, 113:6,
122:18, 131:20, 139:6,
146:22, 158:15,
158:19, 160:2
**poor [4]** 29:7, 49:12,
147:5, 158:12
**poorly [2]** 65:7, 159:20
**poorly-worded** 122:21
**popliteal [14]** 22:7,
26:9, 41:12, 42:6,
59:6, 71:9, 71:11,
71:16, 80:7, 104:6,
153:3, 153:18, 154:7,
159:2
**pops** 111:15
**portable** 58:2
**position [6]** 6:8, 16:7,
16:8, 142:2, 143:12,
143:14
**possibility** 16:23
**possible [5]** 40:4,
93:12, 118:11, 129:7,
160:17
**possibly [2]** 98:11,
107:3
**posterior [17]** 14:15,
22:1, 23:2, 23:12,
24:1, 24:11, 24:13,
24:24, 25:14, 41:11,
54:21, 56:5, 56:19,
57:1, 59:8, 72:19,
72:20
**potassium [2]** 60:12,
122:10
**Power** 141:8
**practice [9]** 6:10,
6:20, 6:23, 27:25,
51:12, 54:16, 56:3,
67:2, 107:17
**practiced** 154:23
**practitioners** 23:17
**preceding [3]** 89:21,
90:10, 149:17
**prepare** 50:25
**preparing [2]** 9:20,
51:23
**prescribe** 30:7
**prescribed [2]** 62:12,
108:2
**prescription** 145:16
**presence [4]** 48:22,

**present [8]** 29:2,
44:11, 44:16, 54:7,
119:9, 129:10, 145:3,
150:24
**presented [3]** 53:12,
107:25, 119:2
**pressure [10]** 16:7,
16:17, 58:24, 64:12,
144:9, 144:10, 144:25,
145:9, 149:4, 149:21
**pressures [2]** 118:22,
119:25
**prevent [4]** 14:19,
16:16, 136:20, 157:11
**prevented [2]** 81:6,
107:16
**previous** 98:11
**previously [3]** 74:10,
138:21, 146:13
**primarily** 39:24
**primary [14]** 24:7,
95:6, 96:7, 98:16,
99:14, 99:17, 99:18,
99:21, 99:23, 100:8,
103:1, 103:3, 103:8,
119:14
**printout [4]** 8:12,
9:18, 30:18, 146:17
**printouts** 8:8
**prior [26]** 9:7, 9:23,
10:2, 10:6, 12:17,
13:15, 27:17, 50:22,
88:21, 90:15, 91:3,
91:19, 91:23, 92:4,
92:7, 92:13, 92:22,
92:25, 93:3, 93:6,
93:20, 94:3, 94:6,
131:24, 133:22, 134:9
**prisoners [2]** 137:3,
137:7
**prisons** 136:14
**probably [9]** 4:13,
42:20, 52:5, 61:10,
66:14, 67:2, 67:21,
77:2, 157:13
**problem [35]** 14:6,
15:8, 15:9, 15:18,
17:12, 17:13, 27:11,
28:25, 29:15, 29:16,
62:21, 63:25, 84:2,
85:3, 86:12, 87:2,
99:12, 101:8, 104:24,
104:25, 113:6, 118:13,
120:4, 120:5, 122:10,
122:14, 123:15,
123:17, 124:3, 141:17,
148:9, 157:25, 159:2,
159:2, 159:3
**problems [17]** 8:3,
18:4, 18:9, 18:21,
25:5, 62:11, 64:11,
66:12, 71:14, 76:21,
81:11, 83:25, 102:5,
108:19, 113:5, 114:23,
116:4
**procedure [11]** 1:18,
80:19, 80:22, 81:6,
81:16, 82:2, 86:12,
107:4, 125:16, 126:14,
159:16
**procedures** 80:13
**process [3]** 4:15,
28:23, 34:22
**progression** 157:11
**progressive [2]** 62:21,
156:14
**prolonged** 19:4
**proper** 128:8
**property** 141:11
**prostate [3]** 16:11,
16:12, 16:14
**protect [3]** 15:21,
19:17
**protected** 20:22
**protective** 85:5
**protects [3]** 18:21,
19:2, 83:24
**proteins** 20:7
**protime [5]** 18:20,
19:4, 20:1, 85:5,
108:15

84:17
**prove** 79:11
**provided** 88:4
**provider** 85:10
**providers [2]** 116:10,
158:6
**providing** 96:21
**proximal** 104:17
**pull** 118:19
**pulled** 20:17
**pulsations** 66:2
**pulse [65]** 22:1, 22:3,
23:2, 23:7, 24:1,
24:9, 24:11, 24:12,
24:13, 24:23, 24:24,
25:6, 25:9, 25:11,
25:12, 26:10, 41:9,
41:11, 47:15, 47:19,
47:22, 47:23, 47:24,
48:3, 48:22, 49:24,
54:14, 54:21, 55:22,
55:23, 56:5, 56:7,
56:17, 56:19, 57:1,
57:25, 58:5, 61:22,
63:13, 69:16, 69:18,
69:20, 69:21, 69:23,
69:24, 69:25, 70:18,
70:19, 70:20, 70:23,
71:1, 71:12, 71:6,
71:20, 72:9, 72:15,
72:17, 73:3, 83:8,
105:19, 150:1, 150:2,
153:9, 154:8, 155:11
**pulses [108]** 14:15,
15:17, 21:22, 21:25,
22:19, 23:13, 23:19,
28:3, 28:8, 28:12,
40:23, 41:3, 47:2,
47:7, 47:9, 47:11,
47:11, 47:14, 48:1,
48:5, 48:7, 49:11,
49:13, 49:22, 53:15,
54:17, 55:5, 55:11,
55:18, 56:21, 57:4,
62:19, 65:13, 66:21,
68:19, 68:22, 70:2,
70:7, 70:7, 70:10,
77:17, 77:19, 79:1,
83:2, 83:22, 84:5,
93:16, 97:14, 97:22,
97:23, 98:7, 98:21,
98:24, 99:5, 99:11,
100:5, 100:17, 100:19,
101:4, 101:21, 102:9,
110:17, 110:22, 111:2,
114:9, 114:11, 114:15,
114:23, 115:14,
115:21, 116:9, 117:12,
120:19, 123:7, 123:10,
123:18, 124:11,
125:16, 126:4, 126:5,
126:15, 126:17, 133:2,
133:9, 133:14, 133:24,
134:9, 134:15, 144:2,
144:8, 144:25, 145:6,
145:8, 145:23, 148:4,
148:5, 148:14, 148:23,
149:4, 149:20, 149:24,
151:6, 153:7, 153:18,
154:4, 154:11, 155:15,
156:5
**punch** 58:19
**purposes** 64:19
**purpura** 75:17
**pursuant [2]** 1:17,
115:6
**push** 58:19
**putting [2]** 72:5,
122:11
**PVD [6]** 52:2, 52:4,
52:17, 52:25, 53:4,
53:7

**Q**

**qualitative** 144:4
**quality [2]** 30:4, 30:13
**quantification** 157:25
**quantitate** 150:10
**quantitated** 144:1
**quantitative [4]** 144:7,

**questioned** 50:16
**quick [10]** 11:7, 12:1,
20:15, 20:15, 32:14,
69:10, 123:15, 123:17,
124:3, 160:15
**quote** 63:9

**R**

**raised [2]** 75:17, 75:20
**raises** 133:8
**range [2]** 54:24, 160:19
**rash [11]** 17:7, 18:14,
28:19, 29:9, 127:23,
129:10, 129:18,
129:20, 161:2, 161:5,
161:11
**rather** 45:11
**re-read** 123:24
**reaction** 17:3
**reading [13]** 46:13,
125:22, 143:25,
144:11, 144:23,
145:16, 147:2, 147:16,
148:21, 148:25, 149:9,
149:18, 152:23
**reads** 104:1
**real [2]** 22:6, 27:4
**really [10]** 46:23,
49:25, 63:17, 75:10,
106:3, 108:25, 110:5,
122:13, 116:3, 143:4
**reason [10]** 36:17,
56:12, 71:4, 105:3,
111:12, 112:25,
114:18, 126:16,
129:19, 148:10
**receive** 87:11
**received** 142:8
**recent [5]** 5:20, 6:4
**recertification** 135:9
**Recess [4]** 32:16,
69:12, 89:7, 160:14
**recognize [2]** 100:23,
133:10
**recognized [4]** 48:12,
67:24, 116:3, 118:12
**recommendation [2]**
150:17, 154:19
**recommendations** 157:16
**record [29]** 7:21, 7:24,
8:7, 10:11, 11:12,
11:14, 12:22, 13:19,
21:13, 32:17, 33:1,
34:13, 50:5, 55:9,
55:14, 76:20, 82:13,
89:20, 101:8, 101:10,
102:1, 102:2, 110:2,
110:19, 112:3, 113:19,
130:19, 132:15, 160:12
**records [46]** 3:20,
3:23, 10:5, 10:20,
12:17, 12:19, 13:4,
13:14, 38:8, 83:11,
88:2, 88:6, 88:7,
88:20, 88:23, 88:24,
89:2, 89:3, 89:9,
89:10, 89:10, 89:11,
89:12, 89:16, 89:19,
90:11, 90:22, 91:1,
91:14, 91:20, 91:23,
92:4, 92:7, 92:13,
92:22, 92:25, 93:3,
93:6, 93:13, 93:20,
93:25, 94:1, 111:15,
112:12, 156:24, 158:4
**recurrent [2]** 102:5,
107:7
**red [17]** 14:10, 25:19,
39:9, 49:1, 60:24,
61:2, 62:18, 64:24,
65:9, 74:14, 75:6,
113:4, 127:25, 128:6,
128:20, 129:2, 129:5
**redness [14]** 25:18,
61:7, 63:22, 63:24,
64:3, 64:9, 64:24,
74:17, 75:13, 108:1,
124:19, 128:17,
128:18, 133:4
**reduced [8]** 49:13,

152:7, 114:23, 117:13,
145:5, 145:7, 149:24,
154:11
**reduces [2]** 66:3, 66:4
**reduction** 15:17
**refer [19]** 15:11,
27:20, 36:15, 36:23,
37:3, 48:15, 59:21,
61:20, 63:10, 67:5,
67:20, 72:25, 87:22,
113:9, 117:15, 120:22,
123:3, 125:3, 147:24
**reference [7]** 7:15,
9:6, 9:23, 119:6,
121:1, 124:17, 124:21
**referenced [7]** 8:25,
9:2, 9:20, 71:24,
73:7, 93:13, 118:17
**referencing [5]** 6:21,
90:9, 146:8, 146:13,
150:20
**referral [4]** 14:20,
49:19, 77:14, 77:20
**referred [15]** 41:19,
48:21, 62:13, 63:19,
66:20, 66:24, 72:10,
72:10, 79:23, 80:1,
80:8, 83:1, 98:17,
107:11, 127:19
**referring [8]** 7:22,
21:13, 26:19, 33:3,
51:6, 88:11, 114:25,
137:12
**refers [2]** 89:21,
129:16
**refill [3]** 25:16,
71:25, 72:8
**Regarding [2]** 35:19,
37:23
**regardless** 150:7
**regular [2]** 100:9,
135:8
**regularly [2]** 99:25,
100:2
**related [18]** 14:11,
14:15, 20:25, 22:16,
28:16, 53:2, 66:8,
66:9, 66:21, 74:13,
75:14, 76:13, 100:13,
120:1, 122:11, 150:17,
119:18, 157:16
**relate** 106:18
**relaxant [2]** 16:12,
16:14
**relaxes [2]** 16:12,
16:14
**relaxing** 16:13
**relevant** 44:6
**relied** 94:25
**rely [2]** 95:3, 97:3
**remark** 22:2
**renal** 80:20
**repairs** 105:15
**repeat [6]** 68:5, 68:11,
147:7, 147:9, 147:17,
147:25
**rephrase [6]** 4:18,
6:18, 62:10, 65:6,
85:23, 122:20
**replenish** 15:20
**report [28]** 3:21,
32:19, 33:8, 33:13,
40:8, 40:14, 41:6,
41:16, 41:19, 42:1,
42:2, 43:23, 44:1,
44:7, 44:11, 44:16,
50:3, 63:7, 73:8,
82:25, 87:22, 88:6,
94:23, 97:8, 97:9,
104:1, 147:3, 152:24
**reporter [7]** 1:19,
81:21, 83:20, 113:22,
121:19, 124:2, 125:24
**represents** 162:8
**request** 90:17
**requests** 90:14
**require [11]** 23:24,
49:19, 56:4, 56:9,
59:9, 59:15, 66:19,
69:15, 70:25, 80:19,
87:10
**required [12]** 23:25,
48:15, 56:18, 70:17,

70:18, 72:17,
143:9, 144:12, 154:21,
159:21, 161:15
**requirement** 158:22
**requires [5]** 23:25,
25:2, 77:14, 85:25,
102:16
**requiring** 26:9
**residency** 153:22
**resolve [2]** 77:25, 78:6
**respect [11]** 21:2,
30:24, 32:7, 41:23,
56:15, 63:18, 64:24,
65:9, 133:19, 154:21,
158:7
**responded** 62:19
**response** 133:8
**responsibility [16]**
57:18, 85:8, 85:8,
85:11, 96:7, 99:18,
100:16, 101:19, 103:5,
108:8, 108:9, 109:3,
116:5, 117:1, 118:1,
120:16
**responsible** 102:22
**rest** 15:2
**restart** 20:21
**restorative** 159:11
**restore [2]** 70:13,
104:18
**restored [2]** 84:5,
86:13
**result [2]** 158:12,
162:12
**results** 90:21
**return [2]** 132:21,
132:24
**returns** 141:15
**retyping [2]** 45:10,
45:11
**revascularizatio [4]**
50:7, 80:9, 104:5,
104:9
**revenue** 140:25
**reverse** 65:20
**review [21]** 12:16,
27:16, 35:5, 88:24,
89:3, 89:11, 90:14,
90:18, 91:20, 91:23,
92:1, 92:4, 92:7,
92:10, 92:13, 92:22,
92:25, 93:3, 93:6,
93:9, 120:10
**reviewed [24]** 10:2,
10:6, 12:19, 13:14,
34:15, 35:20, 35:23,
37:24, 73:19, 74:10,
88:3, 88:7, 88:14,
88:17, 88:20, 90:16,
90:21, 90:24, 91:5,
92:18, 93:23, 94:2,
112:13, 131:24
**reviewing [5]** 40:16,
93:12, 113:15, 113:25,
123:1
**risk [13]** 15:3, 15:25,
28:4, 53:16, 53:17,
53:22, 53:24, 84:1,
145:10, 145:14,
147:10, 151:23, 154:13
**Robertson** 7:10
**Rocky** 138:22
**room [2]** 92:2, 110:7
**rotated [4]** 26:3,
138:7, 156:3, 156:4
**rotation** 138:11
**route [2]** 118:14,
118:15
**rubbed [2]** 61:4, 61:5
**rude** 4:22
**rule** 74:20
**rules [3]** 1:17, 35:7,
35:11
**run** 75:19
**running [2]** 84:14,
84:17
**runs** 136:23

## S

**safe [2]** 27:15, 80:19
**SAITH** 161:23

**sale** 125:24
**sanctioned** 137:24
**Sarah [2]** 2:13, 142:18
**Sarah.wilson2@us** 2:18
**sat** 119:24
**save [2]** 86:10, 106:6
**saved [6]** 81:25, 82:3,
82:6, 82:10, 86:8,
86:15
**saving** 11:17
**saying [28]** 23:24,
24:3, 24:5, 25:2,
37:4, 45:13, 52:17,
63:16, 64:23, 70:6,
77:1, 82:17, 84:19,
84:22, 95:9, 102:15,
102:18, 106:18, 106:18,
106:20, 128:7, 140:11,
152:19, 155:13,
155:17, 158:5, 158:10,
158:21
**says [35]** 26:24, 37:2,
40:22, 50:6, 63:9,
88:7, 97:13, 98:6,
100:22, 102:3, 103:13,
110:22, 111:2, 111:7,
112:1, 112:13, 112:23,
114:11, 115:13, 119:9,
119:13, 127:23,
128:20, 143:22,
143:25, 145:15, 147:2,
147:15, 147:22,
148:16, 148:21, 149:9,
149:18, 152:24, 152:25
**scaling** 75:22
**scanned** 43:14
**scored** 159:20
**scrape** 60:11
**screen [4]** 30:21,
143:7, 143:10, 144:23
**screened** 143:1
**screening [3]** 150:17,
154:20, 157:18
**Secondarily** 14:13
**sedentary** 77:2
**seeing [14]** 39:19,
39:24, 84:12, 99:11,
100:3, 103:2, 109:4,
115:15, 117:22,
123:14, 123:17,
125:12, 135:18, 137:16
**seek** 118:1
**seemed** 156:11
**seems** 8:9
**sees [2]** 22:25, 117:21
**send [4]** 42:16, 63:11,
73:1, 151:14
**sending** 17:20
**sensation [2]** 54:5,
55:12
**sense [2]** 63:8, 129:9
**sensitive [3]** 18:25,
144:4, 149:1
**sensitivity** 18:22
**sensory** 22:14
**sent [6]** 17:16, 27:3,
35:5, 41:17, 103:15,
158:16
**sentences [2]** 147:15,
149:8
**separated** 132:13
**Separately** 88:23
**sequence** 107:15
**sequentially** 68:4
**serially** 71:13
**serious** 133:11
**served** 5:18
**setting [2]** 36:19, 67:9
**seven [14]** 7:1, 7:1,
94:13, 94:18, 94:22,
94:25, 95:13, 95:16,
95:24, 96:1, 96:12,
97:3, 130:11, 137:20
**several [3]** 19:22,
83:11, 131:22
**severe [7]** 15:8, 15:8,
15:15, 16:6, 27:11,
40:3, 150:13
**severity [2]** 14:22,
150:11

**shakes** 129:23
**share** 155:7
**she's [6]** 100:22,
118:8, 118:9, 124:9,
141:4, 156:5
**sheet** 34:23
**Shelby [7]** 3:20, 13:8,
41:17, 41:20, 89:2,
103:15, 162:3
**shoes [3]** 56:1, 64:11,
64:16
**shot [2]** 132:18, 132:19
**shouldn't [4]** 56:13,
69:19, 100:15, 152:10
**showed [9]** 17:14, 42:9,
42:10, 42:11, 48:24,
75:11, 80:6, 113:3,
152:22
**showing [2]** 152:4,
152:5
**shutting** 6:24
**sick [2]** 7:10, 84:23
**sides** 106:22
**sign [6]** 43:5, 75:7,
148:9, 161:2, 161:8,
161:11
**signature [2]** 34:19,
46:1
**signed [9]** 42:17,
43:14, 44:11, 44:16,
44:21, 45:3, 45:19,
45:19, 97:7
**significance [5]**
103:18, 103:25,
104:12, 128:4, 148:10
**significant [6]** 19:5,
25:11, 104:4, 115:23,
115:24, 151:8
**signing** 50:23
**signs [6]** 77:22, 78:4,
78:16, 143:22, 144:1,
144:4, 152:4, 152:5
**similar [2]** 61:8, 67:6,
81:9
**simple [2]** 56:9, 120:20
**simpler** 67:20
**simply** 152:3
**single** 24:2
**sinus** 19:25
**sit** 30:9
**sitting [2]** 16:7,
124:12
**situation** 85:13
**situations** 108:20
**six [9]** 4:13, 11:19,
37:25, 51:5, 68:12,
125:18, 136:7, 137:20,
147:25
**Sixteen** 135:2
**sixteen-page** 8:12
**size [2]** 57:12, 105:18
**skin [22]** 17:18, 17:23,
28:22, 28:25, 71:24,
74:17, 75:1, 75:11,
75:18, 75:20, 75:21,
125:18, 129:17,
132:10, 132:11,
132:13, 132:20, 133:9,
144:2, 144:3, 144:3,
144:3
**sleep** 122:2
**slow** 147:5
**smaller** 87:3
**snaps** 70:14
**socks [2]** 55:23, 56:1
**soft** 31:18
**solely [2]** 48:21, 145:7
**somebody [24]** 7:11,
14:14, 18:19, 32:22,
49:5, 49:14, 54:10,
54:12, 55:23, 70:9,
76:20, 85:18, 90:5,
98:19, 99:11, 103:7,
109:16, 112:1, 112:2,
112:10, 116:12,
117:12, 149:24, 154:10
**somebody's [2]** 115:16,
125:16
**someone [9]** 8:18, 35:4,
50:22, 65:12, 79:17,
94:19, 110:16, 111:4,

**someone's** 161:2
**sometime** 102:9
**somewhat [2]** 98:13,
120:18
**somewhere [2]** 84:20,
116:12
**son [2]** 7:4, 120:8
**sonogram** 57:20
**sore** 131:21
**sores** 131:22
**sorry [6]** 6:14, 16:9,
33:2, 34:12, 34:14,
47:8, 51:21, 91:7,
94:9, 121:5, 128:23,
130:25, 131:4, 131:7,
152:1, 155:12
**sort [6]** 26:23, 60:18,
68:17, 79:6, 83:3,
109:2
**sorts** 119:12
**sounded** 156:9
**sounds [5]** 42:19,
57:15, 66:25, 118:8,
118:12
**source [3]** 25:23,
26:22, 159:21
**sources** 7:19
**South** 2:6
**Southern [3]** 1:3, 93:4,
135:13
**space** 58:10
**spasm** 123:15
**speak** 115:7
**speaking [2]** 116:20,
116:22
**special** 59:15
**specialist [17]** 29:16,
36:15, 37:3, 62:2,
62:5, 62:8, 62:11, 63:19,
66:20, 66:25, 67:6,
73:1, 77:15, 77:20,
79:24, 115:1, 115:3,
145:19
**Specialists [2]** 92:23,
93:4
**specific [3]** 118:5,
144:5, 149:1
**specifically [2]** 72:24,
94:25, 119:5
**speed** 147:5
**spelling** 46:8
**spend [3]** 130:4,
135:23, 136:9
**spent** 137:9
**split [2]** 135:12,
135:17
**spoken** 94:5
**spots [4]** 62:18, 65:9,
74:14, 75:6
**spread** 74:24
**stable [2]** 69:1, 134:10
**staff** 109:6
**stand [2]** 16:7, 52:9
**standard [108]** 14:18,
21:1, 21:3, 21:5,
21:20, 23:21, 23:23,
23:24, 24:17, 24:20,
25:2, 25:23, 26:9,
26:18, 26:22, 27:20,
28:17, 29:22, 30:2,
31:3, 32:16, 32:11,
36:10, 36:14, 37:2,
48:14, 56:3, 56:18,
57:8, 57:9, 57:11,
57:13, 59:9, 63:10,
64:23, 65:2, 65:8,
65:11, 65:14, 66:14,
66:19, 66:22, 68:13,
69:14, 70:17, 70:18,
70:25, 72:16, 72:16,
72:22, 72:25, 76:12,
77:14, 85:22, 85:24,
86:2, 86:4, 86:8,
86:15, 87:10, 96:25,
97:18, 98:23, 99:5,
99:10, 99:14, 101:20,
102:11, 102:15, 113:9,
114:25, 115:3, 115:7,
117:6, 123:2, 123:12,
125:2, 125:25, 126:2,
126:3, 126:13, 127:16,

90:14, 133:12,
133:14, 133:19,
134:14, 143:9, 144:12,
144:20, 147:21, 148:3,
148:13, 153:15,
153:20, 153:21,
154:21, 155:5, 155:14,
155:16, 155:16,
155:22, 157:21,
157:21, 158:6, 159:19,
159:22, 161:14
**standing [2]** 16:8,
16:15
**standpoint [4]** 33:20,
117:9, 136:22, 157:23
**stands** 144:18
**start [7]** 4:6, 13:21,
35:16, 46:10, 110:6,
137:16, 137:21
**started [2]** 8:7, 69:19,
85:18
**starting [6]** 6:17,
38:21, 139:15, 139:17,
139:18, 139:19
**state [4]** 29:20, 140:9,
140:11, 162:2
**statement [4]** 97:9,
103:22, 113:1, 153:15
**States [5]** 1:1, 1:11,
1:20, 2:14, 4:5
**status [2]** 22:5, 93:18
**stay** 11:13
**stenosis [2]** 153:2,
159:7
**Stenotype** 162:6
**stent [7]** 15:20, 81:6,
81:16, 82:2, 105:6,
159:9, 159:15
**stents [2]** 80:11, 81:10
**step [3]** 26:13, 67:25,
86:6
**steroid [3]** 61:11,
74:15, 132:18
**stethoscope** 57:6
**Steven** 2:4
**steventipler@gma** 2:8
**stipulate** 11:23
**stood** 120:5
**stop [2]** 21:10, 23:15
**straight** 158:18
**stratification** 151:23
**street [3]** 1:20, 2:6,
58:11
**stress [3]** 63:3, 63:5,
151:25
**strike** 78:14
**stroke [3]** 16:1, 18:21,
19:18
**strong [2]** 150:1, 150:2
**student** 26:4
**students** 23:18
**studies [10]** 14:17,
28:11, 41:24, 66:4,
79:18, 86:21, 93:21,
93:23, 104:2, 123:8
**stuff [9]** 33:19, 33:20,
35:10, 64:12, 79:8,
105:15, 155:10,
155:14, 159:1
**subpoena** 5:18
**subQ** 20:18
**subscribe** 8:3
**subtherapeutic** 39:16
**successful [2]** 79:11,
79:21
**suffered** 104:3
**sugar** 66:12
**suggest [3]** 123:5,
132:2, 157:2
**suggested [2]** 14:5,
145:18
**suggesting [2]** 46:14,
106:5
**suggests [3]** 14:19,
122:17, 122:23
**Suite** 2:6
**sum** 139:10
**summary [8]** 13:8,
35:16, 36:7, 37:20,
42:7, 42:8, 42:14,
42:17
**supplied** 107:4

**supply [2]** 15:17, 105:12
**support [2]** 143:12, 143:14
**supposed** 33:23
**surgeon [24]** 15:11, 26:19, 27:21, 36:22, 36:23, 41:24, 61:21, 62:2, 64:20, 67:21, 68:1, 78:23, 79:4, 79:24, 80:2, 83:1, 104:1, 106:21, 107:12, 151:13, 151:15, 152:17, 152:23, 160:21
**surgeries** 79:11
**surgery [12]** 14:21, 27:4, 48:17, 48:20, 49:19, 79:15, 127:20, 147:24, 152:15, 158:17, 158:19, 159:21
**surprised [2]** 22:6, 156:6
**surprising** 108:10
**suspect [2]** 53:20, 111:25
**suspected** 151:8
**sweating** 16:6
**sweaty** 17:1
**swelling [2]** 121:21, 123:16
**switch** 20:24
**sworn** 4:2
**Sylacauga [3]** 38:7, 39:19, 83:11
**symptomology** 54:8
**symptoms [12]** 14:23, 15:1, 15:17, 46:13, 47:3, 47:4, 68:11, 76:24, 112:23, 134:13, 145:16, 152:20
**Syndrome** 7:4
**synonymous [2]** 52:12, 149:22
**system [11]** 15:19, 22:16, 25:4, 64:17, 65:18, 84:12, 84:16, 104:18, 104:22, 106:23, 122:12
**systemic** 129:15

**T**

**table** 55:3
**taken [8]** 1:17, 18:13, 38:2, 40:1, 42:8, 73:14, 96:19, 162:5
**takes** 20:8
**taking [4]** 20:4, 20:6, 28:1, 108:7
**talks** 119:7
**tape** 109:18
**tax [7]** 138:24, 139:5, 141:15, 141:16, 141:25, 142:9, 142:20
**taxes [3]** 139:3, 141:19, 142:3
**Tea** 31:19
**tech** 27:7
**technician** 59:16
**teledermatology [3]** 29:19, 29:23, 30:10
**telephone** 136:2
**tells [6]** 15:7, 68:13, 106:1, 148:6, 150:12, 152:24
**temperature** 144:2
**ten [6]** 20:10, 20:10, 80:22, 107:18, 132:20, 159:24
**tend** 108:20
**tendency** 65:20
**term [2]** 52:22, 128:23
**terms [6]** 35:25, 62:9, 71:19, 87:14, 139:5, 157:18
**test [14]** 15:6, 15:15, 63:3, 63:5, 67:18, 67:22, 68:11, 120:20, 148:11, 148:25, 150:6, 150:17, 151:25, 152:11
**testified** 74:12
**testifies** 4:2

**testify [4]** 15:23, 84:7, 142:19
**testimony** 118:17
**testing [12]** 19:1, 21:6, 84:3, 93:17, 144:15, 145:9, 147:8, 147:9, 147:17, 149:14, 155:12
**tests [8]** 15:13, 68:3, 116:6, 144:7, 149:3, 149:19, 150:5, 157:24
**textbooks [4]** 51:2, 51:3, 51:6, 51:14
**texting** 43:16
**thank [22]** 4:5, 7:14, 9:10, 12:21, 13:10, 17:4, 32:13, 38:14, 50:2, 72:20, 77:13, 87:22, 91:18, 103:13, 111:11, 113:18, 113:23, 114:13, 116:20, 116:22, 135:3, 161:22
**therapeutic** 85:6
**therapy** 65:15
**there's [36]** 12:8, 21:25, 22:1, 25:14, 34:8, 44:13, 46:2, 50:3, 53:7, 53:23, 56:12, 56:12, 57:2, 57:23, 57:23, 59:5, 59:6, 59:7, 68:13, 74:23, 75:22, 80:14, 94:12, 108:9, 108:12, 119:12, 123:5, 124:24, 136:17, 142:20, 145:24, 148:9, 148:14, 150:1, 153:1, 159:4
**therefore [2]** 20:8, 29:6
**thereto** 162:7
**they'll [2]** 19:15, 27:8
**they're [27]** 15:13, 20:6, 21:23, 22:20, 27:15, 28:9, 28:13, 47:25, 55:5, 67:15, 68:10, 69:5, 73:25, 90:22, 90:25, 98:17, 98:18, 105:5, 108:23, 108:25, 109:3, 112:1, 112:3, 116:5, 117:13, 149:22, 150:8
**they've** 25:11
**thickened [2]** 60:9, 60:9
**thigh** 59:2
**thin** 144:2
**thing [25]** 11:16, 12:3, 17:13, 52:5, 53:6, 59:18, 63:4, 64:19, 71:20, 72:4, 87:16, 97:7, 108:11, 108:24, 110:4, 110:15, 121:6, 125:13, 132:17, 136:17, 136:25, 149:14, 149:15, 150:4, 159:3
**thinking [4]** 46:19, 46:21, 46:22, 125:6
**thinks** 129:6
**thinner** 10:22
**third** 36:3
**thirty** 28:1
**thirty-year-old** 23:1
**Thomas** 35:16
**thorough** 103:24
**though [2]** 118:4, 159:14
**thousand [2]** 140:16, 140:20
**threatening** 112:24
**thrombus** 20:11
**Thursday** 134:22
**tibia [4]** 7:15, 29:3, 30:25, 32:5
**tibial [20]** 14:15, 22:1, 23:2, 23:13, 24:1, 24:11, 24:13, 24:24, 25:14, 26:9, 54:21, 56:5, 56:19, 57:1, 59:8, 72:19, 72:20, 108:13, 111:3,

**tibioperoneal [2]** 42:5, 104:4
**tight [3]** 12:12, 12:15, 64:16
**tinea [12]** 59:23, 59:24, 60:1, 60:7, 60:10, 60:11, 60:15, 61:1, 128:5, 128:7, 129:16, 129:22
**Tipler [90]** 2:4, 2:5, 5:19, 5:22, 8:8, 9:11, 11:4, 11:8, 11:12, 11:16, 11:22, 12:3, 12:8, 12:14, 33:3, 33:4, 33:6, 33:11, 33:12, 33:24, 35:1, 35:6, 38:25, 39:3, 41:2, 42:14, 43:9, 43:15, 43:18, 44:25, 45:10, 45:14, 49:8, 50:18, 50:20, 51:23, 62:1, 62:4, 62:7, 73:22, 81:1, 81:4, 82:16, 82:20, 87:14, 87:17, 91:4, 91:10, 110:23, 111:1, 111:10, 112:6, 113:23, 114:12, 115:2, 115:6, 116:18, 116:21, 116:24, 119:17, 121:3, 121:8, 121:14, 123:19, 124:3, 127:1, 127:5, 127:8, 127:12, 130:10, 130:19, 131:5, 131:8, 131:14, 131:17, 132:15, 134:1, 134:5, 142:5, 142:14, 142:17, 142:18, 151:18, 156:15, 156:16, 156:19, 160:12, 161:7
**Tipler's [2]** 50:23, 94:20
**tips** 131:22
**tired** 45:10
**titled [2]** 8:9, 9:12
**today [44]** 4:6, 5:6, 5:12, 5:15, 9:21, 10:2, 10:6, 13:15, 26:7, 30:9, 43:24, 63:16, 64:19, 82:15, 82:14, 91:3, 91:19, 91:23, 92:4, 92:7, 92:13, 92:22, 92:25, 93:3, 93:6, 93:14, 93:20, 94:3, 94:6, 97:20, 99:25, 100:14, 101:8, 103:20, 113:16, 116:11, 124:12, 133:23, 142:15, 150:20, 153:5, 156:24, 157:19, 157:22
**toe [2]** 74:24, 132:9
**toenail** 60:23
**toenails [5]** 39:8, 59:25, 114:5, 115:16, 129:17
**toes [8]** 17:9, 25:18, 71:25, 72:1, 74:23, 75:5, 125:6, 129:16
**tolerance** 151:19
**tool** 160:10
**tooth** 20:16
**top [8]** 17:11, 42:11, 46:12, 80:24, 105:14, 111:5, 127:22, 131:23
**topical [2]** 28:24, 129:12
**topics** 8:5
**total [2]** 102:22, 153:2
**totally [2]** 60:5, 70:24
**touch [2]** 25:18, 71:25
**towards** 142:9
**town** 138:10
**tract [2]** 19:25, 99:12
**train [2]** 23:17, 23:18
**trained** 26:1
**training [10]** 25:25, 26:1, 26:4, 36:11, 37:6, 76:3, 138:8,

**transcribed [2]** 121:8, 162:7
**transcript [9]** 3:18, 8:17, 10:12, 10:16, 10:20, 12:23, 91:16, 120:11, 162:8
**traumatic [3]** 17:14, 17:18, 29:3
**treat [5]** 27:14, 78:25, 137:3, 137:7, 148:15
**treated [7]** 61:8, 61:10, 62:8, 62:18, 74:14, 74:19, 85:25
**treating [8]** 28:20, 29:9, 29:15, 31:3, 65:12, 109:1, 122:2, 122:14
**treatises [2]** 7:15, 26:8
**treatment [5]** 25:24, 28:24, 64:24, 65:9, 112:14
**triamcinolone [4]** 61:12, 61:17, 108:2, 108:3
**tried** 42:6
**triggered** 145:8
**triggering** 77:19
**trouble** 85:14
**true [14]** 95:14, 96:13, 97:10, 162:8
**Trujillo [5]** 91:24, 110:16, 112:23, 113:8, 116:17
**Trujillo's** 92:2
**truthfully** 5:15
**Tuesday** 1:21
**turbulent** 22:12
**turn [4]** 18:8, 34:16, 45:23, 87:23
**turned** 42:13
**turns [2]** 25:19, 25:19
**twenty-five [5]** 89:16, 90:25, 91:5, 91:6, 91:14
**type [7]** 32:21, 32:23, 32:23, 59:24, 93:16, 134:15, 136:25
**typed [8]** 32:24, 32:25, 33:13, 35:4, 40:8, 40:14, 42:17, 50:3
**typing** 50:23
**typographical [3]** 44:21, 44:22, 44:24

**U**

**UAB [13]** 6:8, 6:21, 23:18, 26:1, 26:3, 55:14, 58:8, 135:13, 137:9, 137:12, 138:10, 156:4, 158:17
**Uh-uh** 141:12
**ulcerations** 132:7
**ultimate** 156:12
**ultimately [2]** 18:11, 101:16
**umbrella** 52:22
**unattached** 28:2
**undergo [2]** 147:7, 147:17
**undergoing** 81:7
**undergone [2]** 81:18, 81:22
**underneath** 149:7
**understand [14]** 4:17, 16:21, 17:17, 34:22, 38:3, 52:19, 56:2, 72:14, 95:20, 115:9, 148:9, 149:23, 153:4
**understandable** 41:14
**understanding [7]** 4:14, 8:25, 47:6, 110:9, 110:13, 114:14, 135:13
**undressed** 70:24
**United [5]** 1:1, 1:11, 1:20, 2:14, 4:5
**unless [6]** 25:14, 49:22, 60:11, 79:13, 99:7, 99:17

**unstable** 119:11
**unsuccessful** 104:10
**untrue** 95:17
**up-to-date** 6:4
**upon [3]** 14:3, 119:10, 162:9
**upper [2]** 15:18, 59:2
**UpToDate [20]** 3:13, 3:15, 7:20, 7:23, 8:2, 8:8, 8:13, 9:1, 9:6, 9:11, 9:19, 26:23, 27:16, 143:12, 146:9, 146:18, 150:19, 150:25, 157:15, 160:4
**urgency [2]** 72:3, 72:4
**urgent [4]** 19:24, 24:7, 84:18, 152:15
**urinary [2]** 19:25, 99:12
**useful [4]** 146:6, 147:9, 149:3, 149:18
**using [6]** 8:2, 19:12, 29:14, 52:24, 61:13, 85:15
**usually [7]** 53:4, 53:4, 59:25, 60:8, 60:9, 122:8, 122:9

**V**

**VA [33]** 21:19, 26:3, 28:16, 38:7, 39:19, 53:12, 67:15, 67:20, 76:18, 83:11, 84:12, 84:16, 88:5, 88:8, 89:9, 89:16, 90:2, 90:10, 90:15, 98:18, 99:22, 107:25, 109:10, 112:14, 112:19, 118:20, 133:18, 138:5, 138:7, 138:10, 138:14, 156:3, 158:17
**VA's [2]** 85:7, 85:11
**Valley [6]** 3:23, 91:20, 110:3, 110:17, 111:18, 111:20, 112:18, 156:25
**various [2]** 58:25, 88:5
**Varley** 93:7
**Varley's** 93:9
**vascular [89]** 14:5, 14:14, 14:21, 15:11, 15:16, 22:5, 26:19, 27:3, 27:7, 27:8, 36:21, 36:22, 36:23, 37:3, 41:21, 41:22, 41:24, 48:17, 48:20, 49:4, 49:5, 49:9, 49:10, 49:16, 49:19, 51:4, 52:1, 52:12, 52:16, 52:21, 54:1, 54:11, 61:21, 62:1, 62:2, 62:14, 62:20, 63:10, 63:19, 66:20, 66:25, 67:5, 67:21, 67:25, 72:25, 75:14, 77:15, 77:20, 78:19, 78:23, 78:25, 79:4, 79:24, 80:2, 80:6, 83:1, 93:17, 93:21, 93:22, 103:16, 104:1, 106:16, 106:21, 107:12, 115:1, 115:12, 115:13, 117:23, 118:2, 118:14, 120:4, 123:4, 123:8, 125:4, 127:20, 130:22, 145:17, 147:24, 151:13, 151:14, 152:15, 152:17, 152:23, 154:14, 158:16, 158:19, 159:20, 160:21
**vasculitis** 75:12
**vast** 137:8
**vending [2]** 31:20, 31:24
**venous [7]** 52:14, 52:15, 52:23, 53:2, 144:7, 149:3, 149:19
**verbal [2]** 4:20, 4:22
**verbatim** 33:13
**verify** 96:12
**version** 33:8

*versus [10]* 35:14,
38:15, 62:2, 71:16,
72:3, 72:5, 74:6,
121:8, 152:15, 158:1
*vessel [3]* 71:17,
106:1, 106:2
*Vestavia* 138:19
*Veterans* 10:19
*violated [2]* 97:18,
99:4
*virtually [2]* 26:10,
74:9
*virtue* 119:23
*visit [15]* 22:20,
76:18, 102:3, 102:4,
102:12, 113:11,
118:17, 119:2, 123:10,
124:16, 126:17,
134:10, 136:5, 143:10,
157:9
*visited* 112:19
*visits* 12:20
*Vitae* 3:12

___

## W

*wages [3]* 140:4, 140:8,
140:10
*Wait [3]* 73:22, 130:10,
130:10
*walk* 76:22
*walking [3]* 15:2,
46:14, 147:5
*walks [2]* 24:2, 24:6
*wanted [8]* 28:10,
90:12, 95:25, 96:4,
119:14, 120:13,
146:20, 146:20
*warm* 25:20
*Warren [4]* 141:8,
141:18, 142:1, 142:5
*wart [2]* 40:1, 125:15
*wave* 57:24
*WAYNE* 1:5
*we'll [5]* 11:7, 11:25,
12:2, 21:17, 37:14
*we're [15]* 13:17,
51:20, 55:7, 56:14,
87:18, 97:24, 102:22,
116:18, 116:18,
120:18, 121:14,
121:15, 124:14, 146:8,
146:14
*we've [6]* 56:22, 83:3,
87:14, 92:14, 133:23,
155:2
*weak* 118:18
*week [7]* 112:18,
132:21, 132:24,
134:19, 135:24, 136:9,
152:20
*weekday* 134:19
*weekly* 136:11
*weeks [2]* 31:12, 125:18
*welcome* 110:4
*well-trained* 156:11
*wellness [3]* 102:21,
102:24, 103:10
*weren't [3]* 19:7, 19:9,
29:2
*West [7]* 6:8, 6:21,
58:8, 135:13, 135:21,
137:9, 137:12
*what's [15]* 25:1,
26:22, 59:23, 103:18,
103:25, 104:12,
109:24, 111:16,
119:17, 126:6, 128:3,
128:14, 138:16,
158:21, 159:21
*whatever [9]* 6:24,
31:15, 35:24, 45:20,
59:16, 68:24, 88:10,
88:11, 137:18
*whenever* 155:14
*whereas* 158:4
*Whereupon [14]* 5:25,
8:23, 9:16, 13:1,
13:12, 34:2, 73:15,
81:20, 83:19, 109:25,
113:21, 121:18, 124:1,
125:23

*whether [59]* 15:7,
15:15, 21:3, 21:23,
22:20, 28:16, 28:20,
28:21, 29:4, 32:3,
32:10, 46:24, 47:3,
47:4, 48:20, 55:10,
55:10, 55:11, 59:4,
59:5, 59:6, 59:7,
60:15, 63:3, 71:13,
71:19, 72:2, 77:8,
79:10, 79:20, 84:4,
87:2, 87:8, 96:12,
96:24, 97:17, 97:21,
97:22, 98:23, 100:20,
103:6, 103:6, 106:24,
109:15, 111:23,
111:24, 113:6, 116:5,
123:7, 124:6, 127:15,
127:18, 147:16, 147:6,
147:15, 147:16,
147:25, 150:1, 159:1
*whiteness* 74:25
*who's* 103:2
*whoever [7]* 101:18,
108:23, 117:21
*whole [2]* 110:4, 139:8
*whomever* 59:21
*whose* 45:8
*wife* 6:25
*wife's* 138:20
*willing* 11:23
*Wilson [6]* 2:13, 11:10,
12:6, 12:10, 82:22,
121:5
*window [3]* 62:22, 80:4,
107:22
*wise* 135:23
*within [7]* 20:12, 69:3,
69:5, 91:16, 124:15,
152:20, 160:18
*witness [3]* 87:16,
156:16, 162:9
*wondering [3]* 18:23,
18:23, 131:12
*worded* 91:10
*wording* 42:16
*workup* 72:5
*worried [2]* 28:20,
112:10
*worry [5]* 36:25, 54:10,
80:20, 125:17, 150:14
*worse [5]* 29:11, 29:12,
29:14, 39:1, 106:24
*wouldn't [23]* 24:19,
29:24, 31:4, 36:20,
36:22, 36:25, 47:1,
48:13, 49:23, 60:8,
71:8, 74:18, 74:18,
76:9, 79:5, 90:20,
90:24, 93:15, 95:17,
109:15, 113:5, 130:16,
130:17
*wound [11]* 18:1, 29:4,
30:24, 31:3, 31:7,
31:14, 32:5, 108:13,
109:17, 110:15, 112:20
*wounds* 27:6
*writing [7]* 9:7, 9:24,
27:17, 35:16, 88:21,
88:25, 89:4
*written [7]* 35:14,
35:22, 39:11, 39:14,
43:4, 50:10, 50:24
*wrong [8]* 26:15, 67:1,
96:17, 111:17, 111:23,
111:25, 116:2, 131:6
*wrote [8]* 27:19, 32:22,
35:13, 36:9, 38:13,
38:15, 38:25, 118:11

___

## X

*Xanaflex [2]* 122:1,
122:12
*Xanax* 122:2
*Xarelto [4]* 18:24,
20:9, 20:12, 20:20

___

## Y

*y'all [9]* 11:5, 11:17,
11:22, 11:24, 31:17,
31:18, 42:15, 42:15,
87:20
*yeah [49]* 11:8, 11:25,
12:4, 13:7, 14:3,
22:23, 35:12, 38:24,
39:23, 40:5, 43:3,
43:19, 45:14, 47:9,
50:6, 59:24, 60:22,
62:4, 66:23, 83:7,
97:21, 98:13, 101:6,
102:18, 103:17,
103:24, 109:22,
109:22, 115:11,
115:22, 118:6, 119:9,
121:6, 128:12, 129:23,
130:24, 130:24, 134:7,
134:7, 137:2, 139:20,
142:4, 142:7, 146:22,
149:16, 156:23,
157:13, 157:23, 158:20
*yearly [5]* 57:3, 68:12,
102:19, 102:21, 102:24
*yellow* 74:25
*yesterday [6]* 9:2,
9:20, 40:15, 54:15,
160:3, 160:4
*yet* 86:3
*you'd [6]* 58:4, 59:25,
71:12, 76:22, 125:15,
125:17
*you'll [6]* 23:5, 34:16,
45:23, 49:6, 49:6,
145:14
*young* 25:7
*yours* 127:2
*yourself [4]* 34:13,
76:10, 78:24, 103:5

___

## Z

*Zithromax* 19:20