FILED
2019 Jan-23  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

EXHIBIT 1

REL: March 9, 2018

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2017-2018

———————————

### 1150377

———————————

**Amy Langley Hamilton**

**v.**

**Warren Scott, M.D., and Isbell Medical Group, P.C.**

**Appeal from DeKalb Circuit Court**
**(CV-06-149)**

PER CURIAM.

Amy Langley Hamilton appeals from a judgment against her and in favor of Warren Scott, M.D., and the Isbell Medical Group, P.C. ("IMG"), following a jury trial in the DeKalb

1150377

Circuit Court on Hamilton's claim alleging the wrongful death of her stillborn son Tristian.  We reverse and remand.

<u>I.  Facts</u>

This is the second time this case has come before us. In the first appeal, <u>Hamilton v. Scott</u>, 97 So. 3d 728 (Ala. 2012) ("<u>Hamilton I</u>"), this Court reversed in part a summary judgment entered against Hamilton because we concluded that Hamilton was entitled to pursue a wrongful-death claim regarding her unborn son even though the child was not viable at the time of his death.[1]

The basic facts that led to Hamilton's suit are amply described in <u>Hamilton I</u>.  In this appeal, we provide only those facts pertinent to our judgment here.

On January 10, 2005, Hamilton, who was pregnant, contacted IMG to explain that she had a rash on her arms and chest and that she was concerned it might be "fifth disease," an infection caused by human parvovirus B19.  Hamilton's primary physician at IMG, Dr. John Isbell, requested that Hamilton come in the following day for blood testing to see if

---

[1]This Court affirmed the summary judgment entered against Hamilton as to her claim for damages resulting from emotional distress.

1150377

she had the infection.  After the test, IMG informed Hamilton that she had the parvovirus and that Dr. Isbell wanted her to schedule an ultrasound immediately.   IMG also informed Hamilton that, after the initial ultrasound, she should have an ultrasound performed every 2 weeks for the next 10 weeks of her pregnancy.

Hamilton was seen twice more at IMG in January, but because of various circumstances no ultrasounds were performed on those visits.  According to Hamilton, she next went to IMG on February 18, 2005, and she was seen by Dr. Scott, who told her that it would be better to wait until the 18th or 19th week of pregnancy to begin monitoring with ultrasounds. Dr. Scott disputed Hamilton's testimony, stating that he did not see her on February 18.

There is no dispute that Hamilton was seen at IMG on February 25, 2005.  Tracy Talley, an ultrasound technician, performed an ultrasound on Hamilton on that date.   The ultrasound showed that the baby was 18 weeks and 6 days in gestational age at that time.  Hamilton testified that during the ultrasound she "became aware" of "certain abnormalities that [Talley] had seen."

3

1150377

Immediately following the ultrasound, Hamilton was seen by Dr. Scott; Hamilton was accompanied by her husband William. Hamilton testified concerning the conversation between Dr. Scott and herself as follows:

> "A.  In the exam room we asked Dr. Scott, given the abnormalities that were found on ultrasound, we wanted a referral to a perinatologist as soon as possible.  We were told at that point in the day it's too late to be seen, so we requested we would like to be seen on Monday, Monday morning first thing, as soon as we can be seen by a perinatologist.  That's what we wanted.
>
> "Q.  [Hamilton's attorney:]  Very specific question.  Did you and William request of Dr. Scott a referral to a perinatologist based on the abnormality seen in the ultrasound?
>
> "A.  Yes.
>
> "Q.  What did he say?
>
> "A.  He said we can handle it here."

Hamilton testified that Dr. Scott did not tell her that he could not perform a percutaneous umbilical blood sampling ("PUBS"),[2] that he was not qualified to perform a PUBS

---

[2]Hamilton testified that the way it was explained to her, a PUBS involves "taking an amniocentesis needle and guiding it with ultrasound into the baby's umbilical cord vessels, withdrawing blood, testing for anemia, and if anemia was present, then the baby would be able to have a [blood] transfusion at that time without ever withdrawing the needle."

1150377

procedure, or that he was not qualified to perform an intrauterine transfusion.

Dr. Scott testified that during his February 25, 2005, consultation with Hamilton, she asked <u>about</u> a referral to a perinatologist, she did not ask <u>for</u> a referral. He testified that if she had asked for a referral he would have given her one because it would have been a violation of the standard of care to deny such a specific request. Dr. Scott also testified that the ultrasound was performed to look for fetal hydrops, which Dr. Scott defined as follows:

> "[F]etal hydrops is described or defined as having an abnormal amount of fluid accumulation in two specific areas in the fetus, and that includes what's called generalized skin edema, which just basically means fluid in, like, the abdominal cavity and, like, in the pelvis cavity, and they call pleural effusion which just means fluid around the lungs, pericardial effusion, which means fluid around the heart. You can also have what's called ... placentomegaly, that just means an enlarged placenta. And something called hydramnios or polyhydramnios which just means an excessive amount of amniotic fluid."

Dr. Scott testified that this finding of excessive fluid must be present in two or more of the areas he listed. Dr. Scott noted that, if hydrops is present on the ultrasound, the parvovirus has infected the baby. Dr. Scott further

1150377

testified that when the parvovirus infects the baby, it can affect red blood cells, which may result in anemia and, in turn, hydrops.  Dr. Scott stated that, based on his review of the ultrasound photographs, the placenta was of normal size, there was a normal amount of amniotic fluid, and there was no generalized skin edema.  Dr. Scott further testified that the photographs of the ultrasound from February 25, 2005, did not reflect any fluid in the abdomen (ascites), did not show any fluid around the heart, and did not show any fluid around the lungs.  Dr. Scott concluded that based on those observations there was no hydrops and no need to refer Hamilton to a perinatologist that day.

Hamilton returned to IMG on March 8, 2005, because she was feeling ill.  She came back to IMG on March 10, 2005, and an ultrasound was performed that day.  The ultrasound indicated that Tristian had no heartbeat and that hydrops was present.  Hamilton went to the hospital the following day to have the stillborn child delivered.

Hamilton sued Dr. Scott and IMG on April 28, 2006, alleging that they had caused Tristian's death "and that the death of her unborn son was wrongful within the meaning of the

1150377

Alabama Wrongful Death Act, Ala. Code § 6-5-410 (1975)."  More specifically, Hamilton alleged that Dr. Scott's breach of the standard of care prevented Tristian from receiving life-saving care in the form of a PUBS and an intrauterine transfusion of blood.

At trial, Hamilton's standard-of-care expert, Dr. Joseph Bruner, a board-certified perinatologist, testified that an abnormality was present on the February 25, 2005, ultrasound and that the ultrasound required a referral to a perinatologist because it indicated that Tristian was developing hydrops. He further testified that Tristian needed an intrauterine transfusion, that he had performed "quite a few" such procedures in 2005, and that "[t]he earliest transfusion that I can recall doing is 17 weeks." Dr. Bruner testified that if Tristian had received an intrauterine transfusion in time his chances of survival were "probably 85 to 90 percent."

IMG and Dr. Scott countered with testimony from Dr. John Owen, a perinatologist who, at the time of the medical care in question, was practicing at the University of Alabama at Birmingham Hospital ("UAB"), which is where

1150377

Dr. Scott stated he would have referred Hamilton if she had asked for a referral to a perinatologist. Dr. Owen testified that, based on his review of the February 25, 2005, ultrasound, hydrops was not present in the baby at that time. Dr. Owen stated that, because hydrops was not present, the standard of care did not require Dr. Scott to refer Hamilton to a perinatologist. Dr. Owen also testified that, if Hamilton had been referred to UAB on February 25, 2005, she would have been sent home with instructions to return for another ultrasound in two weeks. Dr. Owen further testified that in February 2005 UAB was not performing intrauterine transfusions until 22 weeks in gestational age for a patient who had been diagnosed with parvovirus, even if the patient had had a finding of hydrops on the ultrasound.

Before the presentation of evidence, Hamilton requested certain jury instructions regarding causation.[3] Some of those requested instructions were based on language from this Court's opinion in Parker v. Collins, 605 So. 2d 824 (Ala.

---

[3]We note that the better practice for the trial of a complex civil case is to hold the charge conference after the presentation of evidence so that the trial court has a full picture of how the evidence and arguments of the parties can be best harmonized with the instructions to be given to the jury. Rule 51, Ala. R. Civ. P.

1150377

1992).  ==Specifically, Hamilton's requested instructions relied upon the Parker Court's statement== -- the context for which is explained in the "Analysis" portion of this opinion -- ==that "the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care."  605 So. 2d at 827.==

IMG and Dr. Scott objected to the requested jury instructions that used language from Parker on the ground that the "better-position" language employed in Parker could not apply in a wrongful-death action because the only standard for such a claim is that a breach of the standard of care probably caused the decedent's death.

The trial court refused to give Hamilton's requested jury instructions incorporating Parker's "better-position" principle.  In explaining its refusal to give the requested instructions, the trial court stated:

> "THE COURT:  Well, you know, even looking at the Parker case, it says ... '[t]here was medical testimony to show that prompt treatment of the patient probably could not have prevented the occurrence of a heart attack.  However, there was also evidence that more immediate care could have

1150377

> lessened the severity of the heart attack and
> possibly prevented the patient's death.' So what I
> understand from that is that you're going to have to
> show that the lack of immediate care or some delay
> in the treatment or care probably caused the death.
> I think this is different from an injury as opposed
> to a death situation. The injury in this case is
> the death. And so I say all that to say that I
> don't think your jury charge is appropriate and I'm
> going to deny your request to give that charge."

On August 14, 2015, the jury returned a verdict in favor
of Dr. Scott and IMG. The trial court entered a judgment
consistent with that verdict. Hamilton filed a motion for a
new trial on September 11, 2015. On December 1, 2015, the
trial court denied Hamilton's motion. Hamilton filed a timely
appeal.

## II. Analysis

Hamilton argues that the trial court committed three
separate errors that each warrant a new trial. First, she
contends that her substantial rights were harmed by the trial
court's refusal to allow her to testify that Talley allegedly
told Hamilton that the abnormalities present on the February
25, 2005, ultrasound dictated that she would be referred to a
perinatologist. Second, Hamilton argues that the trial court
erred in refusing to give her requested jury instructions that
incorporated the "better-position" principle from Parker, an

1150377

error Hamilton says caused the jury to misunderstand what she had to prove.  Third, Hamilton asserts that the trial court erred by refusing to use Tristian's name in the jury charges and thereby "did not afford him the dignity it would afford any other deceased person."

We conclude that the trial court did not exceed its discretion in concluding, under Rule 403, Ala. R. Evid., that the probative value of Hamilton's testimony concerning what Talley told her was substantially outweighed by the risk of unfair prejudice.  The trial court discerned that there was a real possibility that the jury could view Talley's alleged statements about what she had observed on the ultrasound and whether Hamilton needed a referral to a specialist as evidence indicating that Dr. Scott breached the standard of care, a matter beyond Talley's expertise.

We also conclude that the trial court acted within its discretion in electing to use the terms "unborn child" or "stillborn child" rather than Tristian's name in the jury charges.  By using those terms, the trial court acknowledged the fact that Tristian was a human being, and those terms were not demeaning.  Moreover, the trial court also allowed

11

1150377

Hamilton and her counsel to refer to the child by his name throughout the proceedings.

Hamilton's contention that the trial court committed reversible error by failing to give her requested jury instructions, which incorporated the "better-position" concept from Parker, warrants closer examination.

> "'A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case.' Pressley v. State, 770 So. 2d 115, 139 (Ala. Crim. App. 1999). Thus, 'generally speaking, the standard of review for jury instructions is abuse of discretion.' Pollock v. CCC Invs. I, LLC, 933 So. 2d 572, 574 (Fla. Dist. Ct. App. 2006)."

Arthur v. Bolen, 41 So. 3d 745, 749 (Ala. 2010). This Court now refers to the "abuse-of-discretion" standard as an "exceeds-its-discretion" standard. See CIT Commc'n Fin. Corp. v. McFadden, Lyon & Rouse, L.L.C., 37 So. 3d 114, 121 n.5 (Ala. 2009).

In Parker, the plaintiffs, Joyce Parker and her husband, Joseph, sued a physician, Dr. Wyatt Collins, and the hospital that employed him, Lanier Memorial Hospital. The Parkers alleged that in January 1988 Mrs. Parker underwent a mammogram at the hospital and that Dr. Collins interpreted her mammogram

1150377

as being negative for breast cancer.   In December 1988,
however, another physician diagnosed Mrs. Parker with breast
cancer, which had begun to spread into her lymph nodes. Mrs.
Parker underwent a mastectomy, and the surgeon also removed
several cancerous mammary glands.   She also underwent a series
of chemotherapy and radiation treatments to help destroy any
cancer cells that might have spread into her lymph nodes.

> "The Parkers argued that the X-rays Dr. Collins
> had interpreted were plainly inadequate and that he
> was negligent in basing his diagnosis upon them.
> They further argued that with earlier detection of
> the cancer Mrs. Parker would have avoided
> chemotherapy and radiation treatment and would have
> had a better chance for long-term survival.
> Finally, they argued that in hiring Dr. Collins,
> Lanier Memorial Hospital became vicariously liable
> for his alleged negligence."

605 So. 2d at 826.

The trial court entered a directed verdict[4] in favor of
Dr. Collins and the hospital.   According to the trial court,
there was no evidence to show that the inferior X-rays caused
Mrs. Parker to undergo a course of treatment in December 1988
that she would not have had to endure in January 1988.
Therefore, the trial court concluded, the Parkers had failed

---

[4]A directed verdict is now referred to as a judgment as
a matter of law.  See Rule 50, Ala. R. Civ. P.

1150377

to establish the element of causation.  This Court disagreed, noting that

> "[w]hile the facts do not establish that Mrs. Parker's cancer could have been prevented altogether if Dr. Collins had rendered a prompt diagnosis based on a clearer X-ray, medical testimony suggests that Mrs. Parker's condition worsened as a direct result of a diagnosis based upon a substandard X-ray.  That evidence was sufficient to create a jury question as to proximate cause in this case; accordingly, we reverse that portion of the judgment based on the directed verdict for Dr. Collins."

605 So. 2d at 827 (emphasis added).  The Court explained that even though this was not a straightforward medical-negligence case in which the physician's negligence caused the initial harm, e.g., the cancer, Alabama law still supported the Parkers' claim:

> "This Court has previously held that the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care. Waddell v. Jordan, 293 Ala. 256, 302 So. 2d 74 (1974); Murdoch v. Thomas, 404 So. 2d 580 (Ala. 1981).  It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence. Waddell; see also Annot., 54 A.L.R. 4th 10, § 3 (1987)."

Id. (emphasis added).

14

1150377

Hamilton argues that her theory of causation is like the one put forward by the Parkers because she alleged that if Dr. Scott had followed the standard of care, which required him to refer her to a perinatologist following the February 25, 2005, ultrasound, hydrops would have been detected earlier, an intrauterine transfusion could have been performed, and that procedure would have ameliorated the effects of Tristian's parvovirus infection. Hamilton notes that the testimony from her expert, Dr. Bruner, strongly supported this theory of causation. Hamilton argues that the trial court's refusal to instruct the jury according to her theory of the case, despite the fact that she had legal authority and expert testimony to support it, probably injured her substantial rights.

In the trial court and on appeal, Dr. Scott and IMG's only argument against Hamilton's requested jury instructions has been that "the facts and holding in <u>Parker v. Collins</u> are inapplicable to a wrongful death case."[5]  The trial court agreed with IMG and Dr. Scott, expressly stating as a matter

---

[5]In the trial court, counsel for Scott and IMG asserted: "[T]he better position aspect has only been applied or seen in personal injury cases[;] it's never been applied in a wrongful death case."

1150377

of law that, because the injury in this case was death, the "better-position" principle is inapplicable, and it refused to give Hamilton's requested instructions.

The trial court's conclusion is directly contrary to the law as stated in our cases.  The Parker Court stated:  "It is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence."  605 So. 2d at 827 (emphasis added).  Thus, in Parker itself the Court indicated that the "better-position" principle could apply in a wrongful-death action.

Notably, as well, cases upon which Parker relied for the "better-position" principle, Waddell v. Jordan, 293 Ala. 256, 302 So. 2d 74 (1974), and Murdoch v. Thomas, 404 So. 2d 580 (Ala. 1981), albeit decided under the former scintilla-of-evidence rule, were both wrongful-death actions.  In Waddell, the Court observed that, "although prompt diagnosis and treatment might not have prevented a massive heart attack, such could have delayed or even prevented a terminal attack and impeded further damage to the heart."  293 Ala. at 259,

1150377

302 So. 2d at 77.   In Murdoch, the decedent, Copeland Thomas, had been in an automobile accident.   Thomas was examined at a hospital by the defendant emergency-room physician, Dr. Donald Murdoch, who concluded that there was nothing wrong with Thomas and discharged him.   The next day Thomas returned to the hospital in severe pain; other doctors determined that he was suffering from internal bleeding and shock.   Shortly after being admitted, Thomas lost consciousness, and subsequent cardiopulmonary-resuscitation efforts failed to revive him. This Court concluded, citing Waddell, that there was evidence indicating that prompt diagnosis and treatment could have retarded or inhibited Thomas's decline.

Moreover, in DCH Healthcare Authority v. Duckworth, 883 So. 2d 1214 (Ala. 2003), the Court plainly applied the Parker better-position principle in a wrongful-death action.   In Duckworth, Mary Duckworth, the wife of the decedent, filed an action against DCH Healthcare Authority d/b/a DCH Regional Medical Center ("the Center"), alleging that on October 9, 1999, Mr. Duckworth went to the Center to pick up his wife who was being discharged that day.   After he arrived at the Center, Mr. Duckworth -- who was 83 years old -- fell on an

17

1150377

escalator and hit his head.  He was taken to the emergency
room for treatment.  In the emergency room, Mr. Duckworth had
to wait 45 minutes from the time a doctor ordered an X-ray
examination until the X-ray examination was performed.  While
he waited, Mr. Duckworth developed a headache and nausea.
Approximately an hour after the X-ray examination, the same
doctor ordered a computerized-tomography scan ("CT scan"),
which was performed one-half hour after it was ordered.  A few
minutes after the CT scan was performed, the radiology
department informed emergency-room personnel that
Mr. Duckworth had a subdural hematoma.  He was then
transferred to the critical-care unit.  Approximately two and
one-half hours after Mr. Duckworth was transferred, a
neurosurgeon performed surgery to relieve the hemorrhage.
Mr. Duckworth remained at the Center, where he died on
October 22, 1999, as a result of the injuries he sustained in
the fall.

Mary Duckworth alleged that

"Dr. Nelson and the other emergency-department
personnel 'caused or negligently allowed
[Mr. Duckworth] to go without proper and timely
evaluation, monitoring, care, and treatment for a
potential closed-head injury, and failed to timely
and properly address, observe and report changes in

18

1150377

> his condition.'  The complaint further alleged that
> as  a  consequence  of  the  alleged  negligence,
> Mr. Duckworth 'was caused to worsen with a cerebral
> bleed and he was so injured that he died.'"

883 So. 2d at 1216.  During the trial, the Center had moved

for a judgment as a matter of law on the ground that Mary

Duckworth had failed to present substantial evidence of

causation by expert testimony.  The trial court denied the

motion, and a jury awarded Mary Duckworth $350,000.

This Court noted that "Mrs. Duckworth's theory of the

case is that the Center's diagnosis of her husband's condition

and its treatment was <u>dilatory</u>."  883 So. 2d at 1217.  The

Court then explained:

> "As   to   causation   in   a   dilatory-
> diagnosis-and-treatment case such as this one, 'an
> action "may properly be submitted to the jury where
> there  is  evidence  that  prompt  diagnosis  and
> treatment would have placed the patient in a <u>better</u>
> <u>position</u> than she was in as a result of inferior
> <u>medical care</u>."'  <u>Shanes v. Kiser</u>, 729 So. 2d 319,
> 320-21 (Ala. 1999) (quoting <u>Parker</u>, 605 So. 2d at
> 827) (emphasis added).  'It is not necessary to
> establish that prompt care could have <u>prevented</u> the
> injury  or  <u>death</u>  of  the  patient;  rather,  the
> plaintiff must produce evidence to show that her
> condition  was  adversely  affected  by  the  alleged
> negligence.'  <u>Parker</u>, 605 So. 2d at 827 (emphasis
> added)."

883 So. 2d at 1217.

1150377

The Court reversed the judgment of the trial court
because

> "[c]onspicuously absent from this testimony is
> any opinion as to how -- or whether -- the two- or
> three-hour diagnostic, or preoperative, period of
> which Mrs. Duckworth complains <u>probably affected the
> outcome of this case</u>.   On the contrary, Dr. Jones
> [Mrs. Duckworth's medical expert] testified that
> there was an <u>optimum period of eight hours</u> between
> diagnosis and surgery.   The hematoma was discovered
> at 2:00 p.m. and removed by 6:00 p.m.   Even
> computing the time from 10:24 a.m., when Duckworth
> <u>arrived at the emergency room</u>, until the hematoma
> was evacuated, only 7½ hours occurred before the
> surgery -- within the optimum treatment period
> Dr. Jones described.   Although Dr. Jones conceded
> that the hematoma 'could possibly [have been]
> smaller two hours earlier,' he did not explain how
> an increase in size would have adversely affected
> Mr. Duckworth's ultimate condition.   He agreed with
> the general proposition that a 'delay in diagnosis
> [<u>could</u>] adversely affect a person's condition,' <u>not</u>
> that it <u>did</u> so in <u>this</u> case."

883 So. 2d at 1220.   In other words, the <u>Duckworth</u> Court did

not fault Mary Duckworth for arguing a dilatory-diagnosis-and-

treatment theory in her wrongful-death action; it simply

concluded that she failed to present substantial evidence that

any delay had an adverse affect on Mr. Duckworth's condition.

See also <u>Shanes v. Kiser</u>, 729 So. 2d 319 (Ala. 1999) (finding

that the plaintiff's wrongful-death claim based on the better-

position theory failed because of a lack of evidence that a

20

1150377

heart attack had caused the death, not because the plaintiff employed an inapplicable theory of legal causation).

Unlike the plaintiff in Duckworth, Hamilton, through Dr. Bruner, presented the crucial evidence necessary to support a dilatory-treatment claim. Indeed, Dr. Scott and IMG do not argue that Hamilton failed to present substantial evidence to support such a claim. They simply agree with the trial court's conclusion that the "better-position" principle is not applicable in a wrongful-death action. As we have shown, that conclusion is incorrect. Accordingly, the trial court erred in failing to give the requested jury instructions espousing Parker's "better-position" principle.

The only remaining question is whether the trial court's failure to give such instructions constituted reversible error.

> "It is a basic tenet of Alabama law that 'a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court's failure to give those instructions is reversible error.' Alabama Farm Bureau Mut. Ins. Service, Inc. v. Jericho Plantation, Inc., 481 So. 2d 343, 344 (Ala. 1985). (Citations omitted.) 'It is the duty of the trial judge to educate the jury on the law of the case.' Grayco Resources, Inc. v. Poole, 500 So. 2d 1030, 1033 (Ala. 1986). As the Court in Grayco observed:

1150377

> "'It is the inescapable duty of the trial
> judge to instruct the jurors fully and
> correctly on the applicable law of the
> case, and to guide, direct and assist them
> toward an intelligent understanding of the
> legal and factual issues involved in their
> search for the truth.'

"<u>Id</u>.  (Citations omitted.)"

<u>Volkswagen of America, Inc. v. Marinelli</u>, 628 So. 2d 378, 384 (Ala. 1993).

It is undisputed that the trial court's charges to the jury did not include the <u>Parker</u> "better-position" principle. That legal principle goes to the heart of Hamilton's theory of the case, i.e., that Dr. Scott's failure to refer Hamilton to a perinatologist during Hamilton's February 25, 2005, visit prevented timely treatment that, according to Dr. Bruner's testimony, would have saved Tristian's life.  Consequently, the trial court's refusal to give such instructions constituted reversible error.

## III.  Conclusion

We conclude that no reversible error occurred in the trial court's exclusion of Hamilton's testimony about Talley's statements during the February 25, 2005, ultrasound exam or its refusal to use Tristian's name in its instructions to the

22

1150377

jury.  However, the trial court committed reversible error by refusing to give jury instructions explaining the "better-position" principle in the context of Hamilton's claims against Dr. Scott and IMG.  Thus, on that basis, Hamilton is entitled to a new trial.

REVERSED AND REMANDED.

Bolin, Main, Wise, Bryan, Sellers, and Mendheim, JJ., concur.

Parker, J., concurs specially.

Stuart, C.J., and Shaw, J., dissent.

1150377

PARKER, Justice (concurring specially).

I concur with the main opinion. I write specially to emphasize the well established principle in Alabama law that unborn children are human beings entitled to full and equal protection of the law. In the present case, Amy Langley Hamilton argues that the humanity of her deceased unborn son, Tristian, was denigrated by the trial court's refusal to refer to Tristian by his name in the jury charges and that she was thereby prejudiced in her wrongful-death action. I do not agree.

To support her argument that the trial court erred by referring to Tristian as the "unborn child" or the "stillborn child" in the jury charges, Hamilton relies on our opinion in Hamilton v. Scott, 97 So. 3d 728, 735 (Ala. 2012) ("Hamilton I"), to argue "that Tristian was just as much a person as any of us." Hamilton contends that the trial court's charges "did not follow the spirit, if not the letter, of this Court's previous opinion." Hamilton quotes specifically from my concurring opinion in Hamilton I, which declared that an unborn child "is a unique and individual human being from conception, and, therefore, he or she is entitled to the full

1150377

protection of law at every stage of development." <u>Hamilton I</u>, 97 So. 3d at 747 (Parker, J., concurring specially). By not using Tristian's name, Hamilton argues, the trial court "did not afford [Tristian] the dignity it would afford any other deceased person." Therefore, according to Hamilton, the jury charges "were incorrect instructions that provide a proper basis for the Court to order a new trial," citing <u>Clayton v. LLB Timber Co.</u>, 79 So. 3d 283, 284-85 (Ala. 2011).

<u>Hamilton I</u> is one case in a line of opinions issued by this Court recognizing the personhood of unborn children since its pivotal holding in <u>Mack v. Carmack</u>, 79 So. 3d 597 (Ala. 2011). In <u>Mack</u>, this Court overruled previous cases and held that Alabama's Wrongful Death Act permits actions for the death of an unborn child regardless of his viability. Since <u>Mack</u>, "[w]e have affirmed Alabama's policy of protecting life at every stage of development," <u>Ex parte Hicks</u>, 153 So. 3d 53, 73 (Ala. 2014) (Parker, J., concurring specially), and have repeatedly recognized the well established principle "that an unborn child is a human being from the earliest stage of development and thus possesses the same right to life as a born person." <u>Id</u>. at 73-74 (Parker, J., concurring specially).

1150377

In <u>Hamilton I</u>, we reaffirmed our holding in <u>Mack</u>,[6] confirming that "Alabama's wrongful-death statute allows an action to be brought for the wrongful death of any unborn child, even when the child dies before reaching viability." <u>Hamilton I</u>, 97 So. 3d at 735. We have recognized the unborn child's right to life in criminal cases, too -- again, regardless of viability. See <u>Ex parte Ankrom</u>, 152 So. 3d 397 (Ala. 2013) (holding that chemical-endangerment statute protects born and unborn children alike); and <u>Hicks</u>, supra (reaffirming <u>Ankrom</u>). Most recently, after the parties in the instant case filed their briefs, this Court issued its opinion in <u>Stinnett v. Kennedy</u>,

---

[6]The Court in <u>Hamilton I</u> agreed that the right to life was a gift of God:

> "[T]his Court's holding in <u>Mack</u> is consistent with the Declaration of Rights in the Alabama Constitution, which states that 'all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; <u>that among these are life</u>, liberty and the pursuit of happiness.' Ala. Const. 1901, § 1 (emphasis added). These words, borrowed from the Declaration of Independence (which states that '[w]e hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness'), affirm that each person has a God-given right to life."

<u>Hamilton I</u>, 97 So. 3d at 734 n.4.

1150377

232 So. 3d 202 (Ala. 2016), firmly rejecting an invitation to qualify in any way or to overrule the holdings in <u>Mack</u> and <u>Hamilton</u>. The Court's decision today is wholly consistent with those precedents.

Although Hamilton cites correct principles, she ultimately fails to demonstrate that the trial court, in not using Tristian's name in its jury instructions, ran afoul of those principles or that it did so to her prejudice.

> "It is a basic tenet of Alabama law that 'a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court's failure to give those instructions is reversible error.' <u>Alabama Farm Bureau Mut. Ins. Service, Inc. v. Jericho Plantation, Inc.</u>, 481 So. 2d 343, 344 (Ala. 1985). (Citations omitted.) 'It is the duty of the trial judge to educate the jury on the law of the case.' <u>Grayco Resources, Inc. v. Poole</u>, 500 So. 2d 1030, 1033 (Ala. 1986)....

> "Our standard for reviewing the trial court's instructions is plain. 'In reviewing instructions to determine if they correctly set forth the applicable law, [this Court] must read and consider the charge as a whole.' <u>Grayco</u>, 500 So. 2d at 1033. (Citations omitted.) The law is clear that <u>the refusal of a requested charge is not error where the trial court's oral charge 'substantially and fairly' covers the same principles as the requested charge</u>. Rule 51, Ala. R. Civ. P.; <u>Hamilton Auto Parts, Inc. v. Rea</u>, 580 So. 2d 1328 (Ala. 1991). ..."

1150377

Volkswagen of America, Inc. v. Marinelli, 628 So. 2d 378, 384-85 (Ala. 1993) (emphasis added). When reviewing a challenged jury charge for error, "reversal is warranted only if the error is prejudicial." George H. Lanier Mem'l Hosp. v. Andrews, 809 So. 2d 802, 806 (Ala. 2001) (emphasis added).

In the charge to the jury, the trial court referred to the deceased primarily as "her unborn child," with one or two references to "Amy Hamilton's unborn child," or "the unborn child." Hamilton argues that because the pattern jury instructions direct the judge to use the decedent's name, the trial court erred in referring to Tristian as an "unborn child" instead. Although the trial court referred to the child as "it" outside the presence of the jury, Hamilton makes no accusation that the trial court used any such impersonal moniker in the presence of the jury. Moreover, in her complaint Hamilton pursued this wrongful-death action as "next friend of her stillborn son"; she did not herself use Tristian's name in any pretrial filings. On this issue Hamilton does not argue that the trial court erred in instructing the jury on the "law of the case" or that the instructions did not "substantially and fairly" cover the

28

1150377

legal principles she requested in her charge. Indeed, the trial court's use of the term "unborn child" was neither inaccurate nor inappropriate, nor was it demeaning to Tristian under the circumstances of this case, particularly where Hamilton invariably used the term in her pretrial pleadings. I am thus hard-pressed to hold that the trial court denigrated Tristian's humanity by not using his given name in its charge to the jury.

Further, even if error were established by the lack of Hamilton's preferred nomenclature for the child in the jury charge, no prejudice to Hamilton occurred. Hamilton alleges, at most, that the trial court's use of the phrase "unborn child" to refer to her unborn son "quite probably cheapened Tristian's life in the eyes of the jury," but this statement is unsupported by facts or law, and it amounts to mere speculation. Moreover, as the main opinion notes, Hamilton was freely permitted by the trial court to refer to her unborn son as Tristian throughout the trial and in closing arguments. Thus, the jury was not prevented from hearing -- and hearing repeatedly -- the name Hamilton had given her unborn son. Hamilton has failed to demonstrate any prejudice by the trial

1150377

court's decision to use the neutral term "unborn child" to refer to Tristian in the jury charge.

In finding no reversible error on this point, the main opinion should not be read as condoning or suggesting that trial courts must adopt the practice of omitting the names of unborn children in jury instructions in wrongful-death cases. Indeed, had the trial court affirmatively prevented Hamilton from using Tristian's name before the jury, or taken any action to denigrate his humanity, then this issue could possibly be decided differently. Trial courts in appropriate cases should allow parties and their counsel to use the name given an unborn child. Even in a state like Florida, where a wrongful-death action is not recognized for the death of an unborn child, one appellate court has held that the trial court in a negligent-stillbirth case "did not err in allowing the plaintiffs and their counsel to refer to the fetus as 'their son,' 'their child' or as 'George Hurley, Jr.'" Kammer v. Hurley, 765 So. 2d 975, 978 (Fla. Dist. Ct. App. 2000). Similarly, in a fetal-homicide prosecution in Ohio, a trial court committed no error in permitting the State to refer to the unborn child by the name "Baby Chloe" at trial and in the

1150377

jury instructions. State of Ohio v. Cutts, 2009-Ohio-3563, ¶ 250 (Ct. App. 2009) (unpublished decision). Any efforts to stifle the recognition of an unborn child's humanity, however, "should be all the more intolerable in Alabama, where the express, emphatic public policy of our State is to uphold the value of unborn life." Stinnett, 232 So. 3d at 224 (Parker, J., concurring specially). Judges should continue to "do all within their power to dutifully ensure that the laws of Alabama are applied equally to protect the most vulnerable members of our society, both born and unborn." Id. (Parker, J., concurring specially).

Although trial courts around the State of Alabama may choose to use the given name of an unborn wrongful-death decedent in their charge to the jury, Hamilton has failed to demonstrate that the trial court in this case erred as a matter of law by using the correct but generic term "unborn child" or that its doing so otherwise prejudicially denigrated Tristian's humanity or Hamilton's ability to share with the jury the name bestowed upon her son.

31

1150377

SHAW, Justice (dissenting).

The dispositive issue addressed in the main opinion is whether the trial court exceeded its discretion in failing to give a "better-position" jury charge drawn from the holding of Parker v. Collins, 605 So. 2d 824 (Ala. 1992). In Parker, the defendant, a doctor, allegedly committed medical malpractice by failing to detect from a mammogram that the plaintiff had cancer. The cancer was ultimately discovered almost a year later. The lapse in time resulted in the plaintiff's being required to undergo surgery, chemotherapy, and radiation treatment that would have otherwise been avoided had the cancer been detected earlier; it also reduced her chances of long-term survival. But for the malpractice, the plaintiff alleged, the patient would have been placed in a "better position." 605 So. 2d at 826.

The trial court granted the defendant's motion for a directed verdict (now a judgment as a matter of law, see Rule 50, Ala. R. Civ. P.). Specifically, it held that, although the defendant initially failed to detect the cancer, there was no evidence to show that that failure caused the plaintiff to later "undergo a course of treatment" that "she

1150377

would not have had to endure" if the cancer had been detected initially.  Thus, the trial court concluded that "the element of causation had not been established."  605 So. 2d at 826–27.

On appeal, this Court discussed cases in which "the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care."  605 So. 2d at 827.  Specifically, "[i]t is not necessary to establish that prompt care could have prevented the injury or death of the patient; rather, the plaintiff must produce evidence to show that her condition was adversely affected by the alleged negligence."  Id. (emphasis added).

Applying the law to the facts, this Court held that, although the evidence did not show that the cancer "could have been prevented altogether" if the doctor had not committed malpractice, the evidence suggested that the plaintiff's "condition worsened as a direct result of" the malpractice. The evidence was thus sufficient "to create a jury question as to proximate cause."  Parker, 605 So. 2d at 827.

1150377

In Parker, the trial court focused on whether the malpractice caused the injury, that is, the cancer that required treatment.  The trial court appeared to believe that because the plaintiff already had cancer when the defendant initially failed to detect it, the malpractice could not have caused the plaintiff's injury.  This, however, was a misidentification of the injury on the trial court's part that, by extension, resulted in a misidentification of causation.  According to this Court, the resulting injury was the plaintiff's progressing to a worse stage of cancer that thus required more extensive treatment and resulted in a greater chance of recurrence, i.e., she suffered further physical injury.  The plaintiff was thus entitled to prove that, if the malpractice had not occurred, she would still have had cancer but would have been placed in a better position as opposed to the worse position that resulted from the misdiagnosis.[7]

---

[7]In her special writing in Groover v. Johnston, 39 So. 3d 33, 43 (Ala. 2009), Justice Smith, concurring specially to a no-opinion affirmance, explained the Parker decision as follows:

"[T]here was proper expert testimony in Parker as to the probable effect of the failure to diagnose: for example, the failure to diagnose probably caused

1150377

I do not see the same sort of "worse-position" injury in this case that would require a special instruction regarding causation.  Here, the defendant, Dr. Warren Scott, allegedly failed to detect that the unborn child, Tristian, was suffering from a condition that required prompt treatment.  As a result of the failure, it is alleged not that the child accrued further physical injury, but that the child died.  It is undisputed that this undetected disease led to a worsening of the child's physical condition.  But a "worse position" in this case--that was the result of the alleged malpractice--was not the worsening of a physical injury; it was death.

If the child's condition had actually been detected at a later time but before his death, and the resulting treatment had been performed but, because of the delay, had led to other complications or physical injuries, then I think that an

----

Parker to undergo additional medical treatments--a mastectomy and the course of chemotherapy and radiation treatments--and caused her to suffer the additional injury of having a higher chance of reoccurrence of breast cancer than she otherwise would have had. In other words, the plaintiffs in Parker presented testimony by a qualified expert with a proper evidentiary foundation indicating that if the defendant physician had not acted negligently, the patient probably would have had a better outcome."

1150377

instruction based on <u>Parker</u> might have been appropriate: if the malpractice had not occurred and the disease had not progressed, then the child would have suffered less injury and been placed in a "better" position.  But those are not the facts here.  Instead, the alleged malpractice resulted in the child's death.  The only issue of causation for which the jury needed an instruction concerned whether the plaintiff, Amy Langley Hamilton, demonstrated that Dr. Scott breached the standard of care and that that breach caused the death of the unborn child.  The trial court's instructions to the jury covered this:

> "Now, in addition to negligence, another element of the complaint against Dr. Scott that the plaintiff bears the burden of proving is what's called proximate cause. The plaintiff must prove that Dr. Scott was negligent by deviating below the standard of care and that such negligence proximately or directly or probably caused the death of Amy Hamilton's unborn child. If you are reasonably satisfied that Dr. Scott breached the applicable standard of care and was negligent, then you would consider whether that negligence proximately, directly or probably caused the death of the unborn child. The proximate cause of an injury or death is defined by the law as that cause which in the natural and probable sequence of things and without the intervention of any new or independent cause produces the injury or death and without which injury or death--or without which cause the injury or death would not have occurred.  More simply put, proximate cause means direct cause. Using that

36

1150377

    definition, it follows that the plaintiff must prove a direct causal connection between negligence on the part of Dr. Scott and the death of her unborn child, that such negligence directly caused the death. There must be more than a possibility that the negligence complained of caused the death. There must be substantial evidence that negligence probably caused the death."

The plaintiff's requested jury charge no. 1, which was denied, stated, in part:

    "To recover damages on this claim, Amy Hamilton must prove to your reasonable satisfaction by substantial evidence all of the following elements:

    "....

    "3. That the death of Tristan [sic] was probably caused by Dr. Scott['s] ... failure to follow the standard of care."

I believe that the trial court's instruction, stated above, adequately explained this element of causation.   The plaintiff's requested instruction also stated: "Amy Hamilton also says that prompt diagnosis and treatment would have placed Tristian in a better position than he was in as a result of inferior medical care."   Further, the plaintiff's requested jury charge no. 6 stated:

    "Amy Hamilton must prove to your reasonable satisfaction by substantial evidence that prompt diagnosis and treatment would have placed Tristian in a better position than he was in as a result of inferior medical care. It is not necessary to

1150377

> establish that prompt care could have prevented
> Tristian's death; rather, Mrs. Hamilton must produce
> evidence to show that Tristian's condition was
> adversely affected by the alleged negligence."

The trial court's instruction that Hamilton was required to prove that the alleged negligence proximately, directly, or probably caused the death of the unborn child properly explained the burden.

To instruct the jury that liability could be found if the breach of the standard of care "adversely affected" the unborn child and that without such breach he would have been in a "better position" would have been needlessly confusing.  The jury might have understood such an instruction--that liability could be found if a prompt diagnosis and treatment would have placed Tristian in a "better position"--as an awkward way of saying that liability could be found if, in the absence of the breach, Tristian would not have died.  Such an instruction might also have indicated to the jury that it could find for the plaintiff if the breach had caused the unborn child to be placed in a "worse position" as opposed to a "better position."  The jury could have taken this to mean that liability could be found if the breach caused his death, which is again awkward and ambiguously repetitious.  Or, the jury

38

1150377

might have believed that it was being called upon to determine whether the lack of a prompt diagnosis and treatment caused Tristian to suffer <u>physical injury before</u> his death.  This, however, is a wrongful-death action, not an action based on injuries that occurred before Tristian's death.  In sum, I believe that the trial court's instruction adequately explained the issue of causation; any instruction regarding prompt care and treatment that could have placed the unborn child in a "better" position was potentially confusing and unwarranted under the facts of this case.  See McGregory v. Lloyd Wood Constr. Co., 736 So. 2d 571, 579 (Ala. 1999) ("A party is entitled to have the jury correctly instructed on the law, provided the requested instruction is relevant to the case and is not confusing or misleading." (emphasis added)).  Therefore, I would not hold that the trial court exceeded its discretion in refusing to give Hamilton's requested jury

1150377

charge incorporating the "better-position" principle,[8] and I respectfully dissent.

Stuart, C.J., concurs.

---

[8]Any error by the trial court in holding that such an instruction could not, as a matter of law, apply in any wrongful-death case is of no consequence to my analysis.  See Smith v. Mark Dodge, Inc., 934 So. 2d 375, 380 (Ala. 2006) ("[T]his Court will affirm a judgment for any reason supported by the record that satisfies the requirements of due process, even where the ground upon which we affirm was not argued before the trial court or this Court." (citation omitted)).